**United States District Court**
**for the District of Maryland**

| | |
|---|---|
| ANIMAL WELFARE INSTITUTE, <u>et al.</u>, ) | Civ. No. 09-1519 (RWT) |
| ) | |
| Plaintiffs, ) | **PLAINTIFFS' REPLY AND** |
| ) | **PRETRIAL BRIEF** |
| v. ) | |
| ) | |
| BEECH RIDGE ENERGY LLC, <u>et al.</u>, ) | |
| ) | |
| Defendants. ) | |

Eric R. Glitzenstein
(D.C. Bar No. 358287)
(admitted *Pro Hac Vice*)
eglitzenstein@meyerglitz.com
William S. Eubanks II
(D.C. Bar No. 987036)
(admitted *Pro Hac Vice*)
beubanks@meyerglitz.com
MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Avenue NW, Suite 700
Washington, DC 20009
(202) 588-5206
(202) 588-5049 (fax)

William K. Meyer
(Fed. Bar. No. 01214)
wmeyer@zuckerman.com
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
(410) 332-1240
(410) 659-0436 (fax)

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    INTRODUCTION AND SUMMARY OF PLAINTIFFS' POSITION: THE
      UNDISPUTED FACTS AND KEY EVIDENCE OBTAINED IN DISCOVERY
      STRONGLY SUPPORT PLAINTIFFS' "TAKE" CLAIMS AND UNDERMINE
      DEFENDANTS' FACTUAL REPRESENTATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THE APPROPRIATE LEGAL STANDARD FOR ASSESSING PLAINTIFFS'
      "TAKE" CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    Defendants' Arguments Concerning Deference to the West Virginia Public
            Service Commission and the FWS Are Both Legally And Factually Groundless.  8

            1.    The West Virginia PSC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            2.    The Fish and Wildlife Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.    As In Any Other Civil Case, Plaintiffs Must Demonstrate By a Preponderance
            of the Evidence That a Take Is Likely; Plaintiffs Need Not Prove Causation
            With Absolute Certainty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.  PLAINTIFFS SATISFY THEIR BURDEN OF PROOF. . . . . . . . . . . . . . . . . . . . . . . 20

      A.    Defendants Have No Meaningful Answer To Plaintiffs' Experts'
            Well-Founded Opinions That Indiana Bats Will Likely Be Among
            The Hundreds Of Thousands Of Bats Killed During Fall Migration. . . . . . . . . 21

      B.    Especially In View Of The Acoustical Data Documenting Indiana Bats On The
            Turbine Site Itself, The Project Will Also Likely Kill, Injure, And Harass
            Summer Resident And Dispersing Indiana Bats . . . . . . . . . . . . . . . . . . . . . . . . 25

            1.    The Anabat Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            2.    Defendants' Mist Net Surveys Were Patently Inadequate Even To
                  Detect Summer Indiana Bat Presence. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      C.    Plaintiffs' Expert Testimony Is Far More Credible And Reliable Than That
            Proffered By Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                  **PAGE**

American Bald Eagle v. Bhatti,
       9 F.3d 163 (1st Cir. 1993) ............................................................................ 18

Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
       515 U.S. 687 (1995) .............................................................................. 16, 20

Bartlett v. N.Y. State Board of Law Exam'rs,
       156 F.3d 321 (2nd Cir. 1998), vacated on other grounds, 527 U.S. 1031
       (1999) ...................................................................................................... 10

Bennett v. Spear,
       520 U.S. 154 (1997) .................................................................................. 16

Building Trades Employers' Education Association v. McGowan,
       311 F.3d 501 (2d Cir. 2002) ....................................................................... 9

Clark v. United States,
       402 F.2d 950 (4th Cir. 1968) .................................................................... 17

Exportal Ltda. v. United States,
       902 F.2d 45 (D.C. Cir. 1990) .................................................................... 20

Fitzgerald v. Manning,
       679 F.2d 341 (4th Cir. 1982) .................................................................... 30

GTE South Inc. v. Morrison,
       199 F.3d 733 (4th Cir. 1999) ..................................................................... 9

House v. U.S. Forest Service,
       974 F. Supp. 2d 1022 (E.D. Ky. 1997) ..................................................... 20

Hurley v. United States,
       923 F.2d 1091 (4th Cir. 1991) .............................................................. 16, 17

Marbled Murrelet v. Babbitt,
       83 F.3d 1060 (9th Cir. 1996) .................................................................... 18

Marbled Murrelet v. Pac. Lumber Co.,
       880 F. Supp. 1343 (N.D. Cal. 1995), (9th Cir. 1995) ................................ 30

ii

National Association of Home Builders v. Norton,
    415 F.3d 8 (D.C. Cir. 2005) ........................................................................... 23

Piney Mountain Coal Co. v. Mays,
    176 F.3d 753 (4th Cir. 1999) ................................................................... 17, 32

In re Sabin Oral Polio Vaccine Products Liability Litigation,
    984 F.2d 124 (4th Cir. 1993) ........................................................................ 18

Salguero v. City of Clovis,
    366 F.3d 1168 (10th Cir. 2004) .................................................................... 11

Tenn. Valley Authority v. Hill,
    437 U.S. 153 (1978) ................................................................................... 1, 19

U.S. Min. Co., Inc. v. Director, Office of Workers' Comp. Programs, U.S. Department
    of Labor, 187 F.3d 384 (4th Cir. 1999) ....................................................... 17

United States v. Demjanjuk,
    367 F.3d 623 (6th Cir. 2004) ........................................................................ 31

Waffen v. United States,
    799 F.2d 911 (4th Cir. 1986) ................................................................... 17, 18

Williams v. Alabama Department of Transportation,
    119 F. Supp. 2d 1249 (M.D. Ala. 2000) ....................................................... 10

## FEDERAL STATUTES

16 U.S.C. §§ 1531-1544 ................................................................................ *passim*

## FEDERAL REGULATIONS

50 C.F.R. § 17.3 ............................................................................................... 20

## STATE STATUTES

W. Va. Code § 24-1-1(a) ................................................................................... 10

<u>**PLAINTIFFS' REPLY AND PRETRIAL BRIEF**</u>

I.   **INTRODUCTION AND SUMMARY OF PLAINTIFFS' POSITION: THE UNDISPUTED FACTS AND KEY EVIDENCE OBTAINED IN DISCOVERY STRONGLY SUPPORT PLAINTIFFS' "TAKE" CLAIMS AND UNDERMINE <u>DEFENDANTS' FACTUAL REPRESENTATIONS.</u>**

Now that the Court has consolidated Plaintiffs' Motion for a Preliminary Injunction with a final trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2), the sole issue remaining in this case arising under the citizen suit provision of the Endangered Species Act, 16 U.S.C. § 1540(g) ("ESA"), is whether the massive Beech Ridge project – consisting of over 120 industrial wind turbines spread out over 23 miles on multiple Appalachian ridges in Greenbrier County, West Virginia, <u>see</u> Plaintiffs Exhibit ("Pfs. Exh.") 15 (Defendants' depiction of "Phase 1 and 2 Turbine Layouts") – will likely kill, wound, harm, harass, or otherwise "take" any federally endangered Indiana bats during the at least two decades that the turbines will operate.[1]

Indeed, Defendants concede that "Plaintiffs are correct that the ESA **compels a curative permanent injunction** to prevent a *proven* ESA violation *at the conclusion of a case . . . .*" Defendants' Memorandum ("Def. Mem.") at 19 (bold added; italics in original) (citing <u>Tenn. Valley Auth. v. Hill</u>, 437 U.S. 153 (1978)).   Accordingly, all of the arguments in the parties' earlier memoranda pertaining to the balance of equities and the correct standard for crafting preliminary equitable relief have no relevance to the Court's resolution of the case at this stage.  Rather, if the

---

[1]  Defendants' August 10, 2009 configuration for the project depicts 122 turbines – 67 in "Phase 1" that are slated for final construction and operation this Winter, and another 55 turbines slated for Phase 2, i.e., turbines that Defendants presently intend to construct and operate in future years. <u>See</u> Pfs. Exh. 15.  However, as proposed to the West Virginia Public Service Commission ("PSC"), and hence as authorized by that state agency, the project consists of 124 turbines.  <u>See</u> Exh. 6 to Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction) (hereafter "Def. Exh. __") at 1-2, 69.  Although this relatively minor discrepancy in the project description has little bearing on the issues before the Court, there is nothing to preclude Defendants from reverting to the 124-turbine configuration it previously proposed.

Court concludes that an ESA violation has or will result from Defendants' activities on the site, appropriate injunctive relief must be fashioned; at the very least, the Court should enjoin further construction and turbine operation until Defendants pursue the permitting process that Congress mandated for all activities that entail "incidental take" of listed species, i.e., the process embodied in section 10 of the ESA for "minimiz[ing] and mitigat[ing] such impacts,"16 U.S.C. § 1539(a)(2)(A)(ii), and that has been and is being followed by other wind power companies, including for the precise purpose of addressing impacts to Indiana bats.

As for the Court's resolution of the merits, it is important to stress at the outset what, in view of the discovery taken to date, appears to be undisputed by Defendants and their experts:

> • that Defendants' own consultant – BHE Environmental ("BHE") – has predicted that more than 135,000 bats would be killed by the turbines, through a combination of direct impacts with the turbine blades and barotrauma, see Deposition of Russ Romme at 104:1-8 (Pfs. Exh. 16);[2]

> • that this huge number of bat fatalities would be one of the largest, if not the largest, of any operating wind power project in the country, Romme Dep. at 105:6-9 (Q: "[D]o you know of any project with a higher mortality rate than this one per year?"  A: "I don't think so.");

> • that such deaths will likely include other "myotis" species – the taxonomic group that includes Indiana bats – including such species that have been captured on the Beech Ridge site and that resemble the Indiana bat and share similar ecological characteristics, Romme Dep. at 51:1-14, 53:7-11, 129:4-10; Deposition of Michael Lacki, Ph.D (Pfs. Exh. 17) at 43:10-25;

> • that other wind power projects built on Appalachian ridges – including the "Mountaineer" facility in West Virginia, which is close geographically to the Beech Ridge project  – have had far higher rates of bat mortality than wind power projects located in other parts of the country, and that the available data reflect that Appalachian projects have killed higher

---

[2]  As explained in the rebuttal declarations of Plaintiffs' experts, if anything, this is a significant underestimate of overall bat mortality associated with the project.  For example, it is based on an anticipated project life of only twenty years when, in fact, the turbines will likely be in operation far longer than that.  See Romme Dep. at 100:10-23 (explaining that the actual project is life is 25 or 30 years).

