# EXHIBIT 24

# Second Supplemental Declaration of Michael J. Lacki, Ph.D.

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

|  |  |
|---|---|
| ANIMAL WELFARE INSTITUTE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BEECH RIDGE ENERGY LLC and<br>INVENERGY WIND LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil No. RWT 09-cv-01519<br>)<br>)<br>)<br>)<br>)<br>) |

### SECOND SUPPLEMENTAL DECLARATION OF MICHAEL J. LACKI, PH.D

I, Michael J. Lacki, make this supplemental declaration based upon my personal knowledge and belief and state that:

1. My credentials and expertise are outlined in Paragraphs 1-3 of my original declaration and Attachment A.

2. This supplemental declaration is made based upon my review of: Anabat analyses completed by Dr. Lynn Robbins; Anabat analyses completed by Dr. Michael Gannon; materials presented in Dr. Gannon's CV; published methodology for Anabat analyses in Britzke et al. (2002); Depositions and rebuttals of Drs. Gannon, Robbins and Kunz; analyses provided in the Deposition of Mr. Craig Stihler; mist netting survey data for West Virginia; wildlife incident report from the Mountaineer Wind Facility; and the email correspondence among Nelson Booth, Cassandra Dominick and Renee Culver.

3. After reviewing the materials, I continue to have a number of concerns with regard to the use of the Anabat data from the Beech Ridge site. First, the qualifications of the person collecting the data are unknown. Second, the placement and number of Anabat units deployed are unknown. And, third, the sensitivity settings of the Anabat units are unknown. Given these considerations, I find it surprising that experts for the Plaintiffs were even willing to examine the data knowing full well that the quality of collection was not verified at the time of their analyses. In fact, one of the Plaintiff's expert witnesses, Dr. Tom Kunz, indicated in his Deposition that without this information he would disregard these data as useful in this case. Regardless, three different approaches and/or software packages were used to evaluate whether or not calls of Indiana bats could be identified by Drs. Robbins and Gannon.

4. The first approach used by Dr. Lynn Robbins employed the Britzke filter, as outlined in Britzke et al. (2202); a paper co-authored by Dr. Robbins. This approach uses 10 call parameters and a minimum of 5 call sequences to classify calls to species. It is designed to ensure that no "false positives" are made with respect to species identification. This is a conservative approach designed to ensure that outcomes are indeed defensible and reliable within a 93 to 100% confidence level. This approach detected no Indiana bat calls when used by both Dr. Robbins and BHE in independent analyses. The subsequent approach used by Dr. Robbins circumvented the more rigorous discriminant model and employed a qualitative assessment based on shorter call sequences. Using this analysis Dr. Robbins found evidence for Indiana bat calls (n = 6) at the Beech Ridge site. If one examines his output, however, it is clear that as fewer call sequences are used in analysis the likelihood of detecting an Indiana bat increases, even for call sequences in his call library that are known to belong to other species. This source of error, or misclassification, is to be expected based on his own co-authored work (Britzke et al. 2002), and is even more likely to occur with data sets that have disproportionately larger

numbers of samples of other *Myotis* species in the area – which was the case at the Beech Ridge site. Again, this concern is expressed in his own co-authored work (Britzke et al. 2002). I find it difficult to understand why Dr. Robbins chose not to use his own published approach which ensures higher accuracy because it is quantitative and requires longer call sequences for analysis. In addition, by his own admission his call library does not contain call sequences of Indiana bats from West Virginia, but instead relies on call sequences of Indiana bats from locations much further west in the distribution of the species. By employing a less rigorous approach, Dr. Robbins analysis is flawed and the Indiana bat calls detected are likely "false positives," as reflected in the text of his co-authored work.

5.  Analyses completed by Dr. Michael Gannon were made using a different filtering system (i.e., Analyze) than that of the Britzke approach (i.e., Analook). Dr. Gannon's filtering approach, which comes from Australia, is older in origin and less commonly used, especially with Anabat studies in eastern North America. It permits more flexibility in use of calls, including calls that are incomplete (i.e., fragments) and /or comprised of shorter sequences. This approach uses a baseline default match probability of only 50%, basically by chance alone, which Dr. Gannon adjusted upwards to 85% to draw his conclusions. He too found evidence for Indiana bats (n = 3) in the Anabat data from the Beech Ridge site. However, his approach too is likely to produce "false positives" as the analysis is less rigorous and uses incomplete call sequences. Moreover, his approach is not widely accepted by bat researchers in North America and his probability cutoff of 85% would not be deemed acceptable, in my opinion, by any peer-reviewed journal outlet. To properly frame this comment, Dr. Gannon's CV shows that he has not senior authored a single peer-reviewed journal paper since 1997, whereas, over this same time frame, I have published 34 peer-reviewed papers and senior authored 14 of them. In my opinion,

3

no actively publishing scientist would use an 85% level of confidence in their work as acceptable for drawing conclusions or inferences from data.

6. The approach used by Mr. Craig Stihler to estimate the likelihood of future kills of Indiana bats at the Beech Ridge facility combined projected kill rates for all bats at the facility (135,000), the proportion of *Myotis* bats killed at the Mountaineer wind facility (13.9%), and the proportion of Indiana bats in mist net captures of *Myotis* bats from across the state of West Virginia (0.24%). He concluded in his Deposition that approximately 400 Indiana bats would be killed over the operating life of the Beech Ridge facility. In my opinion, his logic and approach relies on several assumptions that are not likely met, and his calculations are flawed. First, he does not explain why only mist net data from 2003 to 2007 are used in the analysis. Why not pre-2003 and why not 2008? I suspect these data are in the WV DNR data base and should have been retrievable. Second, I know of no one who would use data from across an entire state to assess relative community composition at a single location. Much of these data likely are from habitats and locations that have no relevance to the Beech Ridge site. Third, if Mr. Stihler had calculated his numbers correctly he would have produced an amount that is 10-fold less than that indicated in his deposition. In other words, $18,765_{bats} \times 0.0024 = 45.0_{bats}$. One cannot multiply bats by percentages (i.e., 0.24%) and derive bats. It is nonsense math. The number of bats should have been multiplied by the ratio he derived which is a unitless number (i.e., 0.0024) to come up with a value that has bats as its unit of measure. Therefore, by all accounts this information is of no use in assessing risk of Indiana bats at the Beech Ridge site.

7. Lastly, I find it hard to understand how trained biologists, Drs. Robbins and Gannon, would accept as conclusive evidence of an Indiana bat kill at a wind power facility: (a) a photo where key diagnostic characteristics are not evident, and (b) the word of an untrained forklift operator. I

4

certainly would not stake my reputation on such evidence. Even the Wildlife Program Coordinator, Ms Rennee Culver, who was contacted about this kill admitted that identification could not be confirmed given the photo provided. In fact, if the sheet is carefully reviewed it indicates that the operator suggested it might be an Indiana bat or a gray bat, neither of which look anything like each other. Further confirming the fact that the person who found the kill has no idea what an Indiana bat looks like. Therefore, I believe this photo and accompanying report provide no evidence of Indiana bat mortality at a wind power facility.


**Reference**

Britzke, E.R., K.L. Murray, J.S. Heywood, and L.W. Robbins. 2002. Acoustic identification. Pp. 221-225 in The Indiana Bat: Biology and management of an endangered species. (A. Kurta and J. Kennedy, eds.). Bat Conservation International, Inc., Austin, TX.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

                                                    /s/
                                        Michael J. Lacki

                                        *  Counsel hereby certifies that she has a signed copy of the foregoing document available for inspection at any time by the Court or a party to this action.

Executed on this 7th day of October 2009.

7