THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | |
|---|---|
| ANIMAL WELFARE INSTITUTE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **BEECH RIDGE ENERGY LLC and INVENERGY WIND LLC**, <br><br> Defendants. | Civil No. RWT 8:09-cv-01519 |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR RECONSIDERATION**

Kirsten L. Nathanson (D. Md. Bar No. 14236)
Steven P. Quarles (admitted *pro hac vice*)
J. Michael Klise (D. Md. Bar No. 29075)
Thomas R. Lundquist (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
knathanson@crowell.com

Dated: December 22, 2009

Attorneys for Defendants Beech Ridge Energy LLC and Invenergy Wind LLC

**INTRODUCTION**

Defendants Beech Ridge Energy LLC and Invenergy Wind LLC have carefully reviewed and considered this Court's December 8, 2009 Memorandum Opinion and Order ("Dec. 8 Order" or "the Order"), which found that the operation of the Beech Ridge Energy Project ("Beech Ridge Project" or "the Project") will violate the Endangered Species Act ("ESA") and "take" the endangered Indiana bat. The Order also enjoined Defendants from constructing and operating 27 out of 67 wind turbines now delivered for the Beech Ridge Project, as well as from operating the 40 turbines already under construction during the non-hibernation seasons of the Indiana bat (*i.e.*, April 1 through November 15), unless and until Defendants obtain an Incidental Take Permit ("ITP") from the U.S. Fish & Wildlife Service ("FWS"). While Defendants have begun the process to obtain an ITP, the scope of the Order's injunction threatens the viability of the Project itself, and imposes immediate burdens on Defendants that are not necessary to prevent any "take." Therefore, Defendants request reconsideration and modification of the Dec. 8 Order.

Specifically, Defendants respectfully request that the Court revisit two aspects of the Order: (1) the prohibition on erection and hibernation season operation of the remaining 27 Phase I turbines; and (2) daytime operation of all turbines during the non-hibernation seasons. There is no evidence in the record demonstrating that the mere erection and hibernation period operation of the remaining 27 Phase I turbines pose any risk of "take" of Indiana bats, nor is there any basis to ban daytime operation when the bats are not hibernating. The Court's rationale for prohibiting erection of the 27 turbines appears to be based on its view (and perhaps some misunderstanding, as explained below) on how the voluntary ITP process will unfold, rather than any actual threat to endangered species. *See* December 8, 2009 Memorandum Opinion ("Mem. Op.") at 70. While there is no protective benefit to the Indiana bat from enjoining further erection and winter and daytime operation, there are significant economic impacts to the Project as a result of the Order, including: (1) millions in lost revenue under an existing Renewable Energy Purchase Agreement ("REPA"), based on the erection and operational restrictions; (2) likely lost

access to some portion of federal grant funds; and (3) millions in costs to move and secure the remaining 27 turbines, which Defendants agreed to accept delivery of long before this suit was filed. *See* Second Declaration of David S. Groberg ("2nd Groberg Decl."), at ¶¶ 3, 5-7, 10.[1] Indeed, it is a higher cost to Defendants to move the 27 turbines off the mountain to storage or another wind project now than to erect them, operate them during no-risk periods, and potentially move or eliminate some turbine locations during the ITP process. *Id.*

Defendants believe that the Court's Order does much more than is necessary to protect the Indiana bat, at great cost to Defendants and their renewable energy project. Injunctive relief, particularly when it involves restrictions on private land use to prevent a future ESA violation, should be limited to prohibiting activities that are reasonably certain to "take" endangered wildlife. Enjoining erection and hibernation period and daytime operation of wind turbines goes far beyond that limitation. Therefore, as explained in greater detail below, Defendants respectfully request the Court to reconsider and modify the scope of its Order to allow for erection and hibernation period operation of the remaining 27 turbines, along with daytime operation of all turbines during the non-hibernation seasons.[2]

---

[1] The 2nd Groberg Declaration is being filed under seal, with an accompanying Motion to Seal, because it sets forth detailed, confidential business information that could damage Defendants' competitive position if publicly disclosed, but that Defendants believe is necessary for the Court to understand the impacts associated with the Court's Order.

[2] As described in the accompanying Motion, Defendants conferred with Plaintiffs and presented proposals on all issues raised in this Memorandum. The parties could not reach agreement prior to the filing deadline under Local Rule 105.10, but discussions are continuing, and the parties will keep the Court apprised of progress in subsequent filings on this motion. Any agreements will be submitted jointly to the Court.

