1                  UNITED STATES DISTRICT COURT FOR
                      THE DISTRICT OF MARYLAND
2

3
     --------------------------x
4  ANIMAL WELFARE INSTITUTE,   :
   Et al,                      :
5                Plaintiff     :
                               :
6                              :
   vs                         :Civil Action: RWT-09-1519
7                              :
                               :
8  BEECH RIDGE ENERGY, LLC,    :
   et al,                      :
9                Defendant.    :
   --------------------------x
10

11                            Wednesday, October 21, 2009
                              Greenbelt, Maryland
12

13        The above-entitled action came on for a Bench
   Trial Proceeding before the HONORABLE ROGER W. TITUS,
14 United States District Judge, in courtroom 2C, beginning
   at 9:11 a.m.
15

16        APPEARANCES:

17        On behalf of the Plaintiff:

18        ERIC GLITZENSTEIN, Esquire
          WILLIAM EUBANKS, Esquire
19        WILLIAM MEYERS, Esquire

20
          On behalf of the Defendant:
21
          CLIFFORD ZATZ, Esquire
22        KIRSTEN NATHANSON, Esquire
          JESSICA HALL, Esquire
23

24 Tracy Rae Dunlap, RPR, CRR              (301) 344-3912
   Official Court Reporter
25
                          I N D E X

1
                           Dir  Cross    Redir     Recross
2
  Michael Gannon          35   110      140
3
  Lynn Robbins            145  218      235       240
4
  Gary Libby              242
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
                                                 <u>Page</u>

24  Reporter's Certificate                       243

25

1        THE CLERK:  The matter now pending before this

2 court is civil docket number RWT-09-1519, Animal Welfare

3 Institute, et al versus Beech Ridge Energy, LLC, et al.

4 We're here for the purpose of a bench  trial.

5        Counsel, would you please identify yourselves for

6 the record?

7        MR. GLITZENSTEIN:  Good morning, Your Honor, Eric

8 Glitzenstein on behalf of the plaintiffs.

9        MR. EUBANKS:  Good morning, Your Honor, William

10 Eubanks on behalf of the plaintiffs.

11        MR. MEYER:  William Meyer on behalf of the

12 plaintiffs.

13        MS. SINNOTT:  Michele Sinnott.  I'm just here to

14 do tech.

15        MR. ZATZ:  Good morning, Your Honor, Clifford Zatz

16 for the defendants.

17        MS. NATHANSON:  Good morning, Your Honor, Kirsten

18 Nathanson on behalf of the defendants.

19        MS. HALL:  Good morning, Your Honor, Jessica Hall

20 on behalf of the defendants.

21        THE COURT:  All right.  I have received a number

22 of things in the last few days.  I have your stipulation,

23 your joint stipulation.  I did indicate my approval of

24 your suggestion on how to proceed with opening

25 statements.  And the only preliminary issue I wanted to

1  make sure I brought to your attention is I have meetings

2  at 1 o'clock, both today and tomorrow, of judges of this

3  court that I need to attend.  So, we will be breaking for

4  lunch right before 1:00 each day.  But I intend to go

5  right straight through to 5:00.  And we are on a

6  three-day timetable, so take that into account when you

7  present your cases.

8           Are you ready to proceed?

9           MR. GLITZENSTEIN:  Yes, Your Honor.

10          THE COURT:  All right.  Proceed.

11          MR. GLITZENSTEIN:  Good morning, Your Honor.  We

12  appreciate the opportunity to present our case.  The

13  parties have been busy over the last couple of weeks and,

14  I think, as a consequence of that, we've been able, as

15  the stipulated facts we presented to the court reflect,

16  been able to at least distill down what the nature of the

17  dispute in this case is, both as a legal matter and as a

18  factual matter.

19          No one disputes that many thousands of bats will

20  be killed by the Beech Ridge Wind Project.  In fact,

21  defendants' own environmental consultant predicted that

22  over 130,000 bats would be killed by the project.  And in

23  fact, no one appears --

24          THE COURT:  Is that for the life of the project?

25          MR. GLITZENSTEIN:  That is over the course of a

1 20-year time frame, Your Honor, which is the -- the

2 parties have stipulated that's the minimum life of the

3 project.  In fact, there's evidence to indicate that

4 there is no reason to think that the project will only

5 last 20 years.  And the evidence that we've seen suggests

6 that it actually will last longer, and considerably

7 longer than that.  But their estimate was based upon a

8 20-year life span.

9        And there does not appear to be any dispute that

10 other bat species that reside in the area of the project,

11 including other what are referred to Myotis species,

12 which are the same taxonomic group as the Indiana bats,

13 will in fact be killed, and in large numbers, because

14 that's what's happened at other Appalachian mountain

15 ridge projects.

16        There is no dispute that Indiana bats reside in

17 close proximity to the project.  In fact, it appears that

18 there is no dispute that when this project is operating,

19 it will be the closest operating plant wind project to

20 Indiana bats in hibernacula anywhere in the country, at

21 least of any substantial size as these particular

22 hibernacula are.  So, the question comes down to, in this

23 particular case, is there some reason to think that

24 Indiana bats will escape the fate that everyone agrees

25 will be visited in large numbers on other bat species

1  that exist and migrate through the project area.

2          And the position of the defendants, as far as we

3  can discern, is, let's roll the dice and see what

4  happens, even though the highest mortality at other wind

5  projects on the east coast and Appalachian ridges has

6  been in the full migration season -- no dispute about

7  that -- and that the defendants studiously refused this

8  Fish and Wildlife Services request to do full migration

9  surveys.  And there's a stipulation that we now have that

10  no fall migration survey was ever done, even though

11  that's the highest mortality risk for all bat species,

12  including Indiana bats.

13          What I'd like to do, Your Honor, with the court's

14  permission, is, first, reframe the legal context for

15  this, because I think it's helpful to put some of these

16  facts within that context, and then return to what we

17  believe are the most compelling pieces of evidence that

18  will be presented.

19          We believe that the "rolling the dice" approach to

20  the Endangered Species Act is clearly not in keeping with

21  what Congress had in mind when it passed the statute.

22  The Indiana bat, everyone agrees, is listed as an

23  endangered species, which is defined by the ESA as a

24  species that is in danger of extinction throughout all or

25  a significant portion of its range.  And the ESA was

1 passed to protect species precisely like this one, in

2 light of Congress' judgment that all species listed as

3 "endangered" are of aesthetic, ecological, educational,

4 historic, recreational, and scientific value to the

5 nation and to the people.

6          And so although it may seem odd to some that a

7 quarter of an ounce bat, which is what the Indiana bat

8 is, could pose a potential obstacle to the construction

9 of a massive project.  As the Supreme Court made clear in

10 its landmark decision, TVA versus Hill, that is a

11 judgment that Congress has made, and it's a judgment that

12 Congress -- that should be respected until and unless

13 Congress sees fit to alter that judgment.  And the Court,

14 in TVA versus Hill, stressed that there is a national

15 policy of institutionalized caution in dealing with

16 listed species, and that such species are to be accorded

17 a high, if not the highest, priority in cases such as

18 this.

19          Under the Citizen's Suit provision of the

20 Endangered Species Act, which is Section 11(g).  If we

21 could take a look at that.  Any person may commence a

22 civil suit to enjoin any person who is alleged to be in

23 violation of any provision of this chapter or regulation

24 issued thereunder.  That provision vests exclusive

25 jurisdiction in federal district courts.  And in Bennett

1  versus Spear, which we cite in the brief, *520 U.S. 154*,

2  of course we must still satisfy Article 3 standing, but

3  the parties have now stipulated that the defendants are

4  making no challenge to plaintiff's standing as to whether

5  plaintiffs have the sufficient kinds of concrete interest

6  to bring this case.

7         So, therefore, we're operating under a citizen's

8  suit provision which the Supreme Court in Bennett itself

9  described as an authorization of remarkable breadth when

10  compared with the language that Congress ordinarily uses,

11  and is a reflection of the obvious purpose of Congress;

12  the Court's language to encourage enforcement of the

13  statute by private attorneys general.

14         And the Court actually observed in that case,

15  Bennett, that this expansive citizen's suit provision is

16  even broader than exists in other environmental statutes

17  including, notably, the Clean Water Act, a statute which

18  defendants refer to by analogy in the last brief that

19  they filed.

20         Section 9(A)(1)(b) of the statute -- take a look

21  at that, Your Honor -- makes it unlawful for any person

22  to "take" any member of a listed species within the

23  United States.  Actually, one technical question.  Is

24  there some way -- I don't have the stuff that's coming up

25  on that screen on this computer.  Can I --

1          THE COURT:  Wait a minute.  Do you have it now?

2          MR. GLITZENSTEIN:  Hopefully it will come up.

3 I'll keep going, Your Honor.  Sorry for that

4 interruption.  Section 9(A)(1)(b) provides that it is

5 unlawful for any person to take any member of an

6 endangered species.  And the definitional section,

7 Section 3, defines "take" to mean to harass, harm,

8 pursue, shoot, wound, kill, trap, capture, or collect, or

9 attempt to engage in any such conduct.

10          Babbitt versus Sweet Home Chapter of Communities

11 for Greater Oregon, which we cite in the brief and is

12 discussed by the parties, 515 U.S. 687.  Over at Page 704

13 through 705 of that decision, which we're highlighting,

14 specifically refers to Congress' objective to create as

15 broad a definition of "take" as possible, and refers to

16 legislative history, which specifically both the Senate

17 and the House Report define "take" as -- the language

18 specifically is, tend to take to apply broadly to cover

19 every indirect, as well as purposeful actions.  The

20 Senate reports stress that "take" is defined in the

21 broadest possible manner to include every conceivable way

22 in which a person can take or attempt to take any fish or

23 wildlife.

24          A similar approach in the House, and even goes on

25 to suggest that "take" even encompasses a situation where

1 people may be bird watching and, through no intention,

2 but happen to harass birds into leaving a particular

3 area.

4 So the definition of "take," as described by the Supreme

5 Court in Sweet Home was extremely broad.

6         This, of course, does not mean that you cannot

7 proceed with an action that may take in some fashion

8 endangered or threatened species.  And in fact, Section

9 10 of the Endangered Species Act creates a specific

10 process for authorizing incidental take under particular

11 circumstances.  And it is true, as defendants point out,

12 that there is no independent obligation to obtain an

13 incidental take permit for an action that will not have a

14 significant risk of taking a species.  But, it is also

15 the case that if a party wants to proceed with an

16 activity that requires an ITP, an Incidental Take Permit,

17 it must get one before that action proceeds.

18         And if you take a look at 50 C.F.R., Section 13.1.

19 If we could take a look at the language of that, it

20 states that, "a person must obtain a valid permit before

21 commencing an activity for which a permit is required."

22 Accordingly, the Court could, as relief in this case, not

23 only enjoin this action until an ITP is obtained, but, as

24 other courts have done Your Honor, the Court could in

25 fact order the defendant simply to initiate the

1   Incidental Take Permit process.  And in a case that we

2   cite, <u>Strahan versus Cox</u>, *127 F. 3d, 155*, from the First

3   Circuit is one case that did exactly that.

4          Tellingly, Your Honor, it is now undisputed that a

5   number of wind power projects are in fact pursuing

6   Incidental Take Permits at various stages, including to

7   obtain incidental take authorization for the Indiana bat

8   specifically.  In fact, defendant's own witness, the

9   project manager, has acknowledged that Invenergy, the

10  defendant in this case, is considering pursuing an

11  incidental take project for another project it's pursuing

12  in Indiana bat habitat.  So, this is not an impossible

13  process.  It's a process that other wind projects are

14  pursuing.

15         And another, I think, crucial fact to keep in mind

16  as we go through this case is that dozens of other

17  projects -- not wind projects, but other ones, that are

18  taking place in Indiana bat habitat are also, and have

19  received incidental take authorization.  And we cite in

20  our brief 72 Fed Reg 57953, natural gas pipelines,

21  highway construction, coal mining, and a host of other

22  projects have gone through the process, have received

23  incidental take authorization, albeit with terms and

24  conditions that are enforceable that are designed to

25  protect the species; and, we respectfully submit that is

1 the process that Congress contemplated would be used for

2 situations like this one.

3       All we're fundamentally asking in this case is

4 that this company be treated in essentially the same way

5 as a coal company, natural gas pipelines and, indeed,

6 other wind projects that have seen fit to pursue

7 precisely that process.

8       Your Honor, in our brief, we refer to another

9 provision of the act -- I won't spend a lot of time on it

10 now -- and it's Section 7(D) of the statute which we

11 believe calls to the court's attention to why you should

12 not allow this massive project to proceed under these

13 circumstances.  It reflects Congress' intent that there

14 not be what's called an "irreversible or irretrievable

15 commitment of resources" before the congressionally

16 authorized project unfolds.  We think that actually

17 applies here as well.

18       Now, in light of this legal frame work, defendants

19 argue, among other things, that we cannot bring a case to

20 stop what they refer to as a "future violation of the

21 act."  They cite no Endangered Species Act principle on

22 case for that proposition, which is an odd one to say the

23 least in light of the protective scheme that Congress

24 adopted.  And it's impossible to reconcile with TVA

25 versus Hill I mentioned a moment ago which is in fact the

1   seminal Supreme Court decision which involved a wholly

2   future violation of the act.

3        In that case, the Supreme Court said that it was

4   necessary to enjoin the completion of a dam which, when

5   completed, would harm a listed fish species, and that is

6   exactly the kind of argument that is being made here.

7   And, again, as a consequence of the ESA precedence and

8   purpose, defendants are forced to rely upon Clean Water

9   Act precedence which, even if accurate, bear not in the

10  least, we would respectfully submit, on the frame work

11  that applies in Endangered Species Act context.

12       But the reality is that the Clean Water Act cases

13  that they've cited actually stand for the opposite

14  proposition than the one that is cited in our brief.

15  What they say at Page 2 of their pretrial brief, which is

16  Defendant's -- excuse me, docket entry Number 48 at the

17  bottom of Page 2.  Their quote is, if we look at that:

18  "Under Supreme Court and Fourth Circuit precedent

19  construing the identical language in the Clean Water Act

20  citizen's suit provision, there is no jurisdiction over

21  claims of wholly future violations."

22       Well, as the Supreme Court has made clear in

23  Bennett, in fact, the ESA citizen's suit provision is

24  more expansive than any other, even in environmental law.

25  And in this case we also have assertions of past

1 violations, including cutting habitat during times that

2 we believe Indiana bats were present on the site.

3        But even if they were correct in that

4 characterization of the facts of this case, if we could

5 take a look at the leading Supreme Court case they cite,

6 Gwaultney of Smithfield versus Chesapeake Bay Foundation,

7 which is referred to in the briefs, and take a look at

8 Page 52, the very beginning of that decision, what Your

9 Honor will see is that the case actually stands for I'm

10 not, I don't think, overstating this -- exactly opposite

11 proposition from the one the defendants cited it for.

12        What the Supreme Court says at the beginning of

13 that decision is that the issue in the case is not

14 whether you could bring a Clean Water Act case for a

15 future violation but, rather, "whether we" -- the court

16 -- we must decide whether Section 505(A) of the Clean

17 Water Act confers federal jurisdiction over citizen suits

18 for wholly past violations.  That's what that case was

19 about.

20        In fact, the court goes on to say elsewhere in the

21 decision -- and we could revisit this in the closing

22 argument at any point the court would like.  It goes on

23 to say, the point of the citizens suit provision is to be

24 forward looking and specifically frames the issue, even

25 in the Clean Water Act context as whether account "there

1  is a likelihood of future violations" of the Clean Water

2  Act.  And so it's actually a bit astonishing to me that

3  the defendants could cite that case for the proposition

4  that we are somehow foreclosed by that line of authority.

5       And Your Honor, another case that they cite is a

6  Fourth Circuit case, which is <u>American Canoe Association</u>

7  <u>versus Murphy Farms</u>, which they cite for the same

8  proposition that we cannot bring a case because of future

9  violations.  This is *412 F. 3d 5367,* another Clean Water

10 Act case.  And the Fourth Circuit specifically says in

11 that case that citizen plaintiffs may accomplish the goal

12 of bringing a citizens suit case, including by adducing

13 evidence from which a reasonable trier of fact could find

14 a continuing likelihood of a recurrence in intermittent

15 or sporadic violations.  And it goes on to explain how

16 the whole purpose of a citizen suit provision is in fact

17 to prevent the damage to the interest at stake before it

18 occurs.  And so I respectfully submit that these cases

19 have not been accurately cited to the court.  And I think

20 the reason that that happens is because there is really

21 no precedent which suggests that we cannot bring a case

22 under these circumstances.

23      Your Honor, in terms of the ESA precedent.  They

24 cannot -- I think this is a fair statement.  They cannot

25 cite a single Endangered Species Act case under Section 9

1  of the ESA in which the court found as a factual matter

2  that a take of a listed species was likely to occur as a

3  result of the action under scrutiny, and yet then went

4  ahead and said we could not enjoin that project from

5  taking place.  And as a consequence --

6          THE COURT:  Wouldn't that be inconsistent with --

7  to argue that to in effect require a dead bat in front of

8  me with the language of the definition of "take," which

9  ends by saying, "or attempts to engage in any such

10  conduct?"

11          MR. GLITZENSTEIN:  Yes, sir --

12          THE COURT:  That doesn't require a dead bat.  That

13  requires somebody to do bad things to a bat; right?

14          MR. GLITZENSTEIN:  I think it certainly signifies

15  the overall congressional intent to preempt the bad thing

16  from happening.  And I think it's also reenforced not

17  only by the citizens suit provision but by the whole

18  scheme that Congress erected in which the Fish and

19  Wildlife Service would authorize conduct before it

20  occurs.  So I think Your Honor is absolutely correct.  In

21  fact, there are a number of indications in the statutory

22  scheme, as well as the case law, as to why we don't wait

23  for the dead bat.

24          Your Honor, if I could just take a moment to --

25  the defendants even say that even if we had a dead bat

1  that wouldn't be sufficient because we wouldn't

2  necessarily know that the dead bat was killed by the

3  turbine.  It might have been planted, I guess they say,

4  by plaintiffs.  Or it might have just died somewhere else

5  and happened to make its way to the turbine site.  The

6  only reason I bring that is up is because we respectfully

7  submit that they're erecting not only a high, but an

8  irrationally high standard in a protective scheme like

9  this one.

10        And I also respectfully submit, Your Honor, that

11  the reason why they have to do that that is because as

12  discovery has taken place in this case, plaintiff's case,

13  which we believe was strong at the outset, has become

14  even stronger.  We have not only testimony from three of

15  the leading bat, and particularly bat and wind power

16  experts in the country, but we also have evidence which

17  has emerged that was kept suppressed for years indicating

18  the presence of Indiana bats on the site itself.

19        And you will hear testimony, for example, from Dr.

20  Kunz, who everyone will acknowledge, even their own

21  witnesses, is one of the leading bat researchers in the

22  country, if not the world, and who the Fish and Wildlife

23  Service itself told Invenergy to read his research in

24  deciding how to go forward with this project.  And he

25  will be in the courtroom tomorrow to provide his live

1  testimony which, I think, will be illuminating.

2          We have also testimony from Craig Stihler, who is

3  the leading bat biologist in the state of West Virginia,

4  everybody agrees, by video deposition, where he predicts

5  many Indiana bats will be killed as a result of this

6  project.

7          And we have testimony, fortuitously, from two

8  other leading bat experts here today, Dr. Michael Gannon

9  from Penn State, Dr. Lynn Robbins, both of whom are -- I

10 say fortuitously leading experts on analyzing acoustic

11 data.  And the reason it's fortuitous is because up until

12 this case was filed and indeed discovery started, nobody

13 had any idea that there was any acoustic data on the

14 site.

15         We were told -- if we can take a look at Russ

16 Romme's declaration which was submitted along with

17 defendant's opening brief in this case.  Defendant's

18 Exhibit 5, Page 6, Paragraph 11.  Mr. Romme specifically

19 made the representation -- if I can get it before me.

20 Unfortunately, I still don't have it on the computer,

21 Your Honor.  Specifically made the recommendation at the

22 bottom of Page 5, Paragraph 11.  The Fish and Wildlife

23 Service indicated that these studies were not warranted.

24 This is referring to acoustic data.

25         Based upon this input from the Fish and Wildlife

1 Service, acoustic studies were not completed.  That was

2 stated in a sworn declaration to the court.  Based upon

3 that, plaintiffs could have opted not to make any

4 discovery requests relating to acoustic data and simply

5 accepted that representation.

6        As luck would have it, out of an abundance of

7 caution, we asked for any acoustic data that was

8 requested.  That's when we learned and when everyone

9 learned, including the federal government, which had been

10 asking for acoustic data for years about this project;

11 including the state, which had been asking about this

12 data.  The Public Service Commission didn't know about it

13 of West Virginia.  That's when we learned for the first

14 time that there was information called AnaBat data

15 collected on the site.  Sat in the files of the

16 environmental consultant for four years.  They say they

17 never analyzed it until this case was filed and they

18 produced it to us, and finally analyzed it four days

19 before the first deposition took place.

20        I respectfully submit, under those circumstances,

21 they cannot be given much credibility, if any, about what

22 that data reflects.  But we -- as happenstance has it, we

23 now have two experts who have had years of experience of

24 analyzing AnaBat data.  And in fact, they're the only

25 experts who will testify in this case who have actually

1 analyzed this particular data.  They may try to attack

2 what they have to say, but they're the only ones

3 testifying live who have done that.  And they both say,

4 using their own methods, which have been accepted not

5 only in the scientific profession, but by federal and

6 state officials, that they have a high probability of

7 showing Indiana bat presence on the project site.  And

8 not only on the project site, at the very place where

9 turbines are being erected Your Honor.

10        So, we think that's obviously an extraordinary

11 revelation which, frankly, we think makes this an open

12 and shut case.  Because if they had actually done --

13 found a bat on the site through whatever technique that

14 they were using at the time, there seems to be a general

15 concession that they would have stopped at that point and

16 pursued an Incidental Take Permit.  So, since we have

17 evidence that was basically not provided to anyone for

18 years, showing essentially the same thing, it's difficult

19 to comprehend why we should not have the same result in

20 light of what we believe is compelling evidence of

21 Indiana bat presence on the very site itself.

22        Now, the last thing, Your Honor, with the Court's

23 permission I would refer to is what Your Honor just

24 brought up, which is this question about whether or not

25 we have a dead bat.  And they keep harping on the fact

1 that while there's never been a dead bat -- a bat killed

2 at another wind power project.  Well, this happens to be

3 the largest one near an Indiana bat hibernaculum that

4 will ever be killed.  So, the predictive question is not

5 necessarily the right one.  But, even if it were, they're

6 wrong.

7        If we take a look at Plaintiff's Exhibit 112,

8 which is a letter that the Fish and Wildlife Service sent

9 relating to another wind power project, the Mountaineer

10 Project, a smaller one, which everyone agrees is in close

11 proximity, relatively speaking, to this one, and that

12 their own consultant relied upon to make the mortality

13 prediction.  Over at Page 2 of that document, the Fish

14 and Wildlife Service said the following:  There is

15 currently no monitoring at the Mountaineer -- Your Honor,

16 for the record, this is Plaintiff's Exhibit 112 -- that

17 was available for the few months that monitoring did

18 occur, indicated the common bat species were colliding

19 with the turbines at a high rate, particularly during the

20 fall migration period.  It is impossible to make a

21 conclusion that turbines do not kill federally listed

22 bats based on one short season of monitoring. In fact,

23 the number of bats killed there at Mountaineer shows a

24 high likelihood that endangered bats are also likely to

25 be killed.  So, that's the federal agency saying that.

1          And now, of course, we have, as Your Honor will

2  hear about, so I won't go into it too much now.  We did a

3  third party subpoena to the company that runs

4  Mountaineer.  And, sure enough, there is a mortality

5  report for something that was identified as an Indiana

6  bat at the Mountaineer facility that no one knew about

7  before this case.

8          Now, of course, we have defendants coming in and

9  saying, oh, we can't trust that because apparently they

10 don't know how to do bat reporting at Mountaineer.  Well,

11 we have responses to that.  But if that's true, how are

12 they relying upon the fact that there was no dead bat --

13 Indiana bat presented over the course of this time?

14         We respectfully submit their position at the end

15 of the day doesn't jibe with the facts.  It doesn't jibe

16 with the law.  It's certainly not the protective scheme

17 that the Endangered Species Act is all about.  And so we

18 will ask the court, at the end of the day, to adopt what

19 we think is modest relief in this case, which is simply

20 saying go through the same process that all the other

21 wind power companies that are seeing Indiana bat presence

22 on the site are going through, and don't build your

23 project until you've gone through that congressionally

24 mandated process.  Thank you, Your Honor.

25         THE COURT:  Thank you.  While you're getting that

1  set up.  Does either party wish to have the rule on

2  witnesses invoked in this case so as to exclude witnesses

3  except when they're testifying?

4        MR. ZATZ:  Your Honor, we have agreed that the

5  expert witnesses will not be sequestered.  We do have one

6  fact witness on our side who has been sequestered by

7  agreement, and one who is not in town yet.

8        THE COURT:  Okay.  All right.

9        MR. ZATZ:  May it, please, the court.  Counsel,

10  good morning.  Your Honor, this is a case about an

11  untested hypothesis, and it asks the question whether an

12  injunction proceeding is the place to test that

13  hypothesis.  A $300 million environmentally responsible,

14  clean, renewable energy project waiting to serve 50,000

15  customers is in limbo over a rare bat that no one has

16  ever seen on the project site.

17        The plaintiffs offer the court hypothesis,

18  predictions, extrapolations, presumptions, speculation,

19  novel detection, and statistical analysis techniques,

20  everything but the endangered species itself.  This is

21  not a case, Your Honor, about the presence of the Indiana

22  bat on the Invenergy/Beech Ridge site.  It's a case about

23  how to interpret the absence of the Indiana bat from the

24  site.

25        It's an unprecedented effort to reverse the burden

1  of proof under the Endangered Species Act.  It's an
2  unprecedented effort to establish a take when even the
3  very presence of the endangered species has not been
4  confirmed on the site, and we submit that there is no
5  case like that anywhere in the federal courts that has
6  been upheld on appeal.

7         Even if the bat were present, Your Honor, that
8  would not be a violation of the Endangered Species Act.
9  There has been no past take of the Indiana bat.  There is
10 no current take of the Indiana bat.  There is no
11 continuing take of the Indiana bat.  This is not about an
12 attempt to take the Indiana bat.  No Indiana bat has been
13 killed on this site.  No Indiana bat has been injured on
14 this site.

15        Our expert evidence will show that presence alone,
16 even if there were present, is not a reliable predictor
17 of death or injury for this species.  The evidence will
18 show that proximity to the project area is not a reliable
19 predictor of mortality for this species.  So what the
20 plaintiffs want to do, Your Honor, is to enjoin something
21 that is not imminent, something that is not reasonably
22 certain to occur, and something that has not occurred at
23 any other wind project.

24        A couple of legal principles should guide the
25 Court's evaluation of the plaintiff's evidence.  First,

1 the burden of proof here is entirely on the plaintiffs.

2 Defendants are not required to prove the negative.

3 That's not good law, and you will hear that it's not good

4 science.

5         Since this is an injunction proceeding, the

6 plaintiffs must prove a definitive threat of irreparable

7 harm.  And even granting Mr. Glitzenstein his view of the

8 burden of proof here, they certainly must establish at

9 least a reasonable certainty of a take of an endangered

10 species, and that take means to actually kill or injure

11 the species.  There is no basis in the law, Your Honor,

12 to presume the presence or the take of the species.  And

13 you will hear from the plaintiff's experts that's

14 precisely what they are doing in the absence of data, and

15 precisely what they want this court to do.

16         The second legal principle, Your Honor, is the

17 adequacy of BHE's environmental surveys is not the issue

18 in this case.  Now, you will hear the plaintiff's experts

19 turn this into a referendum on BHE's competence, the

20 thoroughness of its work, and even its ethics.  But there

21 is, in this lawsuit, no claim of inadequate survey.  It's

22 not a negligence case.  There is no legal duty to conduct

23 a survey; none is required by the Endangered Species Act.

24 There is no legal standard by which to evaluate the

25 consultant's survey, and we will in fact object and

1 request from the Court a continuing objection to all of

2 evidence addressing the adequacy of BHE's work at the

3 Beech Ridge site.

4          Finally, Your Honor, it's important to understand

5 that if there is a take in the future, plaintiffs are not

6 without a remedy.  Everyone agrees that if there is an

7 actual mortality of an Indiana bat on this site, that

8 would be a violation of the Endangered Species Act and

9 remedies will be available at that time.  Right now

10 though our debate is about whether that will occur

11 sometime in the future, whether there's sufficient

12 scientific data to prove that that will happen sometime

13 in the future, and how we answer from both the scientific

14 and legal perspective the question:  Will that take

15 occur, and should it be enjoined?

16          You will hear, Your Honor, from David Groberg, who

17 is the vice president for development at Invenergy and

18 project manager for this site.  Invenergy is the fifth

19 largest wind power provider in the country.  It operates

20 12 wind power sites that look like these.  These are

21 Invenergy sites elsewhere.  It shows this site very

22 carefully, Your Honor.  Mr. Groberg will tell you about

23 the many favorable features of this site, including from

24 an environmental perspective.  It's entirely on private

25 land.  It was approved for siting by the West Virginia

1 Public Service Commission in August of 2006.  Invenergy

2 satisfied all of the requirements of the Public Service

3 Commission.

4        The United States Fish and Wildlife Service did

5 not challenge the granting of the siting certificate.  It

6 did not contend in the West Virginia Public Service

7 Commission that additional surveys or better surveys or

8 more thorough surveys or acoustic detection surveys were

9 required.  Since then, however, Your Honor, this site has

10 undergone four years of challenge from citizens, and the

11 challenges have run the gamut from complaints about noise

12 to complaints about the view; complaints about historical

13 and archeological issues.  There have been many days of

14 public hearings.  There have been several orders by the

15 West Virginia Public Service Commission.  There have been

16 several motions for reconsideration.  And, there have

17 been two trips to the West Virginia Supreme Court.  Now

18 we're here about the bat.

19        In addition to Mr. Groberg, Your Honor, you will

20 hear from four witnesses.  Mr. Russ Romme, of BHE

21 Environmental, who prepared the risk assessment for this

22 site and led the survey effort.  Mr. Romme is a veteran

23 of work at 15 to 20 wind projects and has done more than

24 100 surveys for Indiana bats.

25        You will hear from Dr. Michael Lacki, professor of

1 forestry and wildlife ecology at the University of

2 Kentucky.  Dr. Lacki is President-elect of the

3 Southeastern Bat Diversity Network, an organization

4 devoted to the conservation of bats.  He's an expert and

5 the leading author on the behavior and habitat of forest

6 bats.

7         You will hear from Dr. Karen Tyrell, PhD,

8 biologist, from BHE Environmental, who is an expert on

9 the impact of wind power projects on bats and is a member

10 of the United States Fish and Wildlife Service Indiana

11 Bat Recovery Team.

12        And finally, Your Honor, you will hear from Ms.

13 Brooke Slack, who actually conducted mist-net surveying

14 for BHE Environmental, and is today the leading bat

15 biologist for the Commonwealth of Kentucky.

16        What you will hear from our evidence, Your Honor,

17 is that there's a very low likelihood even of the

18 presence of the Indiana bat at this site.  There is no

19 evidence of presence to date.  There is a limited

20 population.  We are on the fringe of the geographical

21 region of this rare species.  The only critical habitat

22 of the Indiana bat in West Virginia is 75 miles from this

23 site.

24        You will hear that much of this site is unsuitable

25 habitat for the Indiana bat.  It's not a good place for

1  foraging.  That is, looking for food.  It has a shortage

2  of water.  It has a shortage of food.  It is less than an

3  optimal place for roosting, which is what my teenager

4  does these days.  I think they call it "hanging out."

5  It's a site with a great deal of prior degradation.

6         This is not a pristine environment for the Indiana

7  bat to begin with, Your Honor, and it has not been for a

8  long time.  It's a site where there's been a great deal

9  of timber harvesting, clear cutting of forest, strip

10  mining.  And it's at an elevation unsuitable for

11  maternity colonies, which are perhaps the most important

12  issue in addressing the risk to the Indiana bat.

13         It's unknown -- there is very little data except

14  on individual bats whether this is a common migration

15  route for the Indiana bat.  There are landscape features

16  and obstacles to the migration of the Indiana bat through

17  this territory.  There are risks and barriers.  And we

18  will hear that Indiana bats are more likely to follow the

19  path of least resistance through this area, particularly

20  as between Snedegars [ph.] Cave, which has the largest

21  population of bats in this area.  And you're looking here

22  in this view Your Honor from the D Line of turbines,

23  which is the closest to Snedegars Cave, and you're

24  looking toward the cave.

25         Finally, Your Honor, the much maligned mist-net

1 surveys found no Indiana bats.  Those mist-net surveys

2 complied with the prevailing guidelines of the time.

3 They were performed with the agreement of the United

4 States Fish and Wildlife Service.  You will hear that

5 there was much more correspondence, much more

6 cooperation, much more communication with the Fish and

7 Wildlife Service than the three form letters the

8 plaintiffs referred to.

9        Most importantly, Your Honor, the mist-net surveys

10 caught bats.  The mist-net surveys caught lots of bats.

11 The survey in the summer of 2005 caught 78 bats of six

12 different species.  The survey of the transmission line

13 in 2006 caught 42 bats of five species.  And you will

14 hear Ms. Slack testify that she has captured Indiana bats

15 with these mist-net surveys, but she has never caught one

16 in West Virginia.