2

percentages of myotis species than elsewhere in the country, Romme Dep. at 107:9-19; Deposition of Karen Tyrell, Ph.D (Pfs. Exh. 18) at 170:19-171:2;

• that hundreds of Indiana bats presently hibernate in caves within ten miles of the project site – including some that are less than seven miles from turbine locations – and that there are no currently operating wind power projects closer to known Indiana bat hibernacula, Tyrell Dep. at 196:24-197:10;

• that Indiana bats can and do migrate between summer roosting and foraging habitat much further than the distance between the hibernacula and the project site, Lacki Dep. at 107:15-108:3;

• that there is in fact "suitable" Indiana bat habitat on the project site itself, as confirmed by the parties' site inspection, Romme Dep. at 181:12-14;

• that the overwhelming majority of bat kills associated with other wind power projects – including at Mountaineer and other projects located on Appalachian ridges – have occurred during the fall migration period, when bats are returning to hibernacula from their summer roosting and foraging sites, Lacki Dep. at 114:2-7; Tyrell Dep. at 173:21-174:6;

• that the 23 miles of Beech Ridge turbines will be physically located between known Indiana bat hibernacula to the south and east of the project and known Indiana summer foraging and roosting habitat to the west and north of the project. See Pfs. Exh. 19 (September 2009 map generated by BHE, based on data from the West Virginia Division of Natural Resources ("WV DNR"), reflecting known Indiana bat summer and winter occurrences); Romme Dep. at 178:15-179:2; and

• that Defendants performed no surveys whatsoever regarding Indiana bat – or, for that matter, any other bat – use of the site during the crucial Fall migration period, Romme Dep. at 117:17-20, 191:1-18, although both the United States Fish and Wildlife Service ("FWS") and WV DNR sent BHE letters urging that such surveys be performed.

Nonetheless, Defendants maintain that, notwithstanding the hundreds of thousands of anticipated bat mortalities associated with the project that will concededly afflict **other** bat species that reside in the project area, endangered Indiana bats will, miraculously, somehow manage to escape entirely unscathed during the entire life of the project. That counterintuitive proposition – which has been rebutted in detail by several of the nation's leading bat experts who are testifying for Plaintiffs, see attached rebuttal declarations of Drs. Kunz, Robbins, and Gannon, as well as by the

3

chief bat biologist for the West Virginia Division of Natural Resources, who is aligned with neither party but who has nonetheless testified that the project will likely kill **many** Indiana bats, see Deposition of Craig Stihler (Pfs. Exh. 20) at 83:11-85:22 – rests largely on two factual premises, both of which have now been discredited by discovery taken to date.

First and foremost, Defendants assert that Indiana bats are unlikely to be killed, injured, or otherwise taken because Indiana bats have never been detected on the project site itself.  See Def. Mem. at 1 (Plaintiffs "have not demonstrated that endangered Indiana bats are present at the Project site"); id. at 21 ("Plaintiffs have not shown presence of Indiana bats at the project"); id. at 14 n. 11 ("'surveys did not detect any Indiana bat presence in the Project area'") (internal citation omitted). As explained further below, even if it were true that Indiana bats were never detected on the site itself during surveys designed solely to assess summer presence of the species – which are the only on-site surveys Defendants have ever conducted – it would in no way mean that Indiana bats will not be killed, injured, or harassed as they attempt to fly through the project site during their annual migrations to and from winter hibernacula in close proximity to the project site.  See infra at 21-24. In any event, Defendants' factual assertion is wrong.

Thus, although Defendants represented to the Court – including in a sworn Declaration submitted by Defendants' consultant – that no "acoustic studies" for Indiana bat presence were completed at the project site, see Def. Mem. at 14 n. 11; Declaration of Russ Romme (Def. Exh. 3) at ¶ 11 (stating that "acoustic surveys were not completed" at the project site), discovery has uncovered that several such surveys **were** in fact completed at the same time that mist net surveying was undertaken on the project site in July 2005.  Accordingly, as Defendants now admit, a subcontractor hired by BHE did collect "ultrasound" data that is used to detect and record bat calls

4

– using a standard technology called "AnaBat" – "during our 2005 mist net survey of the turbine string area at the Beech Ridge project site."  September 8, 2009 Supplemental Declaration of Russ Romme ("Romme Supp. Decl.") (Pfs. Exh. 21) at ¶ 2.  Remarkably, however, Defendants contend that this acoustic data simply sat in BHE's file, unanalyzed and hidden from federal or state authorities, for **four years**; indeed, but for Plaintiffs' document production request for any acoustic studies performed at the project site, these data would evidently never have been unearthed and analyzed for Indiana bat presence.  Id.[3]

Most important, two of Plaintiffs' experts, Drs. Robbins and Gannon – who have extensive expertise in analyzing such acoustic data and AnaBat files in particular – have now analyzed these

---

[3]  See also Romme Dep. at 144:23-145:5 (Q: "Did you ever mention these [acoustic files] to the Fish and Wildlife Service?"  A: "I don't think so.  Would have had no reason to."  Q: "I assume the same is true with the state Division of Natural Resources?"  A.  "Yeah.  Again, I don't think I would have had any reason  – that would never come up.");  id. at 145:20-21 ("Had this litigation not occurred, we wouldn't have analyzed them, yeah.") (emphasis added).  Defendants' explanation for why BHE handled the AnaBat information in this manner is, to put it mildly, farfetched.  Defendants assert that the surveyor who obtained the data on the project site – i.e., the biologist hired by BHE itself – used "unspecified methods and procedures" in collecting the acoustic data, Romme Supp. Decl. at ¶ 2, and yet BHE's project manager testified that he never even asked the surveyor (a bat biologist named Gary Libby) what procedures he used.  See Romme Dep. at 143:14-24.

Even Defendants' own proffered explanation – that for years BHE has simply disregarded the acoustic files and saw "no reason" to share them with federal and state authorities who were repeatedly urging Defendants to conduct acoustic surveys on the site, see, e.g., July 31, 2007 Letter from FWS to BHE (Pfs. Exh. 2 at Attach. H) at 2 (the "Service has consistently recommended use of several survey methods **such as acoustical detectors**") (emphasis added) – is troubling enough.  But other materials obtained in discovery raise the even more disturbing prospect that BHE suspected the files might contain evidence of Indiana bat presence on the site, and declined to disclose them for that reason.  For example, handwritten notes regarding the 2005 survey state that: "BHE needs to possess the AnaBat files - recorded @ the site.  Can you imagine a call from Ecotech [the subcontractor that was working for BHE] a yr. from now saying 'we just go[t] around to analyzing the AnaBat calls and we think we recorded a sodalis,'" i.e., an Indiana bat.  Pfs. Exh. 22 (BRINV 767).

long-hidden files and have determined, with an extremely high degree of scientific probability, that they **do** indeed record Indiana bat presence **on the project site itself**. See Rebuttal Declaration of Lynn W. Robbins, Ph.D ("Robbins Rebuttal") (Pfs. Exh. 23) at ¶ 9 ("there is a statistical probability of approximately **97%** that Indiana bats were present on the site during the survey") (emphasis added); see also Rebuttal Declaration of Michael R. Gannon, Ph.D. ("Gannon Rebuttal") (Pfs. Exh. 24) at ¶ 15 ("Based on analysis of those files, I identified multiple Indiana bat calls, indicating presence of Indiana bats on these two mist sites in July 2005.").[4]

Second, in addition to erroneously asserting that there was no evidence of Indiana bat use of the turbine site, Defendants also relied heavily on the factual assertion that "there has been no history of an Indiana bat kill at any wind energy facility" presently in operation. Def. Mem. at 33. Once again, even if correct, that assertion would have little bearing on Plaintiffs' claims in this case, which involves a massive project in closer proximity to a "larger concentration of Indiana bats" than any other projects now in operation. Stihler Dep. at 58:9-59:11 (explaining why the FWS and WV DNR had both found an "increased risk" of Indiana bat mortality at Beech Ridge "when compared to other projects" already in operation); Rebuttal Declaration of Thomas H. Kunz, Ph.D. ("Kunz Rebuttal")

---

[4]  Defendants cannot reasonably challenge the expertise of either Drs. Robbins or Gannon in such acoustical analysis. Defendants' own witnesses have conceded that Dr. Robbins is "considered to be proficient in the use of AnaBat acoustic monitoring," Tyrell Dep. at 228:9-12, and trains other biologists in the use of that technology, Romme Dep. at 34:15-34:22, and that, because of Dr. Gannon's "expertise in AnaBat," BHE itself hired Dr. Gannon to assist with Indiana bat detection on a project in 1999. Romme Dep. at 36:20-37:6. Moreover, as discussed further below, to ensure that his analysis was valid, Dr. Robbins provided the data to still another well-known bat biologist who is otherwise unconnected to this case (Dr. Eric Britzke), and who Defendants' own witnesses have conceded is a "well-known specialist in this field of study," Romme Supp. Decl. ¶ 2, and someone who is recognized for his "ethics" and "reliability" with regard to AnaBat analysis in particular. Lacki Dep. at 23:5-24:7 (explaining that he solicited Dr. Britzke to work on an ongoing project specifically because of Dr. Britzke's AnaBat expertise). Dr. Britzke also confirmed Indiana bat calls. See infra at 27 n.18.

(Pfs. Exh. 26) at ¶ 9 ("the Beech Ridge project presents a higher risk to Indiana bats than any existing wind facilities (for example, there are more hibernating Indiana bats within ten miles of the Beech Ridge project than at Mountaineer, Indiana bats are at closer distances to turbines here than at Mountaineer, and there are three times as many mortality-causing turbines here than at Mountaineer.")).