**ARGUMENT**

I. **INJUNCTIVE RELIEF MUST BE NARROWLY TAILORED TO THE MINIMUM NEEDED TO PREVENT A REASONABLY CERTAIN ESA "TAKE" VIOLATION**

Injunctive relief should be no more expansive than is necessary to provide relief for purported violations of law. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs") (internal quotations and citation omitted). An injunction is an "extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 376 (2008). Courts should not enjoin the "whole conduct of the defendants' business" where a narrower injunction can be fashioned. *Hartford-Empire Co. v. United States*, 323 U.S. 386, 410 (1945). Equity embodies principles of "mercy and practicality," and injunctions should be designed "to deter, not to punish." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). As the Fourth Circuit has summarized, "the judge must ensure that the injunction is narrowly tailored." *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 818 (4th Cir. 2004). "[I]njunctive relief . . . should not go beyond the extent of the established violation."[3]

These principles apply equally to injunctive relief in citizen suits under the ESA, which provides a private right of action only to "enjoin . . . [a] violation of this chapter," and which limits a district court's jurisdiction to merely "enforce[ing] any [ESA] provision or regulation." 16 U.S.C. § 1540(g)(1). "[A]ny injunctive relief should be narrowly tailored to remedy the specific ESA violation."[4] An

---

[3] *Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993); *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 201 (4th Cir. 2005) (an "injunction should be tailored to restrain no more than what is reasonably required to accomplish its ends"); *Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001) ("[a]n injunction should be carefully addressed to the circumstances of the case").

[4] *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. CV 01-640-RE, 2005 WL 3576843, at *1 (D. Or. Dec. 29, 2005). "ESA § 9 take relief must be precisely tailored to remedy the precise violation." *Animal Prot. Inst. v. Holsten*, 541 F. Supp. 2d 1073, 1080-81 (D. Minn. 2008). *See also Ctr.*

(continued…)

4

injunction must be narrowly tailored to "impose burdens no greater than reasonably necessary to comply with the ESA." *Natural Res. Def. Council v. Kempthorne,* No. 1:05-cv-1207, 2007 WL 4462395, at *15 (E.D. Cal. Dec. 14, 2007). Where an injunction is overbroad, it should be "narrowly tailored" on remand, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 799-800 (9th Cir. 2005), or, here, on reconsideration.

The Ninth Circuit has reasoned that the ESA cannot be construed to authorize FWS to impose constraints on lawful land-use activity if a Section 9 "take" is not reasonably certain to occur as a result of that particular activity –

> Interpreting the statutes in the manner urged by the Fish and Wildlife Service could effectively stop the proposed cattle grazing entirely. Such a broad interpretation would allow the Fish and Wildlife Service to engage in widespread land regulation even where no Section 9 liability could be imposed. . . . [T]he Fish and Wildlife Service must have a reasonable basis to conclude that a take will occur as a result of the anticipated lawful activity. . . . [I]t would be unreasonable for the Fish and Wildlife Service to impose conditions on otherwise lawful land use if a take were not reasonably certain to occur as a result of that activity.

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1240, 1243 (9th Cir. 2001). Courts are subject to the same statutory limitation as FWS and cannot enjoin land use activities that have zero or negligible possibility of taking Indiana bats, particularly where such prohibitions place heavy economic burdens on defendants.[5] Because the Order imposes broader restrictions on Defendants' private land use activity than is necessary to prevent the "take" of Indiana bats that the Court found may occur, the Court should apply the above principles and narrow the ESA injunction as described below.

---

(continued)

*for Biological Diversity v. Bureau of Land Mgmt.*, No. C 03-02509, 2004 WL 3030209, at *6 (N.D. Cal. Dec. 30, 2004) ("[T]he scope of . . . [the] injunction must be tailored to the likelihood of future harm").

[5]    Plaintiffs' requested injunction for ESA "take" was denied, and a less-onerous injunction was adopted, in *Strahan v. Coxe*, 127 F.3d 155, 158, 171 (1st Cir. 1997). Due to the low "risk" of future "take" and because an injunction would prevent a fisherman "from pursuing his livelihood," an injunction was denied in *Strahan v. Holmes*, 595 F. Supp. 2d 161, 166 (D. Mass. 2009).