17        That's presence, Your Honor.  But the real legal

18 issue here is take.  And the evidence will also show a

19 very low likelihood of take.  This will -- is considered

20 a low risk site by our experts.  You'll hear that

21 presence alone in the area does not equate it with

22 mortality and is, indeed, not a very good predictor of

23 mortality for this particular species.  You will hear

24 that there is no history of mortality of the Indiana bat

25 at wind farms.  And in particular, you'll hear that the

1 Indiana bat is unlikely to be foraging in the physical

2 space of the rotors at this wind farm.

3        The plaintiff's evidence, Your Honor, does not

4 establish any imminent take.  The AnaBat data, the

5 acoustical detection survey, is a subject of considerable

6 scientific debate, and you'll hear this scientific debate

7 in this courtroom.  It is essentially,  in a layman's

8 term, a voiceprint system.  You will hear that it's not

9 used by anyone as the sole evidence of the presence of

10 any particular bat species, and you'll hear that it's

11 particularly difficult to distinguish this bat species

12 from others by AnaBat.

13        You'll also here hear that with what's known as

14 the Britzke Filter, the most common way of filtering out

15 other background noises and other bat calls, both sides

16 found no Indiana bats from the data here.

17        You'll also hear, by the way, Your Honor, that

18 data was not suppressed.  It was not authorized.  It was

19 not part of the agreed upon surveyed protocol.  It was

20 put in a file, and we didn't find it until discovery, but

21 there were no malicious motives there Your Honor.

22        The Mountaineer report you've just heard of.

23 Rather incomplete explanation of.  Mountaineer incident

24 report, the so-called dead bat at the Mountaineer site,

25 was a report of a fork truck operator.  He is not a

1  biologist; he has no training whatsoever in biology.  He
2  has no training in the identification of bats.  He sent
3  his report up the ladder within his organization and got
4  the response that this is probably not an Indiana bat.
5  You'll hear the experts say that on the photograph to
6  use, the distinguishing fake features of the Indiana bat,
7  are not even present.

8          Finally, Your Honor, this extrapolation from Mr.
9  Stihler of the West Virginia West Virginia Division of
10 Natural Resources is an undisclosed expert opinion that
11 we will object to.  But having said that, it is not site
12 specific.  It makes assumptions that are not borne out by
13 data.  It assumes a ratio of Indiana bats to other Myotis
14 bats that appears to actually be zero at this particular
15 site, and it simply is not borne out by any real world
16 data.  It contradicts the actual experience at wind
17 farms.

18          The better solution to this controversy Your Honor
19 is what's called Adaptive Management.  Mr. Glitzenstein
20 calls that "let's roll the dice."  It's actually much
21 more than that.  Experts on both sides agree that
22 Adaptive Management is a valuable technique for assessing
23 and reacting to any mortality that occurs in the future.
24 It is a condition of Invenergy's siting certificate from
25 the West Virginia Public Service Commission.  It will

1  happen.   It will entail three years of post-construction

2  monitoring.   It will include a technical advisory

3  commission with -- technical advisory committee with

4  participation from the Public Service Commission, the

5  Division of Natural Resource, the Fish and Wildlife

6  Service, and environmental groups.

7          Your Honor, the status quo here is that there's no

8  risk to these bats today.   They are in the seasonal cycle

9  called "swarming."   They are likely to be outside their

10 caves getting ready to hibernate for the winter.   There

11 is no possible threat to them from this site until next

12 spring.   There is no reliable scientific data

13 establishing that they are at any risk of imminent harm,

14 and we believe that an injunction is not the way to test

15 the plaintiff's untested hypothesis that they will be

16 taken at this site.   Thank you, Your Honor.

17         THE COURT:  Thank you very much.   All right.   Who

18 is your first witness?

19         MR. GLITZENSTEIN:  Call Dr. Michael Gannon, Your

20 Honor.

21         THE COURT:  All right.

22         THE CLERK:  You can just step up here, please, and

23 raise your right hand for me.

24             (Witness sworn at 9:56 a.m.)

25         THE CLERK:  I need you to state your name for the

1  record.

2      THE WITNESS:  Michael Gannon.

3      MR. GLITZENSTEIN:  Your Honor, while we're waiting

4  for the screen to work, I just wanted to raise two

5  preliminary points that might make the whole process a

6  little more efficient.  One is that, as Your Honor has

7  probably seen, we've stipulated to the vast majority of

8  each other's exhibits.  What we would propose -- I don't

9  know how Your Honor ordinarily wants to do this -- is

10  that obviously when we're going through exhibits, we will

11  indicate whether they've been stipulated to and that, you

12  know, at the end of the case we would then move the

13  admission of all the stipulated exhibits that we refer

14  to.

15      THE COURT:  Under our rules, once you refer to an

16  exhibit without objection, it's admitted.

17      MR. GLITZENSTEIN:  Okay.

18      THE COURT:  Makes it very swift and easy to get

19  things slipped into evidence if you're not watching

20  carefully.

21      MR. GLITZENSTEIN:  That sounds good, Your Honor.

22  And the second thing I was going to raise --

23      THE COURT:  Let me make sure your computer -- have

24  you got the right one?  See if that's working now.  Is

25  that what you need?  Okay.

Direct - Gannon

1       MR. GLITZENSTEIN:  Your Honor, the other thing I

2  could do, and I would be happy to do it from the table.

3  We can move along.  I think it will show up on that

4  screen.

5       THE COURT:  Here comes our computer expert.  Is

6  that the computer you're using over there?  And have we

7  got the right one on?  Okay.

8                    **DIRECT EXAMINATION**

9       BY MR. GLITZENSTEIN:

10 Q.    Good morning, doctor.

11 A.    Good morning.

12 Q.    Dr. Gannon, what is your current position?

13 A.    I am a professor of ecology and biology at the

14 Pennsylvania State University.

15 Q.    Is that a tenured position?

16 A.    Yes, it is.

17 Q.    How long have you been at the university?

18 A.    Eighteen years.

19 Q.    What is your educational background?

20 A.    I have a doctorate in biology and ecology from

21 Texas Tech University.  My thesis was on bats.  I have a

22 masters degree from the State University of New York at

23 Brockport in biology.  I have a bachelors degree  from

24 the State University of New York at Oswego in biology.

25 And I have an associate degree in science and chemistry.

Direct - Gannon

1 Q.      And how long have you been working on bat issues?

2 A.      For about 22 years.

3 Q.      And prior to teaching at the university, have you

4 taught?

5 A.      I taught at Georgia Southern University for a

6 year, and I was also teaching in a post-doctoral position

7 at Texas Tech University before that.

8 Q.      And what courses do you teach?

9 A.      I teach field ecology, field techniques in

10 particular, currently, as well as a number of the general

11 biology courses.

12 Q.      In addition to teaching, have you been engaged in

13 research?

14 A.      Yes, I have.

15 Q.      What kind of research?

16 A.      Primarily, my research involves the ecology of

17 bats, principally, in a number of different areas in the

18 world, but principally looking at how disturbance affects

19 bats.

20 Q.      If you could look at Plaintiff's Exhibit 3, a

21 stipulated exhibit, this is a -- is this a current

22 version of your CV?

23 A.      Yes, it is.

24 Q.      And if we could look at Page 2 of the CV under

25 Professional Memberships/Organizations.

Direct - Gannon

1  A.      Yes.

2  Q.      There's a reference to the American Society of

3  Mammalogists?

4  A.      Yes.

5  Q.      What is that?

6  A.      Yes.

7  Q.      What is that organization?

8  A.      The American Society of Mammalogists is the oldest

9  organization in the U. S. for the study of Mammalogy.  It

10 was founded in 1919.  Until very recently, I was an

11 officer on the board as the Membership Director.

12 Q.      What does it mean to be a Life Member?

13 A.      It means that I am a membership for life.  I hold

14 Life membership.  It's an elevated level of membership.

15 Q.      And the North American Symposium on Bat Research.

16 What is that?

17 A.      That is an organization that's designed

18 specifically for the study of bats.

19 Q.      And two down, Wildlife Society.  What is that?

20 A.      That is a -- it's a national society.  I belong to

21 the Pennsylvania chapter of that.

22 Q.      And the Pennsylvania Biological Survey, Mammal

23 Technical committee.  What is that?

24 A.      Yes.  I currently chair that committee.  That is

25 an advisory committee to the state Game Commission on all

Direct - Gannon

1 -- all information, I guess, involving mammals, anything

2 that has to do with mammals.

3 Q.     You say advisory committee to the state

4 commission?

5 A.     The Pennsylvania Game Commission.  We are their

6 official scientific advisory arm to the Game Commission.

7 Q.     In the state of Pennsylvania?

8 A.     Right.

9 Q.     If we could look at Page 20.  And under -- it

10 says, "A reviewer for peer review journals."  What does

11 it mean to be a reviewer for a peer review journal?

12 A.     It means we're involved in the process of

13 determining whether or not an article submitted to that

14 journal would be accepted.  Normally, there are several

15 reviewers that an article is sent out to when it is

16 received by a journal editor.  We then give our opinion

17 on that article as far as whether the science in the

18 article bears out the conclusions that are drawn and so

19 on; whether the science is current.  We then give advice

20 back to the editor as far as ways that the article can

21 either be approved and our recommendation on whether or

22 not it should be accepted for publication.

23 Q.     And have you been asked to review articles

24 relating to bat issues?

25 A.     Yes.  Most of the articles that I've reviewed are

Direct - Gannon

1 related to bat issues.

2 Q.      Are any of them related to Indiana bat issues?

3 A.      Yes, some of them were.

4 Q.      And then under that first, you were a reviewer for

5 the following agencies, and the first one is the National

6 Science Foundation?

7 A.      Yes.

8 Q.      What does it mean to be a reviewer and panel

9 participant for the National Science Foundation?

10 A.      The National Science Foundation determines funding

11 for grants.  There are a lot of different sub-units

12 within the National Science Foundation.  I was working

13 with a group that deals principally with biology and

14 ecology.

15      I have -- similar to the way we would review

16 articles for publication, we also review proposals for

17 funding, and I've also sat on a -- on panels.  I've been

18 on three different panels over the years which actually

19 determined who gets funding after the reviews are in.  We

20 then look at the reviews.  Usually, they're experts in

21 the field that are on the panel that would then decide,

22 based on the reviewer's information and on our own review

23 of the proposal, and in discussion with others on the

24 panel, we then decide which ones would be recommended for

25 funding and which ones would not.

Direct - Gannon

1  Q.      And has the National Science Foundation asked you

2  to do that with regard to bat issues?

3  A.      Yes.

4  Q.      How many times have they asked you that?

5  A.      I -- off the top of my head, I couldn't say.  I

6  probably reviewed somewhere between 20 and 30 proposals

7  separately, as well as -- usually, on the panels, there

8  are about 100 proposals each time we sit on the panel to

9  review.  So, there is probably several hundred.  Not all

10 of them involve bats, but I would probably say more than

11 half of them did.

12 Q.      And it also refers to the Smithsonian Institution.

13 Is that a similar kind of review process?

14 A.      The Smithsonian Institution?  Yeah.  There were a

15 number of things that were published by the Smithsonian.

16 I've contributed to those, as well a reviewed for them.

17 Q.      Okay.  If we could look at Page 18.  There is a

18 reference on that page to the Pennsylvania Biological

19 Survey Mammal Technical Committee.  What is that?

20 A.      The Pennsylvania Biological Survey is basically a

21 panel of experts within the state biological experts.

22 They have -- they're divided into subcommittees.  The

23 Mammal Technical Committee is the committee that deals

24 with mammals.  And, again, this is the committee that has

25 -- we do have a formal agreement with the Game Commission

Direct - Gannon

1  to act as their scientific advisory agent on all issues

2  that involve mammals in the state, so they frequently

3  come to us for advice on mammal issues, including wind

4  issues.

5  Q.      In fact, it refers to you being the Subcommittee

6  Chair on bats and wind energy 2006 to 2009.  What does

7  that position entail?

8  A.      Well, because of the issues that were coming to us

9  about the wind issues, they formed a subcommittee which

10 was made up all only of individuals that were bat

11 biologists that were familiar with these issues, and I

12 was asked to Chair that committee.  I Chaired it for

13 several years.  I'm now chairing the Mammal Committee, so

14 I'm no longer Chairing the subcommittee.

15 Q.      And then below that it refers to the Pennsylvania

16 Wind and Wildlife Collaborative.  What is that?

17 A.      This is a panel that was put together by the

18 governor several years ago to advise the state on wind

19 and wildlife issues, specifically wind turbines and how

20 they might affect wildlife.  I am the Pennsylvania

21 Biological Survey representative, or one of the

22 representatives on the committee that -- the committee

23 meets periodically in Harrisburg, and so we -- we're

24 involved in the discussion of these issues and how these

25 turbines are impacts, and how we may change the impact

Direct - Gannon

1 through a variety of different ways.  So, we're also

2 designed to give advice to the state on these issues.

3 Q.      And if we look at Page 3 of your CV, there's a

4 reference to at the bottom, "Wind Energy and Bats," under

5 Research Experience.  What does that entail?

6 A.      Yeah.  I've actually done surveys for Indiana bats

7 in general.  And, specifically, I did do surveys, or

8 survey for the Meyersdale site that had to do with bats

9 several years ago before the site was in operation.

10 Q.      Where is the Meyersdale site relative to the Beech

11 Ridge Project?

12 A.      It's north of the Beech Ridge Project.  It's at

13 the southern border of Pennsylvania.  I'm not sure how

14 many -- it's in the same geographical region.  It's in

15 the same mountain range, the Allegheny and the

16 Appalachian mountain range.  So, it's north of there, but

17 it's within, I guess, probably a two hour, three hour

18 drive.

19 Q.      Okay.  If we look over at Page 4 of your CV, about

20 five down, 1998 to 2002, there's a reference to the

21 assessment of the Indiana bat in the Allegheny National

22 Forest of Pennsylvania.  What did that entail?

23 A.      The Allegheny National Forest asked me to become

24 involved in assessing habitat for Indiana bats

25 principally because they were doing Adaptive Management

Direct - Gannon

1 where they were cutting trees, and they wanted to ensure

2 that areas that they were cutting were not affecting

3 Indiana bats.  So I was asked to come in, do an

4 assessment, determine whether or not Indiana bats were

5 likely in those areas.  The areas that they were likely

6 in they would leave to harvest the trees in the

7 wintertime, and the other areas they would then attempt

8 to get them harvested by the timber industry earlier in

9 the year.

10 Q.     And what techniques did you use to assess for the

11 Forest Service the likelihood of Indiana bat impacts?

12 A.     We used two techniques.  We used mist net surveys,

13 and we used AnaBat surveys.

14 Q.     How did you work out with the Forest Service that

15 you would use those two techniques?

16 A.     Excuse me?

17 Q.     How did you work out with the Forest Service that

18 you would use those two techniques?

19 A.     They actually came to me because they knew I used

20 these techniques when I did these kinds of surveys, and

21 they wanted to make sure they had both data sets when

22 they were making decisions on how to manage the forest.

23 Q.     And then below that, one down, 1998, the

24 Assessment of the Indiana Bat in Elkins, West Virginia.

25 What did that entail?

Direct - Gannon

1  A.      That was a similar survey that was done through a

2  consultant for the Department -- the Department of

3  Transportation in West Virginia.

4  Q.      And what kind of techniques did you use for that

5  one?

6  A.      I used the same techniques.  I used the AnaBat

7  surveys, and I used the mist net surveys.  And, again,

8  they came to me specifically because they knew I had been

9  doing these types of surveys for the agencies in

10 Pennsylvania.

11 Q.      And if we look over at Page 6 of the CV.  This is

12 listing under Grants Awarded from the prior page, two

13 down, there is 2001 telemetry study of bats in

14 Pennsylvania, with emphasis on bats a special concern,

15 $50,000 grant from the U. S. Forest Service.  What was

16 that for?

17 A.      That was the -- that was one of the numerous

18 contracts that we had with the Forest Service to do the

19 Allegheny National Forest project.

20 Q.      And that's the one you referred to as doing AnaBat

21 --

22 A.      Yes.

23 Q.      -- analysis?

24 A.      AnaBat and Mist-Netting.

25 Q.      And then down from that, there's a reference to,

Direct - Gannon

1  under 2000, under Continuing Monitoring of Bats in the

2  Allegheny National Forest.  And then Survey Protocol for

3  Bats with emphasis on the Indiana Bat in northwestern

4  Pennsylvania, U. S.  Fish and Wildlife Service through C.

5  H. to M. Hill.  What is that for?

6  A.     Well, the first one is -- again, that was another

7  contract.  There were several years of contracts.

8  Because of the way the Forest Service works financially,

9  they can only do one year of contracting at a time.

10  Although they initially contracted me to do, or wanted me

11  to do four years of survey, which I agreed to, and then

12  we had single year contracts each time.  The other

13  protocol was through the -- they were putting in a gas

14  pipeline through the Allegheny National Forest, and they

15  were -- asked me to do a survey along that pipeline route

16  to -- again, using the same techniques to monitor for

17  Indiana bats.

18  Q.     And then under that, there's, I think, two down,

19  there's a reference to -- under 1999, about the middle of

20  the page, Protocol Development for Surveys of bats using

21  ultrasonic bat detectors, U. S. Fish and Wildlife, and U.

22  S. Geological Survey through BHE.  What was that?

23  A.     I don't see that.  Yeah, there it is.  That was a

24  -- that was -- well, initially, there are two on there.

25  The first one was -- I was contracted by BHE to actually

Direct - Gannon

1 develop an ultrasonic bat survey for the I-99 highway

2 project that ran through central Pennsylvania. The second

3 one was for me to actually carry out that project.

4 Q.     And this is the same BHE that is the environmental

5 consultant in this case as far as you know?

6 A.     Yes.  Russ Romme was the contact that I had with

7 BHE.

8 Q.     And down near the bottom there is a reference to

9 -- on Page 6, the last one, Biology and Conservation of

10 the Federally Protected Indiana Bat, a Dean's Fund

11 Development, Pennsylvania State University.  What is

12 that?  Down at the bottom of Page 6.

13 A.     That was an in house grant.  That was a

14 supplemental grant.  Principally, those kind of things

15 are used to allow students to assist in the research, and

16 this was funding that allowed me to bring a student to

17 basically learn to -- learn some of the techniques as

18 part of their education.

19 Q.     How much on the ground experience would you say

20 you've had in dealing with mist net survey?

21 A.     I've had about 22 years of it.  I mean, I've been

22 doing mist net survey since I started working with bats.

23 Q.     And how much experience would you say you've had

24 in terms of Indiana bats in particular?

25 A.     In the Indiana bats?  Probably the mid-'90s we

Direct - Gannon

1 started -- we were -- principally, before the mid-'90s, I

2 was doing a lot of work in the Caribbean.  After I came

3 to Pennsylvania, and probably about 1995, I began working

4 regionally in Pennsylvania, as well as in the Caribbean,

5 and so I've done a number of surveys involving bats in

6 general and then particularly for the Indiana bat since

7 then.

8 Q.     How much experience would you say you've had in

9 the use of acoustic equipment?

10 A.     We started using acoustic equipment around 1996.

11 We felt that after about three years of using it, working

12 with it, that it was -- we were becoming proficient

13 enough where we could use it actually in research to

14 identify the possibility of bats being present.

15 Q.     Other than what we've talked about, have you had

16 any other involvement in wind power issues as those

17 issues relate to bat impacts?

18 A.     As they relate to?

19 Q.     Bad impacts.  Impacts on bats.

20 A.     Well, I did do a survey for the Meyersdale site

21 where I was asked to do a cave survey for bats at that

22 particular site a number of years ago, as well prior to

23 it -- prior to when it became operational.

24 Q.     And who asked you to do that cave survey?

25 A.     I don't remember the company's name.  I mean, I

Direct - Gannon

1 have that information.  I just, off the top of my head,

2 don't remember who actually -- what -- which company it

3 was and who the contact person was.

4 Q.     Was it the wind power company that asked you that?

5 A.     Yes.  It was the company that was developing the

6 site.

7 Q.     And have you had any involvement with regard to

8 any wind power projects, other than the ones you've

9 mentioned, and the Beech Ridge Project?

10 A.     I've done some consulting on a number of projects,

11 basically reviewing documentation that's been submitted.

12 Several in West Virginia, one in Virginia, and one in

13 Pennsylvania.

14 Q.     Do you recall what positions you generally took on

15 those projects?  What positions you took with regard to

16 those projects?

17 A.     With those projects?  Generally, because of the

18 location of the projects being in close proximity to

19 Indiana bat hibernacula, and because of the quality of

20 the studies that were done, my position was that, well,

21 first off, large numbers of bats would be killed.  And in

22 fact, the consultants principally agreed with that.  But,

23 also that Indiana bats would be killed because there is

24 nothing inherently different about an Indiana bat that

25 would prevent them from running into a turbine, just like

Direct - Gannon

1 the other bats.

2 Q.    Have you ever turned down any work with regard to

3 a wind power project?

4 A.    Yeah.  I've turned down a number of projects,

5 primarily from individuals that had contacted me that

6 were obviously not interested in the science but

7 interested in other aspects of the wind industry as far

8 as basically keeping them out of their backyard kind of

9 thing, and I've told those individuals that's not what I

10 do.  My role in this strictly has to do with the science

11 that is present.  I don't get involved in the politics at

12 all, and I'm not somebody that can advise them on how to

13 do that.

14 Q.    Are you philosophically opposed to wind power?

15 A.    No.  Actually, I'm very much in favor -- I think

16 just like any other renewable energy, wind power has a

17 great potential, but it needs to be sited properly.  Just

18 like with nuclear power plants, or coal plants, you just

19 can't put them anywhere, and there are environmental

20 issues that have to be dealt with when you decide where

21 to put these things.

22 Q.    And you did have prior involvement with the Beech

23 Ridge Project before this case?

24 A.    With the Beech Ridge?  Yes.

25 Q.    Before the litigation?

Direct - Gannon

1 A.      I actually was involved initially back, I think in

2 2005, when the Public Service Commission held the

3 hearings down in West Virginia.

4 Q.      Overall, do you feel qualified to offer an expert

5 opinion on the impacts of the Beech Ridge Project, and

6 particularly the impacts on the Indiana bat?

7 A.      Yes, I do.

8        MR. GLITZENSTEIN:  Your Honor, at this point I

9 would normally, of course, turn it over for voir dire.

10 If you've read the stipulation --

11        THE COURT:  I believe both parties have conceded

12 the qualifications of the experts, and the only question

13 goes to the weight, so I won't proceed with that at this

14 point.

15        BY MR. GLITZENSTEIN:

16 Q.      I will then continue, Your Honor.  Thank you.

17        If we take a look at some photos that we're using

18 purely for demonstrative purposes, which I don't believe

19 the defendants object to.  Dr. Gannon, what are we seeing

20 in these photos?

21 A.      What we're seeing is on the top, the two

22 photographs are different views of an Indiana bat.  You

23 can see the face on one of them, and you can see the hind

24 foot on the other.  And then the bottom two pictures are

25 basically the same view of a little brown bat, which is

Direct - Gannon

1 the more common species that is found throughout the same

2 range as the Indiana bat.

3 Q.      And what are the distinguishing characteristics

4 for these two species?

5 A.      Well, if you look at the yellow arrows, these are

6 indicating some of the distinguishing characteristics,

7 the ones that are the most easily seen.  You can see that

8 the -- in general, the face of the Indiana bat seems to

9 be lighter than the face of the little brown bat which is

10 darker.  But, also, if you look at the hind foot -- if

11 you look where the arrow is pointing on the upper

12 picture, you can see that this structure, which is called

13 a calcar has a keel on it, which is this bump at the

14 bottom that it's pointing to.

15      On the little brown bat below, you can see the

16 same calcar down at this point here is not keeled.  And

17 that's probably the easiest distinguishing characteristic

18 to look for for an Indiana bat is looking at their rear

19 leg and looking for that characteristic.  That's the one

20 that would -- that is most frequently used, and the ones

21 that I tell everybody to look for first when I'm training

22 students to identify Indiana bats.

23 Q.      Are there guidebooks which refer to how to

24 identify Indiana bats from other bats?

25 A.      There are lots of books out there that have

Direct - Gannon

1 pictures and keys in them that include these

2 characteristics among a few others that are more subtle,

3 more difficult to tell apart that would indicate the

4 differences between Indiana bats.  Most of these

5 guidebooks, the whole point of the guidebook is to show

6 the differences between the different species.

7 Q.      If we could take a look at Plaintiff's Exhibit 1,

8 which has been stipulated, and this is a declaration that

9 you submitted July 2nd 2009.  Do you recall submitting

10 this declaration?

11 A.      Yes.

12 Q.      Is this the first declaration you submitted in

13 this case as far as you recall?

14 A.      As far as I recall, yes.

15 Q.      Okay.  And then if we can take a look at

16 Plaintiff's Exhibit 2, September 30th 2009, rebuttal

17 declaration.  Does this appear to be the second

18 declaration you submitted in this case --

19 A.      Yes, it is.

20 Q.      -- also stipulated by defendants.

21        And then at the end of that one, if you could take

22 a look at the pages of publications and other literature

23 beginning with Attachment A, Literature Considered,

24 proceeds for about nine pages.  Did you in fact consider

25 all this literature in formulating your opinion?

Direct - Gannon

1 A.      Yeah.  This is a list that I assembled of

2 basically all the articles that I have that I've reviewed

3 in this case and with Indiana bats in general.

4 Q.      Are you aware of any significant studies or

5 research that you didn't take into consideration?

6 A.      I'm not aware of any at this point, no.

7 Q.      Between these two declarations, 1 and 2, do these

8 declarations generally summarize your opinions?

9 A.      Yes, they do.

10 Q.      Okay.  And you believe they generally continue  to

11 be accurate in terms of summarizing your positions?

12 A.      Yes, they are.

13 Q.      If we could look at Exhibit 1 on Page 7, paragraph

14 nine, about -- it's in the middle -- at the end of the

15 first sentence, there's a reference you make to almost

16 certain use of various parts of the project site for

17 daily activities, referring to Indiana bats.  When you

18 wrote that sentence, did you know about the AnaBat data?

19 A.      No, I didn't.  I, also -- when I wrote this, I had

20 not actually visited the site.  It was only through maps

21 and photographs and descriptions that I had that this was

22 put together.

23 Q.      If you hadn't visited the site, you didn't have

24 the AnaBat data, what was the basis for your saying that

25 there was almost certain use of various parts of the

Direct - Gannon

1 project site?

2 A.     The habitat that's present there from the

3 descriptions is exactly what I would expect to find for

4 Indiana bat habitat.  Also, the close proximity to the

5 hibernacula are key as well.  We have similar sites.  One

6 site in particular in Pennsylvania, the Shaffer Mountain

7 site, where we have almost an identical situation where

8 we have a hibernaculum close by, and the top of a ridge

9 where they have found Indiana bats at a potential site

10 for wind turbines.

11 Q.     Do you know the relative distance from the

12 hibernacula to the Shaffer Mountain Project compared to

13 this project?

14 A.     It was nine miles.  There were two that were close

15 by, nine, and the second one was 14 miles away.

16 Q.     Do you know whether those are closer or further

17 than the hibernacula in this case?

18 A.     I believe they are further away than the closest

19 hibernacula in this case.

20 Q.     Over on the next page of that declaration --

21 actually, at the bottom of the Page 7, continuing up to

22 Page 8, the reference to the Indiana bat being difficult

23 to distinguish from other Myotis.  And then you say,

24 "They are known to migrate long distances along mountain

25 ridgetops between their winter hibernaculum and their

Direct - Gannon

1 summer destinations, including documented migratory

2 movements of more than 300 miles in just a few days."

3 What is your basis for making that statement?

4 A.    The basis of that are the data that have been

5 collected by the Pennsylvania Game Commission over the

6 last few years.  They have been doing a lot of survey

7 work where they have actually tagged Indiana bats.  The

8 location where I am from in Pennsylvania is very close to

9 a park called Canoe Creek State Park which has the

10 largest known population of Indiana bats in the state.

11 And, so, this site is frequently used to study Indiana

12 bats, including by myself.

13        But the Game Commission came there, they were --

14 they radio tagged Indiana bats as they emerged from -- in

15 the spring from the hibernacula, and then they tracked

16 them via plane.  They've tracked them -- there were at

17 least two individuals I know of, one that wound up in

18 Maryland within two days.  It traveled several hundred

19 miles, and two or three days later it was in Maryland.

20        The other one just this -- I believe this past

21 year was found down in southern West Virginia, which had

22 initially emerged from the hibernaculum at Canoe Creek in

23 central Pennsylvania.

24 Q.    If we could look at Plaintiff's Exhibit 63 that's

25 been stipulated.

Direct - Gannon

1        Your Honor, unfortunately, we're having another

2 problem up at the podium.  We got it now.

3        Have you seen this before, Dr. Gannon?

4 A.     Yes, I have.

5 Q.     Okay.  And this is a map that reflects known

6 Indiana bat caves.  The Beech Ridge Project is identified

7 with a star, the green star, and also reflects some other

8 data.  I'll ask you to focus on the bottom portion which

9 reflects the Beech Ridge Project in proximity to known

10 Indiana bat hibernacula.

11        Do you believe that the Beech Ridge Project is

12 within migratory distance of the various Indiana bat

13 hibernacula?

14 A.     Well, based on the data from Pennsylvania -- if

15 you could drop it down a little bit.  Can you -- based on

16 the -- a little more.  Keep going.  I'll tell you.  All

17 right.  The site in Pennsylvania where we have data from

18 is here at this point, and we have data that shows that

19 these bats have traveled at least this far through the

20 Game Commission.  So, basically, they've traveled through

21 the entire region of West Virginia, that entire mountain

22 region, and wound up in southern West Virginia.  I'm not

23 sure of the exact location, but it was -- one of the

24 southern counties.  I don't recall, off the top of my

25 head, which one it was.  But, based on those data, it's

Direct - Gannon

1 potential that any of these bats, for any of these sites,

2 could wind up migrating through this region.

3 Q.     Dr. Gannon, are you ware of any operating facility

4 -- wind power facility that is closer to the nearest

5 Indiana bat hibernacula than the Beech Ridge project?

6 A.     I don't know of any that are, no.

7 Q.     If we could look over at your first declaration;

8 again, that's Exhibit 1 on Page 6.  And in the middle of

9 that page, Paragraph 7, there's a reference to the Beech

10 Ridge mist-net survey, and you indicate that their own

11 net surveys found high numbers of little brown bats:

12 More than 25 percent of the bats captured in the mist-net

13 surveys were little brown bats.  And then you explain why

14 you think it's significant.  Can you just summarize why

15 you believe that is significant to the issues before

16 Judge Titus in this case?

17 A.     Well, Indiana bats and little brown bats typically

18 use the same type of foraging areas.  Although they don't

19 use the same tree structures, they do use similar trees

20 that are in similar areas.  For example, in Pennsylvania

21 we have a large number of Indiana bats that are sharing

22 caves and other roost sites with little brown bats.  So,

23 they frequently use the same areas.  And, therefore,

24 because we have so many little brown bats, it's likely

25 that this much rarer species would be using the same

Direct - Gannon

1 general area as the little brown bats, just based on

2 their biology.

3 Q.      And you referred to the use of the little brown

4 bat as a surrogate species.  Can you explain a little bit

5 more what you mean by that?

6 A.      Yeah.  This is actually something that was --

7 that's being done in Pennsylvania by the Fish and

8 Wildlife units they are -- they're actually looking at

9 the number of little brown bats in the area, and then

10 using that as the proportion of little brown bats to

11 Indiana bats as a predictor of what could be killed at a

12 wind turbine.

13      So, for example, if Indiana bats are one percent

14 of the total number of little brown bats, then we would

15 expect that one percent of the total number of little

16 brown bats that are killed would be Indiana bats.  So if

17 we're killing a hundred Indiana bats, we would kill one

18 little brown bat, just as an example, from numbers.  So,

19 they're using that as a surrogate because Indiana bats

20 are so difficult to find.  They're rare.  They're very

21 similar looking.  And the studies that have been done as

22 far as searching for bats after the fact, to try and

23 recover dead bats, have a very low recovery rate.

24 They're finding only about 30 percent search or

25 efficiency.

Direct - Gannon

1         So, we're looking at sites where we're only --
2    we're looking for something that is very rare, and we're
3    only looking at 30 percent of it.  The chances of
4    actually finding one are very low.  And in fact, we're
5    not doing it on a regular basis in most of these studies
6    that have been done.  So, therefore, as a predictor,
7    they're using the little brown bats as a surrogate, based
8    on their biology being so similar of the number of
9    Indiana bats that might be killed at these different
10   sites.
11   Q.      Do you think that's a valid scientific approach?
12   A.      It certainly is at this point a valid approach to
13   at least as a predictor.  Obviously, we would like to
14   know more about the bats and be able to have a better
15   predictor.  But, I think that given that there is nothing
16   inherently different about an Indiana bat and a little
17   brown bat as far as their ability to be killed by these
18   wind turbines, I would say that's probably a good
19   predictor at this point.
20   Q.      If you were going to engage in a prediction like
21   that in West Virginia, what kind of data would you be
22   looking at?
23   A.      Well, you'd want to have the data on the Indiana
24   bats, as well as the little brown bat.  I know this data
25   is not available.  I know the state does do a lot of

Direct - Gannon

1 survey work, and they would probably be in a much better
2 position to make a prediction like this.  But, you would
3 probably want to do mist-net surveys that determine the
4 number of bats that occurred in different areas versus
5 the number of Indiana bats, the little brown bat versus
6 Indiana bats.
7          And once you get a general feeling of the number
8 of Indiana bats that are occurring based on the number of
9 little brown bats, or the proportion of little brown
10 bats, you then make a prediction on the number of Indiana
11 bats that might be killed based on the number of little
12 brown bats that might be killed.
13 Q.     And do you know anybody in particular in the state
14 of West Virginia who would be an appropriate person to
15 apply that kind of data?
16 A.     The only person that I know that would have that
17 kind of data is the state DCNR.  And Craig Stihler, being
18 the bat biologist, would probably be the person that I
19 would go to with this data.  They don't generally publish
20 this data, because they don't generally want locations of
21 Indiana bats, Endangered Species, known by the general
22 public.  So, those data are usually not available, except
23 through the state.
24 Q.     And if you were to make a prediction like that,
25 would you regard that as a reasonable scientific basis

Direct - Gannon

1 for a prediction?