In any event, Defendants' assertion that an Indiana bat has never been killed at any existing wind power project contradicts the views of both federal and state authorities (and Plaintiffs' experts), all of whom believe that Indiana bats likely <u>have</u> been killed at operating wind power facilities, but that such deaths have, to date, gone either undiscovered or unreported.  <u>See</u> 6/30/09 Letter from FWS regarding Liberty Gap Wind Force project (Pfs. Exh. 25) at 2 ("the number of bats killed [at the Mountaineer project] shows a high likelihood that endangered bats are also likely to be killed," although it is "very difficult to find bat carcasses on the ground" and there is "currently no monitoring [for bat mortalities] at the Mountaineer wind power facility"); Stihler Dep. at 74:10-21 (agreeing with FWS that there are likely Indiana bat deaths at Mountaineer that are "not being found" and that there is "no biological reason" why Indiana bats would not be "impacted similarly" to other bats killed at wind power projects).  Indeed, Plaintiffs' third party subpoena to the company that operates the Mountaineer project – on which BHE relied to make mortality predictions for Beech Ridge – yielded an internal "incident report" <u>suggesting that a carcass of a bat killed by a turbine was that of an Indiana bat</u>.  <u>See</u> Pfs. Exh. 27.[5]

In sum, the central factual premises underlying Defendants' inherently implausible argument

---

[5]  Underscoring the inadequate monitoring and reporting at existing wind power projects, it does not appear that this event was ever referred to the FWS or WV DNR.

that Indiana bats will somehow avoid the fate of the other bat species in the project area have now been discredited by discovery and dissected by leading bad experts, including the head bat biologist for the State of West Virginia.  However, before delving more deeply into why Plaintiffs should prevail on the factual record before the Court, it is first important to elaborate on the appropriate legal framework for assessing Plaintiffs' ESA claims, particularly because Defendants have also painted a seriously erroneous picture of the pertinent legal principles.

II.     **THE APPROPRIATE LEGAL STANDARD FOR ASSESSING PLAINTIFFS' "TAKE" CLAIM.**

A.     **Defendants' Arguments Concerning Deference to the West Virginia Public Service Commission and the FWS Are Both Legally And Factually Groundless.**

Defendants' assertion that the Court "should give strong consideration to the Commission's and FWS's considered judgment that the Project does not violate the ESA," Def. Mem. at 34, suffers from myriad factual and legal flaws.  Neither of those entities made a "judgment," let alone a "considered" one, that the Project "does not violate the ESA," particularly in view of the crucial evidence now obtained in discovery and that has never previously been considered by any federal or state entity, let alone a court with competent jurisdiction over Plaintiffs' federal ESA claim.  Indeed, it is remarkable for Defendants to suggest that their consultant could keep hidden for four years highly probative acoustic evidence bearing on Indiana bats' presence on the site itself – evidence that the FWS repeatedly sought from Defendants – but that this Court should, in effect, disregard such evidence while "deferring" to others who were foreclosed from considering it.  As discussed below, that position makes no legal or logical sense, as applied either to the WV PSC, or the FWS.

8

1.      **The West Virginia PSC**

To begin with, Defendants' novel contention that the Court should defer to a non-federal agency's views on compliance with the federal ESA, Def. Mem. at 34, is conspicuously unaccompanied by any citation to pertinent precedent.  This is unsurprising because, as the PSC has itself recognized, that state agency has no jurisdiction whatsoever over federal ESA compliance.  Rather, the ESA explicitly vests exclusive jurisdiction over ESA citizen suit claims in the U.S. district courts, and does not remotely suggest that, in resolving such claims, federal courts should defer to any non-federal agencies or tribunals.  See 16 U.S.C. § 1540(g)(1) (federal "courts shall have jurisdiction . . . to enforce any such provision or regulation").  In apparent recognition of this fact, one of the PSC's express conditions for its approval of the project is that

> Beech Ridge must comply with the Endangered Species Act [among other federal statutes] in both the construction and operation of the Project.  Should any authorized governmental agency or court with competent jurisdiction find that Beech Ridge is not complying with [the ESA] in either the construction or operation of the Project, then Beech Ridge must notify the [PSC] in writing in this case of any such finding within ten (10) days of any such finding being made.  Furthermore, the Commission may seek any legal remedies it has authority to seek, including injunctive relief, to address any such findings.

Id. at 88 (emphasis added).  Plainly, therefore, the Commission itself contemplates deferring to a "court with competent jurisdiction" over federal ESA claims – i.e., this Court – rather than the reverse, as Defendants advocate.

As to that issue, the Commission has a better understanding of the law than Defendants.  It is well-established that, as a general matter, "federal courts owe no deference to [a] state agency's interpretation of federal law that [it is] not charged with enforcing."  Bldg. Trades Employers' Educ. Ass'n v. McGowan, 311 F.3d 501, 507 (2d Cir. 2002); see also GTE South Inc. v. Morrison, 199 F.3d 733, 745 (4th Cir. 1999) (a state agency's interpretation of a federal statute "is not entitled to

9

the deference afforded a federal agency's interpretation of its own statutes under <u>Chevron</u>").  Such

deference would be "particularly inappropriate in situations involving a statute like [the ESA], which

expressly allows for citizens to bring suit in order to ensure uniform enforcement of federal

environmental laws" and to "deal consistently with a serious national problem."  <u>Williams v.</u>

<u>Alabama Dep't of Transp.</u>, 119 F. Supp. 2d 1249, 1256 (M.D. Ala. 2000).  Congress has "charged

federal courts with the responsibility for hearing [ESA] lawsuits" such as this one, and "[t]his

requirement squarely places upon the federal judiciary the obligation" to apply the ESA's

requirements to the facts before the Court.  <u>Id</u>.

Moreover, even apart from the fact that exclusive jurisdiction over ESA claims is vested in

federal courts, deference to the WV PSC would be especially unwarranted here.  The PSC – whose

core function is to "enforce and regulate the practices, services and rates of public utilities," W. Va.

Code § 24-1-1(a) – does not, and does not purport to, have any "inherent expertise" regarding the

ESA issues now before this Court.  <u>Bartlett v. N.Y. State Bd. of Law Exam'rs</u>, 156 F.3d 321, 327

(2nd Cir. 1998) (when federal courts defer to a state agency's factual findings, it is only because of

the "factfinder's inherent expertise on 'technical matters foreign to the experience of most courts'")

(internal citation omitted), vacated on other grounds, 527 U.S. 1031 (1999).  On the other hand, the

West Virginia official who <u>has</u> such expertise – the WV DNR's endangered bat expert Craig Stihler

– has concluded that the project will cause an "unacceptable" level of bat deaths during the fall

migration, resulting in "declines in bat populations," Stihler Dep. at 55:7-56:8, and that the death toll

will include <u>many</u> Indiana bats.  <u>Id</u>. at 83:6-84:23.[6]

---

[6]  Tellingly, the PSC findings do not even begin to come to grips with what Mr. Stihler and other experts have identified as the leading cause of bat mortality at existing wind projects and the gravest risk to Indiana bats, i.e., collisions and barotrauma during fall migration.

Finally, and perhaps most important, because the PSC proceeding lacked the factfinding mechanisms that are integral to civil claims in federal court – such as the document production requests, depositions, and third party subpoenas that Plaintiffs have pursued here – the PSC's cursory consideration of the Indiana bat issue was based on a patently deficient and, it is now apparent, seriously distorted factual record.  Ironically, for example, Mr. Stihler – the State's own bat expert – did not even testify regarding his "major concerns" with the project.  Stihler Dep. at 79:10-12.  In addition, the PSC knew nothing about the 2005 AnaBat data Plaintiffs have uncovered because Mr. Romme – who testified for Defendants – made no mention of them in his testimony and did not otherwise disclose them, see Romme Dep. at 144:23-145:5, and there was no procedure for their discovery.

Accordingly, when the PSC agreed with Defendants' position that there was inadequate "evidence" to "support a conclusion that Indiana bats live near the project," Def. Exh. 6 at 81, it did not know that there in fact was evidence reflecting Indiana bat presence on the turbine site itself, but that it was sitting undisclosed in BHE's files.  Nor did the PSC have before it evidence of an Indiana bat death at the Mountaineer facility, nor other crucial discovery that Plaintiffs will bring to this Court's attention, along with testimony from leading experts explaining its significance.  In sum, this Court not only has exclusive jurisdiction over Plaintiffs' ESA claim but, as Congress contemplated, it is the only tribunal capable of making a de novo resolution of that claim on the basis of a complete factual record.  Cf. Salguero v. City of Clovis, 366 F.3d 1168, 1174 (10th Cir. 2004) (when the record shows that "facts discovered in federal litigation, witness testimony, or documentary evidence relevant to [the claim] were not previously presented and considered by" an agency, the agency's finding cannot control the court's review).

## 2.    The Fish and Wildlife Service

Defendants' arguments concerning the FWS are equally devoid of merit.  Although that federal agency's views could indeed warrant "strong consideration," Def. Mem. at 34 – assuming, of course, they were informed by the factual evidence now before the Court – Defendants' contention that the Service ever made a "considered judgment that the Project does not violate the ESA" simply has no basis in reality.  Id.  In addition, Defendants' effort to use the Service's purported "judgment" as a shield is particularly incongruous in light of the fact that the Service repeatedly urged Defendants to conduct far more extensive surveys and studies on bat impacts that Defendants either refused to conduct or, in the case of AnaBat data, simply failed to disclose to the agency.[7]

As Plaintiffs have previously explained and as Defendants have conceded in discovery, the FWS sent three formal letters to BHE regarding impacts on bats generally, and Indiana bats in particular – dated March 7, 2006, August 10, 2006, and July 31, 2007.  None of those letters even remotely advised Defendants that proceeding with the Project would not result in the take of Indiana bats.  To the contrary, after BHE had performed its 2005 mist net survey on the site – and without being informed about the AnaBat data recorded at the same time – the Service advised BHE that "[a]s you are aware, the Service remains concerned that the proposed Beech Ridge project may harm or kill federally-listed Indiana bats," and that "[w]e also remain concerned that without 3 years of pre-construction surveys" – which were never undertaken by Defendants – "decisions will be made

_____

[7] As noted previously, Pfs. Mem. at 5 & n. 1, nothing in the ESA conditions pursuit of a citizen suit on the FWS's pursuit of its own enforcement action.  To the contrary, the statute forecloses a citizen suit only when the government has "commenced" an enforcement action.  16 U.S.C. § 1540(g)(2)(A)(ii).  As a practical matter, the Service has extremely limited enforcement resources, and hence has initiated its own "take" claims in only a handful of instances since passage of the Act.

that will negatively impact federally-listed bats." 8/10/06 FWS Letter at 1 (emphasis added).