5

II. **THE COURT SHOULD MODIFY THE DEC. 8 ORDER TO ALLOW ERECTION AND HIBERNATION PERIOD OPERATION OF THE REMAINING 27 PHASE I TURBINES, WHICH POSE NO GREATER RISK TO INDIANA BATS THAN THE 40 TURBINES PERMITTED TO OPERATE DURING HIBERNATION**

By crafting an injunction that permits erection and operation of 40 turbines during the Indiana bat's hibernation season, the Court has acknowledged that there is no risk of "take" from those activities. *See* Dec. 8 Order at 2. But, at the same time, the Order prohibits the remaining 27 turbines from being erected and operational during this same no-risk period. *See id*. There are no facts in the record to suggest such a distinction is warranted. Indeed, when looking at potential impacts to Indiana bats from mere erection and hibernation period operation, the two sets of turbines are indistinguishable, and erection and hibernation period operation of the 27 remaining turbines would pose no greater risk of "take" than operation of the 40. In fact, as Plaintiffs' expert witness Dr. Robbins testified at trial, non-operating turbines do not pose any risk of "take" of the species, *see* Testimony of Dr. Robbins, Hearing Transcript ("Hr'g Tr.") 223:15-17, Oct. 21, 2009 (stating that stopping operation of turbines "eliminates all kill"); and every expert witness who addressed the point testified that there is zero risk to the Indiana bat during the hibernation season. Testimony of Dr. Gannon, Hr'g Tr. 117:7-13, Oct. 21, 2009; Testimony of Dr. Robbins, Hr'g Tr. 226:3-5, Oct. 21, 2009; Testimony of Dr. Tyrell, Hr'g Tr. 12:4-17, Oct. 29, 2009. Furthermore, no additional land clearing or other habitat modification is needed to begin and complete erection of the 27 remaining Phase I turbines, *see* 2nd Groberg Decl. ¶ 8, thus eliminating any potential for risk from construction activities, as the turbine foundations are already poured and the supporting electrical system is fully constructed. *Id.*

The prohibition on construction of the 27 turbines rests on the Court's supposition about the possible development and outcome of the now-underway ITP process. *See* Mem. Op. at 70 ("[t]he simple reason for [enjoining the 27 turbines] is that the ITP process may find that some locations for wind turbines are entirely inappropriate, while others may be appropriate"). Thus the Court acknowledges that the injunction is not linked to any Section 9 "take" of an Indiana bat or any other

6

violation of the ESA, but to a voluntary permitting process not subject to any statutory duty or enforcement authority. There is no ESA duty to obtain an ITP under ESA Section 10(a)(2), and an ITP is not a prerequisite to land development or a mandatory permit that can be the subject of an ESA Section 11(g) citizen suit. *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 927 (9th Cir. 2000); Dec. 8 Opinion at 70 ("this Court cannot require them to apply for or obtain such a permit"). Accordingly, no aspect of the injunctive relief in this case should spring from potential ITP scenarios.

Because the prohibitions related to the 27 Phase I turbines have no nexus to the potential violation of law the Court found, they should be eliminated from the Order. *See Madsen*, 512 U.S. at 765; *Cromer*, 390 F.3d at 818; *Hayes*, 10 F.3d at 217; *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003); *Va. Soc'y for Human Life, Inc.*, 263 F.3d at 393. As described in Part I, *supra*, an injunction must be narrowly tailored to "impose burdens no greater than reasonably necessary to comply with the ESA." *Natural Res. Def. Council v. Kempthorne,* No. 1:05-cv-1207, 2007 WL 4462395, at *15 (E.D. Cal. Dec. 14, 2007) (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 799-800 (9th Cir. 2005).

Further, erecting of the remaining 27 turbines would <u>not affect</u> the outcomes of the ITP process that Defendants will undertake. FWS retains full discretion to evaluate turbine locations and operating conditions during that process and could conclude that issuance of an ITP would be appropriate only if Defendants move, limit operation of, or not operate (and thus remove) certain turbines. Defendants are acutely aware of that possibility and are willing to assume the risk that FWS will make such a request with regard to the remaining Phase I turbines. Defendants' willingness to assume that risk is driven in no small part by the substantial economic burden imposed by the Order – as explained in Mr. Groberg's attached declaration, Defendants will incur higher costs by securing and then storing the 27 turbines at or near the Project site or moving them from Beech Ridge than if they erected them, operated them only during hibernation, and were later forced to dismantle and move some of the turbines as a condition of the ITP. 2nd Groberg Decl. ¶ 7.