2 A.     Yeah.  I would -- I think it is a reasonable

3 prediction at this point, yes.

4 Q.     Now, on Page 11 of your first declaration,

5 Paragraph 14, you say:  "The operation will, to a virtual

6 certainty, result in certain death and injury to Indiana

7 bats."

8 A.     Yes.

9 Q.     What do you mean by "virtual certainty?"

10 A.     I've used a number of different words to describe

11 the same thing.  What I'm saying is that there is a high

12 degree of scientific certainty that Indiana bats will be

13 killed at this site, based on the data that we have

14 available.

15 Q.     Does that remain your opinion?

16 A.     Yes, it does.

17 Q.     And in that same paragraph you refer to BHE's

18 conservative estimates of 6,746 annual deaths, or nearly

19 135,000.  Why is that overall, if it is, that mortality

20 relevant to figuring out whether Indiana bats will be

21 killed?

22 A.     Well, again, if you're going to use bats in

23 general and as a surrogate for the number of bats that --

24 of Indiana bats that are going to be killed, knowing how

25 many bats that are out there that are being killed;

Direct - Gannon

1 obviously, showing a large number that are being killed.

2 Again, there is nothing inherently different  about an

3 Indiana bat that would prevent them from the same fate as

4 these other 135,000 bats that are going to be killed by

5 the site as well.

6 Q.     Are you aware of any biological reason which is

7 unique to Indiana bats that would exclude them from

8 mortality?

9 A.     No.  I believe they're just as susceptible as any

10 of the other species that have been killed.

11 Q.     In that same paragraph you refer to that

12 prediction of 135,000 bat deaths as a "conservative

13 estimate."  Why would you call it "conservative?"

14 A.     Again, it's based on data that's been collected at

15 other sites where we have a search or efficiency  issues

16 with only finding certain percentages of bats that were

17 actually planted.  What they do is they measure search or

18 efficiency by going out and planting bats, knowing where

19 they're planted, and then sending out the searchers and

20 telling them to find them.  And they're only find about

21 30 percent of the bats that are planted out there, which

22 would extrapolate to only finding 30 percent of the bats

23 that are killed.  So, based on the fact that these

24 numbers are based on these sites which have very limited

25 surveys which are being done, and the fact that the

Direct - Gannon

1 search or efficiency isn't that good at them.  These

2 numbers would be very conservative in that we're not

3 really measuring what's really out there.  We're making a

4 guess based on what the search or efficiency is that we

5 know of.

6 Q.     How do bats die at wind power projects?

7 A.     The bats are being killed in two different ways.

8 One is that they're directly striking the turbine blades

9 as the turbines turn.  From evidence that we have, it

10 seems that bats actually will repeatedly fly through the

11 turbine pathways.  We have some video of them that show

12 that they repeatedly will move through the turbines, a

13 number of them then being struck by the turbines.

14       They also can be killed just by being caught up in

15 the downdraft of the turbine as it spins.  This

16 phenomena, which is referred to a Barotrauma, is similar

17 to what you might experience as a deep sea diver as you

18 try too rapidly to emerge.  It actually causes a rupture

19 in the lungs, and the lungs literally explode and

20 hemorrhage.

21 Q.     How big is an Indiana bat?

22 A.     I believe they're about six to eight grams,

23 depending on the, you know, the age of the bat.  So, I

24 mean, I could -- they're small.  Maybe a wingspan of

25 about 6" or 7" at the most.  They're a small species.

Direct - Gannon

1  Q.     Given these modes of mortality you just described,

2  would there be difficulties in ascertaining  whether an

3  Indiana bat had in fact been killed, even assuming one

4  had?

5  A.     Well, again, first off, the surveys have to

6  actually be done to ascertain that.  There are very few

7  sites where surveys are being done.  The second problem

8  is that the surveys are being done at irregular

9  intervals.  There's a lot of issues with scavenging of

10  carcasses by other animals.  And so if you're only

11  looking once a week, you're only finding what's been

12  killed very recently, as opposed to what was killed, you

13  know, six days ago that they may no longer be there.  So,

14  there are scavenging issues that have to be done with

15  these surveys, as well as the frequency of the surveys.

16         There's also issues with the number of actual

17  turbines that are surveyed.  They usually survey a subset

18  of the turbines.  If they've got 50 turbines, they might

19  survey ten of them, and they might do it every couple of

20  weeks over a two-month period.  So, the issue is that

21  they're just not looking very often.  So, right off the

22  bat, if you're looking for a rare species, and -- it's

23  like a needle in a haystack.  If you've got a haystack,

24  and you're only looking at a very small portion of the

25  haystack, what's the odds that you're going to find

Direct - Gannon

1 something rare in that haystack?

2 Q.     Over on Page 10, Paragraph 12 of your first

3 declaration, you refer to, in the middle of that

4 paragraph, "I have reviewed two recent aerial photographs

5 of the project site."  And then you refer to these

6 attachments and the vast clearing depicted in these

7 photographs as, "precisely the kind of habitat

8 destruction, the Indiana bat habitat, that can and likely

9 has caused death and injuries to Indiana bats by

10 disrupting the species' normal behaviors."

11        If we can look at Plaintiff's Exhibit 65, two

12 photos.  Page 144, I think of the PDF, and 227.  Again,

13 these have been stipulated.  These are the photos that

14 you were referring to.  Can you explain how these photos

15 reflect the kind of habitat destruction you were talking

16 about?

17 A.     Well, these photos are showing large areas of the

18 ridgetop that have been clear cut.  And, obviously

19 Indiana bats being a tree roosting species, any trees

20 that they might be using, either as maternity colonies or

21 as even just periodical roost sites, when they're

22 destroyed they are -- if they happen to be in the tree at

23 the time, there could be direct mortality from that.

24 But, also the fact that the trees are no longer there,

25 these bats have a high tenacity to the same sites.

Direct - Gannon

1  They'll frequently go back year after year to the same

2  trees and roost in those trees again and again.  So, by

3  removing those trees, it could lead to a disturbance of

4  the bats' behavior as well.

5  Q.     And continuing over to Page 11, at the top.

6  Referring to the clearing of these kinds of trees in

7  occupied habitat.  You say, "It is my opinion to a high

8  degree of scientific certainty that Indiana bat deaths or

9  injuries have occurred from a felling of potential roost

10 trees."  Does that continue to be your opinion?

11 A.     Yes.  These -- the cutting of the roost -- of the

12 site was done during the summer months, which could very

13 easily have contained Indiana bats roost trees at that

14 period.

15 Q.     And by "the cutting," you're referring to Beech

16 Ridge's cutting?

17 A.     Beech Ridge's initial cutting, yes.

18 Q.     Do you have an understanding that cutting was

19 done, actually, during the summer season?

20 A.     That's my understanding, yes.

21 Q.     And if we could -- let me ask you this.  After

22 submitting this declaration, did you go on a site visit?

23 A.     Yes, I did.

24 Q.     Okay.  And what did that site visit entail?

25 A.     It contained looking at a number of different

Direct - Gannon

1  sites where the mist-nets were done and mist-net surveys

2  were done.  I think we looked at 15 different sites.  We

3  obviously couldn't get to all of them because of

4  construction going on, but we did look at 15 different

5  sites, as well as the general area where the cutting had

6  occurred within the site.  And so we did get a view of

7  the area, based on that particular visit.

8  Q.     And based upon that visit, did you feel that you

9  got a reasonable opportunity to at least get a sense of

10 the habitat and the site location?

11 A.     Yeah.  I mean, we got a chance to look at

12 basically anything that we wanted to look at, except for

13 areas that were under construction at the time.

14 Q.     And if we could take a look at Plaintiff's Exhibit

15 67, which has been stipulated, and it's a -- it's an

16 exhibit that consists of a series of photos, and then

17 some field notes.  And if we look at the beginning, and

18 then we can flip through to Page 97 of that.  Do these in

19 fact appear to be the photos that you took on the site

20 visit, as well as your field notes?

21 A.     Yes, they are.

22 Q.     Okay.  Go to 97 again and just flip from 97.

23 You've got quite a few field notes.  How did you actually

24 prepare these field notes?

25 A.     These were actually -- I took photographs in the

Direct - Gannon

1 field.  They're all numbered photographs.  I made notes

2 on the photographs at different sites, recorded the GPS

3 location at those sites, and then made the general notes

4 which you see that are here.  And then they were

5 transcribed so they could be electronically distributed.

6 Q.     And based upon your field visit, how did that

7 affect your opinion as to whether or not there was

8 Indiana bat presence on the site?

9 A.     It actually reenforced my opinion that there were

10 -- that there were Indiana bats on the site.  The habitat

11 -- at this point, after the alteration, they've now

12 opened up large areas of habitat that would be exactly

13 the type of habitat Indiana bats are looking for.  By

14 doing the cutting, they've cleared areas.  They've left

15 large areas that are open.  They've left a lot of snags

16 behind.  There are a lot of potential roost sites on this

17 site, as well.

18 Q.     And if we could take a look at -- going back to

19 the field notes, the photos, pages 30, 31 -- start with

20 30, 31, 55.  Do these photos have any significance to

21 you?

22 A.     Yeah.  These are trees that we viewed on the site

23 after the cutting, which would be a -- the type of tree

24 that I would look for if I was looking for a maternity

25 colony or any type of roost site that Indiana bats would

Direct - Gannon

1 be found in.  Indiana bats typically roost under the

2 exfoliating bark of dead trees, and so this is the kind

3 of trees -- these are the kind of trees that they would

4 look for when they are roosting.  Frequently, maternity

5 colonies, which would have a number of females and their

6 offspring from that year, their "pups" would be found in

7 these kind of trees.

8 Q.     Could male bats use those kind of trees too?

9 A.     They do, but to a lesser extent.  Male bats

10 usually roost singly in the summer, so they're not going

11 to roost in large numbers, but they do use the same type

12 of sites.

13 Q.     Did you see other trees like that?

14 A.     Yeah.  There were trees like that throughout the

15 area.  I mean, the entire area that's been cut has trees

16 that are -- that were left behind like that.  So there is

17 a lot now -- there are a lot of potential roost sites

18 that have been left behind.

19 Q.     Okay.  And if we could take a look at Page 62 of

20 that -- the photo -- that's another photo, 62, of this

21 document.  And again, what's the significance of that?

22 A.     This is, again, another roost site.  I believe

23 this is the first one that I photographed.  This is a

24 dead tree that is, again, just about perfect for what I

25 would look for for an Indiana bat roost site.

Direct - Gannon

1  Q.      And a moment ago you referred to, I think, the
2  creation of edge habitat.  Could you explain a little bit
3  more by what you mean by that?
4  A.      Well, if you go back to that one photograph
5  showing all the cutting.
6  Q.      That one?
7  A.      Well, the one I was talking about was along the
8  whole ridgetop.  What you can see is that everywhere that
9  they've cut, they've opened up areas --
10 Q.      (Indicating.)
11 A.      Yeah, this one here.  They've opened up these
12 large areas in through here that have created all this
13 edge habitat.  And, edge habitat is one of the areas that
14 you would look for for Indiana bats.  They frequently
15 forage along the edge habitat, and they frequently would
16 use these cuts through the ridge as a pathway to travel
17 from one area to another.  Bats, in general, will use
18 roads, paths in the forest, any kind of opening through
19 the canopy that they can navigate very quickly as a route
20 to move from one place to another.
21 Q.      Does that have any bearing on your prediction of
22 Indiana bats being killed or injured by this project?
23 A.      Well, what they've done at this point is they've
24 actually augmented the habitat significantly, which would
25 then lead me to believe that Indiana bats in the area

Direct - Gannon

1 that are emerging from the hibernacula would very likely

2 use this particular site because it has so much bat

3 habitat now that was not there before.

4 Q.      Once coming on the site, would the bats avoid the

5 turbines?

6 A.      Excuse me?

7 Q.      Once on the site, would the bats avoid the

8 turbines?

9 A.      I don't see how they would avoid the turbines any

10 differently from any of the other bats that are up there.

11 Q.      In terms of this habitat or augmentation, doesn't

12 that contradict -- or, does that contradict the opinion

13 on your first declaration of habitat destruction on the

14 project?

15 A.      Well, no.  We've had two incidents now.  One is

16 the clearing, the actual clearing, which will result in

17 destruction of the habitat.  But then by doing the

18 cutting, we've now opened up additional habitat that,

19 later on, would be available for other bats in the area.

20 So the initial destruction could potentially cause

21 mortality of Indiana bats by cutting trees that the bats

22 are using that were there before.  And then by opening up

23 the habitat, we've now made it even more attractive for

24 other Indiana bats that might move into the area.

25 Q.      Okay.  Now, if we look at your second declaration,

Direct - Gannon

1 which is the one we've identified as Plaintiff's Exhibit

2 3, and take a look at Paragraph 13.

3          THE COURT:  Counsel, why don't we take a recess,

4 now that you're moving into your second declaration?  We

5 will take a recess now until 10 minutes after 11.

6                    (Off the record at 10:51 a.m.)

7                    (On the record at 11:12 a.m.)

8          THE COURT:  You may proceed.

9          BY MR. GLITZENSTEIN:

10 Q.     Thank you, Your Honor.

11          Dr. Gannon, I would ask you to take a look at your

12 second declaration, Plaintiff's Exhibit 3.  I

13 particularly will reference you to Paragraph 13, which is

14 on Page 9.  It's describing your field survey.  And you

15 say a couple of lines down, "As my notes describe in more

16 detail, the sites selected for mist-net  surveying in

17 July 2005 were generally poor sites at which to net for

18 Indiana bats, because many of the sites lacked the

19 requisite canopy cover to obscure the moonlight on those

20 bright lights in almost every case."

21 What do you mean by "lacking a canopy cover?"

22 A.     When netting for bats, bats -- when we put up nets

23 for bats, we don't put up nets randomly and then try and

24 track bats.  What you do is you look for places where

25 bats are likely to be moving.

Direct - Gannon

1        MR. ZATZ:  Your Honor, we would like to have a

2  continuing objection to all testimony about the adequacy

3  about he mist-net surveying.

4        THE COURT:  All right.  I'll permit your

5  continuing objection.  The objection is overruled.

6        MR. ZATZ:  Thank you, Your Honor.

7        BY MR. GLITZENSTEIN:

8  Q.     You may proceed.

9  A.     When you're netting for bats, anyone that nets for

10 bats, you don't just randomly put up bats.  You put them

11 up in places where bats are likely to occur.  Usually,

12 flyways, areas that you can kind of funnel bats into the

13 net.  One of the things that you frequently look for is

14 the overhead canopy, because that helps to funnel them

15 down into the nets.  You can also use things like putting

16 up additional nets which will help funnel them into nets

17 as well.  So, you try and anticipate where the bats are

18 going to be traveling, and then you put up nets in those

19 places to try and capture them.  So, the more enclosed

20 area around the area that you're netting, the more likely

21 you are to have bats moving through that area where you

22 have the nets.

23 Q.     Down at the bottom of that same paragraph, I'm

24 going to refer you over to some diagrams you have on the

25 next page.  You refer to the mist-net survey being

Direct - Gannon

1 conducted during the brightest part of the month when it
2 is most difficult to capture bats, and then you've got
3 phases of the moon for that period of time. First of
4 all, how did you decide to go through the phases of the
5 moon for that particular time?
6 A.      I looked up the dates at the U. S. Naval
7 Observatory site on the Internet.
8 Q.      What's the relevance of a mist-net survey being
9 done when the moon is in that condition?
10 A.      Generally, you avoid periods of very bright light,
11 moonlight, because you are less likely to capture bats on
12 those nights for two potential reasons. Well, actually
13 there's three reasons. One is that the nets are more
14 visible to the bats, and I've actually seen bats avoid
15 nets by going right up to them, flying over the tops, and
16 going on. The bats can detect the nets there. What you
17 want to do is kind of obscure it with vegetation in the
18 background so they can't detect is as something
19 different, and therefore they're fooled into flying into
20 it because they think it's just vegetation they're going
21 to move through. So, doing it on bright nights, they're
22 more visible. Bats do see. They do have eyes. They can
23 see very well, and they can make things out like that, In
24 particular with their echo location that they're using.
25           Secondly, bright nights tend to change the

Direct - Gannon

1 distribution of insects, and so therefore you would be

2 less likely to have insects that they're feeding on at

3 certain locations.

4        And thirdly, the idea that the bats are more

5 visible to predators, therefore, they avoid flying during

6 periods when the moon is very bright is another reason

7 why you tend not to see bats out there on very bright

8 nights.  So, you have a reduced number of bats that are

9 out on nights that are very bright.  That's not saying

10 that there aren't going to be bats out there, but you're

11 not going to catch anywhere near on a night under the

12 same conditions where you have darkness.  So, we tend to

13 avoid any periods -- usually, you know, I'd say three or

14 four days on either side of a full moon we would just not

15 net normally if we can avoid that.

16 Q.     If we can take a look at Plaintiff's Exhibit 118,

17 stipulated exhibit, which is the mist-net survey for that

18 2005 survey you were just describing.  And take a look at

19 the photographs that begin, I think, at Page 20 of that

20 document.  These are photographs of the mist-net survey.

21 Have you seen these photographs before?

22 A.     Yes, I have.

23 Q.     Okay.  How, if at all, do these photos -- and we

24 can flip through them if that helps you illustrate

25 whatever point you'd like to make.  How do these photos

Direct - Gannon

1  bear upon the opinion that you've just offered?

2  A.     Well, these photos -- if you go back to the

3  previous one.  This one, for example, here illustrates

4  how open this net is.  While you would want to put nets

5  up along a trail like this, you wouldn't want to put them

6  out here.  You would want to put them where there is a

7  closed canopy over the top that would serve to -- and

8  again, along the sides here to try and funnel the bats

9  down into the net.

10       So an area like this, this particular net is not

11 the type of net that I would  use.  This area here as

12 well.  Those are things that I would not -- where I would

13 not put nets, because they're less likely to catch bats.

14 They're far less likely to catch bats than other areas

15 where you have the closed canopy and the narrow

16 corridors.

17 Q.     If we can just look through the rest of the

18 mist-net photos.  Do you see any others that have those

19 kinds of concerns?

20 A.     And again, this one here you can see the net right

21 there right out in the open.  This one, the pole is

22 there.  And over there you can see that it's right out in

23 the open.  These are not sites I would have ever chosen

24 to put up nets, because I don't think they would yield

25 high numbers of bats.

Direct - Gannon

1 Q.      And you did refer in your first declaration to the
2 fact that some bats were caught, including little brown
3 bats.  How do you explain the fact that bats were caught
4 even though you've got these concerns about the mist-net
5 locations?

6 A.      Well, it's not that you're not going to catch any
7 bats in these kind of nets.  What you're not likely to do
8 is catch rare bats that are not there in large numbers.
9 What you're going to do is you're going to catch the bats
10 that are in large numbers, but you're going to catch a
11 very reduced sample of them.  If you put out nets in
12 sites that were, as I described, in a location like this,
13 the success -- the number of bats that you caught would
14 most likely be much higher.

15      I think this is a good area for bats.  I think
16 there are a lot of bats up there.  I just think that the
17 sites that were chosen and the way the nets were placed
18 were not the way I would have done it.  They would not
19 yield the maximum number of bats that could be captured
20 at this site.

21 Q.      And if we look over at Page 1 of the document, I
22 think it's Page 4 of the PDF of the exhibit under
23 Introduction.  There's a reference to this being a summer
24 presence -- the investigate the summer presence of bats.
25 What does that mean?

Direct - Gannon

1  A.      The summer bats -- the ones that are there in

2  summer are roosting and foraging there, as opposed to the

3  ones that migrate through the area in the spring and the

4  fall.  So these would be the ones that would are residing

5  there during the summer months as opposed to the bats

6  that are leaving the hibernaculum in the spring or

7  returning to the hibernaculum in the fall.

8  Q.      Based upon your review of all of the records, are

9  you aware of any survey that was done of any bats

10  migrating during the spring or the fall at this site?

11  A.      At this site, no.

12  Q.      If you were interested in bat impacts, is that

13  something that you would recommend?

14  A.      Well, at other sites that we've seen bat mortality

15  at, the major periods of mortality are usually in the

16  fall during the migration period.  So, certainly, that

17  would be something that you want to look at.  If nothing

18  else, you would definitely want to look at it at the

19  period where you have the greatest mortality.  This would

20  indicate that the largest number of bats are moving

21  through at that time.

22  Q.      And if we could look at a couple pages of the same

23  document.  It's Page 4 on the document.  I think it's

24  Page 7 on the PDF.  And over under Site Selection at the

25  top, there's a statement that says, "Mist-net sites were

Direct - Gannon

1 selected during field reconnaissance.  Site selection was

2 based primarily on extent of canopy cover and presence of

3 an open flyway.  Nets were deployed in areas that provide

4 optimum chance to capture foraging bats."  Do you have

5 any comment on that paragraph?

6 A.     Based on what, you know, what I've seen, I would

7 disagree.  When he says "based on extent of canopy

8 cover," I'm not sure if he's talking about in a large

9 amount or small amount.  I don't know what his criteria

10 was, but I would be looking for the maximum amount of

11 canopy cover in the flyway, and that would be the kind of

12 place that I would find the optimum use.

13        What I saw in the pictures was exactly the

14 opposite.  I saw no canopy in any of them, And we visited

15 those sites.  There were a number of sites where there

16 was ample canopy very close by; I mean, within a minute

17 or two's walk.  I would have chosen any number of other

18 sites within that same general area but that had much

19 better canopy cover, that still had open flyways that I

20 thought would yield a much higher number of bats.

21 Q.     Would you describe, based upon what you observed,

22 or anything else you know about this project, that the

23 mist-nets were put up in a place where there was an

24 optimum chance to capture foraging bats?

25 A.     Were they put -- there were several sites out of

Direct - Gannon

1 the photographs that I looked at where I thought this

2 might be a marginal site.  There were one or two that I

3 thought might be adequate, but the majority of them were

4 not sites that I ever would have chosen for -- that would

5 maximize bat captures.

6 Q.    If we could take a look over at Plaintiff's

7 Exhibit 98, which is a Fish and Wildlife Service letter

8 to BHE Environmental, August 10th 2006.

9      THE COURT:  What's the exhibit number?  I can't

10 read it.

11      MR. GLITZENSTEIN:  I'm sorry.  It's Plaintiff's

12 Exhibit 98.

13      THE COURT:  98.  Okay.

14      MR. GLITZENSTEIN:  Stipulated exhibit.

15      BY MR. GLITZENSTEIN:

16 Q.    Dr. Gannon, do you recall seeing this letter?

17 A.    Yes, I do.

18 Q.    And did you take the letters from the Fish and

19 Wildlife Service into consideration in formulating your

20 opinion in this case?

21 A.    Yes.

22 Q.    Okay.  If you look at the second paragraph of that

23 letter, two sentences -- the last two sentences beginning

24 with "as you are aware."  There's a statement, as you're

25 aware, the Service remains concerned that the proposed

Direct - Gannon

1 Beech Ridge Wind Project may harm or kill federally

2 listed Indiana bats and/or Virginia big-eared bats.  We

3 also remain concerned that without three years of

4 pre-construction surveys as described in the Service's

5 interim guidance 2003, decisions will be made that will

6 negatively impact federally listed bats.

7        My question is, do you agree with the Service's

8 statement that without that kind of surveying, decisions

9 will be made that will negatively impact federally listed

10 bats?

11 A.     Well, obviously, one of the decisions you would

12 want to make when you do a pre-construction survey is

13 where exactly you would want to put turbines, because we

14 haven't had those data available.  In fact, in the entire

15 23 miles there were only a handful of sites, I think 15

16 total, that were surveyed along the 23-mile ridgetop.  We

17 don't have that information to guide us in how we would

18 put the turbines in and what areas we might want to

19 avoid, because they would potentially have a greater

20 number of bats and Indiana bats.  So, this -- the idea

21 that decisions have been made or are being made -- I

22 mean, it's already happened.  The decisions -- the

23 turbines are already being put up, and the data that we

24 would need to guide us to determine if that was a site

25 that had a high risk or a low risk has not been provided.

Direct - Gannon

1        In general, we find that, you know, there were

2 sites throughout near all of those turbines that were

3 good habitat for Indiana bats, and that's been produced

4 and certainly opened up the entire area, the entire 23

5 miles of ridgetop as a potential Indiana bat site.  So,

6 decisions are being made at this point without adequate

7 data that may impact these bats negatively.

8 Q.     Down at the bottom of that page there's a

9 statement by the Service.  The last sentence:  In

10 addition, mist-net surveys should be conducted during

11 fall and spring migration to understand the number and

12 diversity of bats passing through the project area.  Is

13 that the same kind of survey you were referring to a

14 moment ago as far as your understanding?

15 A.     Yes.  These are the periods when we see the most

16 bats and the most bat mortality, and the bats are doing

17 something different at these periods.  They're migrating,

18 rather than residing and foraging and roosting.  And so

19 these are the key times that we would want to do these

20 surveys.

21 Q.     If we look over at Plaintiff's Exhibit 99,

22 stipulated exhibit, this is another letter from the

23 Service July 31, 2007 to BHE Environmental.  Do you

24 remember looking at this letter?

25 A.     Yes I do.

1  Q.      And there's a -- in the third full paragraph,

2  beginning with "it should be noted that the bat

3  mortality" on the second page, the second -- the third

4  sentence begins with, "one summer season of survey effort

5  is likely not sufficient to determine species presence

6  and use of the project air space over time, particularly

7  as seasonal weather patterns change.  Weather patterns,

8  topography, or other local and regional elements may

9  affect bat migration or foraging behavior, causing a

10  skewed result if surveys are only conducted for one

11  summer."  Do you know what that -- do you have any

12  opinion on what that would mean?

13  A.      What this means is that conditions are not

14  constant in the field, and weather varies from year to

15  year.  Temperatures vary from year to year.  Colder

16  temperatures occur earlier and later than they would have

17  year to year.  For example, this year we saw a very cold

18  October already.  This may influence how the bats are

19  moving, at what time they move through.  And so

20  therefore, by doing it only at one point, you're not

21  taking into account any of these other variances that

22  occur.  Normally, you would want to do a number of

23  different seasons.

24          In the work that I've done, in particular in the

25  Caribbean -- I mean, I've spent numerous seasons

Direct - Gannon

1 collecting data because of the seasonal variation that

2 occurs from year to year which may influence what the

3 bats are doing at any particular time.

4 Q.      Are you aware of any other situations involving

5 Appalachian Ridge Projects which bears upon that opinion?

6 A.      Which bears upon the?

7 Q.      The need to do surveying at other times of the

8 summer and other times of the year.

9 A.      Well, as far as I know, there's been no surveys

10 that have been done where they've done surveys throughout

11 the year, both in the migratory period and in the summer

12 period.  And I don't know of any that have done multiple

13 studies that have been done over more than one year.

14 Q.      Do you have any experiences with projects that

15 have done more mist-net surveying than was done at this

16 project?

17 A.      That has done more mis- -- there have been a

18 number that have done more mist-net surveys than at this

19 project.  For example, there's a Shaffer Mountain site

20 where the surveys were done.  There were multiple year

21 surveys done there.  In both years they actually captured

22 Indiana bats.  So, they capture them two different --

23 over two different survey periods in different years,

24 indicating that the bats are using that site.  And it's

25 not fortuitous that they happen to be there one year, but

Direct - Gannon

1 they're actually residing on those ridgetops, and they're

2 there over multiple years.

3 Q.      How much surveying did they do at that site before

4 capturing the Indiana bats?

5 A.      I don't know exactly.  I would have to go back and

6 reread the paper, but it was significantly more than

7 here.  That's all I can remember at this point.

8 Q.      And further down on the same page, this next

9 paragraph says, "The Service has consistently recommended

10 use of several survey methods such as acoustical

11 detectors, thermal imagery, and radar.  Mist-netting, for

12 example, by itself, and during one summer is not robust

13 in the case of wind energy projects in the opinion of the

14 Service."  Do you know what the word "robust" would mean

15 as used in this context?

16 A.      Again, we're talking about techniques that could

17 be sensitive to different changes that occurred.  For

18 example, the reason you would want to do an AnaBat survey

19 is to potentially detect species that are there that you

20 may not net at a particular time.  If you're netting, in

21 particular, only over a short period of time, you're not

22 going to catch all the bats there.  We've seen that

23 repeatedly at a number of sites that we've looked at in

24 Pennsylvania, both by myself and by the people in the

25 Game Commission.  We generally have to spend a lot longer

Direct - Gannon

1 time netting in order to catch all of the species that

2 are there.

3        For example, at Canoe Creek, where we have the

4 largest number of Indiana bats present in Pennsylvania,

5 we actually recorded Indiana bats on the first night that

6 we did the survey.  It took us 23 nights of netting

7 before we actually caught one at that site.  We recorded

8 them every night we were there.  We identified them by

9 acoustic AnaBat surveys as being present.  We continued

10 to net until we actually caught one.

11       At another site in Allegheny, it took us nine

12 nights of continuous netting before we identified present

13 on the first night there.  So, in many cases we don't

14 have the time to spend 23 nights of a single site to look

15 for a bat, so we use these to supplement the data to

16 indicate that there is a very high likelihood.  And in

17 fact, in any case that I've ever gone out where I've

18 recorded an Indiana bat.  If we have netted -- if we have

19 been given the opportunity to continue the net there,

20 we've always caught that species.  Not only that species,

21 but other species that we have identified acoustically

22 that were not caught in the initial two or three nights

23 of netting.

24 Q.    That may bear upon the next question I was going

25 to ask you, which is, do you know why the Service would

Direct - Gannon

1 have been recommending acoustical detectors to be used at

2 this particular site?

3 A.     Well, for that very reason, acoustical detectors

4 will detect things that the mist-nets will not.

5 Q.     And based upon your understanding of the methods,

6 how does acoustical detection compare with mist-netting?

7 A.     Again, acoustical detection usually identifies

8 more species than a short-term mist-net study would.

9 Again, given the opportunity, persistent -- I usually

10 have -- well, I usually have -- in every case I've

11 actually been persistent and caught all the species

12 eventually, but it's taken me a lot longer than the

13 initial two or three days of the initial survey that

14 would normally be done there.

15      So, this is why we, you know, in particular at the

16 Allegheny National Forest, where the Forest Service also

17 asked to have acoustical data because they wanted to

18 avoid any sites that potentially had Indiana bats, even

19 if we didn't catch them, because they could -- in that

20 case, they were managing the forest.  So they could just

21 cut those trees at a period when the bats weren't there.

22 But they wanted to maximize their ability to harvest

23 trees, so they wanted to also work over the summer.  So,

24 sites where we netted and we recorded no Indiana bats, we

25 felt that those had the very low probability of having

Direct - Gannon

1  Indiana bats.  Where, if we netted an Indiana bat, or if

2  we recorded them, they had a much higher probability of

3  being there.

4  Q.     Now, you mentioned the Forest Service you worked

5  with on acoustical studies.  Are there other federal and

6  state agencies that are relying upon acoustical data?

7  A.     Well, the Fish and Wildlife -- at least my

8  experience in Pennsylvania is that they've asked for

9  acoustical data with the surveys that they're doing as

10 well, or that they're involved with.

11 Q.     And did you have occasion to analyze the

12 acoustical data that was actually collected on this site?

13 A.     Yes, I did.

14 Q.     And, can you describe the general approach that

15 you took in analyzing the acoustical data?

16 A.     Well, the acoustic data that we collected

17 typically, we take the data and we have certain criteria

18 that we have established to determine whether or not

19 there is a likelihood that we can identify them.  In

20 other words, the policies have to be of a certain length

21 or certain number.  Anything that is less than that we

22 feel we have a very low probability of identifying.  So

23 we then usually take a subset of all the calls, which is

24 always about -- it's always -- my experience has always

25 been about 30 percent of the total calls, somewhere in

Direct - Gannon

1 that area, that we can actually feel we have a high

2 probability of identifying properly, and then we compare

3 those via a computer analysis program to a library of

4 known bat calls.

5        We have in our library about 4,000 calls of all --

6 of all the species that occur in this area.  And in

7 particular, we have about -- somewhere between 300 and

8 400 Indiana bat calls from the area.  And then the

9 computer program will then match us up with a probability

10 of it belonging to what species it belongs to.

11 Q.     Okay.  And you refer to Indiana bat calls in your

12 library.  How were those obtained?

13 A.     Those were obtained by actually going out and

14 netting Indiana bats.  What we do is we mark them with a

15 luminescent tag.  It's a psyllium, those things you break

16 and you shake up.  They make very small ones that we can

17 attach to a bat.  We color code all the different

18 species, and then we release them.  And as they are then

19 foraging in the area, we then use the AnaBat detectors to

20 record them.

21 Q.     Would you consider that to be an extensive library

22 of Indiana bat calls?

23 A.     Yes, I think it is.  It took us about six years to

24 assemble that library.

25 Q.     And is the approach you just described and the

Direct - Gannon

1 approach you worked on with the Forest Service?