Likewise, in its final letter to BHE, the Service advised that it "anticipates that the Beech Ridge facility will have high bat mortality similar to other wind power facilities with similar risk factors in West Virginia and the Northeast," and it even attached a "useful" research "paper by Kunz" – i.e., one of Plaintiffs' experts here – that summarizes much of the data on which Dr. Kunz is relying for his opinion that the Beech Ridge project will indeed kill Indiana bats along with many other species. 7/31/07 FWS Letter at 2 and Attachment. Even further, the Service stressed many of the same factors on which all three of Plaintiffs' experts (as well as Mr. Stihler) have relied in predicting Indiana bat mortality, including that: "Indiana bats migrate between hibernacula and summer maternity habitat, with records ranging from less than 30 miles to over 300 miles," 3/7/06 FWS Letter at 2; that Indiana bats are "known to cross high Appalachian ridges as demonstrated in an electronic tracking study," id., that Indiana bats "prefer[] a mosaic of open and forested areas" and that such "habitat conditions are likely to result from forest clearing associated with construction of the proposed Beech Ridge project," id. at 3 (emphasis added); that the experience at the Mountaineer project is "relevant to the proposed Beech Ridge Project due to geographic proximity" and other factors, and that the "estimates of mortality [at Mountaineer] are among the highest ever reported in the world, and support the contention that forested ridges are locations of especially high risk for bat fatality at wind energy facilities." Id. at 4 (emphasis added).

Defendants' contention that the Service was "content" merely to "recommend adaptive management solutions should an Indiana bat be taken" in violation of the ESA, Def. Mem. at 34 (emphasis added), is also impossible to reconcile with the fact that the Service "consistently," but unsuccessfully, urged Defendants (through BHE) to conduct far more thorough pre-construction

13

surveys designed to address the gravest threats to Indiana bats.  7/31/07 FWS Letter at 2.  Because

the highest mortality risk occurs during migration, the Service stated that "mist net surveys <u>should</u>

<u>be conducted</u> during the fall and spring migration." 8/10/06 FWS Letter at 1 (emphasis added).  But

Defendants refused, and BHE flatly concedes that it performed <u>no surveys whatsoever focusing on</u>

<u>the deadliest fall migration period</u>.  <u>See, e.g.</u>, Tyrell Dep. at 195:10-16; Def. Exh. 3 at Attach. C (July

2005 e-mail exchange between Mr. Romme and FWS in which Mr. Romme acknowledges that the

only mist netting done on the site "address[es] bat presence in the area only during the summer

season" and "does not address presence of bats in the area during other times of the year").

Similarly, the FWS stated that "spring emergence studies" – which involve tracking Indiana

bats leaving nearby hibernacula – "<u>should still be conducted</u>."  8/10/06 FWS Letter at 1 (emphasis

added).  Again, Defendants refused to do so.  Even with regard to the single summer survey

conducted on the turbine site itself, the Service repeatedly warned against a "skewed survey result

if [such] surveys are only conducted for one year," 8/10/06 FWS Letter at 1, and stated that "[p]re-

construction surveys and studies that describe bat presence and use of the area <u>should be performed</u>

<u>for a minimum of 3 years prior to construction</u>."  <u>Id</u>. at 3 (emphasis added).  Again, Defendants

refused to do so.

Most important – in light of developments in this case – the Service repeatedly called for the

use of survey methods besides mist netting, which is capable of catching only a tiny faction of bats

using an area even when deployed properly (and, here, they were not), and particularly stressed the

need for data from "<u>acoustical detectors</u>."  7/31/07 FWS Letter at 2 (emphasis added); 3/7/06 FWS

Letter at 5 (stating that "acoustical studies" and "other appropriate sampling techniques <u>should be</u>

<u>employed</u>," and that "acoustical . . . studies <u>should still be conducted</u>") (emphasis added).  Yet in the

14

face of these unequivocal requests from the "ESA expert agency," Def. Mem. at 34, BHE maintains

that it did not even <u>analyze</u> the acoustic data in its own files, let alone inform the Service that some

of the specific data the agency sought on Indiana bat presence had indeed been collected, but was

being disregarded.[8]

Given this record, and especially Defendants' refusals to perform the specific analyses

repeatedly sought by the FWS – particularly those relating to species presence on the turbine site

itself and passing through it during the migration season – Defendants cannot seriously maintain that

the Service made a "considered judgment" that the project will not kill, injure, or harass any Indiana

bats.  Def. Mem. at 34.  Indeed, not only did Defendants refuse to gather data that the Service said

should be considered, but some of the data that the Service regarded as vital but never received – i.e.,

the acoustic data – reflects Indiana bat presence <u>in the precise locations where turbines are slated for

construction</u>.  Having withheld that crucial information from the "expert agency," <u>id.</u>, Defendants

are hardly in a position to proffer any purported agency "judgment" as a defense to Plaintiffs' claims.

**B.      As In Any Other Civil Case, Plaintiffs Must Demonstrate By a Preponderance
of the Evidence That a Take Is Likely; Plaintiffs Need Not Prove Causation
With Absolute Certainty.**

As noted in Plaintiffs' opening brief, the ESA citizen suit provision is an "authorization of

remarkable breadth," <u>Bennett v. Spear</u>, 520 U.S. 154, 164-65 (1997), which allows "any person"

---

[8]  Defendants attempt to rely on a May 2006 e-mail exchange between the FWS and BHE
to argue that the Service had somehow abandoned its request for acoustic surveys.  <u>See</u> Def. Exh.
3 at Attach. D.  That exchange, however, related solely to BHE's separate surveying of the
<u>transmission line</u>, i.e., an area where wind turbines would <u>not</u> be constructed.  That the Service
adhered to its position concerning the need for and value of acoustic surveys on the turbine site
itself is made clear by the agency's July 31, 2007 letter, which postdated the e-mail exchange by
more than a year, specifically called for "acoustical detectors," and was written after all of BHE's
surveys had been conducted.

with standing to bring a "civil suit" to "enforce any" provision of the Act or any regulation promulgated pursuant to the statute, 16 U.S.C. § 1540(g)(1).  As with any "civil suit" in which Congress has not ordained a causation standard that varies from the common law,  "ordinary principles of causation apply" to ESA section 9 claims.  <u>Babbitt v. Sweet Home Chapter of Communities for a Great Oregon</u>, 515 U.S. 687, 712 (1995) (O'Connor, J., concurring) ("<u>Sweet Home</u>").[9]

As articulated by the Fourth Circuit, the longstanding "traditional causation principle[]" that applies in tort cases is that the "plaintiff must prove proximate cause by demonstrating by a preponderance of the evidence that 'it is more probable than not that defendant's act caused his injury.'"  <u>Hurley v. United States</u>, 923 F.2d 1091, 1097, 1098 (4th Cir. 1991) (internal citation omitted).  Hence, for example, to prevail in a medical malpractice case based on past or anticipated future injury, a plaintiff must demonstrate, through a preponderance of expert testimony and other probative evidence, a "probability" of injury caused by the defendant's actions, and "'[p]robability

---

[9]   Defendants' argument (relying on a law review article authored by Defendants' counsel) that the Supreme Court's ruling in <u>Sweet Home</u> somehow undercuts Plaintiffs' claim or calls into question any of the legal principles on which Plaintiffs are relying, Def. Mem. at 4 & n. 5, is baseless.  In <u>Sweet Home</u>, the Court emphatically <u>rejected</u> an effort to confine the scope of the ESA's "take" prohibition to "deliberate" takings, 515 U.S. at 700, and instead, stressing "Congress' intent to provide comprehensive protection for endangered and threatened species," <u>id</u>. at 699, and "Congress's clear expression of the ESA's broad purpose to protect endangered and threatened wildlife," <u>id</u>. at 700, found that "Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions" that threaten listed species.  <u>Id</u>. at 704.  Further, although the Court found that Congress did not intend to prohibit "adverse habitat modification" unconnected to any demonstrable effect on a listed species, <u>id</u>. at 706, that hardly undercuts Plaintiffs' claims here, where Plaintiffs are arguing that Defendants' project will indeed "actually kill or injure" Indiana bats, <u>id</u>., as well as "harass" them within the meaning of the regulatory definition of that term (which was not addressed in <u>Sweet Home</u>).  More pertinent for present purposes, both parties appear to agree that <u>Sweet Home</u>, and particularly Justice O'Connor's concurring opinion, stand for the proposition that traditional tort principles govern the <u>causation</u> standard that applies in a section 9 claim.  <u>See</u> Def. Mem. at 4.

16

exists when there is more evidence in favor of a proposition than against it (<u>a greater than 50%</u>

<u>chance that a future consequence will occur</u>.'"). <u>Id</u>. at 1097 (internal citation omitted; emphasis

added).[10]

Hence, contrary to Defendants' suggestion, it is <u>not</u> the case that Plaintiffs must establish,

with mathematical precision, some "requisite level of certainty" before they may prevail. Def. Mem.

at 21. Indeed, the Court of Appeals for this Circuit has long rejected any such requirement for <u>any</u>

tort action, explaining that

> [i]t has never been the rule of this circuit that a plaintiff is required to prove to an absolute
> *certainty* what would have happened in circumstances that the negligent wrongdoer did not
> allow to come to pass. Nor must the plaintiff 'negative entirely the possibility that the
> defendant's conduct was not a cause.' . . . The fact of causation is incapable of mathematical
> proof, because it is impossible for a person to state with absolute certainty what could have
> happened if a defendant had acted in another manner.