The scope of the Court's injunction cannot, moreover, be justified by pointing to Section 7(d) of the ESA, as Plaintiffs have during various hearings. That provision prohibits a "permit or license applicant" from making "any irreversible or irretrievable commitment of resources . . . which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" which would avoid jeopardizing the continued existence of any endangered species. 16 U.S.C. § 1536(d). It does not authorize the current injunction or even apply at the present time to the Beech Ridge Project for three reasons. First, the <u>reversible</u> erection of the 27 turbines is not an "irreversible or irretrievable commitment of resources" that would foreclose "reasonable and prudent alternative measures."[6] FWS guidance makes clear that resources commitments are not prohibited under Section 7(d) when they leave the agency with discretion and flexibility to develop appropriate alternative actions.[7] Here, FWS has sufficient discretion and flexibility to reach a decision about the location or operation of turbines, even if the remaining 27 turbines are erected. The possibility that,

---

[6] *See The Bays' Legal Fund v. Browner*, 828 F. Supp. 102, 112-13 (D. Mass. 1993) ("Further construction of the outfall tunnel . . . will not preclude the development of reasonable and prudent alternatives . . . . [The existence of alternative discharge approaches, including those that may be taken only at "significant cost"] demonstrate[s] that continued construction of the outfall tunnel . . . will not foreclose the possible development of alternative avenues of wastewater removal.").

[7] FWS Final ESA Section 7 Consultation Handbook (March 1998), pp. 2-7, available at http://www.fws.gov/endangered/consultations/s7hndbk/s7hndbk.htm ("Not all irreversible and irretrievable commitments of resources are prohibited. The formulation or implementation of any reasonable and prudent alternative must be foreclosed by the resource commitment to violate section 7(d). Thus, *resources commitments may occur* as long as the action agency retains sufficient discretion and flexibility to modify its action to allow formulation and implementation of an appropriate reasonable and prudent alternative.") (emphasis added).

As courts have recognized, Congress enacted Section 7(d) to preclude the investment of large sums of money in activity that might violate the ESA where "that investment was not salvageable (i.e. it could not be applied to either an alternative approach to the original endeavor or to another project)." *Natural Res. Def. Council*, 539 F. Supp. 2d at 1173 (citations omitted). Here, Defendants' 27 turbines remain salvageable even if they are constructed as planned. They could be disassembled and moved, if necessary.

8

following the erection of the remaining 27 turbines, FWS would determine that they should be relocated or not operated is a risk that Defendants are free, and in this instance willing, to assume. *See N. Slope Borough v. Andrus*, 642 F.2d 589, 611 (D.C. Cir. 1980). Because the construction of the remaining 27 turbines would not constrain the development of appropriate alternatives at the Beech Ridge Project, it does not implicate Section 7(d)'s prohibition on the investment of resources.

Second, Section 7(d) applies only where the action itself is "likely to jeopardize the continued existence of" a listed species. 16 U.S.C. § 1536(a)(2), (b)(3), and (d). There is no evidence in the record to suggest that erection and winter operation of the 27 turbines would jeopardize the continued existence of the entire, widespread Indiana bat species, whatever the likelihood of ESA Section 9 "take" of individual Indiana bats the Court has attributed to other aspects of the Project. And third, Section 7(d) applies only after there is a "permit . . . applicant" and only once "consultation" has been commenced, 16 U.S.C. § 1536(d), which occurs late in the Section 10 process. Thus, ESA Section 7(d) does not apply to Beech Ridge now, before its ITP application is submitted.[8]

*       *       *       *

In sum, prohibiting construction and hibernation period operation of the remaining 27 Phase I turbines is not narrowly tailored to prevent the ESA violation (the certain or even likely death or injury to Indiana bats) found by the Court, but is instead tied to a voluntary regulatory process that this Court acknowledges it has no authority to require. There are simply no facts in the record to support a finding

---

[8] *See* "Application of Section 7(d) to the Habitat Conservation Planning Program," Memorandum issued to FWS Regional Managers by Director Jamie Clark (Dec. 11, 2000) at main memorandum ("section 7(d)" applies, "but only after the applicant has identified a plan of action and submitted it to the Services, and the Services have initiated section 7 consultation") Attachment 1 ("[U]ntil the Services receive a complete permit application there is no Federal action that may affect listed species.") (available at http://www.fws.gov/endangered/hcp/7(D).html). *See also Natural Res. Def. Council v. Kempthorne*, 539 F. Supp. 2d 1155, 1174 (E.D. Cal. 2008) ("The[] authorities establish that the § 7(d) prohibition commences with the initiation of consultation . . . ."). Most of the ITP and Habitat Conservation Plan ("HCP") process duration is consumed by the preparation of the HCP and National Environmental Policy Act document, before the application for the ITP is submitted.