2 A.      Yes, it is.

3 Q.      And what was their reaction to that approach?

4 A.      We --

5        MR. ZATZ:  Objection.  Calls for hearsay.

6        MR. GLITZENSTEIN:   I can try to rephrase, Your

7 Honor.

8        THE COURT:  Rephrase it.

9        BY MR. GLITZENSTEIN:

10 Q.      Did you receive any objections from the Forest

11 Service as to the use of that approach?

12 A.      No.  Actually, we presented them data showing the

13 accuracy of the system.  What we did was we did what's

14 called a double blind study where we had gone out and

15 collected calls of a variety of different species of bats

16 where we knew what they were, but the operator who was

17 running the computer program did not.  They only were

18 assigned a number.  And then we ran them through the

19 system, identified them based on the -- what the system

20 would tell us that they are, and then we looked at how

21 often we were right.

22        With the Indiana bats, we had 20 calls that were

23 Indiana bats among the 120 calls that we submitted to the

24 technician, and 18 of those 20 were identified as Indiana

25 bats.  There were two that were identified, as -- well,

Direct - Gannon

1 basically they were unidentified.  They didn't meet our

2 criteria to be called an Indiana bat, but they didn't

3 meet the criteria to be anything else.  So, we didn't

4 misidentify those bats as another species; we simply said

5 we can't identify them based on the criteria we've

6 already presented as being one that, you know, is the

7 minimum we would accept to identify these bats.

8 Q.     And could you describe again, or explain a little

9 bit what you mean by doing a double blind test to

10 evaluate the accuracy of this method?

11 A.     Well, what we do is we take the calls -- again, we

12 know what they are, but the operators don't.  They then

13 run them through there's a criteria that we've preset, as

14 far as the calls have to match up with the calls of that

15 particular species in the library at least 85 percent.

16 So in other words, the call that we call an Indiana bat

17 has to be at least 85 percent similar to the Indiana bat

18 calls, the range of Indiana bat calls we have in our

19 library.  If we then call that an Indiana bat based on

20 that criteria, we're right 90 percent of the time.  The

21 ten percent of the time that we're wrong, we simply fail

22 to identify the bat, so we don't have a -- we didn't have

23 any false positives, or we just simply did not identify

24 that bat because it didn't meet the criteria.

25 Q.     And when you've met this criteria, have you been

Direct - Gannon

1 able to verify in the field the accuracy of this

2 analysis?

3 A.    Well, again, after we did this study, we went out

4 in the field.  And this is one of the reasons we netted

5 continuously the number of sites, because we wanted to

6 demonstrate to the Forest Service that when we identify

7 Indiana bats, we can catch them at those sites.  So there

8 were several sites we netted repeatedly at efforts much

9 higher than would be done by the Indiana Bat Recovery

10 Plan.  We used typically -- at all the sites I net, I set

11 ten nets minimum at a site, and at one of them we netted

12 23 nights; the other one we netted nine nights.  So if we

13 take 23 times ten, that's 230 nights, as opposed to four

14 net nights which would be what the Indiana Bat survey

15 Protocol calls for.

16 Q.    And what happened when you did that?

17 A.    We caught an Indiana bat.

18 Q.    Is this approach you've described sound science in

19 your view?

20 A.    Well, again, the reason we were demonstrating it

21 was to show that it was -- doing it this way was to show

22 to the Forest Service that it was sound science, that

23 what we were getting was actually very accurate.  And

24 after they came out in the field with us and looked at

25 the system and looked it over, they felt that they had --

Direct - Gannon

1  they agreed that we should go forward with the project

2  using that technique.

3  Q.     And what was the result of the analysis that you

4  did in this particular case?

5  A.     I found that there were three calls -- I could --

6  there were 42 calls out of, I think, 160-something that I

7  felt were identifiable based on the criteria that we

8  used.  And of those, three of them were identified as

9  Indiana bats.

10 Q.     So that's three that each met this 90 percent

11 figure that you talked about?

12 A.     Well, our -- again, the studies that we did -- the

13 double blind study shows that we have a 90 percent

14 success rate, but it also shows that usually in every

15 case that we failed to identify an Indiana bat, we didn't

16 identify it as something else.  And so we weren't

17 incorrect; we just failed to identify it.  So the

18 probability that we have misidentified another species as

19 an Indiana bat is extremely low.

20 Q.     Do you know the kind of analysis that Dr. Robbins

21 uses in analyzing acoustic data like this?

22  A.     He uses a similar type of analysis, but it's a

23 different type of program.  There are competing programs

24 out there that do very similar things, and he uses one

25 that does things slightly different.  I'm not as familiar

Direct - Gannon

1 with that program as I am with the one that I use, but it
2 basically does the same kind of thing.  It matches the
3 unknowns with a like a call library.  I know that Dr.
4 Robbins has an extensive call library as well.  We have,
5 on a number of times, communicated with each other in the
6 past about call libraries and about the quality of the
7 calls and things like that in our individual libraries.
8         I know that his call library is extensive,
9 probably at least as extensive as mine; maybe more so at
10 this point.  And so I would say that his -- that what
11 he's -- he's probably the only other person I know of
12 that's doing similar type work where we actually are
13 using computers to analyze this stuff with the -- with a
14 large enough call library to have some accuracy that I
15 would be comfortable with -- you know, that I would be
16 comfortable with as a scientific predictor.
17 Q.     Based upon what you know of Dr. Robbins' approach,
18 do you think that's a reliable scientific approach?
19 A.     I think I would, at this point, have more faith in
20 what he's doing than my own, because he's been
21 continuously developing this over the past few years.
22 I've been recently doing less research, because I've been
23 more involved in administration work.  I've spent a
24 couple of years as the assistant dean for research, and
25 then I was on sabbatical, and I'm now the coordinator for

Direct - Gannon

1 the biology program.  So I haven't been doing as much in

2 the past five years as he has.  There's been some new

3 developments.  There's been some new things that are out

4 there.  So, I would say he's doing at least as well as I

5 am; and I probably have even greater faith in his ability

6 to identify these things.

7 Q.      Do you know who Eric Britzke is?

8 A.      I know the name.  I've never met him, but I do

9 know him, and I do know his work.

10 Q.      Is he somebody who is known for his work on

11 acoustic analysis?

12 A.      Yeah.  He's done some extensive work as well.

13 I've never talked to him directly.  I don't know all that

14 much about the methodology he's using, except that it's

15 similar to Dr. Robbins'.

16 Q.      Based on your experience, is Dr. Michael Lacki

17 someone who is known for his work on acoustic issues?

18 A.      Before this trial came up, I didn't know his name

19 at all.  I don't know of any -- I was not familiar with

20 any of his work.  I don't know -- I don't -- I have not

21 been able to find anything that he's done with acoustic

22 work, so I just don't -- I don't know what his background

23 is.

24 Q.      Have you reviewed his criticisms of the approach

25 that you took?

Direct - Gannon

1  A.     Yes, I did.  I looked at it.  I'm not quite sure I

2  understand it.  I think it's -- it may be because he

3  doesn't understand what I'm talking about when I say this

4  85 percent cutoff that we're talking about.  In science,

5  typically we talk about statistical significance being at

6  the 95 percent level.  When you're doing, say, a T Test,

7  and you're trying to compare the mean of this group to

8  the mean of that group, and you want to have a 95 percent

9  significance level, that's not what these tests are

10 doing.  It's not a statistical test.  This test says this

11 call matches the calls in your library and it matches

12 them -- 85 percent of the calls in the call library that

13 we see as Indiana bats are occurring in this particular

14 call.

15        So, therefore, by saying that that is an Indiana

16 bat -- it will also say you might have two percent chance

17 of being a little brown bat.  But because we've set the

18 level that we'll accept as a correct identification very

19 high, it's a very conservative estimate.  So, in many

20 cases, we may have Indiana bat calls that we're not

21 identifying because we've set the bar so high.  And so

22 therefore I think he's just misunderstanding the

23 difference between what we're talking about, this 85

24 percent as being a 95 percent significance which is

25 normally what is accepted in science for a statistical

Direct - Gannon

1 test.

2 Q.      Do you know whether Dr. Lacki himself analyzed the

3 AnaBat data?

4 A.      I don't know.

5 Q.      Just one other question on the acoustic

6 information.  You referred to the call library you've

7 assembled.  What region of the country did you use to

8 assemble Indiana bat calls from?

9 A.      The calls came from Pennsylvania, Virginia and

10 West Virginia, because those are the areas that we were

11 working in.

12 Q.      Do you have any reason to think that there would

13 be some difference in the analysis based upon the region

14 from which an Indiana bat call came from?

15 A.      At some -- early on there was a lot of talk about

16 regional dialects of bats.  What we found in comparing

17 things with Dr. Robbins -- for example, early on, back in

18 2003, we found that, at least for Indiana bats, we saw

19 very little difference.  What we identified as Indiana

20 bats using my call library he was also identifying as

21 Indiana bats using his call library, which came from a

22 different region.  And our feelings were we didn't see

23 any evidence of this Indiana bat dialect that might

24 change in different parts of the country, at least with

25 that species, as well as a few others that we had looked

Direct - Gannon

1 at.

2 Q.    Dr. Gannon, I'll also ask you to take a look at

3 document Plaintiff's Exhibit 63, which is stipulated.

4 You talked a little bit before about -- excuse me for one

5 second, Your Honor.  Sorry, Your Honor.

6       If we take a look at Plaintiff's Exhibit 59, which

7 has also been stipulated, and ask you -- this is a

8 plaintiff's exhibit, Your Honor, and we're still getting

9 the precise number.

10      Dr. Gannon, have you seen this diagram before?

11 A.    Yes, I have.

12 Q.    And does this diagram have any significance to you

13 in terms of the likelihood of impacts on Indiana bats?

14 A.    Yeah.  What this shows is where Indiana bats are

15 known to occur at different times of the year.  And

16 again, this is based on data that we have at this point.

17 The known Indiana bat winter hibernacula, I believe, are

18 in blue.  So, these counties in here are winter

19 hibernacula.  The summer occurrences are shown in yellow,

20 if I'm correct.  And then the maternity colonies where

21 they have maternity colonies are shown in the hatched

22 area.

23      What this shows is there is known summer habitat

24 here.  There's known summer habitat over here.  In

25 between, there's a lot of Indiana bat habitat because

Direct - Gannon

1 bats are found there.  There is no reason that we would

2 assume that they're not there.  The only reason that we

3 see normally with this kind of county data is that people

4 have really never done surveys in those counties.

5         Frequently, there are people that make their

6 entire career about looking at maps like this and saying

7 this county has never had an occurrence that's been found

8 in the summer, and then they then publish a paper that

9 says this county does actually have them; we went there

10 and surveyed for them and we found them.

11        So, my feeling is that if they're occurring on

12 both sides of those counties during the summer, they're

13 going to be in those counties in the summer as well.

14 There is habitat there that would be ample summer

15 habitat, especially at the site that I visited, which is

16 one of those sites.  And so there is no reason why the

17 Indiana bats would not be there, especially in the

18 winter.

19        There are Indiana bats in Canoe Creek in

20 Pennsylvania that stay in the park the entire year.  They

21 move from one location to another.  They're in the

22 hibernaculum in the winter, the mine.  And they move into

23 an old building, a church, in the summer and, basically,

24 across the street in a number of trees that they've been

25 radio tracked to.  They repeatedly go there each year.

Direct - Gannon

1 But there are others that leave the area and migrate out

2 hundreds of miles.  So, there are bats that stay in the

3 area all year round in other places as well.

4 Q.      Your Honor, I apologize for the confusion.  This

5 is Plaintiff's Exhibit 62 which has also been stipulated.

6        And with respect to that migratory route on Page

7 10 of your second declaration, Paragraph 14, near the

8 bottom of that page, the last couple of sentences, you

9 state, I believe that Indiana bats will migrate across

10 the Beech Ridge Project's ridge lines during spring and

11 fall because the project lies in between known winter

12 hibernacula and known summer roosting habitat.

13        And as discussed earlier, defendant's experts

14 Tyrell and Romme concedes, and the literature

15 demonstrates that Indiana bats cross during -- ridges

16 during migration.  Further, as Dr. Tyrell points out,

17 Indiana bats have been pointed out to travel along power

18 lines during migration, and the Beech Ridge transmission

19 line runs from in a northwest direction from the project

20 site directly toward known summer roosting grounds for

21 Indiana bats.

22        Can you explain a little further the significance

23 of where the transmission line has been built relative to

24 the project?

25 A.      The transmission line runs from outside the

Direct - Gannon

1 project into the center of the project.  And, basically,

2 what's been done is a corridor has been created there

3 that could potentially funnel Indiana bats in one

4 direction or the other.  Because Indiana bats are known

5 to cross ridgetops, and because we have these corridors

6 or these highways that they can now travel along these

7 ridgetops, we would expect to see numbers of bats, as

8 well as Indiana bats using those.  They frequently use

9 them in a lot of different areas.  This is one of the

10 reasons we set up nets along trails and along roadways,

11 but we try and put them, as I said before, in areas that

12 are closed that will funnel the bats into the nets.

13 Q.     Take a look at Plaintiff's Exhibit 112, also

14 stipulated.  And this is a letter from the Fish and

15 Wildlife Service relating to the Mountaineer Project.

16 Let me just ask you a question, first of all.  Do you

17 have an opinion on whether the experience with the

18 Mountaineer Project is relevant to the Beech Ridge

19 Project?

20 A.     Well, the Mountaineer Project is in the same

21 general area.  It's in the same mountain range, the

22 Allegheny-Appalachian mountain range.  Many of the

23 conditions that occur there are similar to the ones we

24 would find at this site.

25 Q.     I'm sorry --

Direct - Gannon

1 A.      I believe also it was used as a -- to -- it was

2 used as a predictor for the number of bats that we might

3 see at this particular site, if I recall correctly.

4 Q.      Yeah.  Just for the record, this letter was

5 relating to the Liberty Gap Project.  But if we look at

6 the second page of this letter, there's a reference to

7 the Mountaineer Project.  And if we look at the second

8 full -- the first full paragraph, there's a statement

9 that says, "For example, there is currently no monitoring

10 at the Mountaineer Wind Power facility.  The limited data

11 that was available for the first few months that

12 monitoring did occur indicated that common bat species

13 were colliding with the wind turbine at a high rate,

14 particularly during the fall migration period.  It is

15 impossible to make a conclusion that turbines do not kill

16 federally listed bats based on one short season of

17 monitoring.  In fact, the number of bats killed there

18 shows a high likelihood that endangered bats are also

19 likely to be killed."

20      Do you agree with that statement by the Fish and

21 Wildlife Service?

22 A.      I agree with that completely.

23 Q.      Okay.

24      THE COURT:  What was that exhibit number again,

25 Counsel?

Direct - Gannon

1        MR. GLITZENSTEIN:  Excuse me, Your Honor?

2        THE COURT:  What was that exhibit number?  The one

3 you were just referring to.

4        MR. GLITZENSTEIN:  This is 112, Your Honor.

5        THE COURT:  112.  All right.  Thank you.

6        BY MR. GLITZENSTEIN:

7 Q.     And if we could take a look at Plaintiff's Exhibit

8 37, also stipulated.  Excuse me.  This one is not

9 stipulated; I correct that.  This is a report from the

10 Mountaineer Project Wildlife Incident Report.  And is

11 this a document you've looked at before, Dr. Gannon?

12 A.     Yes, it is.  Yes.

13 Q.     And do you know what this document appears to be?

14 A.     This is an incident report for a bat that was

15 killed at the Mountaineer site.

16 Q.     If we look at the third box down, "condition/

17 description."

18        MR. ZATZ:  Your Honor, objection.  This is not

19 stipulated.  In fact, we object to this as hearsay.

20        THE COURT:  What's the basis of your objection?

21        MR. ZATZ:  Hearsay, Your Honor.

22        MR. GLITZENSTEIN:  Your Honor --

23        THE COURT:  Is this a business record from this

24 project?

25        MR. GLITZENSTEIN:  It's a business record.  We

Direct - Gannon

1  went to the company that we subpoenaed it from, which we

2  can show you the declaration that we have, which fully

3  comports with the rules, and which says that all of the

4  documents we obtained pursuant to our subpoena were in

5  fact business records.

6          We've pulled it up on the screen.  It's a

7  declaration concerning authenticity of records.  And a

8  senior attorney, the person we dealt with, ensured that

9  the subpoena was complied with Paragraph 2 says, I

10 certify that all of the records that were collected and

11 provided to plaintiffs, in response to the subpoena, were

12 true and authentic copies of documents and Nextera Energy

13 files and that they were obtained, maintained, and kept

14 by Nextera Energy in the ordinary course of Nextera

15 Energy's regularly conducted activity at or near the time

16 of the events recorded.

17         It is the regular practice of Nextera Energy to

18 obtain and maintain the information that is recorded in

19 these documents and to create the records based upon

20 personal knowledge of Nextera Energy's employees or

21 persons with a business duty to  Nextera Energy.  In

22 particular, our Wildlife Incident Reporting forms, which

23 Your Honor is what this is, are maintained and kept in

24 the ordinary course of business according to our

25 company's protocol for reporting such incidents.

Direct - Gannon

1        This is exactly what the case law says we have to

2  produce in order to bring in a business record.  There is

3  simply no reason why it shouldn't come in under that

4  exception to the hearsay rule.

5        MR. ZATZ:  Your Honor, we would also object under

6  Rule 702.  This document states an expert opinion.  There

7  is no foundation for Mr. Booth's expertise to identify an

8  Indiana bat.

9        THE COURT:  All right.  I'll overrule the

10  objection.

11        BY MR. GLITZENSTEIN:

12  Q.     Thank you, Your Honor.

13        Dr. Gannon, have you looked at the records

14  relating to that incident report which we -- if we can

15  pull that back up.  Once again, it's Plaintiff's Exhibit

16  37.  And if we can look through the entire report.

17  Again, condition/description.  It says, list species if

18  known.  And then it says, appears to be an Indiana bat or

19  a gray bat.  Both are endangered.  Do you see that

20  statement?

21  A.     Yes, I do.

22  Q.     And if we could look down -- continue on looking.

23  Is an Indiana bat actually a bat that does exist within

24  the range of this project?

25  A.     Yes, it is.

Direct - Gannon

1  Q.      Okay.  Is a gray bat a species that's generally

2  within the range of this project?

3  A.      No, it's not.

4  Q.      And did you look at all the other records that you

5  have available to you relating to this particular

6  identification?

7  A.      Yes, I did.

8  Q.      Is it, in your view, possible that the bat that

9  was identified here was an Indiana bat?

10 A.      It's possible.

11         MR. ZATZ:  Objection, Your Honor.  Expert opinion

12 about possibility is not admissible.  Unless Dr. Gannon

13 can state to a reasonable degree of scientific certainty

14 that this was an Indiana bat, this opinion should be

15 excluded.

16         THE COURT:  I'll permit it.  Overruled.

17         BY MR. GLITZENSTEIN:

18 Q.      Can you give an opinion about the reliability of

19 -- about this being identified as an Indiana bat?

20 A.      The photograph of the -- by the company showed a

21 bat.  It is very possible it could be an Indiana bat.

22 Again, none of the characteristics that I would look for

23 are shown here.  The fact that it was identified by

24 somebody else as an Indiana bat I thought would trigger

25 some kind of a confirmation.  I mean, it would be very

Direct - Gannon

1 easily confirmed if we had the carcass.  If the carcass

2 was frozen; if somebody had collected a sample and sent

3 it out for DNA.  I mean, it would be very easy to confirm

4 this.

5          So, in this case, I can't say it's not an Indiana

6 bat.  I'm going, again, by their identification.  And I

7 would say, you know, it should lie with the company to

8 confirm this, especially given the fact that this has

9 been identified as a potential endangered species and

10 that windmills kill bats and that this is an issue that

11 has come up repeatedly.  What this shows is that there is

12 no -- basically, no followup, at least at this site for

13 confirming whether -- when an Indiana bat is reported as

14 being killed and that they actually follow up to

15 determine if indeed that's what happened.

16 Q.     When you said there is no features to identify, I

17 think is the way you put it.  Just to be clear about

18 this.  You're saying those features aren't there?  Or you

19 couldn't tell from this photograph whether they're there

20 or not?

21 A.     They're there; we just can't see them.  The two

22 that I pointed out before were, you know, the facial

23 color and also the calcar that's down ere.  But,

24 obviously, unless you stretch out the membrane, you can't

25 see it.  Again, those are characteristics that would be

Direct - Gannon

1 the first ones to be looked for, and those would be the

2 first -- you know, the type of characteristics that would

3 be in an identification manual to determine whether this

4 bat is or is not an Indiana bat.

5 Q.     If we could look at Plaintiff's Exhibit 38, and

6 scroll down to that.  And if we could bring up the

7 language near the top there.  This is an email that

8 relates to the same identification.  And, apparently,

9 this is from somebody who was consulted about this with

10 the company.  It says, "I would say that this is likely

11 either a little brown bat or big brown bat but is

12 certainly some sort of vesper bat and not a tree bat.

13 Need some scale and some other angle of the bat tail,

14 face, and fur.  If interested, the Indiana bat has a

15 distribution that does cover that site and is endangered.

16 Can't say that it is not an Indiana bat, but it is not

17 probable."

18      Does that sound to you like an adequate basis on

19 which to conclude that this is not an Indiana bat?

20 A.     No.  I mean, the bat wasn't examined for the

21 proper characteristics so we can't rule out that it is an

22 Indiana bat.

23 Q.     Based upon what you reviewed, do you know any

24 other steps that were taken to verify what this bat was?

25 A.     I don't know of any other steps that were taken.

Direct - Gannon

1  Q.      Would it surprise you if this were an Indiana bat?

2  A.      No.

3          MR. ZATZ:  Objection.

4          THE COURT:  Sustained.

5          BY MR. GLITZENSTEIN:

6  Q.      If we look at Exhibit 2, Page 4.  This is your

7  second declaration.  You state in Paragraph 6:

8  Therefore, my opinion -- at the end of the paragraph on

9  Page 4.  "Therefore, my opinion is still that to a high

10 degree of scientific certainty, or to a high likelihood,

11 or to a high probability, this wind project will kill or

12 injure Indiana bats."  Is that still your opinion?

13 A.      Yeah, that is my opinion.  And especially since we

14 now have the AnaBat data, and we've also had the site

15 visit where I was able to actually see what the site

16 looks like.  I am as or more convinced as I was when

17 initially this -- we -- this project initially started

18 that Indiana bats would be present.

19 Q.      Dr. Gannon, do you know precisely where all of the

20 Indiana bats that are in the hibernacula near the project

21 are migrating to or from?

22 A.      No.

23 Q.      How can you come to a conclusion with a high

24 degree of scientific certainty without that information?

25 A.      Well, the fact that we have now the AnaBat data

Direct - Gannon

1  shows that there are Indiana bats on the site.  But even

2  without that, we also have habitat that's present.  We

3  have augmented habitat that's present.  We have it in

4  close proximity to a hibernaculum which is exactly what

5  you would look for to determine whether or not an Indiana

6  bat has a high probability of being there.  So, based on

7  those, this site has a high probability of being there.

8  It's even more convincing at this point now, because we

9  also have calls that are -- came from that site which

10 have been identified as Indiana bat calls.

11         MR. GLITZENSTEIN:   I have nothing further, Your

12 Honor.

13         THE COURT:  All right.  Cross.

14         MR. ZATZ:  Thank you, Your Honor.

15                    **CROSS-EXAMINATION**

16         BY MR. ZATZ:

17 Q.    Dr. Gannon, I want to point your attention back to

18 Plaintiff's Exhibit 37, the photograph of the bat found

19 at the Mountaineer Wind Project.  Just to be clear.  Your

20 testimony is that you cannot identify any characteristics

21 from this photo that prove that this is an Indiana bat;

22 correct?

23 A.    I cannot identify any characteristics in this

24 photo that proves it is not an Indiana bat also.

25 Q.    That's not my question, sir.

Cross - Gannon

1  A.      Well, again, I think -- but that -- I think that's

2  the issue here is that we can't tell from this photo

3  whether it is or it isn't.

4  Q.      Dr. Gannon.

5  A.      I didn't identify it as an Indiana bat.  The

6  Mountaineer company did.  They were the ones that called

7  it an Indiana bat.  I can't say from this photo that it

8  is not an Indiana bat.

9  Q.      Dr. Gannon, the Court will decide what the issue

10 here is.  My question is much simpler.  You cannot, from

11 this photograph, Plaintiff's Exhibit 37, identify any

12 characteristics of an Indiana bat.  Correct, sir?

13 A.      That is correct.

14 Q.      And you don't know who took this photograph, do

15 you?

16 A.      No, I do not.

17 Q.      And you don't know the gentleman who identified

18 this as being possibly an Indiana bat, do you?

19 A.      No, I do not.

20 Q.      Have you ever heard of Nelson Booth?

21 A.      No, I haven't.  Not before this.

22      MR. ZATZ:  Your Honor, this is not in evidence,

23 and I'm using it solely for impeachment purposes.

24      MR. GLITZENSTEIN:  I'm not entirely clear how one

25 can impeach a witness with a statement from somebody

Cross - Gannon

1 else.  This is not even a statement being made about Dr.

2 Gannon.  This is a pure out of court declaration from

3 someone who could have been deposed and everybody would

4 have a chance to cross-examine him, and it's -- I don't

5 see how it possibly falls within any exception to the

6 hearsay rule.

7        THE COURT:  How can you use the statement of

8 someone who is not here to impeach him?  It's not his

9 statement.

10        MR. ZATZ:  I'm not offering it for the truth, Your

11 Honor.  I'm offering it to show that this witness has not

12 investigated the qualifications of this person to

13 identify this bat.

14        THE COURT:  The objection is sustained.

15        BY MR. ZATZ:

16 Q.    Dr. Gannon, did you know that the gentleman who

17 identified this as possibly an Indiana bat is a fork

18 truck operator?

19 A.     I heard that from somebody.  Yes.

20        MR. GLITZENSTEIN:  Your Honor, I object to that.

21 That's not based upon any evidence in the record or any

22 -- that was simply a roundabout way to get in what was in

23 the declaration.

24        THE COURT:  It sounds like he was a forklift

25 operator.  I'll overrule the objection.

Cross - Gannon

1       BY MR. ZATZ:

2  Q.     Dr. Gannon, you have no reason to believe that the

3  gentleman who identified this photograph as possibly an

4  Indiana bat had any training in biology?

5  A.     I get a lot of calls from people that don't have

6  training in biology which tell me they found something,

7  and I take all of those seriously, especially if it's

8  something like an endangered species.  So what I do is I

9  usually go out and I verify whether it is or it isn't.  I

10 don't know in this case -- had he called me, I would have

11 gone and verified or made arrangements to have it

12 verified to determine whether it is or is not an Indiana

13 bat.

14 Q.     And so it has not been verified; correct?

15 A.     That's correct.

16 Q.     And you do not know his qualifications to identify

17 it as an Indiana bat.

18 A.     I do not.

19 Q.     Okay.  And would you agree that a fork truck

20 operator would have lesser qualifications than you to

21 identify it as an Indiana bat?

22 A.     I'm sure they would.  I mean, it's not hard to

23 teach somebody how to identify Indiana bats, but I don't

24 know what his training, you know, training was.  What I

25 was told was that he looked at a manual to determine

Cross - Gannon

1 whether it was an Indiana bat or not.  Again, most of the

2 these manuals do have key characteristics listed in them.

3 Q.     Let me ask my question again.  It was quite

4 simple.  Dr. Gannon, would you agree that Mr. Booth, as a

5 fork truck operator, is less qualified than you to

6 identify this photograph as an Indiana bat?

7 A.     Again, I don't know what his training is,

8 biologically, and so I don't think I can answer that

9 question accurately.  I would say, in general, forklift

10 operators probably don't have training in biology, but I

11 don't know what his background is.

12 Q.     Would you agree that this forklift truck operator

13 couldn't see the keeled calcar in this photograph any

14 better than you could?

15 A.     Well, he was on site.  He could have picked up the

16 bat and examined it.  I don't know that he did or didn't

17 do that.

18 Q.     And is it fair to say that if you don't have a bat

19 in hand, you probably can't tell whether this is an

20 Indiana bat?

21 A.     In this particular case, without having more data,

22 no, we can't be 100 percent sure either way.

23 Q.     And you said it was easy to confirm a species by

24 doing DNA analysis; is that correct?

25 A.     That's correct.

Cross - Gannon

1 Q.      And to your knowledge that was not done here, was
2 it?
3 A.      As far as I know, nothing was done.
4 Q.      You told us that you were a peer reviewer for
5 professional journals; is that correct?
6 A.      Yes.
7 Q.      One of your jobs as a peer reviewer is to ensure
8 that statements made in scientific journals have the
9 requisite amount of certainty, qualifications, and
10 expertise behind them; is that correct?
11 A.      That's correct.
12 Q.      You would not, in your role as a peer reviewer for
13 professional journals, accept for publication the
14 statement by a fork truck operator that a photograph was
15 possibly an Indiana bat, would you?
16 A.      Again, this wasn't done for publication purposes.
17 There is a higher standard for publication purposes.
18 Again, this was identified by someone who worked for the
19 company as an endangered species but, again, there was no
20 followup.  There very easily would could have been
21 followup on here.  It would have been very simple to
22 determine whether it is.  And what this shows is there is
23 basically no mechanism in place at this company to follow
24 up on these things.  When there is an endangered species
25 kill reported, nothing is done.

Cross - Gannon

1 Q.     My question, Dr. Gannon, was, would you, as a peer

2 reviewer for a professional journal, accept the statement

3 of a fork truck operator that an Indiana bat was possibly

4 -- that a photograph was possibly one of an Indiana bat

5 for publication?

6      MR. GLITZENSTEIN:  Your Honor, I need to lodge an

7 objection because it --

8      THE COURT:  All right.  Sustained.  I think I

9 understand the point.

10     MR. ZATZ:  Thank you, Your Honor I'll move on.

11     BY MR. ZATZ:

12 Q.     Dr. Gannon, you have no evidence of Indiana bat

13 mortality at the Beech Ridge Project, do you, sir?

14 A.     The wind turbines are not functioning, so at this

15 point they could not be killing bats.

16 Q.     Do you have any evidence of any mortality of an

17 Indiana bat ever at the Beech Ridge Project?

18 A.     Again, the turbines that are in question are not

19 functioning, so they cannot have killed bats.  So the

20 answer is no, there is no evidence before the -- you

21 know, before the item that we're talking about as killing

22 bats is operating.  It's impossible for them to kill bats

23 at that site.  You're right.

24 Q.     And to follow up on your point, Dr. Gannon.  You

25 identified an exhibit that showed that Greenbrier County

Cross - Gannon

1 is a location of a winter hibernacula of Indiana bat;

2 correct?

3 A.      That's correct.

4 Q.      And, by definition, winter hibernacula means that

5 those bats are, in layman's terms, sleeping; correct?

6 A.      They are hibernating.

7 Q.      Okay.  And hibernating bats are not going to be at

8 risk from this project right now; correct?

9 A.      Not while they're hibernating.  No.

10 Q.      And hibernating bats would not be at risk from

11 this project even if the turbines were up and running,

12 were they?

13 A.      Not as long as they remain in the hibernaculum.

14 Q.      And you have no evidence of any capture of an

15 Indiana bat at this site, do you?

16 A.      The capture?  No.

17 Q.      And you didn't do any mist-net survey of your own

18 at this site, did you?

19 A.      No, I did not.

20 Q.      And you didn't ask for access to the site to do

21 any mist-net survey, did you?

22 A.      It would not have been possible in the time frame

23 for this case to take place.  I would have been happy to

24 do it, but it would take much longer to make arrangements

25 for such a thing.

Cross - Gannon

1 Q.      So the answer to my question is?

2 A.      No.

3 Q.      You did not ask for permission to this site to

4 perform mist-net surveying; is that right?

5 A.      No.

6 Q.      And other than the photograph taken by this fork

7 truck operator, you have no evidence of Indiana bat

8 fatalities at the Mountaineer Project, do you?

9 A.      No direct evidence, no.

10 Q.      And other than this photograph taken by the fork

11 truck operator, you have no evidence of Indiana bat

12 fatalities at any other wind project, do you?

13          MR. GLITZENSTEIN:  Your Honor, my objection

14 actually is that if you look at -- what we have is

15 actually a worst situation that if the declaration had

16 come in, because this declaration does not say that Mr.

17 Booth is a fork truck operator.  It says he is the site

18 environmental lead which means that I am reporting any

19 bird and bat fatalities.  What we have now is actually

20 defense counsel is testifying he's a fork truck operator

21 in a way that's conflicting with the very out of court

22 declaration he tried to get in before Your Honor.  There

23 is nothing in here that says he's a fork truck operator,

24 so this seems to be defense counsel's personal testimony.

25          MR. ZATZ:  I'll put the exhibit back up.

Cross - Gannon

1          THE COURT:  Is it a fair characterization to refer

2    to him as a fork truck operator if that's what it says?

3          MR. ZATZ:  I'll put the exhibit back up.

4          BY MR. ZATZ:

5    Q.    Dr. Gannon, in that first box headed "discovery

6    information," fourth question down -- can you see that?

7    A.    Yes.

8    Q.    "What was person doing when bird was found?"  Have

9    I read that correctly?

10   A.    Yes.

11   Q.    And does it say next to that "operating fork

12   truck?"

13   A.    It does.

14         MR. GLITZENSTEIN:  Your Honor, I object.  It

15   clearly does not say that he was the one who was

16   operating the fork truck.  In effect, the declaration

17   that they got under oath from this fellow does not

18   describe himself that way.  It says he supervises and

19   performs maintenance activities on turbines and that he

20   is also a site environmental lead which means "I am

21   responsible for reporting any bird and bat fatalities I

22   discover while performing work near the turbines."  I

23   think they're simply inaccurately characterizing their

24   own out of court declaration.

25         MR. ZATZ:  Your Honor, the witness has testified

Cross - Gannon

1  that he understood that Mr. Booth was a fork truck

2  operator.