<u>Waffen</u>, 799 F.2d at 918 (quoting Prosser, <u>Law of Torts</u>, § 41 at 242); <u>see also</u> <u>Piney Mountain Coal</u>

<u>Co. v. Mays</u>, 176 F.3d 753, 763 (4th Cir. 1999) ("Claimants need not prove entitlement beyond a

doubt, but rather by a simple preponderance of the evidence."); <u>Clark v. U.S.</u>, 402 F.2d 950, 953 (4th

Cir. 1968) ("[W]e know of no court that requires plaintiff to prove causation to a certainty.").

Moreover, while it is correct that courts in this Circuit (and elsewhere) have sometimes

referred to the causation standard as one of "reasonable certainty," <u>see</u> Def. Mem. at 20-21, the

Fourth Circuit has made clear that this standard is interchangeable with, and no more rigorous than,

---

[10] <u>See also</u> <u>U.S. Min. Co., Inc. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of
Labor</u>, 187 F.3d 384, 389 (4th Cir. 1999) (applying the "preponderance of the evidence" standard
in a Black Lung Benefits Act case that the plaintiff must establish that the "existence of the facts
supporting the claim are more probable than their non-existence"); <u>Waffen v. United States</u>, 799
F.2d 911, 918 (4th Cir. 1986) ("The plaintiff has the burden of introducing evidence which
affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the
defendant was a substantial factor in bringing about the result."), <u>abrogated on other grounds by
Hurley v. United States</u>, 923 F.2d 1091 (4th Cir. 1991).

the "probable" or "more likely than not" standard.  Waffen, 799 F.2d at 917-18 ("[T]he plaintiff must

submit proof that the injury complained of was 'more likely' or 'more probably' due to defendant's

action rather than to any other cause.  Another way to phrase the test for causation is that it is one

of reasonable probability or reasonable certainty.") (internal citations omitted; emphasis added); see

also In re Sabin Oral Polio Vaccine Prods. Liab. Litig., 984 F.2d 124, 128 (4th Cir. 1993) ("The test

of probable cause is one of 'reasonable probability or reasonable certainty.'  In other words, '[t]he

plaintiff has the burden of introducing evidence which affords a reasonable basis for the conclusion

that it is more likely than not that the conduct of the defendant was a substantial factor in bringing

about the result.'") (internal citations omitted).

Likewise, courts in other circuits resolving ESA section 9 cases have employed these phrases

interchangeably and specifically have held, consistent with the traditional tort standard, that well-

supported expert testimony and other evidence demonstrating that a defendant's activities will

"likely" take one or more members of a listed species is sufficient to sustain Plaintiffs' burden,

whereas claims based entirely on speculation and remote possibilities are not.  Compare, e.g.,

Marbled Murrelet v. Babbitt, 83 F.3d 1060, 1067 (9th Cir. 1996) (plaintiff produced evidence of take

to a "reasonable certainty" where "several experts testified to the probability of the murrelets' nesting

in Owl Creek, and that implementation of Pacific Lumber's harvesting plan would likely harm

marbled murrelets") (emphasis added) with Am. Bald Eagle v. Bhatti, 9 F.3d 163, 165 (1st Cir.

1993) (rejecting, as insufficient, evidence of a "one in a million risk of harm" to bald eagles from

the ingestion of lead slugs used during deer hunts).[11]

---

[11]  Accordingly, notwithstanding Defendants' selective quotations from various ESA
cases, see Def. Mem. at 20-21 & n. 17, Defendants have not, and cannot, point to a single case in
which a court has made a factual finding that a "take" was in fact more likely to occur than not,

Moreover, any suggestion by Defendants that Plaintiffs must satisfy an even <u>higher</u> causation standard than that applied to other civil cases is not only totally unsupported by the plain language of the ESA and any case law construing it, but is impossible to reconcile with the statutory scheme. Thus, in view of Congress's "plain intent . . . to halt and reverse the trend towards species extinction, whatever the cost" – an intent reflected in "every section of the statute," including Section 9, <u>Tenn. Valley Auth. v. Hill</u>, 437 U.S. 153, 184 (1978) – Congress could not possibly have intended to create a citizen suit provision under which civil actions may be brought to "enjoin" imminent threats to listed species, 16 U.S.C. § 1540(g)(1)(A), but, at the very same time, render such an enforcement mechanism a virtual nullity by imposing an impossibly high causation burden on citizens bringing such claims. If anything, the ESA's animating policy of "affording endangered species the highest of priorities, thereby adopting a policy which [Congress] described as 'institutionalized caution,'" <u>Hill</u>, 437 U.S. at 194, would counsel in favor of a more <u>lenient</u> causation standard than applies in the ordinary tort case, but, in any event, it surely cannot be reconciled with imposing on Plaintiffs a higher burden than applies in other areas of jurisprudence.[12]

<hr />

and yet ruled that this was insufficient to support a section 9 claim. Rather, as even Defendants' own description of the precedents on which it is relying make clear, courts in those cases have made case-specific factual findings that the particular species at issue were not even <u>present</u> in the project area and/or that any risk of harm was no more than conjectural. That is hardly the case here where, once again, Defendants themselves predict that hundreds of thousands of bats will be killed; Indiana bats reside in nearby hibernacula and have used the project site itself; and leading experts on the impacts of wind turbines on bats, including the head bat biologist for West Virginia, can fathom no reason why Indiana bats will escape the carnage. Indeed, under these circumstances, it is plainly <u>Defendants</u> who are engaged in baseless speculation or wishful thinking in positing that there will not be a single Indiana bat killed, injured, harassed, or otherwise taken during the two decades or more that this project will be in operation.

[12] Defendants' argument concerning the "required level of certainty," Def. Mem. at 21, is also impossible to square with the ESA implementing regulations. Rather, the regulations define "harass" as an "intentional or negligent act or omission which creates the <u>likelihood of injury</u> to

### III.   **PLAINTIFFS SATISFY THEIR BURDEN OF PROOF.**

When the appropriate legal framework is applied to the facts as refined through discovery, Plaintiffs should prevail for several reasons; first, Defendants have no coherent, let alone convincing, response to the contention of Plaintiffs' experts' and West Virginia's bat biologist that some of the many thousands of migrating bats that will concededly be killed by the project will be Indiana bats; second, given the recently disclosed AnaBat data reflecting Indiana bats present on the turbine site itself during the summer, the likelihood of Indiana bat deaths, injuries, and harassment is even higher; and third, the leading bat experts on whom Plaintiffs are relying, and who have now each set forth their views in two detailed declarations, are vastly more credible and reliable than those proffered by Defendants – two of whom are employed by the very contractor whose surveying work is under scrutiny.  Plaintiffs address each point in turn.

---

wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3 (emphasis added).  Defendants' contention that this provision has no applicability to "habitat-modifying activities" or "[l]and use activities," Def. Mem. at 5, has no basis whatsoever in the plain language of either the statute or the regulation, see, e.g., Exportal Ltda. v. United States, 902 F.2d 45, 50 (D.C. Cir. 1990) (agencies must abide by the "plain meaning" of their regulations) or in the ESA's legislative history.  Indeed, as explained in Sweet Home, the legislative history indicates that the statutory prohibition on "harassment" could apply to "regulate or prohibit the activities of birdwatchers where the effect of those activities might disturb the birds and make it difficult for them to hatch or raise their young." 515 U.S. at 705 (emphasis added).  Accordingly, it makes no sense for Defendants to contend that their erection of 120 massive turbines directly in the pathway of migrating bats (and birds) is automatically excluded from the "harassment" prohibition.  See also House v. U.S. Forest Serv., 974 F. Supp. 2d 1022, 1031-32 (E.D. Ky. 1997) ("Indiana bat's foraging habitat may be adversely affected by the Leatherwood Fork timber sale and thus may constitute a 'taking' of the Indiana bat, as the timber sale may harass and/or harm the Indiana bat in violation of the ESA.").

A.  **Defendants Have No Meaningful Answer To Plaintiffs' Experts' Well-Founded Opinions That Indiana Bats Will Likely Be Among The Hundreds Of Thousands Of Bats Killed During Fall Migration.**

The central premise on which Defendants base their position that "takes" of Indiana bats are unlikely is the absence of Indiana bat captures during Defendants' <u>summer</u> mist net surveys.  <u>See</u> Defs. Opp. at 14 ("Mist net surveys in the wind turbine area and transmission line corridor located no Indiana bats at the Project site."); <u>see also id.</u> at 21-22; Lacki Decl. ¶ 8 (Def. Exh. 1).  However, even apart from the AnaBat data that <u>does</u> document Indiana bats' use of the turbine site during summer, Defendants never come to grips with the fact that, even assuming Indiana bats were absent from the site during <u>summer</u>, this in no way means that they will not migrate through the site during their <u>fall</u> migration, when the overwhelming majority of bat deaths (and myotis deaths in particular) are known to occur from wind turbines, and when Plaintiffs' experts – as well as Mr. Stihler, the WV DNR's own leading bat biologist – anticipate the highest likelihood of Indiana bat deaths during the lifespan of the project.  <u>See</u> Kunz Rebuttal ¶ 8; Robbins Rebuttal ¶ 10; Gannon Rebuttal ¶ 14.[13]

As the literature indicates, and as even Defendants' witnesses Romme and Tyrell concede, Indiana bats are known to cross ridgetops during migration, and they frequently cross many ridgetops