9

that erection and hibernation period operation of the additional 27 turbines pose any risk to endangered species.  In addition, there is no constraint on FWS to impose restrictions on turbine location or operation in the final ITP.  Accordingly, Defendants respectfully request the Court to modify the scope of the injunction to allow the erection and hibernation period operation of the 27 remaining Phase I turbines.

### III. THE COURT SHOULD MODIFY THE DEC. 8 ORDER TO ALLOW DAYTIME OPERATION OF ALL TURBINES DURING SPRING, SUMMER, AND FALL, AS THE PROHIBITION ON THAT OPERATION HAS NO BASIS IN THE RECORD AND DOES NOT WORK TO PREVENT AN ESA VIOLATION

The Court banned all daytime operation of turbines during the spring, summer, and fall because the Court believed it lacked the expertise to make determinations on non-hibernation period operational restrictions.  However, the record before the Court has ample evidence demonstrating that Indiana bat activity during the spring, summer, and fall is limited to the period between dusk and dawn.[9]  Therefore, Defendants believe that the injunction can and should be more narrowly tailored to protect the endangered bat while allowing the turbines to operate for the portion of each day when bats are not active.

Plaintiffs presented no evidence demonstrating that there is a risk to Indiana bats during the day, and indeed, the exhibits before the Court illustrate that the bats are active only between sunset and sunrise, as the below examples illustrate –

- **Indiana Bat (*Myotis sodalis*) Draft Recovery Plan: First Revision (April 2007) (Plaintiffs' Ex. 52) at 50** – "The Indiana bat is a <u>nocturnal</u> insectivore.  It emerges shortly <u>after sunset</u> and begins feeding on a variety of insects that are captured and consumed while flying (Sparks et al. 2005b).  At two maternity colonies–one in Michigan

---

[9]   And indeed, the evidence in the record on this issue is far more straightforward and indisputable than the more complex scientific issues the Court considered in its evaluation of the Anabat data analysis.

10

and one in Illinois–Indiana bats began emerging from the roost to forage around 19 minutes after sunset, with peak emergence around 21 to 26 minutes after sunset (Viele et al. 2002).  In western Illinois, emergence averaged 21 minutes after sunset and peaked 30 to 45 minutes after sunset (Gardner et al. 1991b)." (emphasis added).

- **Relationships between Bats and Wind Turbines in Pennsylvania and West Virginia, Kerns et al. (Defendants' Ex. 45) at 106** – "Bat activity is conspicuously higher in the first two hours after sunset, and then tapers off (Figure 3-6).  We often noticed a lull in activity close to midnight, which was expected as many forest bat species are thought to seek out night-roosts after an initial bout of foraging (Kunz 1982, Kunz and Lumsden 2003, Kunz 2004).  These same species often re-emerge for additional foraging periods in the early morning hours (Erkert 1982).  We did observe higher numbers of bat passes after a midnight lull in some data sets, but the overall trend was a gradual decrease.  Insects appeared to be most active in the hours immediately after sunset, and their numbers decline steadily throughout the night (Figure 3-6)."

- **Excerpts of The Indiana Bat: Biology and Management (Plaintiffs' Ex. 57) at 189** – "Variation within the night also could result if Indiana bats actively select different prey at different times of night. However, if bats actively select certain prey before dawn, compared with after sunset, we would predict that insects high in fat, such as gravid moths (E. H. Studier pers. comm.), should be preferred before dawn.  A high-fat meal <u>prior to the l6-h fast, from dawn to dusk</u>, would provide the most energy per gram and also would yield the most metabolic water (Hill 1976), thus aiding in water balance while roosting." (emphasis added).

- **Assessing Impacts of Wind-Energy Development on Nocturnally Active Birds and Bats, Kunz et al. (Plaintiffs' Ex. 30) at 2453** – The below graph, taken from one of Dr.

11

Kunz's articles, illustrates that bat activity begins after sunset and returns to zero activity at sunrise.



Figure 4. The distribution of activity during the night for bats, birds, insects, and unknown objects recorded with thermal infrared cameras from 2030 hours to 0530 hours at the Mountaineer Wind Energy Center, Tucker County, West Virginia, USA, August 2005 (from Horn et al. 2008).