3       MR. GLITZENSTEIN:  He understood that based upon

4  the question that was put to him by defense counsel.

5       THE COURT:  Counsel, I think that based upon what

6  I've been told, I don't think it's fair to simply

7  describe him as a fork truck operator.  I think I

8  understand what he does, and I've heard what his position

9  is.  Let's move on.

10      BY MR. ZATZ:

11 Q.    All right, Your Honor.

12      Other than Mr. Booth's photograph, you know of no

13 evidence of Indiana bat fatalities at any wind project

14 other than Mountaineer; correct?

15 A.    That's correct.

16 Q.    And you know of no summer captures of Indiana bats

17 in Greenbrier County, West Virginia; correct?

18 A.    I don't know of any surveys that have been

19 performed there, so I don't know of any summer captures.

20 Q.    And you've testified about other wind projects

21 where no Indiana bats were confirmed to be on site;

22 correct?

23 A.    Were confirmed to be on site?

24 Q.    Yes.

25 A.    I'm sorry.  By whom?

Cross - Gannon

1  Q.      Let me give you an example.

2  A.      I never confirmed that Indiana bats were not on a

3  site anywhere, if that's what you're asking.  I'm not

4  quite sure what you're asking.

5  Q.      Did you testify in Virginia about the Highland

6  Wind Project?

7  A.      Yes, I did.

8  Q.      And no Indiana bats were confirmed to be on that

9  site; correct?

10  A.      As far as I know, there was -- the surveys that

11  were done did not confirm them.  No.

12  Q.      And that was true, even though there were 25 or 30

13  hibernacula within a 50-mile radius of that site;

14  correct?

15  A.      Again, the issue that I have there is the quality

16  of the surveys that was done.

17  Q.      The answer to my question, Dr. Gannon, is, that

18  was so even though there 25 to 30 hibernacula within a

19  50-mile radius; correct?

20  A.      My answer would be, with the quality of the

21  surveys that were done, the answer is no, there were no

22  Indiana bats confirmed on that site.  I would take issue

23  with the quality of the surveys, because I don't think

24  they were adequate to detect the Indiana bats.

25  Q.      You also testified in the West Virginia Public

Cross - Gannon

1 Service Commission about the Liberty Gap Wind Project;

2 correct?

3 A.    Yes.

4 Q.    And there were no Indiana bats sighted or captured

5 on that site; correct?

6 A.    That's correct.

7 Q.    And that was true even though there were

8 hibernacula in a 50-mile range; is that correct?

9 A.    Again, I would take issue with the quality of the

10 surveys that were done at that site as well.

11 Q.    But the answer to any question is correct.

12 A.    Correct.

13 Q.    So even when they are in their geographical range,

14 Indiana bats are not necessarily present at any

15 particular site; correct?

16 A.    However, we do have a site in Pennsylvania where

17 there is a hibernaculum close by where the quality of the

18 survey was not in issue, and they did actually capture

19 Indiana bats two successive summers, exactly what I had

20 predicted they would prior to the surveys being done.

21 Q.    Dr. Gannon, you're going to have a lot of

22 opportunities to explain on redirect, but I need an

23 answer to my question too.  Even though we are within the

24 geographical range of an Indiana bat, that does not mean

25 that bat is present at any particular place; correct?

Cross - Gannon

1 A.      I guess I'm not quite understanding the question.

2 You're saying that the likelihood is equal in all places

3 throughout that that it will be present or will not be

4 present?

5 Q.      My question is very simple, Dr. Gannon.  Even when

6 an Indiana bat is within its geographical range, that

7 does not mean it will be present at any particular place;

8 correct?

9 A.      No.  We know there are sites where they are

10 present within the range.

11 Q.      And sites where they are not present within the

12 range; correct?

13 A.      That we have -- that they have not been detected

14 at within the range.

15 Q.      And other than the ridgetops at the Beech Ridge

16 site, there are ample habitats for Indiana bats elsewhere

17 in the region; correct?

18 A.      That is correct.

19 Q.      One of the places you would look for appropriate

20 Indiana habitat is where there are water sources;

21 correct?

22 A.      That is correct.

23 Q.      And at the Beech Ridge site you would expect those

24 might be further down into the valleys and the side

25 slopes; correct?

Cross - Gannon

1 A.      There were water sites on the ridgetop as well,

2 yes.

3 Q.      But you would be looking for them more likely

4 further down into the valley; wouldn't you?

5 A.      I would be looking for them throughout the habitat

6 they were at.  So, yes, that would be one site I would

7 look at.

8 Q.      And you didn't get to do a thorough view of the

9 lower lying areas of the Beech Ridge site, did you?

10 A.      No, we didn't.  We drove through some of it, and I

11 have examined maps to look at the habitat that's shown on

12 maps.

13 Q.      But you did not visit it?

14 A.      Excuse me?

15 Q.      But you did not visit it.

16 A.      That's correct.

17 Q.      And you're not familiar with the habitat

18 surrounding Snedegars Cave, are you?

19 A.      No, I'm not.

20 Q.      You have no evidence that there was any actual

21 Indiana bat mortality from cutting trees on the Beech

22 Ridge site, do you?

23 A.      No.  I was not there when it was cut.  No.

24 Q.      Regardless of whether you were there, you have no

25 other evidence that Indiana bat mortality resulted from

Cross - Gannon

1 cutting trees on the Beech Ridge site; correct?

2 A.     I have no direct evidence.  No.

3 Q.     And you have no evidence that there were any

4 maternity colonies present on the Beech Ridge site;

5 correct?

6 A.     That's correct.

7 Q.     One of the things you told us that you could look

8 at in predicting whether there would be Indiana bat

9 mortality at Beech Ridge was the ratio between Indiana

10 bats and little brown bats; is that correct?

11 A.     That's correct.

12 Q.     And that's a ratio you take from mist-net survey

13 results?

14 A.     That would be correct.

15 Q.     And this mist-net survey in the summer of 2005

16 caught little brown bats; correct?

17 A.     That's correct.

18 Q.     And there was a second mist-net survey you did not

19 mention, that was the mist-net survey of the transmission

20 line in 2006; is that correct?

21 A.     That's correct.

22 Q.     And that survey caught little brown bats too;

23 correct?

24 A.     That's correct.

25 Q.     And the 2005 summer survey did not catch an

Cross - Gannon

1 Indiana bat; correct?

2 A.      That's correct.

3 Q.      And the 2006 transmission line survey did not

4 catch an Indiana bat; correct?

5 A.      That's correct.

6 Q.      And so at both of those survey sites, Dr. Gannon,

7 wouldn't the ratio between little brown bats caught and

8 Indiana bats caught be zero?

9 A.      I'm sorry.  The ratio of?

10 Q.      The ratio of Indiana bats captured to little brown

11 bats captured at this site is zero; correct?

12 A.      We caught no Indiana bats at that site.  That's

13 correct.

14 Q.      So my arithmetic is correct, the ratio of little

15 brown bats --

16 A.      The ratio -- you're misusing the ratio.  The ratio

17 is to be used as a predictor for an incredibly rare

18 species.  So we would not expect that if we're only

19 catching small numbers of Indiana bats -- or of little

20 brown bats that we would catch a proportion of Indiana

21 bats.  Because if -- again, if you're catching one

22 percent of ten bats, or a half a percent of ten bats,

23 you're catching less than one.  The math -- it's

24 mathematically calculatable.  At this point we haven't

25 done enough netting at that site enough little brown bats

1 to determine what the ratio is there.

2 Q.      Let's answer my question first, Dr. Gannon.  The

3 ratio of little brown bats to Indiana bats.

4 A.      There were none captures.  That's correct.

5 Q.      The ratio of little brown bats to Indiana bats in

6 the mist-net site surveys performed at the Beech Ridge

7 site in the summers of 2005 and 2006 was zero; correct?

8 A.      There were no bats captured.  You're right, no

9 Indiana bats captured.

10 Q.      You do not rely on AnaBat data for definitive

11 presence or absence determinations, do you?

12 A.      We use it for high probability.

13 Q.      But not definitive; correct?

14 A.      No.

15 Q.      And that's because nothing in science is a hundred

16 percent; correct?

17 A.      That's correct.

18 Q.      And you would agree that AnaBat never gets it a

19 hundred percent right; correct?

20 A.      I'm sorry.  It never what?

21 Q.      Never gets the results a hundred percent correct,

22 does it?

23 A.      If you're asking me -- I'm not sure if you're

24 asking me if my data or my analysis was correct.

25 Q.      No, sir.  I'm asking you more generally.  AnaBat

Cross - Gannon

1 is not a full-proof technology; correct?

2 A.      Can it make errors?  Yes, it can make errors.

3 Q.      And it can produce what are called false

4 positives; correct?

5 A.      Yes?

6 A.      That's correct.

7 Q.      And false positive is a bat that is identified as

8 an Indiana bat that is not an Indiana bat in fact;

9 correct?

10 A.      That is correct.

11 Q.      And one cannot be certain without catching and

12 holding a bat in hand that the result of the AnaBat

13 detection was correct.

14 A.      Again, every incident that I've actually examined

15 has shown that I am correct when I do that.  If I've gone

16 out and if I've identified Indiana bats as being present

17 and I have gone and done the netting surveys, we've

18 always captured Indiana bats.

19 Q.      But you agree it is not a perfect system.

20 A.      No, it's not perfect.

21 Q.      And it's based on probabilities; correct?

22 A.      That's correct, just like everything in science is

23 based on probability.

24 Q.      And, here, the probability that you incorporated

25 was an 85 percent match between a call and an

Cross - Gannon

1  identification as an Indiana bat; correct?

2  A.     That was the minimum probability that we accepted.

3  Most of the calls -- of the three calls that we -- I

4  examined, one was an 87-; one was a 92-; and was one was

5  a 94 percent probability match, but they all met the

6  minimum 85 percent.

7  Q.     As I understood your direct testimony, we should

8  not take what you just said as a true statistical test;

9  correct?

10  A.     It is not a statistical test, no.

11  Q.     Has not had any confidence interval applied to it,

12  for example?

13  A.     What I've demonstrated is that using this test --

14  when we have used this test before, we are correct 90

15  percent of the time.

16  Q.     Okay.

17  A.     That's the only -- that's the only thing I've

18  applied to it.

19  Q.     But you are not representing --

20  A.     There has been no statistical tests.  You're

21  right.

22  Q.     Now, just to be clear, you told us that you found

23  three Indiana bat calls when you analyzed the AnaBat

24  data; correct?

25  A.     That's correct.

Cross - Gannon

1 Q.      And three Indiana bat calls is not necessary

2 three Indiana bats, is it Dr. Gannon?

3 A.      In my opinion it is.

4 Q.      Okay.  But it can also be one Indiana bat captured

5 three times making a call; correct?

6 A.      It could -- it could be.  My understanding is that

7 there were several nights -- there were two nights of

8 data.  You're right, it could be the same bat; we can't

9 tell.

10 Q.      The AnaBat detection system isn't capable of

11 answering that question for us; is that correct?

12 A.      It can't identify individuals; you're correct.

13 Q.      The computer programs that you used in analyzing

14 the AnaBat data, those are not published are they?

15 A.      I don't think any of these programs are published,

16 no.  They're available, but they're not published.

17 Q.      They have not been subjected to peer review, have

18 they?

19 A.      I believe they have in publications -- there are

20 publications that have used these techniques that have

21 been peer reviewed.  The programs themselves, I don't

22 know that they've ever been peer reviewed, but the

23 technique has been peer reviewed.

24 Q.      You did not save any of the computer output from

25 your analysis, did you?

Cross - Gannon

1 A.      No, I didn't.

2 Q.      You don't know who performed the detection at

3 Beech Ridge in the summer of 2005, the AnaBat detection?

4 A.      There was a name I was given.  I don't recall the

5 name at the top -- off the top of my head.

6 Q.      You don't know his qualifications, do you?

7 A.      I don't know directly what his qualifications are,

8 no.

9 Q.      And you don't know where he placed the detectors.

10 A.      I don't -- I was not there, so I do not know.

11 Q.      AnaBat detection can be affected by what's called

12 "clutter;" correct?

13 A.      That's correct.

14 Q.      Clutter is a density of different bats in the same

15 place creating background noise and so forth?

16 A.      That's correct.

17 Q.      And you don't know if the operator placed the

18 detector in a place that was subject to clutter, do you?

19 A.      No.  The system that we use is designed to filter

20 that out, so we adjust for that particular thing when we

21 analyze them.

22 Q.      But you don't know where the detection was made?

23 A.      No, I don't.

24 Q.      When you detect a bat of any species by an AnaBat

25 detector, you don't know where that bat came from, do

Cross - Gannon

1 you?

2 A.      No.  We only know it's there at that moment.

3 Q.      You don't know where it's going next?

4 A.      No.

5 Q.      You don't know if it's ever coming back?

6 A.      That particular bat, we have no idea where it's

7 going or where it's coming from.

8 Q.      You have no idea whether it's ever been there

9 before?

10 A.      That particular bat?  No.

11 Q.      And you don't know if that bat is there in 2009,

12 do you?

13 A.      Is there in 2009?

14 Q.      Yes.

15 A.      That particular bat?  No, I don't know where it

16 is.

17      MR. ZATZ:  That's all I have.  Thank you, Your

18 Honor.

19      THE COURT:  Before you do redirect, I just have a

20 couple of questions for the witness.

21      If I understand you correctly, the Forest Service

22 has recommended the use of several survey methods, rather

23 than one alone; is that correct?

24      THE WITNESS:  That's correct.

25      THE COURT:  And why is that?  Is, like, one a

Cross - Gannon

1 check on the other?

2        THE WITNESS:  Different techniques give you

3 different data sets.  So, for example, an infrared camera

4 would show you movements of bat, but you may not be able

5 to identify what species of bat that is.

6        THE COURT:  Why is the technique that was used in

7 this case, "mist-netting," called mist-netting?

8        THE WITNESS:  Because the nets are very fine.

9        THE COURT:  That's referring to the type of net it

10 is?

11        THE WITNESS:  Yes.

12        THE COURT:  Okay.  So, it's not like a volleyball

13 net.  This is a much finer?

14        THE WITNESS:  No.  It's a very fine net.  Again,

15 different thicknesses of nets are used for different

16 types of animals.  If you were going to catch an alloy,

17 you would use a much thicker net.

18        THE COURT:  This actually captures the bat --

19        THE WITNESS:  Yes.

20        THE COURT:  -- so you can examine the bat?

21        THE WITNESS:  That's correct.

22        THE COURT:  Now, the AnaBat system is an

23 acoustical system?

24        THE WITNESS:  That's correct.

25        THE COURT:  And that's because bats talk to each

Cross - Gannon

1 other?

2      THE WITNESS:  They emit calls, which are

3 ultrasonic calls which we cannot hear, but these devices

4 record those calls.

5      THE COURT:  So you're recording bats talking to

6 each other, or calls?

7      THE WITNESS:  Not necessarily talking to each

8 other, but they may be navigating.  They use this similar

9 to the way a submarine may use sonar.  They send out

10 pulses, they strike things, and the sound comes back.

11 They detect that with their ears.  So, basically, they're

12 saying with their ears what bats are doing.  So we're

13 recording those echo location calls that they're using as

14 they are navigating in the dark.

15 Q.    So the AnaBat system then, based upon analysis of

16 perhaps a known bat, determines what that bat call is

17 going to sound like.  And, when it records one, it can

18 detect which type of bat it is with a level that's not

19 100 percent perfect but very high percentage; correct?

20      THE WITNESS:  That's correct.  What we do is we

21 don't have just one bat call that we match it to.  So,

22 because there's variations among bats, as -- just like

23 there are variations among our voices.  And so what we do

24 is we have a number of -- a large library of different

25 calls of different species.

Cross - Gannon

1          What we -- what I found is that the more calls you
2  have of a particular bat in there, the more likely you
3  are to be correct.  When we only had 200 or 100 calls, we
4  didn't have as much confidence as we did when we now have
5  400 calls of Indiana bats.  So what it's doing is it's
6  matching up this unknown to the known library, and it's
7  looking among the library of all the ones out there and
8  which group does it match up to the best.  And it then
9  tells me -- it matches up the best with this particular
10 species, an Indiana bat or a little brown bat or whatever
11 the call matches up to.
12         THE COURT:  Now, you examined more than three
13 calls, did you not?
14         THE WITNESS:  There were 42 in the group of 160
15 that I felt were identifiable.
16         THE COURT:  The others were not?
17         THE WITNESS:  The others were usually -- when we
18 record these, a lot of times as bats are moving you may
19 not get a complete -- a long enough call to identify, or
20 one that has enough pulses in it to identify, so we --
21 typically, those are the ones that we're going to have a
22 very low continence in anyway.  So we only look for the
23 ones that -- we have a set of criteria to say, these meet
24 our criteria of ones that are potentially identifiable.
25 And then we go into those about 30 percent that we will

Cross - Gannon

1  then attempt to identify.

2         THE COURT:  So, within that subset of 30 percent

3  of the overall calls, you were able to identify three of

4  them as being Indiana bats?

5         THE WITNESS:  Three out of 42, yes.

6         THE COURT:  And they -- were they on the same day

7  or different days?

8         THE WITNESS:  I don't know.  I don't recall.

9  There were two days that the recordings were.  I don't,

10  off the top of my head, remember what day they were

11  recorded on.

12        THE COURT:  But it could have been the same bat

13  three times?

14        THE WITNESS:  It could have been the same bat

15  three times.  It could have been three different bats.

16        THE COURT:  Okay.  Now, you indicated that the

17  programs that you use are -- or that you do use is

18  different than the one used by Dr. Robbins; correct?

19        THE WITNESS:  That's correct.  They are similar in

20  what they do, but there are subtle differences in them

21  and the way they do it.  I guess if I was going to

22  describe it, there are statistical packages out there

23  like SPSS and SASS.  They all analyze statistical data

24  but they don't do it exactly the same.

25        THE COURT:  Are the methods and algorithms on the

Cross - Gannon

1 programs significantly different?

2          THE WITNESS:  Excuse me?

3          THE COURT:  Are the methods that are used

4 necessary programs, the algorithms, are they

5 significantly different?

6          THE WITNESS:  No.  They're not significantly

7 different.  They're subtly different.

8          THE COURT:  All right.  Would it have been

9 impossible for you to analyze all 160 calls?

10          THE WITNESS:  Yes.  But I would not have the same

11 confidence, because some of them were so short that the

12 probability of it matching up with any of the calls would

13 be very low and so they would remain.

14          THE COURT:  You picked approximately 30 percent

15 that were potentially identifiable?

16          THE WITNESS:  Right.  The ones that I didn't

17 identify would have sorted out as unidentifiable, because

18 they were not long enough to be able to be identified by

19 the technique that's used.

20          THE COURT:  And if I understand the technique is

21 that you build up a library, as it were, of recognizable

22 calls based upon a known bat.

23          THE WITNESS:  Right.

24          THE COURT:  That's, then, recorded.  And you then

25 use that to be able to say that is the call of an Indiana

Cross - Gannon

1  bat.

2       THE WITNESS:  Right.  All the calls in our library

3  were calls of known individuals that we recorded and then

4  placed in the library as "this is a known Indiana bat."

5       THE COURT:  Sort of like voice recognition

6  software?

7       THE WITNESS:  Excuse me?

8       THE COURT:  Sort of like a voiceprint?

9       THE WITNESS:  I guess it would be something like

10  that.  They do produce what is called a sonograph where

11  you can actually see the prints and you can, in some

12  cases, see differences between species.  But, again, the

13  computer program is designed to pick up subtle

14  differences that you may not see in the sonograph, so

15  it's -- I guess it is very similar in that way.

16       THE COURT:  If you were engaged by a party,

17  whether a party supporting or opposing a project to do an

18  analysis of the presence or absence of Indiana bats,

19  would you use the AnaBat system?

20       THE WITNESS:  Yes.  I would not do it without

21  using both the mist-netting, and the AnaBat.

22       THE COURT:  You do the mist-netting as well?

23       THE WITNESS:  Right.  The prevailing scientific

24  position is that using both techniques gives you a better

25  picture than just using one or the other.

Cross - Gannon

1          THE COURT:  How about thermal imagery, and radar?

2          THE WITNESS:  Again, all of those things will add

3  additional data, but they won't allow you to identify

4  individuals.  So if you're looking for a particular

5  species, those techniques will not allow you to identify

6  those.  Those techniques will allow you to look at the

7  bat activity and exactly what the bats are doing, as

8  opposed to foraging, flying through the turbine blades,

9  things like that.

10          THE COURT:  So, in order to identify the species,

11  you really need to limit yourself to mist-netting, and

12  AnaBat?

13          THE WITNESS:  Those are the two tests that would

14  identify the species, yes.

15          THE COURT:  If you were to conduct a survey and

16  you used mist-netting and AnaBat techniques to identify

17  bats, and your client wanted to advise you, are there

18  circumstances under which you would not disclose to the

19  client that you did an AnaBat surveying?

20          THE WITNESS:  No.

21          THE COURT:  Okay.  All right.  Thank you very

22  much.

23          You may redirect.

24          MR. GLITZENSTEIN:  Thank you, Your Honor.  Just a

25  few minutes.

Redirect - Gannon

1                    **REDIRECT EXAMINATION**

2        BY MR. GLITZENSTEIN:

3 Q.      Dr. Gannon, if we could take a look at the second

4 declaration which, once again, is Plaintiff's Exhibit No.

5 2, Page 11, Paragraph 15.  You say, in the middle of that

6 paragraph, "It was clear from the quality of the bat

7 calls contained in those AnaBat files that the person

8 mounting the detectors and collecting the data was

9 familiar with the technology, and competent in using the

10 technology."  What's the basis for that statement?

11 A.      The basis for that is that the calls that I

12 reviewed looked like calls that I have recorded myself.

13 There was nothing inherently different from these data

14 that -- as something that I would have collected.  So,

15 therefore -- and they were all things that I could run

16 through the computer program.

17        Again, I looked at them individually and I chose

18 the 30 percent or so, the 42 that were most likely to be

19 identified by the program, and those are the 42 that I

20 analyzed.  But there was nothing inherently different

21 about these than any other calls or any other data set on

22 AnaBat that I've seen.

23 Q.      And you were asked some questions about the ratio

24 at this particular site of bats, and you referred to bats

25 being "captured."  If we could take a look at the

Redirect - Gannon

1 stipulations that the parties have entered into, and

2 particularly stipulation Number 40, which states,

3 according to the survey sheets filled out during the July

4 2005 mist-net survey, six species of bats were captured,

5 including post-lactating females and juveniles of Myotis.

6 Species survey sheets indicate several bats, etcetera,

7 escaped prior to being identified, including at least one

8 Myotis species.  Do you see that?

9 A.      Yes, I do.

10 Q.      Is an Indiana bat a Myotis species?

11 A.      Yes.

12 Q.      So we don't actually know all the bats that were

13 captured, do we?

14 A.      No.

15 Q.      In terms of the ratio that you were asked about.

16 Given what you know about this survey, was this a large

17 enough sample size to evaluate the ratio of little brown

18 bats to Indiana bats?

19 A.      No, it wasn't.

20 Q.      And you talked about 90 percent reliability of

21 your AnaBat analysis.  Would you say that this mist-net

22 survey is a survey that had a 90 percent chance of

23 identifying every species that was on this site?

24 A.      No, I wouldn't.

25 Q.      Do you think your AnaBat analysis is more or less

Redirect - Gannon

1 reliable than the mist-net survey that was done at this

2 site?

3 A.     I would say based on my experience it is more

4 reliable.

5 Q.     Is AnaBat analysis generally accepted in the

6 scientific community at this point?

7 A.     Yes, it is.

8 Q.     Is it generally accepted by people who engage in

9 peer reviewed scientific publications?

10 A.     Yes.

11 Q.     Do scientific publications relating to surveys

12 look for AnaBat analysis?

13 A.     Yes.  There are a number of papers that actually

14 state that such surveys should not be done without both

15 techniques being used because of the likelihood of

16 detecting things that the mist-nets would not.

17 Q.     And you were asked some questions about various

18 projects that were within 50 miles of Indiana bat

19 hibernacula, and then you were asked also about Shaffer

20 Mountain, where Indiana bats were identified.  Is this

21 project closer in proximity to Indiana bat hibernacula,

22 relative to the Shaffer Mountain Project or relative to

23 other projects you were asked about?

24 A.     This one is the closest.  The hibernacula are

25 closest to the project than any of the other ones I'm

Redirect - Gannon

1 aware of.

2 Q.      Are they much closer than the other projects you

3 were asked about?

4 A.      The Shaffer Mountain site, the closest

5 hibernaculum was nine miles.  I believe it is closer.  I

6 believe it was six, but I'm not positive of the exact

7 distance on -- it's six or seven miles, maybe, but it is

8 closer I know that.

9 Q.      And in terms of the other projects you were asked

10 about.  Was the AnaBat analysis done on those projects

11 indicating that Indiana bats were present?

12 A.      On which?

13 Q.      You were asked about Liberty Gap, and I think you

14 were asked about a project in Virginia and your opinion

15 on those, but my question is -- and you said no, there

16 was no mist-net survey capture.  Was AnaBat analysis done

17 on those projects?

18 A.      I don't recall any AnaBat survey being done, but

19 -- I would have to go back and check on that for sure,

20 but I don't believe that any AnaBat was done on any of

21 those surveys.

22 Q.      Can mist-net make errors -- let me scratch that.

23 Can we take a look at Plaintiff's Exhibit 62, I think

24 which we had before.  Again, this is the map which shows

25 the existence of summer habitat and winter habitat, and

Redirect - Gannon

1 you had drawn some lines, I think, showing where and

2 relative to the project site, which is the green arrow.

3 And you had shown some lines previously indicating

4 migration routes.  Do you know of any biological or

5 ecological, or any other reason why Indiana bats, given

6 the identifications on here, would not be migrating

7 across this project site?

8 A.     No.  I actually would expect that they would be.

9 Q.     If you were advising someone in the field at the

10 Mountaineer facility, for example, how to identify

11 Indiana bats, is that something you would be able to do?

12 A.     Yeah.  I do that with my students all the time.  I

13 teach them how to identify them.

14 Q.     What would you tell them to do?

15 A.     Again, I would tell them to look at the

16 characteristics I pointed out earlier.  In particular,

17 the keeled calcar is a key that is difficult to miss if

18 you look for it.

19 Q.     And I think you said this before.  Is that the

20 same kind of information you think that would be in any

21 Indiana bat guidebook?

22 A.     That is the best distinguishing characteristic for

23 the species.  So, yes.

24 Q.     And that's generally known among the people who

25 publish literature or other information about this

Direct - Robbins

1 species?

2 A.      As far as I know.  I don't think that they could

3 publish -- get a guidebook published.  Even those things

4 are peer reviewed.  So, yeah, it would have to have that

5 information in it to be publishable, in my opinion.

6        MR. GLITZENSTEIN:  I have nothing further, Your

7 Honor.

8        THE COURT:  Any recross?

9        MR. ZATZ:  No, Your Honor.

10       THE COURT:  All right.  You may step down, doctor.

11 Thank you very much.

12             (Witness excused at 12:43 p.m.)

13       MR. EUBANKS:  Plaintiff's now call Dr. Lynn

14 Robbins.

15             (Witness sworn at 12:43 p.m.)

16                 **DIRECT EXAMINATION**

17       BY MR. EUBANKS:

18 Q.      Good afternoon, Dr. Robbins.  What is your current

19 position?

20 A.      I am professor of biology at Mississippi State

21 University.

22 Q.      Is it a tenured position?

23 A.      It is.

24 Q.      How long have you been a professor at the

25 university?

Direct - Robbins

1 A.       Twenty-four years.

2 Q.       What courses have you taught during that time?

3 A.       Cell biology, wildlife biology, mammalogy, general

4 biology, advanced vertebrate zoology.

5 Q.       Is this undergraduate or graduate students?

6 A.       Both.

7 Q.       Let's take a look at Plaintiff's Exhibit 9 which

8 has been stipulated to by the parties.  Do you have that

9 on your screen?

10 A.       I do.

11 Q.       Can you tell us what this document is?

12 A.       It's my CV.  My resume.

13 Q.       And is this a current reflection of your

14 professional background?

15 A.       It is.

16 Q.       And what degrees do you hold, Dr. Robbins?

17 A.       I have a bachelor's degree from Long Beach State,

18 a master's Fort Hays State in Kansas, and a Ph.D from

19 Texas Tech University.

20 Q.       How long have you been working on bat issues?

21 A.       I've been collecting bats for 40 years, but I've

22 been doing research on bats -- I started with my Ph.D

23 work.

24 Q.       And when did you start your Ph.D work?

25 A.       In -- I believe it was '83.  No, '79.  Sorry.  I

Direct - Robbins

1 began in '79, and I finished in '83.

2 Q.     Have you published any peer review publications on

3 bats?

4 A.     I have.

5 Q.     Are those -- some of those noted on your CV here?

6 A.     They would be noted on here, yes.

7 Q.     What is -- I know we've gone over this a little

8 bit, but in terms of the bat world, what is a peer

9 reviewed publication?

10 A.     A peer review publication is where you submit a

11 paper to a journal that then sends those manuscripts out

12 to be reviewed by experts in your field to determine if

13 you have followed the guidelines for scientific research.

14 Q.     And what are your primary areas of research?

15 A.     Well, I've published on a wide group of mammals,

16 but right now, for the last dozen years, it's basically

17 been bat ecology, bat distribution and, more

18 specifically, endangered species in northern Missouri.

19 Q.     Have you done any research on the Indiana bats,

20 specifically?

21 A.     I have.

22 Q.     How long have you been working on Indiana bat

23 issues?

24 A.     About 11 years.

25 Q.     During your time at the university, have you

Direct - Robbins

1 overseen any Ph.D or masters students?

2 A.      We only give masters degree there.  Yes.

3 Q.      What areas did their work focus on?

4 A.      Early in my career I had a wide variety of them

5 working on from rabbits to deer to wood ducks, but in the

6 last ten years I've been specifically targeting bat

7 research.

8 Q.      And did any of that work focus on Indiana bats

9 specifically?

10 A.      It did.

11 Q.      And I would just like to, if you could, point out

12 for us -- are there any papers that you've published that

13 deal specifically with Indiana bats?

14 A.      Yes.  The most recent one -- go down to the

15 Publications, please.

16 Q.      It's going to be on -- starting on Page 2 and

17 going over to Page 3.

18 A.      Well, in the last one that's in press we were

19 comparing Myotis sodalis, which is the Indiana bat, to

20 the northern bat, looking at an area in northern Missouri

21 and comparing and contrasting their roost and roosting

22 behavior.  In the Robbins, et al, we tested the

23 effectiveness of the protocol as written in the recovery

24 plan to see if it was adequate for determining presence

25 of Indiana bats in areas that we knew they existed.

Direct - Robbins

1 Q.      In what protocol is that?

2 A.      That was the Indiana bat protocol to determine

3 presence or absence of Indiana bats using mist-nets.

4 Q.      What was the conclusion of that study?

5 A.      Well, the last author is a biologist for the Fish

6 and Wildlife Service, and they contracted me to test this

7 by using AnaBats as an alternate source to determine if

8 Indiana bats were present but not being captured by the

9 nets.  And, basically, the results showed that we

10 recorded them in all instances at all of our net sets but

11 captured them only sparingly at some of these, even

12 though there were maternity colonies within a half a mile

13 of the locations.

14 Q.      Has that phenomenon been represented elsewhere in

15 the peer review literature?

16 A.      Yes.  There's a number of studies that go up to

17 Murray, where we were, again, testing mist-nets and

18 AnaBats for all bat species.  It might be on the next

19 page up.

20 Q.      Page 2, thank you.

21 A.      We were surveying bat communities in comparison to

22 mist-nets and AnaBat detectors.  That was, again, looking

23 at not just Indiana bats but all bat species to see what

24 kind of species diversity was represented by the net

25 captures versus the AnaBat captures.

Direct - Robbins

1 Q.      In all these different surveys -- you're speaking

2 about all the different studies you did.  What survey

3 technologies did you use?

4 A.      I almost always used mist-nets.  And since we

5 started working with the AnaBats back in about '97-98, I

6 always use AnaBats in conjunction.  In fact, in one of my

7 projects I was hired to do a survey for National Guard,

8 and they just asked me to do just AnaBat surveys to look

9 for endangered species because of my reputation of using

10 that for a technique that would document presence or

11 absence using just the AnaBat detection.

12 Q.      And who was that?

13 A.      Missouri National Guard.  To see if their training

14 on their sites was going to adversely affect bats.

15 Q.      And no mist-netting was done for that study?

16 A.      We did some mist-netting, but that's not what they

17 contracted me to do.  Being out there at night, we put

18 out detectors; we put out nets anyway.

19 Q.      Have you participated in conferences based on your

20 research on Indiana bats?

21 A.      Yes.  Many.

22 Q.      And similar so what we did with Dr. Gannon -- I

23 believe you were here for his testimony -- I wanted to

24 see if, on the first page of this document, if you could

25 explain to us what the different societies are that

Direct - Robbins

1 you're a member of.  Under Society Affiliations on the

2 first page?

3 A.      Southwestern Association of Naturalists, which is

4 a southern and western U. S.  All invertebrates mainly.

5 American Sign and Allergist, I've been a member for 30

6 years.  The Wildlife Society, both the national chapter

7 and the state chapter.  Bat Research News is now called

8 the National Association for the Study of Bat Research.

9 And then the Central Plains Society of Mammalogists, of

10 which I'm a Board of Governors, it's in Arkansas,

11 Oklahoma, Missouri, Nebraska, Iowa studying mammals.

12 Q.      And have you ever been involved with research on

13 wind power?

14 A.      Yes, I have.

15 Q.      Was that research related in any way to Indiana

16 bats?