---

[13]  In his deposition, Mr. Stihler explained that the "number of Indiana bats on the landscape," along with the "sheer numbers" of bats that will be killed by the project, mean that "if the kills are as predicted [by BHE] . . . more than one of those bats would be an Indiana bat." Stihler Dep. at 84:20-24.  He further set forth what he described as a "conservative" formula based on a percentage of Indiana bats mist netted in West Virginia in relationship to other myotis species, and the known mortality figures for the Mountaineer project.  Stihler Dep. at 83:6-84:23. Although Mr. Stihler estimated in his deposition that approximately "400 Indiana bats [are] likely to be killed over the course of the project," he also made clear that his formula was what should be relied on.  <u>Id.</u> at 84:14-23.  Employing that formula (.24% of approximately 19,000 myotis "likely to be taken" based on the Mountaineer data), yields an estimate of 46 Indiana bat kills.  That estimate is not only highly "conservative" for the reasons set forth in Mr. Stihler's deposition, but also because it is based on a shorter project life span (20 years) than expected. <u>See</u> supra at 2 n.2.

in a short period of time.  See, e.g., Romme Supp. Decl. ¶ 17; Gannon Rebuttal ¶ 8.  Additionally, Indiana bats in the eastern mountain region of the United States have been documented stopping during migration to forage on ridgetops to replenish energy supplies.   Gannon Rebuttal ¶ 8. Therefore, Indiana bats, like other bats being killed by wind turbines on eastern ridgetops, are known to cross and otherwise use ridges during the fall migration period, thus making them highly susceptible to death or injury from ridgetop wind turbines during the fall migration period when the largest proportion of bat deaths occur.  As succinctly summarized by Dr. Kunz, in light of the "staggering mortality figures observed generally in the bat community," and the fact that "other species of myotis with similar characteristics" have been killed in large numbers at Mountaineer and other eastern wind projects, Defendants' apparent "surmise that Indiana bats are uniquely adapted to avoid wind turbines is scientifically unfounded."  Kunz Rebuttal ¶ 10.

As noted, it was precisely because of this concern that the FWS repeatedly urged that Defendants to undertake surveys designed to monitor Indiana bat use of the project site during migration.  See supra at 13-14.  Inexplicably, however, Defendants' never undertook those or, for that matter, any other studies specifically addressing the harm to Indiana (or other) bats during what all scientists agree is the period of greatest mortality risk.[14]

---

[14] Notably, BHE itself initially agreed that Indiana bats would be present during fall migration and hence susceptible to turbine collisions during that period, stating in a November 2005 draft report that, "[c]onsidering known proximate locations of summer and winter occurrences of Indiana bats, it is reasonable to presume individuals of this species move through Greenbrier County in spring and fall . . . [which] increases the likelihood the species will be present in the project area and have potential to collide with turbine blades during spring, summer, and fall."  Draft Chiropteran Risk Assessment (Attachment 4 to Pfs. Exh. 4)  (emphasis added).  Yet BHE abandoned this "reasonable" presumption in the final report, see Final Chiropteran Risk Assessment (Pfs. Exh. 6), despite undertaking no new surveys during either the fall or spring migration.

Instead of explaining their failure to analyze the issue, Defendants cite two cases for the proposition that a failure to conduct surveys does not, in and of itself, equate to "take." <u>See</u> Defs. Mem. at 24-25.   However, what those rulings actually make clear is that a failure to conduct an appropriate survey along with <u>other</u> factors – such as the extensive expert opinions and other information here emphasizing the high fall migration risk – may indeed support injunctive relief in a section 9 case.  <u>See, e.g.,</u> <u>Nat'l Ass'n of Home Builders v. Norton</u>, 415 F.3d 8, 15 (D.C. Cir. 2005) ("The results of the survey, the decision to conduct a site assessment but not a survey, the failure to perform either, or any other course of action by the landowner would constitute just one piece of the evidence necessary to obtain an injunction.").[15]

---

With regard to one of the migration studies that the FWS sought – a "spring emergence" study – Defendants claim that they did not utilize this method because such studies "are contingent upon first capturing an Indiana bat . . . so that a radio transmitter can be attached to the animal [but] BHE's [summer] surveys did not detect any Indiana bat presence in the Project area." Defs. Mem. at 14 n.11.  However, such studies are not related to the summer mist netting described by Defendants, but rather are conducted by going to <u>known</u> Indiana bat caves near the project site and placing radio-transmitting devices on the bats as they emerge from hibernation in <u>spring</u>.  Defendants knew of at least two nearby hibernacula, each with populations of no fewer than 250 Indiana bats (Snedegar's Cave and Martha's Cave), but made no effort to conduct the specific migratory study sought by the FWS.  Gannon Rebuttal ¶ 16; Robbins Rebuttal ¶ 6.

[15]  Defendants have advanced a groundless argument that pre-construction surveys of species presence hold no predictive value because pre-construction bat activity – including migration through an area – has no correlation with post-construction mortality.  <u>See, e.g.</u> Tyrell Decl. ¶ 5 (Def. Exh. 2).  During her deposition, however, Dr. Tyrell conceded that her Declaration had cited the "wrong paper[s]" to support that peculiar position, Tyrell Dep. at 162:24-163:1, and it is contradicted by, among other things, the research by Dr. Kunz that the FWS itself advised BHE to consult.  <u>See</u> Attachment to July 31, 2007 FWS Letter, at 317 ("Many, if not most, of the bat species that have been killed by wind turbines in the US [] are resident during the summer months.").  In fact, all of Plaintiffs' experts believe that rather strong correlations do in fact exist, because, not surprisngly, the migrant bats passing through a project area are the same species being killed by the turbines during fall migration, and resident bats present on the project area during summer are the same bat species being killed during fall dispersal.  Robbins Rebuttal ¶ 7; Deposition of Dr. Thomas H. Kunz (Pfs. Exh. 28) at 62:18-21.

In any event, notwithstanding Defendants' anomalous argument that there is insufficient data to support Plaintiffs' claim because of Defendants' own refusal to conduct the fall migration studies sought by the expert agency, Plaintiffs' experts believe that there is more than sufficient information already available – including the nearby locations of confirmed Indiana bat winter hibernacula and confirmed summer habitat on opposite sides of the project; suitable foraging habitat and roost trees that exist on the ridgetops near turbines as a result of turbine corridor clearing; the large rotor-swept area of the project's 124 turbines; the apparent death of an Indiana bat at the Mountaineer facility; and no scientific basis for believing that Indiana bats can avoid turbine collision and barotrauma – to conclude, with a high degree of confidence, that Indiana bats will very likely be killed or injured by turbines as they attempt to migrate through the massive project site along with many thousands of other bats.  See Kunz Rebuttal ¶¶ 8-9; Robbins Rebuttal ¶ 10; Gannon Rebuttal ¶ 17; see also Kunz Dep. at 54:25-55:3 (opining that the probability of Indiana bat death and injury at the Beech Ridge site is at least 95%).   And, once again, that view is also shared by the WV DNR's bat biologist, who is held in high regard as a neutral, knowledgeable expert by Defendants' own witnesses, see Lacki Dep. at 154:3-155:7, Romme Dep. at 168:7-19, Tyrell Dep. at 102:23-103:20, and who predicts that many Indiana bats will be killed by the project, particularly during fall migration.  See supra at 21 n.13.[16]

_____

[16]  As noted earlier, the commonly held view in both the scientific research community and federal and state wildlife agencies is that Indiana bats have been killed by existing wind projects, but have thus far gone undetected and/or unreported for a variety of reasons, including the rarity of the species, lack of mortality searches, low carcass recovery rates when searches do occur, and scavenger removal of carcasses.  Kunz Rebuttal ¶ 10.  In fact, the FWS strongly disagreed with Defendants' expert Dr. Tyrell on this precise point when she sought to rely on the lack of confirmed deaths in connection with another wind project in West Virginia; the Service stressed that the "the number of bats killed" at the Mountaineer facility "shows a high likelihood that endangered bats are also likely to be killed," and that the "more appropriate conclusion" is

**B.**     **Especially In View of the Acoustic Data Documenting Indiana Bats On The Turbine Site Itself, The Project Will Also Likely Kill, Injure, And Harass Summer Resident And Dispersing Indiana Bats.**

In addition to the substantial majority of bats that are killed during fall migration, another large concentration of bat deaths from wind turbines occurs during fall dispersal as summer resident bats disperse from an area used for roosting and foraging to fly back to winter hibernacula.  See, e.g., Robbins Rebuttal ¶ 7.  Although this mode of mortality (unlike the fall migration risk) does necessitate Indiana bat presence on the project site during summer, Defendants' contention that there is no such presence – and hence no likely mortality – is unsustainable for two reasons: (1) the AnaBat data that has long been in BHE's possession documents Indiana bat summer presence to an almost certain statistical probability; and (2) as suggested by the AnaBat results, the single summer mist net survey on the project site was totally inadequate to assess Indiana bat use of the site and Defendants refused to conduct any of the additional summer surveys requested by the Service.[17]

---

simply that "no kill of Federally-listed bats has been identified to date" because of poor monitoring and other factors.  Pfs. Exh. 25 at 2.  That "conclusion" has proved prescient in view of the apparent identification of a dead Indiana bat last year at Mountaineer (a fact uncovered only by discovery in this case), which is the closest proximate operating wind project to the Beech Ridge site and shares many physiogeographical characteristics with the site.  Robbins Rebuttal ¶ 10; Gannon Rebuttal ¶¶ 10, 17.

[17]  Based on the available data, Plaintiffs' experts believe that it is very likely that male Indiana bats use the Beech Ridge project site during summer.  See Robbins Rebuttal ¶ 5; Kunz Rebuttal ¶ 6; Gannon Rebuttal ¶ 14.  Further, while it is unnecessary to Plaintiffs' claim for the Court to find that any maternity colonies exist on the project site itself, Plaintiffs' experts also believe that there is no valid scientific reason to conclude that Indiana bat maternity colonies will not be present on the Beech Ridge project site.  Robbins Rebuttal ¶ 5; Kunz Rebuttal ¶ 7.  This is especially true in view of the fact that maternity colonies have recently been found on other Appalachian ridges, as well as the number of forest edge snags created by Defendants' land clearing activities for the turbine corridor, which considerably increased the amount of suitable roosting and maternity colony habitat known to attract Indiana bats.  Gannon Rebuttal ¶ 14; Robbins Rebuttal ¶ 4; Kunz Rebuttal ¶¶ 5-6.