In accordance with these data, Defendants propose that turbine operations be permitted during daylight hours between April 1 and November 15, with a buffer time for start and stop times that is tied to published sunrise and sunset times for Greenbrier County, West Virginia. Specifically, Defendants submit that the injunction should be modified to allow for turbine operations between April 1 and November 15 that start fifteen minutes after published sunrise times and stop fifteen minutes prior to published sunset times on a daily basis. Defendants can also establish a reporting mechanism to allow verification by the Court and Plaintiffs for compliance with this schedule.

Such a modification of the Court's Order would avoid the judicially disfavored remedy of enjoining the "whole conduct of the defendants' business," as the current injunction does for seven and a

half months of the year. *Hartford-Empire Co.*, 323 U.S. at 410. Rather, allowing the daytime operation schedule outlined above for all turbines would do no more than is necessary to "remedy the specific ESA violation" and would bring the injunction within the narrow and appropriate legal limits of ESA injunctive relief. *Nat'l Wildlife Fed'n*, 2005 WL 3576843, at *1; *see* Part I., *supra*. Accordingly, Defendants respectfully request that the Court modify the Dec. 8 Order to allow for daytime operation between April 1 and November 15.

**IV.   THE BREADTH OF THE INJUNCTION IN THE DEC. 8 ORDER IMPOSES SUBSTANTIAL ECONOMIC HARM ON DEFENDANTS**

Defendants ask the Court to modify its Order not only because it is overbroad for the reasons given above, but because it will cause severe economic harm to Defendants. Defendants have estimated that they would suffer tens of millions of dollars in losses under the injunction, an amount that varies depending on the length of time it would reasonably take to obtain an ITP (*i.e.*, between 1 and 3 years), even with the Court's exhortation that FWS process the ITP application promptly. 2nd Groberg Decl. ¶¶ 3, 5, 10. This estimate includes lost revenues due to the inability to operate the 27 remaining turbines during the same period of the year that the 40 currently constructed turbines are free to operate under the Court's Order, as well as lost revenues from not operating the full 67 turbines during daylight hours for over seven months a year. *Id.* ¶¶ 5, 10. Projected losses reflect the fact that the REPA includes pricing differentials associated with peak demand months and times of day, as well as fixed yearly price increases. *Id.* ¶ 4.

Beyond the loss of revenues, the Order places Defendants in jeopardy of losing access to some stimulus grant funding for the Project. *Id.* ¶ 6. Beech Ridge is eligible to receive grant money in the amount of 30 percent of the capital cost of the Project, *provided* that the Project is placed in service before December 31, 2010 or, if the Project is placed in service by January 1, 2013, construction begins before the end of 2010, and a grant application is filed by October 11, 2010. *Id*. If Defendants are

unable to access the grant funds for the remaining 27 turbines, they would be required to find significant, additional sources of equity funding for the Project. *Id.*

If Defendants are unable to erect the remaining 27 turbines planned for the Beech Ridge Project, which they were contractually required to accept delivery of prior to Plaintiffs filing suit, they will also incur substantial costs related to storage or relocation of turbines (between approximately $2.2 million and $5.4 million) or on-site security for turbines (approximately $600,000 per year), as well as equipment costs associated with delaying turbine construction (up to $400,000 per month), which Defendants will begin to incur in early January 2010, when current construction activities for the 40 turbines are complete. *See id.* ¶ 7. Significantly, Defendants suffer a higher economic penalty from moving the 27 turbines down from Beech Ridge to off-site storage or another wind project than from erecting the turbines and later dismantling and moving them if required as an ITP condition. *Id.*

Given the considerable burdens and costs associated with the Court's Order, the Court should modify the injunction so that it restricts turbine operations only to the extent necessary to effectuate Congress's intent under the ESA and prevent any "take" of the Indiana bat.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request reconsideration and modification of the Court's Dec. 8, 2009 Order to eliminate unnecessary hardships to Defendants and limit prohibitions on private land development to those necessary to protect the nocturnal, hibernating Indiana bat, including permitting the erection and hibernation period operation of the remaining 27 Phase I turbines and daytime operation of all turbines between April 1 and November 15.

                    Respectfully submitted,

                    ___/s___ *Kirsten L. Nathanson*
Kirsten L. Nathanson (D. Md. Bar No. 14236)
Steven P. Quarles (admitted *pro hac vice*)
J. Michael Klise (D. Md. Bar No. 29075)
Thomas R. Lundquist (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116
knathanson@crowell.com

Dated:  December 22, 2009         Attorneys for Defendants Beech Ridge Energy LLC and Invenergy Wind LLC