17 A.      All of it.

18 Q.      And can you tell us a little bit about each of the

19 wind projects you've been involved with?

20 A.      Well, I was originally contacted four years ago by

21 a wind company -- by an environmental consulting firm

22 representing a wind company.  They had received my name

23 from the Fish and Wildlife Service as someone who could

24 adequately determine presence or absence of Indiana bats

25 on a proposed wind farm.  I then, a few weeks later, got

Direct - Robbins

1  a call from another company to do the same thing.  Both

2  -- the first company I worked for two summers in

3  pre-construction surveys.  The second company I'm still

4  working on the third year of pre-construction surveys.

5          I did another site for the second company doing a

6  full summer of mist-netting and AnaBat detection.  I was

7  hired by another company to go into their area to do an

8  AnaBat mist-net survey again.  They got my name from the

9  Fish and Wildlife Service as someone who could conduct

10 these surveys.  And then the last one I did a site survey

11 to determine whether netting would be necessary, and I

12 determined it wasn't necessary, but the company went

13 ahead and put out bat detectors and analyzed those calls.

14 Q.     And how many wind companies have you worked with?

15 How many companies total?

16 A.     Four.

17 Q.     Four.  And how many different wind projects?

18 A.     At five sites.

19 Q.     And with how many of those companies is your

20 research still ongoing?

21 A.     One we have research ongoing, and the second one

22 I'm providing information for a habitat conservation plan

23 that they're considering.

24 Q.     And what is a habitat conservation plan?  Your

25 understanding of that.

Direct - Robbins

1  A.      My understanding, it's a process by where one

2  would get an Incidental Take Permit, but the plan itself

3  outlines what research and mitigation might occur if

4  Indiana bats are indeed taken with the Incidental Take

5  Permit.

6  Q.      And have you been involved in any way -- what is

7  your involvement with that process?

8  A.      Right now my involvement is collecting

9  pre-construction survey data.  Once we determine presence

10 of the Indiana bat on an area, we designed studies that

11 could be comparable to post-construction to see if in

12 other words repeatable data using both mist-nets, radio

13 telemetry and bat detectors, to see if once the turbines

14 go in if there's any changes in that behavior and habitat

15 use, in addition to looking for mortality under the

16 turbines when they become active.

17 Q.      I just wanted to clarify.  Which detection

18 methods, again, are you using for the wind projects?

19 A.      We're using mist-nets and AnaBat.

20 Q.      Were those coordinated with any federal agencies?

21 A.      Yes.  I believe the Fish and Wildlife Service

22 recommended me because I use the multiple techniques.

23 Q.      Have you participated in any conferences based on

24 your research dealing with wind power projects?

25 A.      Yes.

Direct - Robbins

1  Q.     And you have prepared some written testimony in

2  this case so we can look to that?

3         THE COURT:  I'm going to the break until 2:00 p.m.

4  and then we'll get right into it.

5                (Off the record at 12:54 p.m.)

6                (On the record at 2:07 p.m.)

7         THE COURT:  You may proceed.

8         MR. EUBANKS:  Thank you, Your Honor.  I'd like to

9  call Dr. Robbins back to the stand.

10               (Witness resumes the stand at 2:07 p.m.)

11        BY MR. EUBANKS:

12 Q.     Good afternoon, Dr. Robbins.  When we left off, we

13 were discussing wind power and your involvement with wind

14 projects.  Are you opposed to wind power in any way?

15 A.     Oh, no.  I was really excited to be able to work

16 with it.

17        THE CLERK:  I'm sorry.  You need to slide up.

18        THE COURT:  You need to get closer to the mic.

19        THE WITNESS:  I was quite excited when I got the

20 call to work with them.

21        BY MR. EUBANKS:

22 Q.     What is your view on the utility of wind power?

23 A.     From what I can tell, not being a physicist, it

24 seems to be the best idea for an alternative energy

25 source.  It helps the landowners in our area.  The

Direct - Robbins

1  landowners in our area are really pleased with it.  They

2  get to have a lease.  And the energy, because of

3  metropolitan areas in Springfield, St. Louis, Kansas

4  City, makes it ideal for our area.

5  Q.     I'd like to take a look at Plaintiff's Exhibit 7,

6  which has been stipulated to.  And if you could just take

7  a quick look through here and tell us what this document

8  is, please.

9  A.     Did you ask me something?

10 Q.     Do you remember seeing this document?

11 A.     I do.  Yes.

12 Q.     What is this document?

13 A.     It's an affidavit that I put together.

14 Q.     And, first of all, let me ask you about that one.

15 Your opinions that were included in that affidavit, are

16 those generally accurate in summarizing your opinions?

17 A.     I believe so.

18 Q.     Can we now look at Plaintiff's Exhibit 8, which

19 also has been stipulated to by the parties?  And does

20 this appear to be your rebuttal declaration?

21 A.     Yes.  I'm familiar with that, too.

22 Q.     Is that generally accurate in summarizing your

23 opinions in this case?

24 A.     Yes, it is.

25 Q.     I'd like to have you -- similar to what we did

Direct - Robbins

1 with Dr. Gannon, I'd like to have you look at Page 11 of

2 this rebuttal declaration.  There's a long list of

3 literature considered.  Did you, in fact, review all of

4 these pieces of literature in coming to your conclusions?

5 A.     I believe I have reviewed those and used them in

6 some of my research.

7 Q.     Do you believe there are any key publications

8 which have not been reviewed in preparation for your

9 opinion today on wind power and Indiana bats?

10 A.     No.  I think that summarizes it.

11 Q.     In addition to the literature review, what have

12 you done to familiarize yourself with the Beech Ridge

13 Project?

14 A.     When I was first approached by your firm, you sent

15 me materials dealing with that:  Maps; surveys that had

16 been done; material from the Fish and Wildlife Service;

17 and then I Googled it and looked up some more information

18 to see exactly where it was located.  I then went into

19 the Indiana Bat Recovery Plan to see what they had as far

20 as distribution of Indiana bats relative to that area.

21 Q.     Were you involved in the site inspection that was

22 discussed earlier?

23 A.     I was.

24 Q.     And this came up during Dr. Gannon's testimony.  I

25 believe you were involved in some way with AnaBat related

Direct - Robbins

1 to this project?  Can you explain what your involvement

2 was?

3 A.     Yes.  I was sent a disk with some AnaBat files on

4 it recently, and I then opened those and began analysis

5 of them.

6 Q.     And before we get too far into what the analysis

7 was, I'd like to talk, first, about AnaBat and how those

8 calls are recorded.  I believe you've brought something

9 that we can use to demonstrate that to the court.

10 A.     I brought an example of an AnaBat detector.  This

11 is a version of the type of detector that was put out,

12 from what I could tell.  This is an updated version.

13 It's a bit smaller, but it's basically the same thing.

14 It's a microphone that records onto a flash drive, stores

15 the data, and then those data can be downloaded on the

16 computer to run with different software packages.  But,

17 it's very sensitive to the ultrasonic sounds from about

18 200 Kilohertz down to about 20.  Our hearing goes up to

19 maybe 15 or 18, unless we're really young, and then it

20 goes up to 20.  But, this picks up sounds that we cannot

21 hear.  And then what it does, it takes those sounds and

22 divides by a factor of 16.  The sound you could hear

23 there is ultrasonics, but it's been dropped down to -- by

24 a factor of 16, into a range that we can hear.

25 Q.     Is there a general consensus on how you use that

Direct - Robbins

1  and what you do in terms of pointing it somewhere?

2  A.      Yes.  I mean, basically, you want to get it set in

3  an area where you can survey with the cone of reception

4  to that.  This machine has to pick up calls of bats that

5  fly by.  You want to put it in somewhat of an open area

6  where they would be flying.

7          It was mentioned earlier about "clutter."  Clutter

8  would be if we pointed it directly at the wall and

9  expected to get good calls.  Because the bats are flying

10  too close to other -- clutter would be trees, that type

11  of thing, that would interfere or change their call

12  parameters or make it so we couldn't record them at a

13  distance that's necessary.

14  Q.      And what distance can AnaBat record calls at?

15  A.      Depending on the species of the bat -- it usually

16  picks them up somewhere around 30 or 40 meters, depending

17  on the species.  The lower frequency bats -- lower

18  frequencies go farther than higher frequencies, but it

19  can pick up bats flying anywhere in this room.

20  Q.      How tall are mist-nets, generally?

21  A.      Mist-nets go from 3 meters to 10 or 15 meters,

22  depending on the habitat.  The nets are 2.6 meters high,

23  and you can stack them on top of each other two or three

24  high to fit in the available habitat.

25  Q.      So, bats that are flying higher than the mist-nets

Direct - Robbins

1 could actually be picked up by AnaBat, depending on their

2 distance from them?

3 A.      Definitely.  Definitely.

4 Q.      Is this the same kind of detector you're using in

5 wind projects in Missouri?

6 A.      It is exactly the same thing.

7 Q.      And how many detectors are typically used on an

8 entire project site?

9 A.      I have 13 detectors out right now, as we speak, on

10 a site in northern Missouri.  It, again, depends on the

11 available habitat and what the question is.

12         We've also had detectors up on meteorological

13 towers, too, as well as ground level, to look at not only

14 habitat variables but also height variables.

15 Q.      And the wind projects you discussed.  Did the Fish

16 and Wildlife Service approve of your use of this AnaBat

17 detector at these projects, or did they have any

18 objection with this AnaBat detection?

19 A.      No.  I sent my scope of work to the Fish and

20 Wildlife Service at the time I was submitting it to the

21 companies to see if that fit their guidelines.

22 Q.      And to your knowledge, did it fit those

23 guidelines?

24 A.      Yes.  I got a positive response back.

25 Q.      In your experience, do AnaBat results ever -- you

Direct - Robbins

1 touched on this earlier, but do AnaBat results ever

2 differ on the net catch results?

3 A.      They usually differ in the number of species that

4 you record.  In a couple of our studies, one that's

5 published, it shows basically a  species richness, which

6 is basically that the number of species in the area is

7 always equal to or higher -- almost always equal to or

8 higher than what you capture in the mist-nets.

9 Q.      You say -- how frequently have you observed that

10 when you've actually been out in the field using both

11 techniques?

12 A.      Every time.

13 Q.      Have you ever --

14 A.      I must say, when this technology first came out --

15 I had been doing lots of mist-net surveys, and when this

16 came out, it was -- I was kind of horrified.  I was

17 thinking we were actually surveying the number of bats

18 and the type of bats that were there.  And when I found

19 out how many were actually in the area based on

20 acoustics, I found out that mist-nets were not very

21 efficient.

22 Q.      And in places where you know that the species

23 exists, that you know a certain species in the AnaBat

24 exist, have you ever failed to capture that species with

25 mist-nets but you did in fact detect it with AnaBat?

Direct - Robbins

1 A.      Quite often.  That's very often the case.  Even in

2 an area where we know they exist, capturing them seems to

3 be -- plus, mist-nets are much less efficient in

4 capturing bats that are there, especially Indiana bats.

5 Q.      And once you've collected AnaBat data in the field

6 using the device you just showed the Court, what do you

7 do next with that data?

8 A.      The data are then taken from the card and put into

9 files on the computer.  And then at whatever time that

10 we're ready to analyze the calls, we then use a package

11 that comes with the detector called AnaLook for sorting

12 files.  It has some basic filters on it that will get rid

13 of or diminish the number of -- the amount of noise that

14 doesn't represent bat calls.

15      Bat calls tend to be connected calls from one

16 individual bat passing by, or a number of bats passing

17 by.  It's very different from bug noise or the noise that

18 you receive from people walking around, cars driving by,

19 or echoing of the actual bat off the vegetation.  Once

20 that's done -- we have been using a program that Eric

21 Britzke and I developed while he was in my masters -- a

22 masters student of mine.  It's called a Discriminative

23 Function Analysis.

24      We realized very early on that identifying bats

25 without the use of a computer program was problematical,

Direct - Robbins

1 and so we began a five- or six-year period of collecting

2 known calls using, basically, the technique described by

3 Dr. Gannon:  Catching bats, identifying them to species,

4 and then putting a specific light-colored tag on them,

5 and then putting detectors at a distance away from the

6 release point so the bat was behaving somewhat normally

7 and flying and producing normal calls.

8         We found early on that by hand-releasing them, or

9 trying to record them inside a large building, that the

10 calls were not such that we could -- they were not

11 repeatable.  They weren't consistent with what we would

12 pick up in the wild.

13 Q.     In terms of Indiana bats and your call library, or

14 the call library you and Eric Britzke developed, what

15 states do you have Indiana bats from in your call

16 library?

17 A.     Missouri, Arkansas, Kentucky, Tennessee, North

18 Carolina.

19 Q.     Do you have any from West Virginia?

20 A.     I do not.

21 Q.     Does that affect your ability in any way to

22 identify Indiana bats -- AnaBat calls coming from West

23 Virginia?

24 A.     I do not believe so.

25 Q.     Has there been any publication on that?

Direct - Robbins

1  A.      Yes.  We actually had a paper rejected because we

2  didn't include variation in our model, and so we began

3  collecting in other states.  And, Murray, et al, I

4  believe it's '99, we published a paper looking at

5  geographic and non-geographic variations in the call

6  structures.  And although there's a lot of variation

7  between and among locations, most of the variation that

8  is involved in a bat echo location call is within the

9  sequence from one bat, and within or between and among

10 bats from the same location.

11         We actually tested this.  Even though there's

12 variation by dividing our identification model and

13 building the model, using bats from different geographic

14 areas to see if those from a different geographic area

15 could successfully identify those from another area, and

16 the accuracy was not diminished at all.

17 Q.      And were you a co-author on that paper?

18 A.      I was.

19 Q.      Was that peer reviewed?

20 A.      Yes, it was.

21 Q.      Based on the extensive research you've done on

22 AnaBat analysis, how accurate is your AnaBat analysis in

23 accurately distinguishing between species of bats, just

24 generally speaking?  Not Indiana bats.

25 A.      Well, it depends on the species.  Some of the

Direct - Robbins

1 species, like, especially the *Myotis*, have call

2 characteristics that do overlap at some level.  In the

3 paper that Britzke and I co-authored on identification of

4 the *Myotis* species using our Discriminate Function

5 Analysis -- basically, the way it worked with the

6 Discriminate Function Analysis was we tested our known

7 calls by pulling out a random subset and doing multiple

8 iterations, pulling it out and testing these as unknowns

9 against the model using the knowns.  And what we

10 developed there is a matrix of identification and

11 misidentification, and it was basically above 90 percent

12 accuracy.

13        But, there was that misidentification of some

14 Indiana bat calls as little browns, and some northern

15 bats as Indiana bats.  And so because of that error of

16 misidentification, we then developed a mathematical

17 program -- the last author on that paper is a

18 statistician -- and developed a likelihood test where,

19 depending on what the total bat species that were

20 identified and their number, we could come up with a

21 probability value that the identifications were actually

22 correct.

23        For instance, if you had 20 little browns and 20

24 northerns sequences identified, and two Indiana bat

25 sequences, it would not have given us a P value that

Direct - Robbins

1 would have suggested that was statistically present in

2 the area.  However, if you have more of one than the

3 other -- and in this case if you have equal amounts --

4 the probability is above the 95 percent level in most

5 cases, depending on -- we'll run that program to see what

6 is the probability that this data set was random or

7 actually represented the presence of Indiana bats or

8 little browns or northerns, or whichever species.

9 Q.     So the number of calls particular to a species

10 within a data set is important.

11 A.     Very much so.

12 Q.     Just so the Court and we have an understanding of

13 it, you actually sent some sound files of bats just so we

14 could hear what one of these sounds like.  Of course,

15 these are all ultrasonic, so we couldn't actually hear

16 them, but we just wanted to play that for the Court so

17 you could explain what we're hearing.

18 A.     The ones I received were from the data set that I

19 received from you from the site, and I basically

20 converted the sounds.  Where you can hear my fingers

21 doing this (Indicating), this would be the sounds you

22 would hear picked up by this detector after they've been

23 divided by a factor of 16.

24 Q.     So if we could play -- I believe it's AnaBat 1.

25 We're just going to play two representative samples so

Direct - Robbins

1 the Court can hear what this sounds like when it's

2 divided by a factor of 16.

3 A.      (Sound file plays.)  Those represent one bat

4 flying within the distance where it could be picked up

5 for that amount of time.  Actually, it's much less time

6 because we've divided by 16.  But, each one of those is

7 what we call a "pulse," and each pulse is identified in

8 the model instead of using means, because 40 to 50

9 percent of the variability within a species is within one

10 segment, like you heard there, that we need to include

11 all the variability that that bat would put out making

12 those calls.

13 Q.      Actually, following along with that -- let's

14 actually move to what we have down as Plaintiff's

15 Demonstrative 5, please, and we'll give you a chance to

16 explain the different factors -- different parts of a

17 phase call.  So, if we can focus in on -- can you just

18 explain what that top picture is there?

19 A.      What this top one is, it shows the variability

20 within one sequence.  And we tend to talk about search

21 phase calls.  These are the pulses made by a bat when

22 it's actively searching for prey or moving through the

23 habitat, and it's basically that part of the call

24 sequence that allows us to identify that species.

25          Once that individual bat picks up something

Direct - Robbins

1 interesting by the echo return, it then needs more

2 information about that, whether it's a big bug, a little

3 bug, or a branch across it, and so it changes its

4 frequency sweep.

5          So, what we're seeing there at the top is each one

6 of those lines represents one of those noises we can

7 hear.  If we could really break it down slowly, it goes

8 "E-yoo, E-yoo" [ph.].  It starts high up and comes down,

9 giving it some information about the -- at the high

10 frequency, and more distance information at the lower

11 frequency.

12          Well, once it picks up something it's interested

13 in in the area in pink, that's an area that we can't

14 distinguish most bat species, because they're all looking

15 for getting the same kind of information from a bug or

16 something unknown.  And so as we look through a sequence,

17 those type of pulses we can't use.  And so the filter

18 that we built in will either eliminate those, or it might

19 end up giving us an identification that doesn't fit

20 because they're so similar.  And so what we do is have a

21 sequence of things that we do to identify them.  We run

22 them through the program.  And anything that comes up

23 suspected as Indiana bat, we then flag those files and

24 look at them separately and individually in a way that

25 would give us an indication that, well, this was just a

Direct - Robbins

1 feeding buzz or just a fragment of a call that doesn't

2 represent what would normally be heard from that bat.

3        If we look down to the next one --

4 Q.     Before you move on, can I just ask you to clarify,

5 again, those different phases, the search the approach,

6 and the terminal.  Which ones are the ones that are

7 critical for identifying?

8 A.     Search phase.  Search phase are the ones that give

9 us kind of information between and among species that

10 allows us for identification.

11 Q.    Okay.  Thank you.  (Indicating.)

12 A.     What this just shows is search phase from four

13 different species showing kind of the range from

14 variability that would be picked up; and, basically, all

15 of these species were present on the site, and we had

16 call files that looked very similar to these and

17 identified as the same species.  The one at the top would

18 be the northern bat.  The one to its right would be the

19 eastern red bat.  The next one would be a big brown bat.

20 And the fourth one would be Eastern Pipistrelle, or now

21 called a tri-color bat.

22 Q.    What we're looking at here, did these actually

23 come from the Beech Ridge Project site?

24 A.     These did not.  These were actually part of a

25 publication that we put out.

Direct - Robbins

1  Q.       Thank you.  If we can go to next page?

2  A.       Some of the parameters, or the areas that are

3  measured on these individual pulses that are shown here,

4  our program pulls out -- the AnaLook pulls out ten

5  parameters that we are using in our Discriminate Function

6  Analysis, these being the most obvious ones.  But, each

7  one of these pulses, you see on the screen, basically has

8  a frequency component, and then a time component, and

9  those are the critical areas for identification.

10         This shows the maximum frequency at the top,

11  F-Max, and then the minimum frequency.  And then the

12  others have to do with slope components on how fast that

13  goes from what we call frequency modulated, the high

14  frequency sweep to the more constant frequency part there

15  at the bottom.

16  Q.       Are these slopes important in determining --

17  A.       Very important.  The slope is one of the major

18  components that the program and that we use for

19  identifying between or among these three species of

20  *Myotis*.

21  Q.       All right.  Can we actually skip Page 3 and move

22  on to 4, please?  And what do we have here?

23  A.       This is a call sequence taken on July 24th in 2005

24  at the first site that we got Indiana bat calls from.

25  This is a call sequence that we identified as Indiana

Direct - Robbins

1 bat.

2 A.      You can see that it is quite long.  We're using

3 many pulses in order to identify them.  We're not

4 identifying fragments or short sequences, because you

5 don't know exactly what point in there the call sequence

6 that comes from, and it doesn't give you enough

7 statistical or qualitative information to make a

8 decision.

9 Q.      And you said this was July 24th 2005.

10 A.      Yes.

11 Q.      Was this taken at the Beech Ridge Project site as

12 far as you know?

13 A.      Yes.  It was this was part of the file we were

14 sent.

15 Q.      And this is one file that you determined was an

16 Indiana bat.

17 A.      Yes.  High probability.

18 Q.      High probability.  Can we go on to the next page,

19 please?

20 A.      What this shows is a component of the AnaLook

21 program where we can look at one component called the

22 slope component.  The part on the left is part of the

23 same sequence you looked at before, and the part on the

24 right gives a frequency component that tells us that the

25 slope component of those pulses fall within the range

Direct - Robbins

1 that we consider typical for Indiana bats.

2 Q.      And do you -- when you look at these, it seems --

3 so you seem to have two different -- you sort of look at

4 one screen, what you just showed us a moment ago, and you

5 look at the second screen.  Can you explain what the

6 difference between the two screens are?

7 A.      This is what's called a split screen, and the

8 component on the left is identical to what you were

9 seeing before, just a portion of that sequence.  And then

10 the part on the right shows the frequency slope of that

11 portion of the sequence.  And we can scroll through the

12 whole sequence and look at the slopes of all of the

13 pulses.

14 Q.      I believe you have some other calls on here that

15 were also from the project site.

16 A.      Correct.

17 Q.      Is it similar, or are there some that we could --

18 A.      I think, as you can see, some of the differences

19 that we're looking at between and among the different

20 species taken -- recorded at the site.  This is a second

21 one, 2 of 8, that we identified as Indiana bat showing

22 very similar characteristics to the first one.

23         Next, please.

24 Q.      All right.

25 A.      And, again, the slope factors for that particular

Direct - Robbins

1 segment of that second sequence.

2       Next.

3 Q.     (Indicating.)

4 A.     This shows a little brown bat sequence.  And

5 although looking very similar, what it does is have a

6 slope component that's much greater or less slope, more

7 bent.  But you can see from the right-hand side of this

8 sequence that this bat has gone into an approach and

9 feeding buzz, so that you can see how you can have a

10 change within one sequence of a bat.  And if all you had

11 was the five or six pulses at the right, it would -- you

12 could misidentify it.  That's why we make sure we have

13 long sequences that will give us more information about

14 what that bat is doing as it's echo locating in the area.

15       And then, again, the slope component showing the

16 slope coming down into the 100, rather than staying above

17 120.  This is a an identifying factor for little brown

18 bats.

19 Q.     (Indicating.)

20 A.     Then, this is an eastern red bat sequence.  Very

21 typical the way it goes.  It doesn't have the same kind

22 of slope components, and it's very inconsistent in its

23 minimum frequency.  And one of the characteristics to be

24 used to identify these is a coefficient of variation on

25 the minimum frequency, because it is -- where other bats

Direct - Robbins

1  are very consistent with that characteristic, these are

2  very flexible with that characteristic.

3  Q.      (Indicating.)

4  A.      And then the Eastern Pipistrelle is very

5  consistent across that bottom frequency.  Even though the

6  frequencies may overlap with the red bat, this one is

7  always going to be consistent, and you definitely have to

8  have long sequences to be positive in your identification

9  between these two species.

10  Q.      (Indicating.)

11  A.      And then you get files like this.  This would be

12  -- I identified about 50 percent of the files as

13  belonging to species that I could recognize, but then you

14  get files like this.  These, again, are from the same

15  files that we got from Beech Ridge.  And although there's

16  evidence of bats flying through this area and echo

17  locating, this is not one I would attempt to identify

18  because it's either at too much distance or it's come in

19  contact with the clutter of the edge of the road.  Again,

20  not knowing exactly where the detectors were placed.

21  But, this is a good example of clutter and noise that

22  basically precludes any kind of species identification,

23  other than the fact that this is a bat.

24  Q.      So, do you -- on something like this, do you even

25  attempt to identify it?

Direct - Robbins

1 A.      The program will attempt to identify it, but it'll

2 come out "unknown," because it won't have enough pulses

3 that are consistent with any one species.  And if we

4 actually applied the noise filter to this, it would

5 eliminate almost all of it.

6 Q.      (Indicating.)

7 A.      And here again we have a series of pulses that

8 indicate to me that this bat is not producing search

9 phase calls because, again, they're very inconsistent or

10 very distance from the microphone.  Even though, again,

11 we have quite a number of pulses there, I would not

12 attempt to give an identification to this one.

13         So, if this was one that was actually identified

14 as *Myotis* by the model, our visual examination of it

15 would say to kick it out because it has no valid

16 information for species identification.

17 Q.      And all of those files we just looked at, all of

18 the data there, is that from the Beech Ridge Project

19 site?

20 A.      Yes, it is.

21 Q.      How long have you been engaged in this type of

22 analysis, the one you just described for the court?

23 A.      Well, we started at the beginning about 12 years

24 ago as I said collecting calls for our library, because

25 we found -- I was quite naive at the beginning.  I'd go,

Direct - Robbins

1 oh, I've got a recorder; I can go to our sound lab; I can

2 distinguish all of these bats that fly by.  And so after

3 a year of unsuccessful hours, we started over and started

4 to develop our call library by catching bats and

5 recording known ones before we ever started trying to

6 identify them.

7 Q.     And has this statistical analysis that you engage

8 in, has that ever been published?

9 A.     Yes.  It was published in 2002.  And Britzke --

10 Q.     Is that peer review?

11 A.     Yes.

12 Q.     And I would actually like to take a look at

13 Plaintiff's Exhibit 51.  Is this the document you're

14 referring to?

15 A.     Yes, it is.

16       MR. EUBANKS:  Your Honor, this has not been

17 stipulated to to this point.  It is a scientific study.

18 We know that those generally are not admitted into

19 evidence; however, we have reason to believe that experts

20 on the other side will be characterizing some of the

21 interpretations from this study.  So, to the extent the

22 Court would be interested in reading it for Your Honor's

23 own purpose --

24       THE COURT:  What is the exhibit number?

25       MR. EUBANKS:  Excuse me?

Direct - Robbins

1        THE COURT:  What is the exhibit number?

2        MR. EUBANKS:  Plaintiff's Exhibit 51.

3        THE COURT:  51?  Okay.

4        MR. EUBANKS:  We would request -- since we believe

5   there will be characterizations made about that, we would

6   request that it be moved into evidence.

7        THE COURT:  Any objection?

8        MR. ZATZ:  Your Honor, the document itself is

9   hearsay, but we're amenable in providing the Court with

10  literature in whatever form.

11       THE COURT:  It would be helpful for me to

12  understand the methodology, so I will receive it for that

13  purpose.

14       BY MR. EUBANKS:

15  Q.     Thank you.

16       As to the AnaBat data that was collected on the

17  Beech Ridge Project site.  What is your understanding on

18  when and where that data was collected?

19  A.     I had data from two different days, the 24th and

20  the 26th.  The files I was sent contained some

21  information from the 25th, but there are no bat files on

22  it.

23  Q.     And what is your understanding on how that data

24  was collected?

25  A.     The data were collected using an AnaBat II bat

Direct - Robbins

1 collector, which is very similar to the one I showed you

2 except it has two units for the storage of the data.  And

3 from the calls and the cleanliness of the calls, I

4 basically believe that it was placed in an area -- in an

5 open flyway away from clutter.  About the same number of

6 calls are identifiable to belonging to bats, as are

7 normally done in my areas.  Tend not to put bat detectors

8 out in open fields where you will have no clutter.  Try

9 to put them in places where the bats will be passing

10 through, and it looked like that was done in this case.

11 Q.    So, is it possible to examine the quality of the

12 calls based on analyzing calls?  Can you draw inferences

13 about the quality from the analysis that's conducted?

14 A.    Well, the fact that the program will analyze them

15 and they're still existing after filters are run through

16 that get rid of unconnected noise, yes.  And then just

17 visually looking at them, they are good, clean

18 identifiable sequences in most cases.  Well, in at least

19 half the cases.

20 Q.    I'd like to have you just walk me and the Court

21 through what you did to analyze the July 2005 AnaBat data

22 from the Beech Ridge Project site.

23 A.    I analyzed the two days separately, using the

24 Discriminate Function Analysis that was described in the

25 paper that was just accepted in where, basically, we have

Direct - Robbins

1 a library of known calls.  And, Discriminate Function

2 Analysis basically takes unknown sequence, pulse by

3 pulse, and compares each pulse with that library of known

4 calls and comes up with an identification of each pulse.

5        At the end of that information, you end up with a

6 readout that says 8 of 10 pulses, or 7 of 10 pulses were

7 identified as this particular species.  We basically -- I

8 look at it at 75 percent.  It means I move those into a

9 known category.  But anything that comes up in the *Myotis*

10 category I will look at using the technology that I just

11 showed you in a pulse by -- call by call way to make sure

12 that I agree what the computer's done.

13        The computer, based on our matrix of

14 misidentification, will misidentify some, and I want to

15 make sure that we lessen that, and that's the way we've

16 done it all the time before we've made our matrix of

17 misidentification or false positives.

18 Q.     And what were the results of your AnaBat analysis

19 here?

20 A.     We identified four sequences from the first day,

21 on the 24th, and two sequences from the second day as

22 being most probably Indiana bats, based on these

23 criteria.

24 Q.     Sorry.  Just to go back.  It was four from the

25 first day?

Direct - Robbins

1 A.      Four from the first day -- no.  Six from the first

2 day.  Six from the first day; two from the second day;

3 for a total of eight.

4 Q.      Is that consistent with the position you took in

5 your declaration -- rebuttal declaration?

6 A.      Yes, it is.

7 Q.      I'd like to --

8 A.      And then we took that second part of that program,

9 in that publication, and looked at the probability of

10 false positives by the fact that we know that we're going

11 to misidentify X percent of little browns as Indianas and

12 vice versa.

13      And so using identification that we made for those

14 of Indianas, little browns, and northerns, we put those

15 into a second program that gives us a P value that's

16 testing the hypothesis that they are -- they do not exist

17 in this data set.  And for the whole data set, that P

18 value was, I believe, .024.

19 Q.      For those of us who are not statisticians, can you

20 explain what a P value of .024 is?

21 A.      In this study, you can say -- you can reverse that

22 and say it's 96.7 percent probability that they're there.

23 But statisticians, as I was told numerous times this last

24 week, you can't reverse what seems to be the obvious as a

25 statistician.  What this program -- it's a likelihood

Direct - Robbins

1  test, and that P value is testing the hypothesis that

2  they don't exist.  So, using that program of false

3  positives and positive identifications, there is a .024

4  percent probability that they don't exist in this data

5  set.

6  Q.     So .024 would be 2.4 percent; correct?

7  A.     Yes.  Or -- yeah.  It would be, you know -- you

8  know, a 95 percent confidence limit is what usually is

9  done, and this is higher than that.

10  Q.     When you refer to a 95 percent confidence level,

11  what does that mean?

12  A.     That's kind of the benchmark when you're doing

13  statistical analyses to say, this is significant or

14  non-significant.  It depends on what you set as your

15  normal hypothesis.  Sometimes it's 90 percent.  But

16  usually it's 95, or sometimes even 99.  It depends on

17  your sample size and the question you're asking.

18  Q.     So, based on the P value you got using your

19  analysis, are you able to say whether this is or is not

20  statistically significant?

21  A.     It is statistically significant.

22  Q.     I'd like to have you look at Plaintiff's Exhibit 8

23  at Page 8, and this is going to be the last sentence on

24  the page.  We're going to run over to Page 9 also.  You

25  said -- this is in your rebuttal declaration.  You said,

Direct - Robbins

1 "Given the limits of the AnaBat survey that was

2 conducted, the results indicate that Indiana bats are

3 using the Beech Ridge Project site, and the most logical

4 scientific conclusion is that if more extensive surveys

5 were done, a much larger number of Indiana bat calls

6 would be found throughout the site."

7          Could you just explain that a bit further?"

8 A.       Well, I based it on the fact that this represented

9 only a brief period, for two nights, based on -- from

10 what I was told from the notes of the person that did the

11 survey, and that these -- it was only done one night at

12 each of these two sites, rather than the two nights that

13 they were actually netting at these two sites.  And if we

14 say they were -- if they did 15 sites across the ridges,

15 it would be reasonable to assume that these kind of data

16 would be collected at other places.

17 Q.       Was this the same AnaBat analysis you're using for

18 the wind projects you've been working with?

19 A.       Yes.

20 Q.       And those --

21 A.       The only difference in the one we're using at the

22 wind project we're doing now, and at the projects I'm

23 doing for national parks, is that we have put *Myotis*

24 leveye, the small foot, in, because we now have known

25 calls from that species, and I checked that against this

Direct - Robbins

1 also.

2 Q.    Remind me again, if you will.  Are there any

3 federal agencies involved with those wind projects you're

4 working with?

5 A.    Fish and Wildlife Service is, I guess you'd say,

6 overseeing it.  They're aware of everything we're doing,

7 and they are involved now in developing, with the two of

8 the wind companies, HCP.

9 Q.    What is your understanding about defendant's

10 analysis of the July 2005 AnaBat data?