### 1.      The AnaBat Data

The most compelling evidence of Indiana bat presence on the turbine itself is acoustic data collected during the July 2005 survey by Gary Libby – a biologist <u>hired by BHE</u> to conduct survey field work, and who is an experienced AnaBat user frequently recommended by the FWS for conducting acoustic surveys of this kind.  Defendants evidently concede that the AnaBat data at issue were in fact recorded on the turbine site – indeed, they are referred to on the contemporaneous project survey sheets filled out by Mr. Libby – and Defendants have no discernible basis for discrediting their reliability, especially because Mr. Romme admits that Mr. Libby's is a "a name that had been around in the Indiana bat circles . . . [as an] Indiana bat specialist[] for quite a while." Romme Dep. at 140:3-9; <u>see also</u> Gannon Rebuttal ¶ 15 ("It was clear from the quality of the bat calls contained in those AnaBat files that the person mounting the detectors and collecting the data was familiar with the technology and competent in using the technology.").

Based on a thorough statistical analysis methodology, which has been published in a peer reviewed publication and has been proven to identify 95% of Indiana bats accurately to species, <u>see</u> Deposition of Lynn W. Robbins (Pfs. Exh. 29) at 191:1-4, 193:1-20, Plaintiffs' expert Dr. Lynn Robbins identified eight Indiana bat calls of the 162 call sequences collected in July 2005.  Robbins Rebuttal ¶ 9.  Using standard statistical models to compare the eight Indiana bat calls to the total number and distribution of bat calls, <u>there is a 97.6% likelihood that Indiana bats were present on the Beech Ridge project site in July 2005</u>.  Robbins Rebuttal ¶ 9.  In addition, Plaintiffs' expert Dr. Gannon completed an independent analysis of Defendants' AnaBat files based on his own bat call

library, ultimately identifying a number of Indiana bats calls, lending even stronger support for Dr. Robbins's findings.  Gannon Rebuttal ¶ 15.[18]

Thus, based even on a very limited acoustic sample conducted on only two mist net sites in 2005, there is a virtual certainty that Indiana bats were present on and using the Beech Ridge turbine site during the summer four years ago.  Because of Defendants' creation of substantial forest edge habitat since that time due to turbine corridor clearing, see Gannon Rebuttal ¶¶ 14, 17; Kunz Rebuttal ¶ 5; Robbins Rebuttal ¶ 4, and with annually increasing numbers of Indiana bats in nearby hibernacula and statewide, see Stihler Dep. at 60:25-61:3, the probability of Indiana bats using the project site during summer now is higher than it was in 2005, meaning that the probability of Indiana bats currently using the project site during summer is even greater than 97.6%.  See, e.g., Robbins Dep. at 127:3-10 (explaining that the site visit strengthened his opinion on the likelihood of Indiana bat use of the site).  As such, the resident Indiana bats present on the project site during summer are highly susceptible to death, injury, and harassment from turbine collisions and barotrauma during

---

[18] Defendants maintain that, although the AnaBat data went unanalyzed for four years, when BHE finally did analyze them – just a few days before providing them in response to Plaintiffs' document production request – a BHE employee used the "Britzke Filter," see Romme Supp. Decl. ¶ 2, which was developed by Plaintiffs' expert Dr. Robbins and his former graduate student Dr. Eric Britzke as the first step in identifying bat calls during an analysis of AnaBat data files.  See Robbins Rebuttal ¶ 9.  On that basis, BHE concluded that the filter identified no Indiana bat calls, Romme Supp. Decl. ¶ 2, thus terminating its inquiry without incorporating both qualitative and quantitative statistical analysis that leading AnaBat experts, such as Plaintiffs' experts Drs. Robbins and Gannon, utilize in the ordinary course of all AnaBat analyses to enhance species identification accuracy that is frequently much lower with the Britzke filter alone.  Robbins Rebuttal ¶ 9; Gannon Rebuttal ¶ 15.  Indeed, as noted earlier, to ensure the accuracy of his analysis, Dr. Robbins contacted Dr. Britzke himself and asked him to analyze the files using his standard statistical analysis.  Robbins Dep. at 192:1-16.  Without knowing the origin of or context for the AnaBat files to preserve complete independence, id. at 192:9-11, Dr. Britzke's analysis also identified Indiana bat calls.  See supra at 6 n.4.

fall dispersal, as well as future tree cutting and land clearing for the project during spring and summer.[19]

### 2.     Defendants' Mist Net Surveys Were Patently Inadequate Even To Detect Summer Indiana Bat Presence.

As confirmed by the recently disclosed AnaBat data, Defendants' July 2005 mist net survey – the only one conducted on the turbine site itself – was severely inadequate to assess summer presence of Indiana bats.  Because the defects in the survey are detailed in Plaintiffs' experts' accompanying rebuttal declarations, and the identification of Indiana bats by virtue of the recently released AnaBat data renders the adequacy of the mist net survey of far less importance than would otherwise be the case, Plaintiffs will simply summarize some of the glaring reasons why the survey appears to have been designed and implemented to avoid, rather than capture, Indiana bats.

First, as Plaintiffs' experts learned during the August 31 site inspection, the specific mist net site locations were generally poor for Indiana bat surveys, although other more appropriate sites, e.g., near streams or under more closed tree canopy, could usually be found nearby that were, inexplicably, not surveyed.  Robbins Rebuttal ¶ 4; Gannon Rebuttal ¶ 13.  Second, Defendants' survey only covered five nights in July, as opposed to a full summer season from mid-May through mid-August, which is especially important because captures of species at a location can differ significantly from one summer month to the next.  See Robbins Rebuttal ¶ 6; Kunz Rebuttal ¶ 8.

---

[19]  Although Mr. Romme now maintains that AnaBat technology is not a reliable means of distinguishing Indiana bats from other myotis species – a view evidently not shared by the FWS, which repeatedly asked that acoustic surveys be performed for this project – Mr. Romme's own company has used the technology to survey for Indiana bats in connection with a number of projects.  See, e.g., Tyrell Dep. at 124:11-22.  Indeed, BHE hired Dr. Gannon to do so ten years ago.

Third, although the FWS's mist-netting guidelines provide that mist nets should be placed under overhanging canopy to better funnel bats and block ambient light, and that mist netting should not be set when the moon is full or near-full unless the canopy is closed – because Indiana bats avoid predators who may use the moonlight – the sole summer survey on the site violated both of these precepts. Many of the sites had little canopy closure and, even more egregious, BHE opted to conduct the survey during the underlined brightest part of the lunar cycle, with a full moon or near full moon during the entirety of the survey period. Gannon Rebuttal ¶ 13; Robbins Rebuttal ¶¶ 6, 8; Kunz Rebuttal ¶ 8.[20]

In sum, in view of the known "robust" Indiana bat populations in nearby hibernacula, see Stihler Dep. at 60:25-61:3; habitat on the site itself that Defendants concede is "suitable" for male Indiana bats, Romme Dep. at 181:12-14, 181:20-21; a single summer mist net survey on the turbine site that was woefully inadequate to detect any Indiana bats that were present; and repeated refusals by Defendants to conduct the more extensive surveys sought by the FWS, Plaintiffs' experts believe that summer presence should be presumed even aside from the AnaBat data that now confirms it.

---

[20] In addition, the Mist Netting Guidelines expressly call for one mist net site for every kilometer of a project's linear corridor. The linear corridor for the Beech Ridge project's turbines is 23 miles, or approximately 37 kilometers. Thus, at a minimum, the guidelines provided for the setting of no less than 37 mist net sites on the project site itself (excluding the transmission line corridor which requires its own minimum number of mist net sites according to its length). Although Defendants maintain that they were able to "negotiate" the Service down to fifteen mist net sites, Romme Dep. at 119:18-120:5 – while refusing to abide by other Service requests for, e.g., three years of summer survey effort and acoustic surveys – Plaintiffs' experts' independent review of the number of mist net locations, based on their decades of experiences with similar wind projects and other projects requiring mist netting coordination with the Service, concludes that 15 mist net sites is a totally inadequate sample size for a project consisting of 23 miles of ridgetop turbines. See Robbins Rebuttal ¶ 8 ("[T]he number of mist net sites was far too low considering the size of the project"); see also Kunz Rebuttal ¶ 8; Gannon Rebuttal ¶¶ 7, 13.

<u>See</u> Kunz Rebuttal ¶ 8; Robbins Rebuttal ¶¶ 5-6, 8.  Accordingly, because the lack of such presence

has been the linchpin of Defendants' defense, this is yet another reason why Plaintiffs have made out

a compelling section 9 case.  <u>See also</u> <u>Marbled Murrelet v. Pac. Lumber Co.</u>, 880 F.Supp. 1343 (N.D.

Cal. 1995), (9th Cir. 1995) (finding a take in part because surveys appeared designed to "avoid

detecting" the endangered bird at issue), <u>aff'd</u> 83 F.3d 1060.[21]

## C.      Plaintiffs' Expert Testimony Is Far More Credible And Reliable Than That Proffered By Defendants.

As in any case in which causation is a central issue, this case will largely distill down to the

Court's assessment of expert testimony.  As the Fourth Circuit has explained, "proof of causation

– that is that the defendant's negligence was 'more likely' or 'more probably' the cause of the

plaintiff's injury – requires expert testimony," and the well-founded opinion of an expert "is

evidence.  If the fact finder chooses to believe it, he can find as fact what the expert gave as an

opinion."  <u>Fitzgerald v. Manning</u>, 679 F.2d 341, 350 (4th Cir. 1982) (internal quotation marks

---

[21]  Defendants' assertion that the "FWS uses a distance of five miles from a hibernaculum to assess potential impacts to Indiana bats," Def. Mem. at 35, is a red herring.  First, where, as here, Indiana bat presence has actually been documented <u>on</u> the turbine site itself, that is obviously the best evidence of the species' "potential" for collisions with turbines; that, of course, is <u>why</u> the Service repeatedly urged Defendants to undertake acoustic and other surveys in connection with this project.  Second, the five mile radius relates solely to an estimated distance that Indiana bats typically engage in two specific behaviors – "staging" in spring and "swarming" before hibernation; it has no bearing on the likelihood of death and injury to either migrating Indiana bats or summer residents using the site or dispersing for migration.  Kunz Dep. at 30:17-19 ("[T]his five-mile boundary does not really address the migratory period.").  Third, even as to staging and swarming, Defendants' own expert witness concedes that Indiana bat "can and have" been found – <u>including by her</u> – engaging in such behavior beyond a five mile radius from a hibernaculum.  <u>See</u> Tyrell Dep. at 222:21-225:15.

omitted).  The experts on whom Plaintiffs are relying here are vastly more credible and reliable than those proffered by Defendants.[22]

All of Plaintiffs' experts are on the faculties of major research universities, and each has decades of experience on issues pertaining to bat biology and conservation, including many years each involving the impact of wind turbines on bats specifically.  Dr. Kunz – who, as Mr. Stihler testified, is widely recognized (including by Defendants' own witnesses) as "one of the premier bat biologists, at least in North America," Stihler Dep. at 86:20-87:3 – has done groundbreaking research documenting the effects of wind power on bats, particularly on Appalachian ridges; as noted, the FWS urged Defendants to consult Dr. Kunz's seminal work on this issue.  See supra at 13.