11 A.    Well, it's my understanding they ran it through

12 what is commonly called the Britzke filter, or the

13 Kentucky Indiana bat filter, and this is basically a

14 filter for dummies.  If you know nothing about the calls,

15 and you have no way of checking the results, you run the

16 Britzke filter.  It has nothing to do with the analysis

17 that was published or the way I identify the calls.

18        What it does is it basically has any person doing

19 AnaBat studies, which are required in Kentucky, for

20 anybody putting out a mist-net, that they run it through

21 this filter.  It's a very conservative filter in that it

22 will only say Indiana bats are present if it identifies

23 five of those individual pulses in a sequence as having

24 the ideal characteristics for an Indiana bat.  That

25 sounds like that would be easy to do if it was really an

Direct - Robbins

1 Indiana bat, so we also ran the Britzke filter against

2 this data set and agreed with their person's initial

3 discovery that they did not represent Indiana bats.

4       So we checked it with four pulses, and it popped

5 out two of the Indiana bats.  We checked it with three

6 pulses, which means it's not just looking at three

7 pulses, it is looking at the whole sequence; it's picking

8 out three pulses as being perfect.

9       Well, to see how accurate and useful this Britzke

10 filter is, we ran the Britzke filter against the library

11 of known calls that Britzke uses in his Discriminate

12 Function Analysis and the one that we use, and it

13 identified 27 percent of them as Indiana bats, and so it

14 is very conservative.

15       I would say, without testing it, that if it came

16 back as a positive for Indiana bats, there's a very high

17 probability they're there.  But it's obvious that if it

18 says they're not there, it doesn't mean they're not

19 there, it just means that they didn't have enough perfect

20 pulses.

21 Q.    Is this what is referred to in the scientific

22 community as a "false negative?"

23 A.    Yes.  It would be a false negative.

24 Q.    And what percentage of the time would the Britzke

25 filter result in a false negative, based on the review

Direct - Robbins

1  you did?

2  A.      Based on the calls that we developed for our call

3  library of known Indiana bats carrying a light tag, it

4  identified -- it would have had false negatives 73

5  percent of the time.

6  Q.      Do you generally only use the Britzke filter in

7  your research?

8  A.      I use the Britzke filter as kind of a secondary

9  guide.  It's so easy to run on multiple files, which

10 makes it easy for somebody who doesn't know what they're

11 doing, that we will run it very quickly if we're not sure

12 there's Indiana bats in this particular call file.  If it

13 pops them up, then we'll go back and look at those calls

14 to make sure they're there.  It's just a presence or

15 absence.  But we won't just use that.  We will use our

16 own call analysis which makes much longer to come up with

17 calls that -- to see for sure.  But we use it.  We'll

18 play with it on a five, four, three pulses to target

19 areas or target sequences we want to look at later.

20 Q.      Considering your level of expertise with AnaBat,

21 would you ever rely on just the Britzke filter?

22 A.      I would not rely on the Britzke filter to tell me

23 that the bats were not present.

24 Q.      And do you know -- I know Britzke was a grad

25 student of yours and you've worked closely with him.  Do

Direct - Robbins

1 you know if he uses only the Britzke filter in analyzing

2 AnaBat data?

3          MR. ZATZ:  Objection.  Foundation and hearsay.

4          THE COURT:  Lay a foundation.  Sustained.

5          BY MR. EUBANKS:

6 Q.     Would an AnaBat expert of your level of expertise

7 be limited to a filter?

8 A.     I don't know anybody who has expertise in AnaBat

9 analysis that would use the Britzke filter for a

10 definitive answer.

11 Q.     And you touched on this, but I want to go back to

12 it.  What is the length of the call sequences you

13 analyzed here?  Did it differ in any way from what the

14 Britzke filter would look at?

15 A.     No.  The Britzke filter will look at every

16 sequence in its entirety, just as we do.  But as I said,

17 it will only give a positive if it has five pulses in

18 that sequence.  Whether it's a sequence of five, ten or

19 20, it will only -- it must have five that it likes, I

20 guess you would say, that have the right parameters.

21          The problem with the filter is those parameters

22 were developed by Britzke based on a mean and a standard

23 error around the mean of each parameter in one of those

24 pulses.  And the problem is, as I mentioned, 40 percent

25 of the variability or more is within one sequence, and so

Direct - Robbins

1 it's only including a very small part of the variation

2 that's within a good Indiana bat call sequence.  But it

3 looks at them all, as we do.

4 Q.    Did any of the calls you identified from the Beech

5 Ridge Project site have fewer than ten overall pulses?

6 A.    No.  None of the ones identified as *Myotis* or

7 Indiana bat.  Some of the other species, like the horry

8 bad, or the big brown, their minimum frequency is so

9 characteristic of that have species and none other.  They

10 might, say, be only looking at four or five pulses down

11 at that level, because that is indicative of those two

12 species.  But, others?  I would need more.

13 Q.    Have you read the critique of your AnaBat analysis

14 by Dr. Michael Lacki?

15 A.    Yes, I have.

16 Q.    Do you have any comment to that critique?

17 A.    I think he misunderstood the idea of the five

18 pulses.  In the manuscript that he cited that I was

19 violating, the Britzke manuscript, we have nothing in

20 there about five pulses, and the Britzke filter was not

21 developed at that time.  What the five pulses may have

22 come from is in the study we published on variability

23 within calls, we used sequences that had five or more

24 pulses.  So, we had a range of the variation, but we

25 don't use that in developing either a library or in

Direct - Robbins

1 identification.

2 Q.      One of the things Dr. Lacki spoke about in his

3 critique was false positives, the opposite of what we

4 were talking about here.  Can you tell us how false

5 positives apply to your analysis?

6 A.      That's where the identification matrix comes in.

7 We have figured out what percent of false positives

8 you're likely to get between and among these three

9 species of *Myotis*, and so that's why you need an adequate

10 sample size, in this case Indiana bats, so that the

11 possibility of false positives is overweighed by the

12 number of sequences that were identified as that species.

13 Q.      And, earlier you spoke about using statistics to

14 come to a P value which you believe to be statistically

15 significant.  Have you ever had statistics training?

16 A.      I had a binary course in my masters degree stuff,

17 and then a population genetics course which to me was

18 statistics, even though it was talking about population

19 in my Ph.D work.

20 Q.      Even though you've had those experiences, would

21 someone need advanced statistical training to generate a

22 P value based on an AnaBat analysis?

23 A.      No.  Not to generate a P value.  Once you have

24 identification of a species in that particular area, the

25 four-tram program that Dr. Heywood, the third author on

Direct - Robbins

1 the paper generated, is basically a cut and paste.  You

2 tell it now many of each species you identified at that

3 location, and it will give you a P value of whether the

4 hypothesis is accepted or not.

5 Q.     Just to get it on the record here one time.

6 Again, how many Indiana bat calls did you identify from

7 the Beech Ridge Project site?

8 A.     Eight.

9 Q.     Do you believe that your analysis of that data is

10 sound science?

11 A.     Yes, I do.

12 Q.     Do you believe that your results are reliable?

13 A.     Yes.  And repeatable.

14 Q.     Why is repeatability important in the scientific

15 community?

16 A.     Because that's basically the test of the

17 scientific method.  That other people, given the same

18 information, could come up with the same results.

19 Q.     Generally, after you determine a certain AnaBat

20 analysis and the results from that, do you ever do

21 anything to verify those results?

22 A.     Well, we're usually netting in conjunction with

23 those reports, and I would not accept as -- I rely a lot

24 on the AnaBat work and the studies we're doing in

25 northern Missouri, because we have documented the

Direct - Robbins

1  presence of Indiana bats in the area by a variety of

2  methods.  The calls now that we are using to look at

3  activity areas, and timing of movement across there I

4  accept as valid, as does the company and the Fish and

5  Wildlife Service.

6         But, in doing multiple techniques, AnaBat and

7  mist-netting, I would like to have both be positive,

8  because, first, the AnaBats tell you nothing about age or

9  sexual condition of the individuals, and that's an

10 important aspect for any study; but we also use them to

11 point us to areas for further netting.

12        Many times you can't put a net over a lake or over

13 a big river or over an area with no canopy cover, and so

14 a bat detector can be put in those areas to get the kind

15 of information, while you should be netting in areas that

16 would be more likely to funnel Indiana bats and the other

17 bats to your nets.

18 Q.    Where you have detected Indiana bats using AnaBat,

19 have you ever gone back out and captured those by

20 mist-net with more effort?

21 A.    We've had at least three cases in these wind farms

22 that I'm working on.  At one, the whole wind farm, we

23 didn't collect any Indiana bats in the first survey in

24 early May, but we did get a couple of very suspicious

25 sequences from one location that we identified as Indiana

Direct - Robbins

1 bats.  We went back there a month later and collected a

2 lactating female Indiana bat that we were able to put a

3 radio on and follow her.

4        The other places were places -- widely distant

5 places on wind farms where we had put nets and had no

6 success or didn't find any Indiana bats, but the detector

7 said they're probably there.  We went back and picked

8 them up.  And since we're looking on these areas where on

9 the wind farm are they located that might have to do with

10 siting, we wanted to know where they did exist, but we

11 weren't going to do a positive unless we actually

12 captured them.  We captured them based on where the

13 detector told us to put our nets.

14 Q.    Back to verification that we were talking about.

15 Do you ever send results to other scientists in the

16 field?

17 A.    Quite often, especially with my students, and

18 they'll send them to me.  I have people from wind farms

19 I'm working with actually sending me data from a study I

20 wasn't involved in and saying, could you independently

21 look at these calls.  And I send them out to at least

22 three of my past grad students to check, because of

23 verification and repeatability, as I said.  If I'm very

24 worried about the implications of identifying these as

25 Indiana bats or any other species, I like to have backup.

Direct - Robbins

1 Q.      And is that an ordinary practice in the field?

2 A.      I think so.  At least I get calls from other

3 people.

4 Q.      Is it ordinary practice for you personally?

5 A.      Yes.  I send them out to a number of people,

6 including Eric Britzke.

7 Q.      Did you ask anyone to verify your findings with

8 respect to the Beech Ridge AnaBat data?

9 A.      Yes.

10 Q.      Who did you ask to verify it?

11 A.      Well, in the files that were sent to me, Lisa

12 Winholdt, the person who had managed those files, had a

13 separate file in there that I had noticed later.  It was

14 just labeled as "*Myotis*," and I didn't look at that file,

15 because I had also already looked at the whole two days

16 of files.  And that file, I believe, had 25 or 30

17 sequences in it.  And so I said, well if somebody in

18 their group identifies *Myotis*, let's see if Eric can

19 identify these.  And so I sent them to him and asked him

20 if he could do it; at the same time, I did them

21 separately.

22 Q.      When you say "Eric?"

23 A.      Eric Britzke.

24 Q.      Britzke?

25 A.      Dr. Britzke.

Direct - Robbins

1 Q.      Is this the same Britzke who the Britzke filter is

2 named for?

3 A.      Yes, it is.

4 Q.      Did he know anything about the data before he

5 analyzed it?

6 A.      He didn't know where they were coming from and

7 didn't know what I needed it for.

8 Q.      Do you know what the results of his analysis were?

9 A.      I do.

10       MR. ZATZ:  Objection.  Calls for hearsay, Your

11 Honor.

12       THE COURT:  Overruled.

13       THE WITNESS:  In the file that I sent him that was

14 labeled "*Myotis*" from BHE, he identified six sequences as

15 being consistent with his identification as Indian bats.

16       BY MR. EUBANKS:

17 Q.      Of that subset of files, how many Indiana bat

18 calls had you identified?

19 A.      Six.

20 Q.      How many, again, did Dr. Britzke identify?

21 A.      Six.

22 Q.      Do you know what method Dr. Britzke used in

23 analyzing the files?

24 A.      I do not.

25 Q.      Is he someone you would consider to have expertise

Direct - Robbins

1 in this area?

2 A.      Yes.  He's probably published more on the use of

3 AnaBat, and identification, and worked with Indiana bats

4 than I have.

5 Q.      Did you and Dr. Britzke have any discussion with

6 Dr. Gannon, who was here earlier, about his results

7 before you came to your conclusions?

8 A.      No.  I know I didn't, but I don't know about Eric.

9 Q.      I'd like to take a look at Plaintiff's Exhibit

10 124.  That has been stipulated to in part.  The first

11 four pages have been stipulated to.  We would like to

12 move the first four pages in evidence as stipulated to;

13 the last two pages we would move in evidence.

14      These are printouts you provided to the plaintiffs

15 in this case, Dr. Robbins, and I just want you to give us

16 a quick run through.  I believe you've already explained

17 all this.  But, since you do have printouts, I wanted you

18 to put these before the Court and explain what they are,

19 starting with the first page.

20 A.      This is the likelihood test that Dr. Heywood wrote

21 a program for.  And you can see at the top, it basically

22 asks how many of each of these species, or in this case

23 species group, were identified based on the discriminate

24 function, and you supply those data.  As you can see, in

25 this case there were no horry bats or gray bats

Direct - Robbins

1 identified, so they got a zero.  And the others were

2 given the identifications that I received from

3 discriminate function and our qualitative analysis.

4        And then if you go down, it basically estimates

5 the high square value, and in this case showing that this

6 was from the 24th only that the probability -- the

7 hypothesis -- the null hypothesis being wrong was .03,

8 and so this  basically translates into a .03 probability

9 that Indiana bats were present in this sample, the P

10 value.

11 Q.     Were present or not present?

12 A.     Were present in the sample.  No.  Were not present

13 in the sample.  Sorry.

14 Q.     Thank you for the clarification.

15 A.     Yes.  It's that reverse that the statisticians

16 like to --

17 Q.     So on this night, July 24th, there was a 3.3

18 percent probability that Indiana bats were not present on

19 the Beech Ridge Project?

20 A.     Yes.  Or in that sample.

21 Q.     Just to be clear here, can you explain the

22 different species names?  Which one is the Indiana bat?

23 A.     MYSO.  *Myotis sodalis*.

24 Q.     Thank you.

25 A.     And so this had a good number of little browns,

Direct - Robbins

1 and a good number of northern bats, but also enough of

2 the sequences identified as Indiana bats that the false

3 positives would not overweigh the data.

4 Q.    And so this is -- on the first night the AnaBat

5 data was collected, did you also identify Indiana bats on

6 the second night?

7 A.    I did.  It would be in another file for the 26th.

8 In this case, the identifications are as given.  We had

9 one horry bat sequence; again, no gray bat sequences; a

10 large number of little browns; only one northern, but

11 then only two *Sodalis*, which are the Indiana bat, and so

12 -- though we also had a quite a number of Eastern

13 Pipistrelles in that file.

14       And if you look down at the P value, basically,

15 the P value is .4 that they are not there.  Therefore,

16 it's not statistically valid that you could say that they

17 were present, based on this sample from the 26th.

18 Q.    Can you explain what this is?

19 A.    This combines the 24th and the 26th for the site,

20 rather than just at each location.  And so it -- the data

21 are combined from the two days.  And based on the total

22 number, we actually have a higher significant value of

23 .024 probability that they're not present on the site

24 when these two are combined.

25 Q.    And were these sheets we're looking at here, were

Direct - Robbins

1 they generated at or near the time of your AnaBat

2 analysis?

3 A.     Yes.  Yes.  Once I got the analysis of the

4 species, I plugged that into this model of Dr. Heywood's

5 and got it immediately.

6 Q.     Next page.  Oh, right.  And then the last -- can

7 you describe what this is, please?

8 A.     This is a printout of what happens with the

9 Britzke filter if you apply it to -- the five pulses to

10 the known library of known calls, and it shows that it

11 identified 34 of 123 known sequences.  It came in as a

12 27.64 percent identification of ones that we believe were

13 100 percent Indiana bats.  As you reduce the number of

14 pulses needed -- perfect pulses to do it, as you get down

15 to one pulse, even at that case it only identifies 74

16 percent of them because it is so stringent, and it

17 requires a level of excellence, I guess you would say, or

18 perfectness in a pulse that you don't see very often in

19 the wild.  It also starts picking up some false positives

20 because mainly because of those search phase of those

21 feeding or approach phase calls that tend to mask species

22 identification.

23 Q.     Based on the findings you've discussed with us

24 here, and also Dr. Britzke's further verification of

25 those results, what can you now say about the Indiana bat

Direct - Robbins

1 presence on the Beech Ridge site in 2005?

2 A.     Statistically highly probable that they were

3 present in significant numbers to allow us to positively

4 identify them at those -- that site on that day.

5 Q.     Do you believe they will continue to be present on

6 the project site during the life of the Beech Ridge Wind

7 Project?

8 A.     I have no reason to believe, based on the

9 information I've been given, that that was an aberrant

10 day in an aberrant month.  So, I would assume that would

11 be indicative of summer activity.

12 Q.     What do you think the likelihood is of Indiana

13 bats being present on this site during the course of this

14 project?

15 A.     To me, there is no doubt they were present there

16 during the summer.  I was very surprised when I analyzed

17 the files and they were present because, in my looking at

18 the site, I felt also that as high as it is, and the

19 distance from the hibernaculum where males may be or

20 usually stay during the summer time that, indeed, they

21 are either present in roosts on the site, or they're

22 moving farther than I expected them from the caves.  I

23 expected them to be there in the fall and the spring as

24 they move through, but they're obviously there in the

25 summer.

Direct - Robbins

1 Q.      We talked at length about the AnaBat data.  Are

2 there any other factors that influenced your opinion --

3 the opinion that Indiana bats are likely to be on the

4 site?

5 A.      Well, I did a review of the literature, not having

6 done any work myself in West Virginia.  I looked at all

7 the available literature I could and looked at the known

8 locations, including not just the two closest

9 hibernacula, but the fact there are hibernacula farther

10 to the south, and that there are records, including

11 maternity colonies, one founded by Eric Britzke, to the

12 north and west.

13      And, looking at the habitat, I could see no

14 barrier to Indiana bat movement.  The habitat -- my site

15 visit really increased my feeling that they're going to

16 be present, because the habitat's been altered in a way

17 that, in my opinion, and in the literature, increases the

18 food and the foraging area for Indiana bats.  I saw no

19 barrier.  So, it seemed to me that the logical assumption

20 would be, if they're to the north and the west and the

21 south and the east, that the data on their migration,

22 where they put radios on them and followed by plane, they

23 moved in a pretty much straight line regardless of

24 topographical features that they would be on the area.

25 Q.      And you originally gave your opinion in this case

Direct - Robbins

1 about Indiana bat presence without the AnaBat data.  Do

2 you believe that the AnaBat results just further confirm

3 what you believe to be the case beforehand?

4 A.     Well, to me, they absolutely verify the fact that

5 Indiana bats are using the area.

6 Q.     You just spoke of a site inspection a moment ago.

7 Can you give me a brief summary -- I'm sorry.  Dr. Gannon

8 already spoke about this earlier, but can you tell us

9 what the site inspection consisted of?

10 A.     Well, it showed that the area that is privately

11 owned by a logging company is uneven, aged forests, which

12 means you have forests of all ages.  You have some areas

13 that have been clear cut, some that seem to have been

14 thinned, and you have some areas that are in tact that

15 conform to flight areas for not only Indiana bats but a

16 lot of bats moving along protected corridors.

17         The roads in the area that have been made for the

18 construction of the turbines, as well as the transmission

19 line, are through forests that give protection from bats,

20 as they're moving along forest edges, and these kind of

21 areas have been shown to have increased levels of insect

22 abundance.

23         Indiana bats are insectivores.  If you look at the

24 recovery plan on food study habits, they feed on a

25 variety of different orders of insects, depending on the

Direct - Robbins

1 season, depending on the sex, the paleo-geographic

2 location.  But, they are basically small -- forage on

3 small flying insects, and those kind of areas would

4 increase production of those.

5 Q.     You seem to be talking about Indiana bat habitats

6 -- what is suitable Indiana bat habitat?  Can I ask you

7 what the factors -- what do you look for when you want to

8 assess that something is or is not suitable for Indiana

9 bats?

10 A.     Well, when I go into an area to do a pre-netting

11 survey to determine if netting needs to be done, I look

12 for forest connectivity.  I look for the presence of

13 snags, and the possible generation of new snags.  "Snags"

14 in this case are dead trees, or dead parts of trees.

15        Indiana bats are bark specialists, I guess you

16 could say.  Ninety-nine percent of all maternity colonies

17 and roosts have been found under the bark of dead trees.

18 This happens to be a very ephemeral habitat for them.

19 The trees can fall over, lose their bark in a matter of

20 years, or in the same season.  So, they must have a

21 constant supply of these in the area.  And so I look to

22 see -- one big tree is not going to make an Indiana bat

23 colony if there is no other dead trees in the area.  So I

24 look for kind of, as I say, connectivity of forests among

25 areas, and the presence of these snags in the type of

Direct - Robbins

1 tree where exfolient bark would be suitable for Indiana

2 bat roosts.

3 Q.     Did you see those characteristics during your site

4 inspection on the Beech Ridge site?

5 A.     I did.  I saw quite a number of both larger and

6 smaller snags.  But I also saw that the effects of not

7 only the logging, but the carving of roads along the

8 ridgetops, will kill a lot of trees, even though they

9 don't remove them, and those trees will now start

10 supplying a steady source of snags, at least for the near

11 future.

12 Q.     Can we take a look at Plaintiff's Exhibit 66,

13 please?  This has been stipulated to.  Plaintiff's

14 Exhibit 66.  Did you take -- go ahead.

15 A.     I mean, this is an obvious signpost to me that

16 there are snags in the area.  As I said, one tree like

17 this would not convince me that this would provide

18 suitable, at least long-term, habitat for Indiana bats.

19 This was just on the edge of the road, in a very good

20 area for topography.  But, as we drove around, you could

21 see expanses of where they had either selectively cut, or

22 in areas that left trees that were in the process of

23 dying.  And these Indiana bats need these trees with

24 almost full sun exposure.  They need to have their

25 babies.  And when they're pregnant, they need to have

Direct - Robbins

1 that heat for warming up, and sun exposure like this

2 would provide that.

3 Q.      And did you in fact take this photograph?

4 A.      I did.

5 Q.      And did you see other -- would you say you saw --

6 how many snags did you see like this on the project site?

7 A.      This one was the closest one to the road that we

8 were on.  But in the distance, and looking down the

9 hills, it was quite evident that snags -- in my opinion,

10 it would basically warrant a netting experience.  I've

11 done some site surveys for a couple of projects where I

12 went in and said we don't need to go further because this

13 is not suitable habitat.  This is a habitat I would

14 consider suitable.

15 Q.      Same exhibit, Page 44.  Did you take this

16 photograph?

17 A.      I did.

18 Q.      What does this photograph show?

19 A.      This is a road going between turbine sites.  And,

20 basically, although this is the kind of area that one

21 could not put a mist-net and expect to catch bat, this

22 would be the kind of area you could put an AnaBat and

23 expect to get a lot of activity on there because the bats

24 would be flying along the edges of the forest.  The trees

25 are mature.  As you can see, it looks like some are in

Direct - Robbins

1  the process of dying.  And I would expect as the time

2  went on this would actually increase the likelihood of

3       Indiana bats moving along these corridors where --

4  I know there's some information that shows Indiana bats

5  don't fly along ridgetops, but ridgetops don't usually

6  have corridors connecting the whole area.  And I would

7  expect bats, not just Indiana bats, to be using these

8  areas and bringing them in to proximity of turbines that

9  they may not have been near if they were flying over the

10 ridgetops.

11 Q.     Did you see other forest edge corridors on the

12 project site similar to what we see in this photograph?

13 A.     Almost everywhere.

14 Q.     And I just wanted to go back to something you just

15 said a moment ago.  Just to clarify, you mentioned

16 something about Indiana bats and bats in general using

17 ridgetops.  Are you aware of other ridgetop projects in

18 the eastern U. S. and what bat mortality data has shown

19 there?

20 A.     Only from my readings, the Mountaineer Project.

21 There's one up in Wisconsin that's along ridgetops.  But

22 from what I can tell from my readings, these eastern

23 ridgetops are killing, or have projected a mortality of

24 twice as much or more than most areas farther west.

25 Q.     Did the site inspection we just spoke of, did it

Direct - Robbins

1  have any impact -- I think you spoke of this earlier.

2  What impact did it have as to your opinion about Indiana

3  bat presence on this site?

4  A.     It confirmed my earlier statements that -- based

5  on their range and known locations, I was not expecting

6  to see forests like this up there.  Knowing it was owned

7  by a logging company, I expected more clear cutting and

8  open areas that would be unsuitable for any bat presence,

9  and I did see some in that area.  But I saw enough of

10  this kind of area that led me to believe, and looking

11  down the slopes, and looking down the corridor from the

12  transmission line, that this -- I'm much more convinced

13  that this area will be used by Indiana bats.

14  Q.     Can you look at Defendant's Demonstrative 2, with

15  permission from the defendants?  This is a chart.  I

16  don't believe you've seen this.  This was prepared for

17  this litigation by the defendants, and I will point out,

18  before we go any further, Indiana bat caves within five

19  to ten miles, all Indiana bat caves.

20        And outside of ten miles, it only looks at

21  Priority 1 and 2, I believe.  So, there are caves that

22  are not represented once we get outside of ten miles.

23  But I wanted you, Dr. Robbins, to look at this chart that

24  was put together, and I want you to focus right now on

25  Snedegars Cave, which is the third one down, and that is

Direct - Robbins

1 6.7 miles from the nearest wind turbine of the Beech

2 Ridge site.

3          Are you aware of any existing wind projects with a

4 higher population of endangered bats within -- first of

5 all, are you aware of any closer Indiana bat hibernacula

6 to any operating wind project?

7 A.      No, I am not.

8 Q.      And then if we can -- you can barely see the

9 population numbers there to the right.  If we can expand

10 that out a little bit.  All the way to that "recent

11 population."  You will see there within -- these are

12 within ten miles only.  Snedegars Cave, the most recent

13 count has 287 Indiana bats; Martha's Cave has 251; those

14 are both within ten miles.  Are you aware of any existing

15 wind project with a higher population of endangered bats

16 within ten miles?

17 A.      No, I'm not.

18 Q.      In your experience with wind projects, how far do

19 Indiana bats ordinarily migrate in spring and fall?

20 A.      In my area, where most of my studies are on the

21 maternity colonies up in northern and central Missouri,

22 band records have shown that these bats fly to southern

23 Missouri, northern Arkansas, southern Illinois, anywhere

24 from two to 300 miles.

25 Q.      And where you have captured Indiana bats on a wind

Direct - Robbins

1  project site, how close is the nearest Indiana bat

2  hibernaculum to that site?

3  A.      There was -- there's a Priority 4, which is very

4  few bats about a hundred miles away, and all the rest of

5  them are 200+.

6  Q.      And those are on site -- are those on sites where

7  you have in fact captured Indiana bats?

8  A.      Yes.

9  Q.      What is your understanding of the Indiana bat

10 population within migration distance of the Beech Ridge

11 Project?

12 A.      Within migration range?

13 Q.      What you consider to be migration range of this

14 species.

15 A.      All of them to the south, not just the ones that

16 are there based on our movements in other places.  The

17 only relevance is the area around -- at the swarming time

18 in the fall that might indicate they might not go more

19 than, you know, five miles or so, but that's a very small

20 portion, especially in the migration that they could move

21 through heading to caves farther south, and maternity

22 caves farther north.

23 Q.      So, looking at this chart that was put together,

24 including these down at the bottom, which are all within

25 150 miles.  Would all of these hibernaculum within 150

Direct - Robbins

1 miles, are those within the migration distance of Indiana

2 bats?

3 A.      Yes.

4 Q.      And just for the record, that includes one cave

5 that hasn't been discussed in this lawsuit, and that is

6 this Hell Hole cave which has approximately 13,000

7 Indiana bats, and that is 72 miles from the Beech Ridge

8 Project.  So in your opinion, 72 miles is within the --

9 do you believe 72 miles is within the Indiana bat

10 migration range?

11 A.      I do.  The other part of this that I'm most

12 interested in is, in Missouri our population has gone

13 down over 90 percent in the last 25 years, and here in

14 West Virginia they seem to be increasing.

15 Q.      Do you know how much they've increased over the

16 years?

17 A.      I think Beverly and Gumbert had them actually up

18 50 percent over the last 14 years.

19 Q.      Would you consider that a significant increase?

20 A.      Any increase in an endangered species is

21 significant.

22 Q.      Are they increasing throughout their range?

23 A.      No, they are not.  They seem to -- still seem to

24 be declining in the west.  And from the latest data, they

25 may be remaining stable but low levels in Illinois and

Direct - Robbins

1 Kentucky and, I believe, also in Indiana.  I don't have

2 the data from Indiana.

3 Q.      With the range-wide population decreasing, is

4 there any significance to ensuring that the populations

5 that are increasing continue to increase?

6 A.      Obviously, there is something about the reason why

7 they're decreasing.  One of the hypotheses that has a lot

8 of traction is global change and warming of caves may be

9 -- they may be finding some of these warmer caves

10 unsuitable for hibernation, and areas with colder caves

11 may be picking up more bats, but those are correlations

12 without a cause and effect yet.

13 Q.      Do you have an opinion about whether the Beech

14 Ridge Wind Project will kill bats, including common bat

15 species?

16 A.      Based on the data provided by the defendants, and

17 based on what's going on at Mountaineer and other wind

18 farms in the east, as well as across the country, it's

19 absolutely certain that bats will be killed.

20 Q.      In setting aside Indiana bats for a moment, do you

21 expect bats of other *Myotis* species to be killed by the

22 Beech Ridge Wind Project?

23 A.      Based on what has been killed at other farms in

24 the east and other places where *Myotis* has been found to

25 be present, yes, they are killed there, albeit in

Direct - Robbins

1  somewhat lower numbers than relative to their projected

2  abundance.  They are being killed at all the sites where

3  they are present.

4  Q.     Do Indiana bats exhibit any behavioral

5  characteristics that would preclude them from being

6  killed similar to other *Myotis* species?

7  A.     I can think of no other behavioral difference

8  other than that they're harder to catch.  I don't know if

9  they're more wary of nets or feeding on smaller insects,

10 so they're picking up the nets -- the nets can be heard

11 by the bats.  It's obvious that their echo location

12 parameters -- they're eating bugs smaller than knots in

13 the net, so you have to try to funnel them and put them

14 in and fool them.  But, from my captures of the other

15 two; my echo location areas of the other two *Myotis*

16 species, I don't see that they're using different areas

17 that I can actually significantly describe.  They're

18 found in the same general areas, but maybe not --

19 definitely not in the same abundance.

20 Q.     What is your opinion about the time of year when

21 bat mortalities will most likely occur on the Beech Ridge

22 Project site?

23  A.    Well, other studies -- fall seems to be the time

24 from about mid-July on to September, depending on how far

25 north you are.  That is when it seems to be 80 to 90

Direct - Robbins

1 percent in the area are killed.  However, right now, most

2 of the studies are confining themselves to the fall,

3 because that's when they think they're going to be having

4 the most mortalities.  No one has ever done any adequate

5 searches to look for Indiana bats throughout the season,

6 but I would assume, based on the little brown and

7 northern bat kills, that fall would be the most likely

8 time to find them.

9 Q.     For the wind projects with which you're involved,

10 are any fall surveys being conducted?

11 A.     Yes.  I have bat detectors out right now which

12 will be out until the end of the month to make sure we

13 cover the entire fall migration.  We started them on

14 April 15 and started our netting survey on May 15, and

15 kept the detectors are out right now.

16 Q.     What is your understanding regarding migration

17 surveys that were or were not conducted at the Beech

18 Ridge Project site?

19 A.     I found no documentation of any spring or fall

20 migration studies from that area.

21 Q.     Do you know where particular Indiana bats in

22 nearby hibernacula are hibernating?

23 A.     No idea.

24 Q.     Does that affect your ability to project when some

25 Indiana bats will migrate across the Beech Ridge site?

Direct - Robbins

1  A.      Not at all.  From other studies -- and I don't

2  assume these bats are doing anything different from those

3  that have being tracked, that they are going in more or

4  less straight lines between summer habitat and winter

5  hibernacula.  And if Beech Ridge falls between those

6  areas, then they will cross that area.

7  Q.      Are you familiar with what is called "Landscape

8  Theory," as it relates to bats?

9  A.      Landscape theory is more -- from my understanding

10 of it, and that's not my general field, it's more the big

11 picture of trying to describe general patterns based on a

12 variety of parameters to make predictions about presence

13 or movements or behavior of animals.  In this case, bats

14 --

15 Q.      Considering what you do know in this case, and

16 your AnaBat analysis in this case, does landscape theory

17 have any impact on your opinion?

18 A.      If all the Indiana bats were staying in the area,

19 then you might be able to figure out what kind of habitat

20 they were using, how they're being partitioned out.  But

21 the fact that they are moving through the area, and the

22 fact that we did find presence in the summer, I don't see

23 that any predictions are going to contradict.  They are

24 there and will be there.

25 Q.      Besides migrating over and across the Beech Ridge

Direct - Robbins

1 Project site, what kinds of activities can male and

2 female Indiana bats use the project site for throughout

3 the year?

4 A.      Well, if reproduction is going on in the area,

5 which we have no information on, they would be using

6 those types of snags, dead trees with sun exposure,

7 either on top of the hills, or on the edge of roads; edge

8 of fields.  Male Indiana bats and non-reproductive bats

9 and juveniles will tend to use both snags and interior

10 trees, all of which are available on the project side.

11 Q.      Are you aware the defendants undertook mist-

12 netting on the project site in July 2005 and no Indiana

13 bats were identified?

14 A.      Yes.

15 Q.      Does that affect your opinion on the likelihood of

16 Indiana bat presence?

17 A.      No.

18 Q.      Why not?

19 A.      Because although the surveys followed the minimum

20 requirements set forth by the Fish and Wildlife Service

21 to determine presence before destruction of habitat, they

22 were not conducted in a way that would look at seasonal,

23 long-term, or periodic use of the area.  At the time they

24 netted, I have -- they did not catch them.  But at the

25 time they netted, they did record them, and so they were

Direct - Robbins

1 present there, which indicates to me, like everywhere

2 else, Indiana bat presence may mean that they're just

3 harder to catch than those species they did catch.