Likewise, Dr. Gannon has studied and written on the effects of wind power on bats, including Indiana bats, for many years and he is also a long-recognized expert on Indiana bat detection in Appalachian forests; he was not only asked by BHE itself to assist with AnaBat detection of Indiana bats for a project ten years ago, see supra at 6 n.4, but he has also helped develop Indiana bat survey protocols and conduct Indiana bat surveys by the FWS, the U.S. Forest Service, and the West Virginia Department of Transportation.  Gannon Rebuttal ¶ 18.  As noted previously, Defendants' own experts concede that Dr. Robbins is a recognized expert in AnaBat analysis – a matter that has become even more crucial as this case has progressed – and, notably, he has also assisted wind power companies in surveying for, and addressing potential impacts on, Indiana bats in particular.

---

[22]  Because this a bench trial, the Court has broad discretion to admit expert testimony and then, after hearing it, decide on how much, if any, weight to afford it.  See, e.g., United States v. Demjanjuk, 367 F.3d 623, 633-34 (6th Cir. 2004).  Accordingly, although Plaintiffs believe that one or more of Defendants' witnesses could properly be challenged on Daubert grounds if this were a jury trial, Plaintiffs will instead direct their efforts, both at this stage and at trial, to questions of weight rather than admissibility.

Further, Professors Robbins and Gannon went on a full-day inspection of the turbine locations, and have shared their field notes and photographs with Dr. Kunz.  Hence, their detailed views, based on all of the available data including that extracted through discovery taken to date, that Indiana bats will very likely be killed and otherwise taken, are worthy of reliance by this Court. Indeed, their prediction of Indiana bat mortality is echoed by that of Mr. Stihler, the WV DNR bat biologist, whose deposition testimony was subpoenaed and who Defendants' own witnesses recognize as an expert on bat and wind power impacts in West Virginia.[23]

The contrast with Defendants' proffered experts is stark.  Two of them (Mr. Romme and Dr. Tyrell) work for the very consultant whose surveying work is under scrutiny.  Those experts have a patent conflict on two levels.  First, according to its own marketing materials, BHE is "aligned with the wind power industry," Tyrell Dep. at 86:18-20, and it derives a substantial and growing amount of its income from that industry, including Defendant Invenergy.  Tyrell Dep. at 78:3-16.  Second, although BHE's representatives may certainly seek to explain their actions regarding the project – including with respect to the AnaBat files and their refusals to conduct the studies that the FWS

---

[23]  That Plaintiffs' experts and Mr. Stihler, although expressing their views with a high degree of confidence, have refrained from opining with absolute certainty as to what will happen in the future, hardly detracts from the weight and reliability of their opinions on the likelihood of Indiana bat impacts.  As the Court of Appeals has explained in discussing medical experts, "a reasoned medical opinion is not rendered a nullity because it acknowledges the limits of reasoned medical opinions.  Many wise speakers choose their words carefully and conservatively, never overstating as certain an opinion that admits of any doubt," while "others 'believe passionately in the palpably not true,' and forgo no opportunity to share these beliefs."  Piney Mountain Coal Co., 176 F.3d at 763 (quoting H.L. Mencken, The Portable Curmudgeon 31 (Jon Winokur ed., New American Library 1987)).

requested – they are obviously in no position to furnish the Court with the kind of independent expert opinion on which factfinders ordinarily rely.[24]

Indeed, Defendants' remaining expert, Dr. Lacki, was consulted precisely because Defendants themselves recognized the need for an "independent" opinion. Lacki Dep. at 120:5-14. However, he has published nothing regarding the impacts of wind power on bats. Lacki Dep. at 94:3-7. Moreover, Dr. Lacki – who is charging Defendants $ 215/hour more than he has ever charged for any consulting services he has performed in the past, id. at 126:24-127:7, and who testified that if he "wasn't going to be compensated" this handsomely, he "wouldn't have done it," id. at 125:2-4 – acknowledged in his deposition that he was unaware of crucial materials bearing on the case, including the FWS's letters to BHE. Id. at 187:24-188:10, 194:1-4, 204:9-19. Remarkably, he also did not know until the morning of his deposition that there was AnaBat data from the site, let alone take them into account in formulating his opinion. Id. at 178:14-23. Finally, he conceded in his deposition that the "Indiana bat has not been one of my primary research species," id. at 64:5-6 (emphasis added), and that he was unaware of recent literature on the species – including that Indiana bats do indeed migrate across Appalachian ridges – that might bear on his opinion. Id. at 248:14-249:9.[25]

---

[24] Tellingly, BHE was advised by Defendants that it was not awarded the contact for post-construction monitoring of bat impacts at the project in order to avoid a "perception that BHE was biased in any way, shape, or form." Romme Dep. at 212:24-25. It is difficult to conceive of how BHE could be viewed as too "biased" to engage in post-construction monitoring, but sufficiently neutral to furnish expert testimony (for which it is being paid approximately $ 90,000, see Romme Dep. at 12:1-22).

[25] Consequently, Defendants' assertion that Defendants' witnesses have more "specialized expertise on Indiana bats and wind power" than Plaintiffs' experts, Def. Mem. at 2 n. 2, is completely unfounded.

## CONCLUSION

In light of the compelling evidence that the project will likely cause a take of Indiana bats, the Court should enjoin Defendants from proceeding until and unless Defendants pursue the section 10 permitting process that is designed for precisely these circumstances. In this connection, Defendants' contention that they will engage in post-construction monitoring and "adaptive management" <u>without</u> complying with the section 10 process is no basis on which the Court should refrain from crafting relief. At present, state and federal officials have not even seen <u>draft</u> plans for these activities. <u>See</u> Stihler Dep. at 145:22-25. More important, it is only through the section 10 process embodied in the ESA that the Service – with public comment – can impose binding "terms and conditions" on Defendants, 16 U.S.C. § 1539(a)(1), or can evaluate whether other steps (such as turbine relocation) are necessary to "minimize and mitigate" the impacts on Indiana bats. <u>Id.</u> Accordingly, whatever <u>post</u>-construction measures Defendants may elect to implement will not, as a <u>legal</u> matter, be "comparable" to the process mandated by the ESA for authorizing the taking of a listed species. Def. Mem. at 38 n. 29.[26]

---

[26] For example, Plaintiffs' expert Dr. Robbins is currently providing bat survey data to the FWS for another wind project in Indiana bat habitat where an incidental take permit ("ITP") is being pursued, and the FWS has incorporated that data into a "habitat conservation plan" ("HCP") that will mitigate impacts to Indiana bats in various ways, including by "re-sit[ing] those turbines that [a]re within the high [bat] activity areas." Robbins Dep. at 235:12-18. Similarly, BHE itself was helping another wind power company in West Virginia to develop an ITP/HCP application addressing Indiana bat impacts before the company elected not to proceed with the project. <u>See</u> Tyrell Dep. at 31:16-33:11.

It is also significant that, in the section 10 permitting process, the FWS brings its expertise to bear on whether the "taking" will "appreciably reduce the survival and recovery of the species in the wild," particularly in view of other threats to the species. 16 U.S.C. § 1539(a)(2)(B)(iv). Accordingly, that is the appropriate context for consideration of, e.g., "cumulative" threats to the species from a string of current and proposed wind projects on

Finally, Defendants do not get dispensation from compliance with the ESA because they deem wind power to be "environmentally beneficial," Def. Mem. at 1, and "environmentally sound," id. at 44, or because the President has made speeches in support of wind power. Id. Just as that kind of rationale could not be used by a nuclear power plant or coal company to avoid strict compliance with federal environmental law, nor can it be relied on by Defendants to gain a special exemption for wind power that Congress has not seen fit to adopt.

Respectfully submitted,

/s/ Eric R. Glitzenstein
Eric R. Glitzenstein      (admitted *Pro hac vice*)
William S. Eubanks II   (admitted *Pro hac vice*)

Meyer Glitzenstein & Crystal
1601 Connecticut Avenue NW, Suite 700
Washington, DC 20009
(202) 588-5206
(202) 588-5049 (fax)

William K. Meyer
(Federal Bar No. 01214)
Zuckerman Spaeder LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
(410) 332-1240
(410) 659-0436 (fax)
wmeyer@zuckerman.com

---

Appalachian ridges throughout Indiana bat habitat, see Stihler Dep. at 80:1-81:25, as well as the degree of mortality the species can withstand from wind power plants in view of evolving threats like White-nose Syndrome. Id. at 102:19-103:18; Kunz Rebuttal at ¶ 11 ("Especially in light of the fact that White-nose Syndrome is threatening Indiana bats throughout much of their range, I believe it is essential to avoid or minimize additive sources of mortality if the Indiana bat is to survive and recover . . . [M]aintaining as many viable populations as possible throughout the species' range may prove critical to the species' long-term survival and recovery.").