4 Q.      Since you expect Indiana bats to likely occupy the

5 Beech Ridge Project site, what is your opinion as to the

6 likelihood of death or injury to Indiana bats as a result

7 of collision, or barotrauma?

8 A.      I can only say the other species of *Myotis* are

9 being killed.  And the fact they are using the area, I

10 can conclude there is a high likelihood that they will be

11 killed also.

12 Q.      Do you believe the opinion you just gave is a

13 sound, scientific conclusion based on the data we do

14 have?

15 A.      I think it's a sound hypothesis that needs to be

16 tested.

17 Q.      Are you aware -- just to go back to that.  Based

18 on what we do know, which you walked us through a few

19 minutes ago in terms of factors that are out there, do

20 you believe, based on what we have to this point -- of

21 course, it would always be great to have more, as we

22 know.  But, based on what we have to this point, do you

23 believe that the likelihood you just stated, the very

24 high likelihood, do you believe that to be sound based on

25 what we do actually have?

Direct - Robbins

1  A.      Could you repeat that again?

2  Q.      I'm sorry.  The opinion you gave about the very

3  high likelihood of Indiana bat death or injury based on

4  what we do have at this time, and the things we do about

5  know about this site, do you believe that's a sound,

6  scientific conclusion based on what we do know, at least

7  the factors we have at this time?

8  A.      I believe that's a logical conclusion.

9  Q.      And are you aware that no Indiana bat death from

10  wind power has been confirmed to date?

11  A.      Yes.

12  Q.      Does that affect your opinion as to the likelihood

13  of death or injury here?

14  A.      No.

15  Q.      I know Dr. Gannon already explained that a little

16  bit, but can you provide any other thoughts you have on

17  that?

18  A.      Well, from my perusal of the literature and

19  discussions with others, it seems that the surveys that

20  could be designed to determine whether or not Indiana

21  bats have been killed at other sites have not been

22  conducted.  I realize that not finding them does not mean

23  they are there, but not conducting proper surveys does

24  not eliminate the high possibility that they are there.

25  Q.      All right.  Are any of the wind companies you're

Direct - Robbins

1 currently working for -- you mentioned earlier they were

2 pursuing Incidental Take Permits.  Can I ask you, to the

3 extent -- do you know why they're getting Incidental Take

4 Permits?

5 A.     Because there are Indiana bats on the area, and

6 there is a high probability, because of the numbers and

7 the locations of, in this case, maternity colonies that

8 these bats will be adversely affected, either killed or

9 have their behavior changed in a way that would

10 constitute "take."

11 Q.     Are those companies that are pursuing the

12 Incidental Take Permits, are they planning to also

13 implement Adaptive Management techniques?

14 A.     Definitely, they are.  In fact, the two companies

15 I'm working with are proposing to make changes in siting

16 based on our pre-construction survey to lessen as much as

17 we can the chance of Incidental Take.

18 Q.     And do you know why the -- if they're planning to

19 use Adaptive Management techniques, do you also know why

20 they're also getting an Incidental Take Permit?

21 A.     Because to do an Adaptive Management Plan, you

22 have to have some information to tell you what to do with

23 that plan, and the only way to have an Adaptive

24 Management Plan is to have information about mortality or

25 changes in the movement or locations of the bats once

Direct - Robbins

1  operations begun.  And, so, without information on what's

2  being -- what's happening, I don't know how you plan any

3  Adaptive Management.

4  Q.    And the habitat conservation plan that accompanies

5  the Incidental Take Permit, I believe you've been

6  involved with that process.  What kind of things have the

7  wind company and the Fish and Wildlife Service agreed to

8  do to mitigate and minimize mortality to Indiana bats?

9  A.    Well, the first thing that was done --

10        MR. ZATZ:  Objection.  Hearsay, Your Honor.

11        THE COURT:  Overruled.

12        THE WITNESS:  The first thing that I did after I

13  documented the presence of Indiana bat maternity colonies

14  on there, I wrote a proposal that would involve a full

15  summer of research using telemetry of captured bats to

16  see where they're moving and what their maternity

17  colonies -- where they were, and how many bats were using

18  them; capture for presence and absence, and AnaBat

19  detectors in different habitats in a repeatable manner

20  where we could have baseline data to check for any

21  changes that might occur or make predictions on where

22  high levels of activity might be prior to construction.

23        BY MR. EUBANKS:

24  Q.    What was that research used for?

25  A.    Right now the telemetry and numbers is being

Direct - Robbins

1 presented to the Fish and Wildlife Service so they can

2 develop a take number based on the population size and

3 any information they can glean.  The activity data based

4 on the AnaBats basically indicates areas within each of

5 the project sites where we have higher and lower

6 activity, based on activity of the bats recorded by the

7 AnaBat.

8 Q.     And so the survey technique used to determine the

9 levels of activity that you -- was that an AnaBat

10 detector?

11 A.     Yes.

12 Q.     And based on that activity data, have any -- are

13 any modifications planned to the project?

14 A.     I believe both companies have or are presenting to

15 the Fish and Wildlife Service a proposal to resite

16 turbines that are within a certain distance of these

17 highest levels of activity.  They're not going to remove

18 them.  They haven't put them in yet, but they're going to

19 resite them to areas that, according to them, have lower

20 wind resources.

21        MR. EUBANKS:  I have nothing further, Your Honor.

22        THE COURT:  All right.  We'll take a recess until

23 five minutes of four.

24              (Off the record at 3:35 p.m.)

25              (On the record at 3:59 p.m.)

Cross - Robbins

1        THE COURT:  Please be seated.

2        MR. ZATZ:  May I proceed, Your Honor?

3        THE COURT:  You may proceed.

4                    **CROSS-EXAMINATION**

5        BY MR. ZATZ:

6   Q.    Good afternoon, Dr. Robbins.  Good to see you

7   again.  Did I hear you correctly say that you are

8   absolutely certain Indiana bats will be killed at the

9   Beech Ridge site?

10  A.    I hope not.  One, I hope they're not killed; and

11  two, that's a level of certainty that I don't believe I

12  could either repeat or hope I didn't say.

13  Q.    All right.  Fair enough.  If you said that, we

14  should not interpret it so literally?

15  A.    No.  I'm absolutely certain they will be using

16  Beech Ridge.  I don't think I said I will be absolutely

17  certain they will be killed.

18  Q.    Okay.  Fair enough.  Thank you.  Indeed, Dr.

19  Robbins, you know of no scientific evidence that there

20  has been any mortality of Indiana bats at Beech Ridge so

21  far; correct?

22  A.    Correct.

23  Q.    And you know of no scientific data that would

24  prove that there will, in fact, be any mortality of

25  Indiana bats at Beech Ridge.

Cross - Robbins

1 A.      That's correct.

2 Q.      And you know of no Indiana bat killed at any wind

3 energy facility; correct?

4 A.      I know there's been a reported one.  I don't know

5 of any scientific proof that that was one.

6 Q.      Okay.  And is the report you're referring to the

7 photograph from the Mountaineer site that we saw earlier?

8 A.      Yes.

9 Q.      And I won't repeat all the questions I went

10 through with Dr. Gannon, but you would agree that that's

11 not a piece of reliable scientific evidence; correct?

12 A.      That -- it can't be documented based on that.

13 Q.      Okay.  You would not rely on that photograph to

14 conclude that --

15 A.      I would not.

16 Q.      -- an Indiana bat was killed at Mountaineer?

17 A.      I would not.

18 Q.      Doctor, you're of the opinion that Adaptive

19 Management at wind power sites is critical, aren't you?

20 A.      If it's been determined that there is an option of

21 having Adaptive Management, that will decrease the

22 likelihood of kill or take.

23 Q.      And is one of the ways to find out if there is

24 such an option to do post-construction monitoring for the

25 presence of Indiana bats?

Cross - Robbins

1 A.      By that, do you mean mortality or additional

2 surveys using nets and AnaBat?

3 Q.      Well, let's start with that.  You've described at

4 length what the AnaBat Acoustic Detection System is and

5 how to do the analysis; and I can't begin to understand a

6 word you said about the statistics, so I'm not going to

7 go there.  But, AnaBat could be used as part of an

8 Adaptive Management regime at a wind power site; correct?

9 A.      Yes, it could.

10 Q.      And has been?

11 A.      I don't know of any Adaptive Management plans that

12 have been put forth based on any data, mortality, AnaBat

13 or netting post-construction.

14 Q.      Let me ask you this.  You would recommend that

15 AnaBat be used as part of an Adaptive Management regime;

16 correct?

17 A.      Definitely.

18 Q.      And mist-net surveying -- further mist-net

19 surveying could also be done as part of Adaptive

20 Management?

21 A.      Yes.  With telemetry.

22 Q.      I'm sorry?

23 A.      With radio-telemetry to see where the bats are

24 actually going after they're caught.

25 Q.      Let's get that clear on the record, because I

1 don't think this has come up before, Dr. Robbins.

2 Telemetry requires you, first, to capture a bat of the

3 species you're looking at; correct?

4 A.      That is correct.

5 Q.      So we can't do telemetry on Indiana bats until we

6 have captured one.

7 A.      That's correct.

8 Q.      And if we capture one, we can then -- well, you

9 tell me how it works.  You attach a battery?

10 A.      No.  You attach a radio that puts out a signal of

11 a specific wavelength -- it's battery-powered -- and then

12 you have antennas and track where that bat goes for the

13 length of the life of the transmitter which is, because

14 of the size of the bat, you have to have such a small

15 transmitter that it's usually around two weeks.

16 Q.      And that's something that could be done as part of

17 Adaptive Management at a wind power site?

18 A.      That would be part of what you would do to

19 determine if there needs to be Adaptive Management, yes.

20 Q.      All right.  The best way to know how Indiana bats

21 behave at an operating wind turbine site is to operate it

22 and do Adaptive Management; would you agree?

23 A.      I don't know how you're going to know how they

24 would have behaved if the turbines hadn't been in place,

25 so I think you need pre-construction data to find out if

Cross - Robbins

1 they had been adversely affected or changed their

2 activity patterns using telemetry and that, the other

3 techniques.

4 Q.     But those are techniques that can also be used

5 once the turbines are operating; correct?

6 A.     Yes.

7 Q.     And one of the reasons we would do that is because

8 at present we don't have enough data to really understand

9 the mortality patterns at operating wind turbine sites;

10 correct?

11 A.     Correct.

12 Q.     Now, if we use those methods, further mist-net

13 surveying, acoustic detection and so forth, there are

14 some options about ways to operate differently that might

15 reduce mortality; correct?

16 A.     Correct.

17 Q.     One of those is to curtail operations during low

18 wind speeds?

19 A.     Yes.

20 Q.     And the data would suggest to date that low wind

21 speed is one of the greatest risk factors for bats

22 generally at operating wind turbines; correct?

23 A.     That seems to be correct.

24 Q.     Okay.  And by "curtail," we mean, for example, we

25 can turn the turbines off at a particular time window

Cross - Robbins

1 that we find to be risky.

2 A.      Correct.

3 Q.      And mist-net surveying might help us determine

4 what that time window is?

5 A.      In conjunction with acoustics, because it gives

6 you more broad range activity patterns.  But, yes.  I

7 mean, telemetry of a captured bat is going to tell you

8 more about where that particular bat is going -- I mean,

9 you're not going to capture a live bat under a wind

10 turbine.

11 Q.      But we can use those techniques to determine when

12 it is that bats are killed at operating turbines;

13 correct?

14 A.      Yes; with mortality surveys in conjunction.

15 Q.      And so we can turn the turbines off completely;

16 correct?

17 A.      Yes.  That eliminates all kill.

18 Q.      Okay.  Fair enough, and obvious enough.  Thank

19 you.  We can also adjust the wind speed at which the

20 turbines kick in; correct?

21 A.      It's called "cut in speed," yes.

22 Q.      Cut in speed.  And a change in cut in speed can

23 reduce mortality at a wind turbine site; correct?

24 A.      From the results of research I've seen, yes.

25 Definitely.

Cross - Robbins

1  Q.      There's a second technique called "feathering?"

2  A.      Yes, I'm aware of it.

3  Q.      And as I understand it, feathering is turning the

4  turbines perpendicular to the wind so that they do not

5  turn in low winds; correct?

6  A.      I think that's what it is, yes.

7  Q.      And feathering could be used to reduce the risk of

8  mortality?

9  A.      That's been shown also.

10 Q.      And the kinds of techniques you've described,

11 mist-net surveying and acoustic detection, could help us

12 determine when to feather at a wind turbine site;

13 correct?

14 A.      Yes.

15 Q.      And all of these technique we've been discussing

16 could be used to reduce the risk of mortality to Indiana

17 bats at Beech Ridge as part of an Adaptive Management

18 Plan; correct?

19 A.      That's correct.

20 Q.      And you're aware that Beech Ridge has agreed, as a

21 condition of its siting certificate with the West

22 Virginia Public Service Commission, that -- to do post-

23 construction monitoring?

24 A.      No, I'm not aware of that.

25 Q.      Were you aware of the Technical Advisory Committee

1 that will be a part of Adaptive Management at the Beech

2 Ridge site?

3 A.     I have heard about one, but I don't know who's on

4 it so I couldn't comment on it.

5 Q.     So you don't know whether it's met yet?

6 A.     No.

7 Q.     You didn't don't know what it's going to do?

8 A.     I don't know if they have a bat biologist on it.

9 Q.     Today is October 21st.  The bats are swarming,

10 presumably?

11 A.     Presumably, yes.

12 Q.     And --

13 A.     Depending on weather.

14 Q.     And in the ordinary course of the seasonal cycle

15 of their behavior, you wouldn't expect them to be up on

16 the ridgetops; correct?

17 A.     I don't know what the probability is.  I've never

18 put radios on swarming bats.  I don't know how far they

19 go during that period.  I know many of my studies in

20 National Park, we put radios on swarming bats and they

21 disappear, and the topography is such that we were not

22 able to track them, but they were not hanging around the

23 cave where we initially captured them.

24 Q.     In the ordinary course of things, the bats today

25 ought to be swarming near their caves and getting ready

Cross - Robbins

1 to hibernate; correct?

2 A.       Yes.

3 Q.       And during hibernation, bats are not at risk from

4 the turbine site; correct?

5 A.       Correct.  As far as I know.

6 Q.       Now, I've asked you some questions about West

7 Virginia ridgetops.  Before this case, you've never

8 actually worked on bat issues in West Virginia, had you?

9 A.       No.

10 Q.      And most of your work on wind projects was in

11 Missouri?

12 A.      Correct.

13 Q.      In Missouri, the ridgetops are lower than in

14 Appalachian West Virginia; correct?

15 A.      Yes.

16 Q.      And your work in Missouri is mostly at altitudes

17 or elevations more like 2,000'?

18 A.      Or less.

19 Q.      And you have not mist-netted Indiana bats above

20 2,000', have you?

21 A.      I have not.

22 Q.      And you've not done acoustic detection of Indiana

23 bats above 2,000' have you?

24 A.      I have not.

25 Q.      Is it fair to say that the topography of

Cross - Robbins

1 Appalachian West Virginia is very different from that of

2 Missouri --

3 A.    Northern Missouri, yes.

4 Q.    -- where you've done your work on wind projects?

5 A.    The wind projects going in in Missouri is in the

6 northern part.

7 Q.    And would it be fair to say that the habitat for

8 Indiana bats is very different in West Virginia than in

9 northern Missouri?

10 A.    Well, I'm not sure about -- I mean, the habitat is

11 patchy.  I saw agricultural lands and grazing lands down

12 slope from the wind turbine site, which is basically what

13 it is in northern Missouri.  It's a mixture of forests,

14 riparian grazing operations, and farming operations, but

15 it's flat.  Flatter.

16 Q.    Your AnaBat call library does not have Indiana bat

17 calls from West Virginia, does it?

18 A.    That's correct.

19 Q.    And it doesn't have Indiana bat calls from

20 altitudes above 2,000', does it?

21 A.    I am not sure where Eric got the known calls in

22 North Carolina and eastern Kentucky, so I can't say yes

23 or no.

24 Q.    On your site visit to the Beech Ridge site, you

25 said you saw some suitable habitat for Indiana bats;

Cross - Robbins

1 correct?

2 A.      That's correct.

3 Q.      And you also saw some areas of quite unsuitable

4 habitat too, didn't you?

5 A.      That's correct also.

6 Q.      There are areas of the ridgetops and surroundings

7 that you would call "highly degraded?"

8 A.      Yes.

9 Q.      There were areas that had been stripmined?

10 A.      Yes.

11 Q.      There were areas of clear cut foresting?

12 A.      Yes.

13 Q.      There were areas of very low vegetation growth?

14 A.      Yes.

15 Q.      And in those areas I've just listed, you wouldn't

16 particularly expect to find Indiana bats would you?

17 A.      Not as resident, no.

18 Q.      You said, if I wrote this down correctly, that

19 looking down the hills you saw snags that would be

20 suitable habitat for Indiana bats?

21 A.      Yes, as well as on the ridgetops.

22 Q.      And so what you meant was you were looking toward

23 lower elevations or altitudes than the ridgetops.

24 A.      I was looking for continuous habitat --

25 Q.      But when you say --

Cross - Robbins

1 A.        -- leading up to the ridgetops.

2 Q.        But when you said you were looking down the hills,

3 you meant at lower elevations; correct?

4 A.        Correct.

5 Q.        And if they were lower elevations than where you

6 were standing on the ridgetops, they would certainly be

7 lower elevations than where the rotors sweep on an

8 operating turbine.

9 A.        That is true.

10 Q.       You would not describe as suitable habitat for

11 Indiana bats a single exposed snag or two, would you?

12 A.        If there was no other in proximity.  I mean, we

13 have them in northern Missouri moving, you know,

14 basically a mile between and among roost trees within

15 their maternity colony range.

16 Q.       Okay.  But generally, you need a large number in

17 an area and not just one or two; is that fair to say?

18 A.        Correct.  Generally.

19 Q.       I think, in your deposition, you said upwards of

20 ten or 20?

21 A.        Yes.  From the published literature and the stuff

22 I have done, yes, but not in West Virginia.

23 Q.       And you would need a particular habitat for

24 maternity colonies of Indiana bats; correct?

25 A.        That was what we were talking about.  Yes, those

Cross - Robbins

1 type of snags.

2 Q.      They particularly need the larger trees because

3 they need the thermal heating?

4 A.      Well, they need to be exposed trees.  "Large" is

5 relative.  In the Indiana Bat Recovery Plan, they're

6 anywhere -- in maternity roosts anywhere from 8" diameter

7 to 30" diameter.

8 Q.      Big trees and the sun, basically?

9 A.      Yes, or on the edge.

10 Q.      And as far as the data shows, no maternity

11 colonies have been found in Greenbrier County, West

12 Virginia; correct?

13 A.      Correct.

14 Q.      And you wouldn't necessarily expect maternity

15 colonies to be on the ridgetops.

16 A.      I would not have expected them to be on the

17 ridgetops prior to the AnaBat data.  Now, I don't know if

18 those are males and females.  It can't be told.

19 Q.      All right.  Well, doctor, you had reviewed the

20 AnaBat data before your deposition was taken on September

21 17th; correct?

22 A.      Correct.

23 Q.      And I'm happy to show you, but would you take my

24 word for it that on that date, September 17th, after

25 analyzing the AnaBat data, you said you would predict

Cross - Robbins

1 maternity colonies would not necessarily be on the

2 ridgetops but, rather, on the sides, the slopes, and in

3 the valleys?

4 A.      Not necessarily be on the ridgetops.  Okay.

5 Q.      And would you agree that maternity colonies in

6 West Virginia have generally been found at lower

7 altitudes than the ridgetops?

8 A.      I believe the number in the Beverly and Gumbert

9 paper was 900 meters maternity colony, which is somewhere

10 around 2,700'.

11 Q.      And this site is generally at between about 3,600

12 and 4,200'; correct?

13 A.      I don't know.

14 Q.      One of the things you did on the site visit was to

15 stand on what's called the D Line, and that's the turbine

16 line, I guess, sort of furthest to the northeast;

17 correct?

18 A.      Correct.

19 Q.      And you looked from there to the east toward where

20 Snedegars Cave is?

21 A.      That's what I was told it was the direction, yes.

22 Q.      And you described what you saw as just continuous

23 forest habitat down the smaller ridges; correct?

24 A.      That's correct.

25 Q.      But you don't know whether there is suitable

Cross - Robbins

1  habitat for Indiana bats around Snedegars Cave, do you?

2  A.      I do not.

3  Q.      And you haven't been to Snedegars Cave, have you?

4  A.      I have not.

5  Q.      And you can't say that Indiana bats would choose

6  the Beech Ridge turbine site over surrounding habitat at

7  Snedegars Cave to roost or forage, can you?

8  A.      Not having been there to compare, I can't say yes

9  or no.

10 Q.      You answered some questions from Mr. Eubanks about

11 migration of Indiana bats.

12 A.      Yes.

13 Q.      And you pointed to some caves north of the Beech

14 Ridge site, and you testified that they were all within

15 the migrating distance of Indiana bats.

16 A.      Caves north of the site?

17 Q.      Yes.

18 A.      Well, okay.  I mean, within my knowledge of their

19 migration range, all caves in the state are within range

20 of any other place in the state.

21 Q.      I'm glad you said that, because you're getting to

22 my point which is all of those caves are also within

23 migrating range of every wind power site in the

24 Appalachians; correct?

25 A.      I can't say yes or no.  But if they're within a

Cross - Robbins

1 couple hundred miles of them, I would say they're within

2 a range of where the Indiana bats are capable of

3 migrating.

4 Q.    And isn't it your opinion, then, that Indiana bats

5 could migrate over each and every wind power site built

6 in the Appalachians from New York to Georgia?

7 A.    Without any different data, yes.

8 Q.    Okay.  And so your position would be simply that

9 there should not be any wind power projects along

10 Appalachian ridgetops anywhere; correct?

11 A.    I don't believe you had me say you shouldn't put

12 wind power where there's Indiana bats.  That's not

13 something I would say or what I believe.  I believe

14 Adaptive Management is what we were -- as a way of

15 mitigating mortality.

16 Q.    All right.  And that's the best way to mitigate

17 mortality?

18 A.    Well, obviously, not putting them in would be the

19 best way, but I don't think that's a feasible way.

20 Q.    All right.  We don't actually know where or what

21 direction or what route Indiana bats follow in migration,

22 do we?

23 A.    That's correct.

24 Q.    We don't have any data on that.

25 A.    Not in West Virginia.

1 Q.      And there's really no data that tells us whether

2 Indiana bats in West Virginia tend to fly along mountain

3 ridgetops.

4 A.      Along them?  No, no data.

5 Q.      And there's no data that tells us whether Indiana

6 bats in West Virginia tend to fly along strings of wind

7 turbines.

8 A.      No, there's no data like that.

9 Q.      And you wouldn't be able to draw the migration

10 route of an Indiana bat in West Virginia, would you?

11 A.      No.

12 Q.      You would be speculating.

13 A.      I would be speculating.

14 Q.      Is it fair to say, Dr. Robbins, that simply

15 knowing there's available habitat in a particular spot

16 does not mean the same as saying there are Indiana bats

17 there?

18 A.      That's correct.

19 Q.      And would you agree that no amount of scientific

20 data can prove a negative?

21 A.      That's correct.

22 Q.      One last thing, Dr. Robbins.  You worked on a

23 project where you consulted with the Fish and Wildlife

24 Service to agree on a survey protocol for one of your

25 consulting clients; correct?

Cross - Robbins

1  A.       Correct.

2  Q.       And I guess you've done that more than once.

3  A.       Yes.

4  Q.       And on at least one of those occasions, you got

5  the approval of the Fish and Wildlife Service for your

6  survey protocol orally.

7  A.       Yes.

8  Q.       And it's your experience, isn't it, that in the

9  process of developing and agreeing on survey protocols,

10  you do communicate orally with the United States Fish and

11  Wildlife Service.

12  A.      I sent them my protocol by email, and they sent me

13  an approval both email and orally.

14  Q.       Okay.  And so it's -- it's ordinary and routine to

15  have oral telephone and email communications with the

16  Fish and Wildlife Service.

17  A.       That's correct.

18          MR. ZATZ:  Thank you.  That's all I have, sir.

19                       **REDIRECT EXAMINATION**

20          BY MR. EUBANKS:

21  Q.       Dr. Robbins, you and Mr. Zatz spoke of telemetry.

22  Do you know if telemetry was recommended here by the Fish

23  and Wildlife Service?

24  A.       I don't remember that being one of the four

25  methods that they mentioned.  I was looking at the mist-

Redirect - Robbins

1 net acoustic, infrared, and radar that I remember.   I

2 don't remember telemetry at this time.

3 Q.      Take a look at Plaintiff's Exhibit 97, please --

4 it's actually Page 5 -- and I'd like to look at the

5 fourth paragraph down, the last sentence of that

6 paragraph.  And that sentence reads:  "With respect to

7 federally listed species, we recommend conducting

8 springtime emergent studies."

9 A.      Wait a second.  Let me find it, please.

10 Q.      I'm sorry.  There we go.

11 A.      Okay.

12 Q.      "With respect to federally listed species, we

13 recommend conducting springtime emergent studies to

14 detect when and where species from nearby hibernacula

15 travel."  And this was a letter sent from the U. S. Fish

16 and Wildlife Service field office, with approval from the

17 regional office, on March 7, 2006 regarding this project.

18         Can you explain for me what a springtime emergent

19 study for Indiana bats and other endangered bats --

20 A.      I do remember this now, and it meant to me that

21 when bats were coming out of hibernation, as they've done

22 in other places between Pennsylvania and New York, that

23 they would like to find out where those bats are

24 traveling.  And as far as I know, the only way to do that

25 is by attaching radio transmitters on them.

Redirect - Robbins

1 Q.      And to do that, would you need to -- would that

2 require a capture and a mist-net on the project site, or

3 is that done elsewhere?

4 A.      If you're going in to do a spring emergent, you do

5 it at a hibernacula.

6 Q.      And so that can be done at a known nearby Indiana

7 bat hibernaculum?

8 A.      Correct.

9 Q.      And you spoke about curtailing and feathering with

10 Mr. Zatz.  Could that be part of an Incidental Take

11 Permit process in a habitat conservation plan?

12 A.      Of course.

13 Q.      Is that incorporated with the habitat conservation

14 plan of the companies you're working with are obtaining?

15 A.      In the working model that I have seen, I'm only

16 providing data, I'm not consulting separately on the

17 form.  They talk about if Indiana bats are indeed found

18 past the Incidental Take Permit, then they listed things

19 like curtailment and changing cut in speed or on specific

20 turbines if it's determined that certain sites are more

21 prevalent for causing mortality of Indiana bats.  Those

22 were things that were brought up.  It would be based on

23 mortality surveys that are done in a way that's going to

24 document adequately the kill.

25      The problem with every survey I've seen, except

Redirect - Robbins

1  one in Canada, the ability to find dead bats is somewhere

2  less than 50 percent.  And unless -- and one of the

3  things that we are recommending as part of the management

4  plan -- if, let's say, Plan B comes into effect where

5  they do kill Indiana bats.  The only way you can

6  determine that is to have a high level of efficiency at

7  finding that rare species.  We have to be able to

8  eliminate the possibility that's there, as well as find

9  them if they are.

10 Q.     And just to be clear on that point.  Curtailment

11 and feathering and other Adaptive Management strategies,

12 are those included as incorporated as part of the

13 Incidental Take Permit and the habitat conservation plan?

14 A.     No.  Only if it is found that Indiana bats are

15 indeed being killed.

16 Q.     But it is built in as part of the plan.

17 A.     That is -- from what I know of the draft that I

18 have seen, it hasn't been -- the plan has not been

19 approved, and so -- but I believe they are talking about

20 what would occur if the Incidental Take is exceeded.

21 Q.     Do you have any reason to think that altitude

22 changes Indiana bat calls in any significant way?

23 A.     No.

24 Q.     And you refer to a paper earlier on variation for

25 Indiana bat calls.  Was that a substantial factor in

Redirect - Robbins

1 terms of variation between calls?

2 A.     Yes.  For me it was.  And the fact that the other

3 piece species we identified fit well within the

4 parameters of our call library.

5 Q.     And that was a peer review publication?

6 A.     Yes.

7 Q.     Does the presence or absence of maternity colonies

8 on a project site have any impact on whether Indiana bats

9 will migrate through the project site during spring and

10 fall?

11 A.     I don't believe so.

12 Q.     And even though -- as you and Mr. Zatz were

13 talking about, even though Indiana bats are within the

14 range of any wind energy project in the Appalachians, do

15 you know of any existing wind power facility with closer

16 Indiana bat hibernacula?

17 A.     No, I don't.

18 Q.     And do you know of any other wind projects with

19 more than the known 550+ Indiana bats within ten miles of

20 this project?

21 A.     I do not.

22 Q.     Or, approximately 550.  Can you draw a migration

23 routes for any of the common bat species that you and

24 defendants agree will be killed by the Beech Ridge

25 Project?

Redirect - Robbins

1  A.      No.

2  Q.      Do you have an opinion about whether -- you've

3  said earlier, though, that those common species will be

4  killed.  So, not having the migration data, does that

5  impact in any way your ability to predict that the common

6  bat species will be killed?

7  A.      No.  I'm just looking at other studies to see when

8  they're killed, and they're killed during that migration

9  period and not necessarily if they are a resident during

10 the summer.  And so that is the only explanation that I

11 have seen put forth that they are being killed during

12 their fall migration.

13 Q.      And that's happening even where we don't -- we

14 aren't able to draw migration routes.

15 A.      Correct.

16      MR. EUBANKS:  I have nothing further.

17      THE COURT:  Any recross?

18      MR. ZATZ:  Just one thing, Your Honor.

19                      **RECROSS EXAMINATION**

20      BY MR. ZATZ:

21 Q.      Dr. Robbins, you told Mr. Eubanks that the ability

22 to find dead bats is less than 50 percent, typically.

23 A.      Yes.

24 Q.      And there's a way to study that; correct?

25 A.      Yes.

Recross - Robbins

1 Q.     And it's sometimes called a Search or Efficiency

2 Study, or Search or Efficiency Trial?

3 A.     That's correct.

4 Q.     Were you aware that a Search or Efficiency Trial

5 was part of the Adaptive Management Plan being considered

6 at Beech Ridge?

7 A.     I assume that if you're doing a mortality survey

8 that those are basically built into it.  So, yes, I would

9 assume they are.

10     MR. ZATZ:  Fair enough.  Thank you.

11     THE COURT:  All right.  You may step down.  Thank

12 you very much.

13          (Witness excused at 4:31 p.m.)

14     MR. GLITZENSTEIN:  Your Honor, our next live

15 witness was going to start tomorrow.  He's flying in

16 tonight.  He teaches classes today.  What we were going

17 to do, and we're going to see how the court wants to

18 handle this.  We have a videotaped deposition where

19 plaintiffs designated parts and defendants have

20 designated parts.  We have agreed we would show the

21 entire videotape together.  I'm not sure exactly how long

22 that is now with your guys' additions.  I don't have the

23 same math skills as some of our witnesses, but I think

24 it's 46 minutes.  I think we could show you our part

25 today if the Court wants.

1          THE COURT:  Why don't you show your part today,

2 and we can break somewhere around 5:00.

3          MR. GLITZENSTEIN:  Thank you, Your Honor.

4          THE COURT:  This is a deposition of whom?

5          MR. GLITZENSTEIN:  Let me explain that.  This is

6 the deposition of Gary Libby, who was the person who

7 actually took the AnaBat information on the site.  He's

8 not being introduced as an expert in AnaBat analysis;

9 he's simply being called by us in order to basically

10 testify to what he did on the site and how he put out the

11 AnaBat equipment and used standard methods and that sort

12 of thing.

13          THE COURT:  All right.

14          MR. GLITZENSTEIN:  So, that's the purpose of his

15 testimony Your Honor.

16          (Videotape deposition of Gary Libby

17          begins playing at 4:32 p.m.)

18          THE COURT:  I can't hear the audio.

19          MR. EUBANKS:  The audio for the overall system

20 we've having some difficulty with.  We can call Reggie.

21          THE COURT:  You can put the microphone up to the

22 system.

23          MR. EUBANKS:  This's what we're trying right now,

24 and I'm not sure it's making it throughout the courtroom.

25          THE CLERK:  I think the judge means the microphone

1  that is actually on the table.

2          MR. EUBANKS:  We have one that is right on top of

3  the speaker.  We'll try.

4                  (Videotape deposition of Gary Libby

5                  begins playing at 4:35 p.m.)

6                  (Videotape deposition of Gary Libby

7                  is concluded at 5:05 p.m.)

8          THE COURT:  Counsel, we are going to recess.  I

9  have a conference call at 5:15.  I will see you tomorrow

10  morning at 9 o'clock.

11                 (Off the record at 5:07 p.m.)

12                          **CERTIFICATE**

13         Tracy Rae Dunlap, RPR, CRR, an Official Court
   Reporter for the United States District Court of
14  Maryland, do hereby certify that I reported, by machine
   shorthand, the proceedings had in the case of ANIMAL
15  WELFARE INSTITUTE, et al versus BEECH RIDGE ENERGY, LLC,
   et al, Civil Action Number RWT-09-1519 on October 21,
16  2009.

17         In witness whereof, I have hereto subscribed my
   name, this 24th day of October 2009.

18

19                          _____/S/_____
                            TRACY RAE DUNLAP, RPR, CRR
20                          OFFICIAL COURT REPORTER

21

22

23

24

25