1                    UNITED STATES DISTRICT COURT FOR
                        THE DISTRICT OF MARYLAND
2

3  --------------------------x
   ANIMAL WELFARE INSTITUTE,   :
4  Et al,                      :
                 Plaintiff     :
5                              :
                               :
6  vs                          :Civil Action: RWT-09-1519
                               :
7                              :
   BEECH RIDGE ENERGY, LLC,    :
8  et al,                      :
                 Defendant.    :
9  --------------------------x

10

                              Thursday, October 29, 2009
11                            Greenbelt, Maryland

12

13       The above-entitled action came on for a Bench
   Trial Proceeding before the HONORABLE ROGER W. TITUS,
14 United States District Judge, in courtroom 2C, beginning
   at 9:03 a.m.

15

16       APPEARANCES:
17
         On behalf of the Plaintiff:
18
         ERIC GLITZENSTEIN, Esquire
19       WILLIAM EUBANKS, Esquire
         WILLIAM MEYERS, Esquire

20

21       On behalf of the Defendant:

22       CLIFFORD ZATZ, Esquire
         KIRSTEN NATHANSON, Esquire
23       JESSICA HALL, Esquire

24

25 Tracy Rae Dunlap, RPR, CRR            (301) 344-3912
   Official Court Reporter

1                           **I N D E X**

2
                           Dir  Cross
3

4 Karen Tyrell              3     36

5

6                                                 Page

7 Plaintiff's Closing                             96

8 Defendant's Closing                             138

9 Plaintiff's Rebuttal                            179

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                                Page

24 Reporter's Certificate                         199

25

Direct - Tyrell

1        THE COURT:  Are you ready for your last witness?

2        MS. NATHANSON:  Yes, Your Honor.  Good morning.

3 The defendants call Dr. Karen Tyrell.

4        THE CLERK:  Will you raise your right hand for me,

5 please?

6              (Witness sworn at 9:03 a.m.)

7        THE CLERK:  Please be seated.  I just need you to

8 begin by just stating you name for the record.

9        THE WITNESS:  Karen Tyrell.  K-A-R-E-N

10 T-Y-R-E-L-L.

11                    **DIRECT EXAMINATION**

12        BY MS. NATHANSON:

13 Q.     Good morning, Dr. Tyrell.

14 A.     Good morning.

15 Q.     Could you please describe your current position

16 for the court, please?

17 A.     I'm a senior vice president with BHE

18 Environmental.

19 Q.     And what do your duties involve as senior vice

20 president?

21 A.     There's a number of duties.  One of my principal

22 duties is to help develop the business development plan

23 and identify business development strategies within the

24 company, and to oversee those and the planning processes

25 behind them.  I also am a senior project manager and will

Direct - Tyrell

1 actually manage and design and implement studies, usually

2 more complex and larger scale studies.

3         I also work with staff development and other

4 duties that are throughout the company.

5 Q.     If we could put Defendant's Exhibit 12 up on the

6 screen.  Do you recognize this as the first page of your

7 CV?

8 A.     I do.

9 Q.     Could you, please, summarize for the court your

10 educational background?

11 A.     I have a bachelors of science in zoology from the

12 University of Wisconsin in Madison.  I have a doctorate

13 degree, Ph.D, in biology from the University of Illinois

14 at Champaign.

15 Q.     And could you summarize your professional

16 experience prior to joining BHE?

17 A.     While I was at the University of Illinois, I

18 worked for a year in a lecturer position.  It was a

19 non-tenured  position teaching both undergraduate and

20 graduate courses.  I also -- when I went to the

21 University of Tennessee in 1989, it was in a lecturing

22 position; taught the general biology course, oversaw lab

23 and lecture courses for the undergraduate curriculum in

24 the pre-med track.

25 Q.     And prior to BHE, do you have other private sector

Direct - Tyrell

1 experience?

2 A.      Well, I was with another company called 3-D

3 International, a 500-person architecture/engineering firm

4 that is -- was headquartered at the time in Houston.

5 Q.      Could you summarize your professional experience

6 with respect to Endangered Species Act compliance?

7 A.      Yes.  I've worked with endangered species,

8 especially started working with endangered species

9 working with Indiana bats in 1985 while I was at the

10 University of Illinois.  During my dissertation program,

11 I worked during two summers during the complete summer

12 period doing endangered species surveys focusing on

13 Indiana bat distribution and the potential effects of

14 Department of Transportation development projects on

15 Indiana bats and other endangered species throughout

16 Illinois.

17 Q.      And at BHE, what is the scope of your current

18 duties with respect to Endangered Species Act compliance?

19 A.      It's the same as, really, an extension of my

20 professional requirements going back to that 1985

21 endangered species survey assessment -- impact assessment

22 and analyses.  I have worked extensively for several

23 federal entities, the Department of Defense, principally;

24 the Army; but, the Army reserves and Air Force as well.

25 Federal Highway Association, FAA, state departments of

Direct - Tyrell

1  transportation, and Fish and Wildlife Service, and U. S.

2  Forest Service conducting endangered species distribution

3  assessments and impact assessments that go with --

4  primarily that support impact assessment and guidance

5  that go into forest management planning, habitat

6  management planning, and as well as impact assessment

7  studies.

8  Q.      Could you tell us what the Indiana Bat Recovery

9  Team is, please?

10  A.      I've been associated with the Indiana Bat Recovery

11  Team as a consulting member since, I think, 1983.  The

12  Indiana Bat Recovery Team is a group of established

13  professionals that act in a voluntary position.  So, you

14  have to be willing to give up some time and money to

15  support the U. S. Fish and Wildlife Service to provide

16  technical insight and guidance in developing recovery

17  goals, and conservation measures to establish guidelines

18  and processes, as well as recovery criteria for

19  particular species.  I've been participating since 1993,

20  I believe it is, on the recovery team for Indiana bats.

21  Q.      Do you have professional experience with respect

22  to wind power?

23  A.      I do.  Many of the projects that I described where

24  I've completed endangered species studies, particularly

25  bat surveys, and my focus has been on Indiana bats.  But

Direct - Tyrell

1 I deal with a number of endangered bats; a lot of those
2 surveys were for the fossil fuel industries.  I've done a
3 lot of mining work, and I've done a lot of gas and
4 natural gas pipeline work.
5      So, starting back a half a dozen years or so ago,
6 some of the energy companies that we worked for were
7 looking to increase their portfolio of energy products
8 and develop green solutions and green products as well,
9 and asked if we would provide the same sort of assessment
10 and management input into their planning processes and
11 impact evaluations as they started going into renewables.
12 So, most of that work has been in wind power; some in
13 solar; other elements of a renewable, diversified energy
14 portfolio.
15 Q.     And are you involved with any habitat conservation
16 plans for the wind industry?
17 A.     Yes, three of them; all for wind projects that
18 I've been directly involved with.  I've been peripherally
19 involved with three other habitat conservation plans.
20 BHE, not under my project management, but with some high
21 level guidance and input, developed the first habitat
22 conservation plan to be done in the state of West
23 Virginia.  That was actually for a ski resort and did not
24 deal with bats, but I have worked on two habitat
25 conservation plans for Indiana bat -- addressing Indiana

Direct - Tyrell

1 bat concerns for the wind power industry.  Neither of

2 those have gone to fruition.  Both of those projects are,

3 I think, kind of in a stalled state as the developer

4 works with their own financial planning and decision

5 making processes.

6         I am also the project manager for the American

7 Wind Association, a newly developed initiative that is

8 supported by AWEA, the American Wind Energy Association,

9 to look at development, or to develop a habitat

10 conservation plan to develop effects of whooping cranes

11 and lesser prairie chickens.  It's considered a very

12 substantial effort.  The U. S. Fish and Wildlife Service

13 has supported this so far.  Some of the final decision

14 making as to how the stakeholders will come together is

15 still in process.

16         In fact, I was originally planning to be leading a

17 meeting in Denver as we speak on that project, but I had

18 something else to do, so I -- that project deals with

19 whooping cranes from Saskatchewan all the way down to

20 Texas.  It's a regional, multi-species, multi-stakeholder

21 HCP addressing the effects of wind energy throughout that

22 entire regional area.  It's supported by, at this point,

23 at least a dozen industry partners who have come

24 together.

25 Q.     And do you have professional experience with

Direct - Tyrell

1 surveying for presence or absence of Indiana bats?

2 A.    Oh, gosh.  Absolutely.  Yes.  There are probably

3 four or five years of my life where I was literally home

4 one day during the summer and spent the rest of the time

5 out in the field.  I have done numerous in-field studies,

6 mist-netting studies, harp trap studies, cave surveys.

7 I've surveyed caves in West Virginia with Craig Stihler.

8       I've had the opportunity a couple of times to go

9 down into Hell Hole cave, which is a very exciting thing

10 to do.  It's a 180-foot straight drop into access the

11 cave, which is not as difficult as a 180-feet to climb

12 out.  But the -- so, I've done mine portal survey work

13 throughout Pennsylvania primarily, Kentucky, and mist-

14 netted for other entities in West Virginia.

15 So, that pretty much covers --

16 Q.    Do you have experience with acoustical survey

17 techniques?

18 A.    Yes.  I actually got my Ph.D work on an NIH

19 fellowship that was awarded to study the use of acoustic

20 cues by bats, and the development of the auditory system

21 and processing acoustic cues.  So, during that work, I

22 had been using various kinds of -- we used the term "bat

23 detectors;" they're really ultrasound transducers.  Since

24 -- that would make it 1983 -- and Have used a whole

25 variety of iterations.

Direct - Tyrell

1          The bat detectors that we heard described last
2 week had their origin in the U. S. Army's leak detector,
3 which was developed for -- to find gas leaks in -- by the
4 Army.  So, it was -- almost looked like a Geiger Counter.
5 You go around the room and you hear the high frequency
6 sounds.  That's given way to the discovery that bats use
7 ultrasound and that we could use some of the same
8 equipment to detect and transduce the ultrasound.
9 There have been many, many kinds of different types of
10 equipment developed over the years to use and study bats
11 and bat echo location.
12 Q.     And finally, have you published any peer review
13 papers?
14 A.     I've published probably, I think, four or five
15 peer review papers.  What I spend more of my time doing
16 now is giving presentations, and I've given -- and
17 training courses, including to Fish and Wildlife Service,
18 U S Army Corps of Engineers.  But for some of the papers
19 that I have published, they do go through an extensive
20 peer review process.
21          Also, much of the work that we do is held under
22 confidentiality agreements or done, for example, for the
23 Corps of Engineers where -- that does not have a
24 confidentiality agreement.  As the federal government,
25 it's publicly available.  But they go through an internal

Direct - Tyrell

1 peer review, so they may go out to the US EPA, or they

2 may go to different experts within the entities' own

3 technical experts for review and analysis.

4 Q.     Now, have you prepared expert opinions of -- in

5 this case?

6 A.     Yes, I have.

7 Q.     Just for identification, if we could display

8 Defendant's Exhibits 9, 10, and 11.  If you could just

9 look at each as they appear and tell us if these are the

10 declarations that you prepared for this case.

11 A.     They appear to be, yes.

12 Q.     As declared in those declarations, do you have an

13 opinion to a scientific certainty on whether Indiana bats

14 are on the Beech Ridge site?

15 A.     I do have an opinion.

16 Q.     And what is your opinion?

17 A.     I think it's highly unlikely.

18 Q.     Unlikely?

19 A.     Unlikely.

20 Q.     Do you have an opinion to a reasonable degree of

21 scientific certainty on whether there is an imminent

22 risk of death or injury to Indiana bats on the Beech

23 Ridge Project?

24 A.     I think the risk is low.

25 Q.     And the bases for your opinions, are they

Direct - Tyrell

1 explained in the three declarations that you've prepared

2 in this case?

3 A.     Yes, they are.

4 Q.     I wanted to ask you to tease out a little more the

5 -- some details on the risk of -- imminent risk of death

6 or injury.  If you could explain for the court whether

7 there is any temporal variation to that risk.

8 A.     There is a couple of different sources of temporal

9 variation.  The most prominent one that we see in the

10 limited data set that we do have is seasonable variation.

11 Because bats, whether they're migratory bats or the

12 hibernating, cave-dwelling bats -- typically, in the cold

13 months, bats are not going to be present and flying.

14 There is some exceptions to that.  They're very minor.

15 But by in large, during the winter months, bats are going

16 to be hibernating, sleeping, or simply not present in the

17 area.  So the risk there is negligible.

18       During the springtime, bats will be either

19 migrating through an area, or coming out of hibernation,

20 and can be passing through a particular area on their way

21 to resident summer ground.  The risk that we have seen

22 there I would reflect on the data -- the limited

23 imperical data that we do have from post-construction

24 mortality studies at wind farms that suggest that there

25 is a relatively higher risk to some species of bats

Direct - Tyrell

1 during the springtime migration period.

2        Then we enter the summer, where bats are resident

3 in an area.  They're foraging; typically having their

4 young, raising their young.  And then they're in what we

5 call "summer foraging habitat."  The risk there, as

6 reflected by the imperical data that we have, seems to be

7 relatively low during that period of time.  There is much

8 lower, as a generalization, incidence of mortality during

9 the summer.

10        Where we see the highest mortality reflected in

11 post-construction surveys is during the fall period,

12 where bats are leaving their summer ground and going

13 toward -- back to their winter hibernacula; or, for other

14 species of bats, migrating out of the area.  There we,

15 have a higher incidence of observed mortality in some

16 species of bats.

17 Q.     Have there been any observed mortality of Indiana

18 bats at the wind projects?

19 A.     There has not.

20 Q.     In terms of the temporal variation of a risk.

21 Does the risk of Indiana bats vary by time of day at all?

22 A.     Oh, absolutely.  Indiana bats are a species that

23 very, very -- it would be highly unexpected and unusual

24 for them to fly at all during the day.  So, this is a

25 species that emerges shortly after dusk, and there is

Direct - Tyrell

1 typically a bi-modal period of activity during the
2 nighttime hours during the dark hours.  So, between dusk
3 and dawn, the bats may be out foraging.  And it varies
4 during the season and reproductive condition, and whether
5 you're talking about males and females and amount of prey
6 in the area.  But there is, in general, a bi-modal
7 distribution where most of the foraging activity takes
8 place early in the evening for the first, maybe, four to
9 five hours after sunset or at dusk.  And then there may
10 often be a second increase in foraging activity
11 immediately prior to dawn, and then the bats returning to
12 a roost site.
13 Q.    Does the risk to Indiana bats have any variation
14 when considering environmental factors?
15 A.    Oh.  Such as the other factors in the environment
16 that the bat is in?  Yes.  There -- in fact, we'd like to
17 understand these things better, but there are -- bats do
18 not seem to fly -- this has been known prior to wind
19 studies.  If the wind is very high, bats don't fly, for
20 pretty obvious reasons.  They are very light-bodied
21 creatures and can be blown around.  So they tend to, in
22 times of what you would consider bad weather, rain, cold
23 temperature, very windy temperature, the bats are not
24 active or are less active for a couple of reasons.  One,
25 physically you're talking about an animal with a lot of

Direct - Tyrell

1 exposed skin.  They cool off very readily, and their body
2 temperature drops to a point where metabolism is not
3 efficient.

4       Secondly, just simply exposure to the elements.
5 The bats go hunker down in bad weather.  There is some
6 indication -- in fact, I did a small study looking at the
7 effects of barometric pressure.  As a weather front comes
8 in, often times you have a barometric pressure drop.  You
9 may have an increase in insect abundance that may be
10 associated with prey movement that seem to, we think at
11 this point bats seem to, we think, become more active at
12 that period of time, in fact, perhaps to take advantage
13 of the local abundance.

14       There are a number of factors.  We don't really
15 understand them all very well, but there are a number of
16 things that are associated that you can use to kind of
17 predict how bats will be in the environment.

18 Q.     And what about geographic factors in terms of the
19 risk to Indiana bats?
20 A.     Again, you can look at this in a number of
21 different scales.  There are some -- first of all, at
22 this species level, certain species have very wide
23 geographic ranges.  The migratory bats or the tree bats
24 that we've been hearing about typically are those with
25 very broad ranges.  They may go all the way across the

Direct - Tyrell

1 United States and Canada.  So, they -- and that reflects

2 a fact that they migrate from suitable habitat to

3 suitable habitat.  So, they have a broad range.  Other

4 species have very, very narrow geographic range and

5 almost have a small locally, what we call endemic

6 population size.  Indiana bats are kind of in between,

7 and West Virginia is really on the edges of their

8 established range.  You might not be surprised to know

9 that Indiana and Missouri are in fact kind of the central

10 location for most of the observations of these species.

11        Again, then -- so on a species level, you see

12 that, and then you see within species they will adjust

13 their range according to their own natural behavior or

14 their ecology, whether they migrate, whether they go in

15 and out of caves.  Then, at another level, there may be

16 sex or gender differences in how they use the area around

17 them.  So, you have to break it down.

18 Q.     Finally, what about physiographic factors and how

19 that impacts the risk to Indiana bats?

20 A.     The physiographic characteristic that I've seen

21 associated with bats -- I mentioned that they're subject

22 to cold temperatures --- modifying their metabolic state

23 because they have so much exposed skin.  The

24 physiographic characteristic that we see affecting how

25 the bats occur in the environment is altitude.  Because

Direct - Tyrell

1  as you go up in altitude, very often you get colder
2  temperatures.  And I won't say the word correctly; it's
3  antibiatic cooling, I believe.  So, as you go up in
4  altitude or elevation, temperatures get colder.  You also
5  typically, depending on where you are in the country.
6  But in this area, in the Appalachians, you get into a
7  wetter, you know, the foggy -- I live near the Smoky
8  Mountains -- that dense, cold fog.  That is not
9  consistent with an animal that is very subject to cold
10 temperatures being in that area.  So, yes, you tend to
11 see them in areas where they can control their body
12 temperature, not the higher elevations.
13 Q.     Okay.  You touched on this briefly.  It seems that
14 based on what you have already described, you are
15 familiar with the data on bat mortality at wind project
16 sites.
17 A.     Generally so, yes.
18 Q.     Based on the data that you've reviewed, could you
19 describe for the court a distribution of bat mortality
20 across the United States, starting with discussing the
21 geography?
22 A.     Right.  At this point, there have been wind energy
23 facilities in operation across the United States.  And we
24 really don't have a whole lot of post-mortality data to
25 look at, but what we do have shows a regional difference

Direct - Tyrell

1 in terms of the post-construction mortality where it

2 seems to be generally low in the western states; moderate

3 or low in the Midwest, although some recent data is

4 showing that that may in fact be higher than we

5 originally thought.  And then the greatest mortality is

6 identified is in the Appalachians, along the Appalachian

7 and Allegheny area.

8 Q.     Could you describe the species that are being

9 affected by this mortality?

10 A.     Yes.  It seems very heavily skewed toward these

11 migratory or tree bats.  Like some of the other experts,

12 I stumble a little bit at the use of the term "migratory

13 bats" and "tree bats."  It's a term that's been really

14 coined specifically to talk about wind farms, because we

15 see a predominance in these species with these wide

16 geographic ranges that move from area to area in the

17 mortality.  Up to 85 percent, 89 percent, in any given

18 year, of the bats that are found in post-construction

19 mortality surveys are comprised of these migratory or

20 tree bats, not the cave dwelling bats such as the Indiana

21 bat or some of the others that we see.

22 Q.     Can you summarize any natural history differences

23 between the migratory bat and the cave bat that perhaps

24 would help explain the difference in mortality?

25 A.     Sure.  There's a paper, a 2007 paper Dr. Kunz, I

Direct - Tyrell

1 think, mentioned it in his testimony, where they talked

2 about some of these migratory bats having -- Dr. Lacki

3 talked about it, as well -- a wing-loading -- they are

4 not strong -- they're not very maneuverable.  They're

5 high fliers.  They're physical.  Their physical nature is

6 built for open space flight and long-distance flight,

7 just like you see the same sort of physical

8 characteristics in a bird:  Long wings for long distance

9 powered flight.  This is typical of tree bats.  And in

10 terms -- typical of those bats where we see the higher

11 mortality.  So, those tree bats are the ones that have

12 the higher mortality.

13 Q.      I'd like to talk about foraging heights for a

14 moment.  You heard -- you were present for Mr. Groberg's

15 testimony on the height of the rotors of the Beech Ridge

16 turbines from the ground.  I recall the testimony being

17 approximately 137'.

18 A.      Um-hum.

19 Q.      Could you discuss the data that exists on the

20 heights that Indiana bats would be -- are typically

21 foraging, and whether it would be at that height?

22 A.      I'm sorry.  Indiana bats are characterized as

23 being "edge foragers," so they will forage at the edge of

24 the vegetation.  So, if you think of vegetated areas,

25 trees in particular, they forage in and around the groups

Direct - Tyrell

1  of trees.  So, the area that we expect to see this animal

2  foraging is going to be treetop or canopy level most

3  typically, and the mature trees in this area are probably

4  going to go 60, maybe 80' at the most.  And so I would

5  expect that the majority of the foraging -- and in fact,

6  this is from studies -- I haven't completed these studies

7  that I'm referring to, but studies looking at foraging

8  height of this species indicates that they forage at or

9  below tree crown level.

10 Q.     Does the location of the prey have a role in that?

11 A.     Sure.  Absolutely.  Species will -- different

12 species of bats -- there is over 900 species of bats in

13 the world, and they eat everything from fish to blood to

14 insects to nectar.  And in this area we're talking about

15 insectivorous bats.  But even within that group that we

16 find in this area of the country, they eat different

17 kinds of insects.  And the kinds of insects Indiana bats

18 forage upon, primarily the dipteran, the flies are also

19 located -- they eat a mixed diet, but the species that

20 are associated with that edge-type habitat and the tree

21 canopy edges.

22 Q.     And so do you have any reason to believe that the

23 Indiana bat would be foraging in the space dozens of feet

24 above the tree canopy?

25 A.     I would not expect this species, from what's known

Direct - Tyrell

1 in the literature, to occur in that area.  It's -- it

2 would be unexpected to see them there.

3 Q.    Are you familiar with the relative sizes of bats

4 that are being discovered in post-construction mortality

5 studies?

6 A.    Yes.

7 Q.    Are bats being found that are of similar or

8 smaller size to the Indiana bat?

9 A.    Oh, sure.  One of the bats that has been

10 associated with mortality at wind farms is a Pippestrel,

11 which is a very small-bodied bat.  Eastern, small-footed

12 bats are in or smaller size range than Indiana bats.

13 And, of course, some of the other *Myotis* that are

14 identified are the same size or can be smaller.  Now, at

15 the same time, there are some other species that

16 typically are much larger.

17 Q.    Do you have experience with pre-construction

18 surveys for wind projects?

19 A.    Yes, I do.

20 Q.    Could you, please, describe your experience with

21 pre-construction surveys for wind projects?

22 A.    For wind projects?  Well, I've worked on -- if you

23 include Beech Ridge, and I really did not participate in

24 the pre-construction surveys in a direct fashion, but I

25 managed pre-construction surveys at the Pinnacle Wind

Direct - Tyrell

1 Farm.  We did not do the pre-construction surveys at

2 Liberty Gap but did some assessment work there as well.

3 We've done pre-construction survey work specifically for

4 Indiana bats in Illinois, Indiana, Wisconsin; so, really,

5 throughout much of the range of the bats, the core range

6 of the bats.

7 Q.    Are you aware of any operating wind project that

8 has performed three years of pre-construction surveys?

9 A.    I am not.

10 Q.    Could you -- pre-construction surveys you've been

11 involved with.  Have the methods been uniform across the

12 projects?

13 A.    No.  Absolutely not.  In fact, there's quite a bit

14 of variability, and there's a couple of reasons for this.

15 There is really -- we've been learning a lot as we go

16 about what types of studies can best be used to develop

17 information about bat use at the site -- at a particular

18 site.  Unfortunately, so far, we haven't been able to

19 take any sort of known pre-construction surveys and use

20 that to reliably predict what post-construction mortality

21 is going to be.  So, typically, what the agencies have

22 said is learn more about the bats at this site, and then

23 we'll -- we'll at least understand what we started with.

24 And so in order to design those studies, really, with any

25 sort of impact study, whether you're talking about, you

Direct - Tyrell

1  know, energy privatization at an army base, or a highway

2  going in, we always talk with the agencies to develop a

3  scope of work that they feel is going to best allow them

4  to assess and understand potential impacts at the site.

5  A.      So, we've done that in all cases where we've done

6  wind projects that I can think of, with the exception of

7  Liberty Gap.

8  Q.      If we can take a quick look at Plaintiff's Exhibit

9  16.  Are you familiar with this document, Dr. Tyrell?

10 A.      Yes, I am.

11 Q.      If we could flip to the page that reflects the

12 pre- and post-construction monitoring paragraph; I

13 believe it's three pages in.  Could you describe to the

14 court what this document is and then what this -- and

15 what this paragraph reflects?

16 A.      This is a document that introduces the guidelines

17 that at the time -- and in fact, they are still the

18 current guidelines.  They're called "Draft/Interim," and

19 the service will very quickly remind you that they are

20 both draft and interim guidelines that describe potential

21 studies that can be done to develop information about

22 effects to resources -- endangered species resources at

23 wind farms.

24       And there are some statements in here that talk

25 about the application of these guidelines.  And without

Direct - Tyrell

1  reading the paragraph in detail, my understanding -- and

2  this has been reflected in conversations with agencies

3  without exception, is that these guidelines are meant to

4  be understood and applied in a site-specific way.  So it

5  gives you a range of potential ways that you can assess

6  impacts, and then says, please get with the Fish and

7  Wildlife Service to establish what you need to do at this

8  site.  And, really, in conversation, that also goes to

9  post-construction.

10 Q.     And in the interactions with the Fish and Wildlife

11 Service, with the emphasis in this paragraph on the

12 impact on the local situation.  In your experience, which

13 office of the Fish and Wildlife Service does that involve

14 interactions with?

15 A.     It involves the local field office, which is

16 usually called the Ecological Services Field Office, or

17 very often the state office.  In fact, if you tried to --

18 if you're talking about a -- I've worked in including

19 Beech Ridge -- and, again, my entry into this project is

20 very late in the game.  But, including that, if you look

21 at the three different wind projects that I've worked on

22 in the state of West Virginia, all three have had very,

23 very different recommendations developed by the service

24 as to the required survey guidelines.

25         They -- in the case of the two that I'm more

Direct - Tyrell

1 closely involved in, we specifically asked the field

2 office, the local -- and by the way, the Fish and

3 Wildlife Service personnel that we deal with, the primary

4 point of contact was the same in all three.  So, this is

5 not a different --

6 Q.      Who is that?

7 A.      Christy Johnson-Hughes.  And so in conversations

8 with Ms. Hughes, you know, I said, I want to make sure

9 that this -- that the conversation that we're having

10 reflects the service's position.  And it is pretty widely

11 understood that the regional office may in fact -- they

12 will typically say in practice, defer to the field

13 office.  They want you to work on a technical evaluation

14 basis with the local office.

15 Q.      And despite this guidance, you are unaware of the

16 wind projects you've worked on, or any wind project

17 performing the actual three years of surveys; correct?

18 A.      That's correct.

19 Q.      Okay.  If we can move on to -- if we can take a

20 look at Plaintiff's Exhibit 37, the photo, please.  Very

21 quick question on this, Dr. Tyrell.  Does this look like

22 an Indiana bat?

23 A.      No, it does not.

24 Q.      Could you, please, explain why?

25 A.      Well, there's a couple of things to say about this

Direct - Tyrell

1  one photograph.  One, typically, when you take a

2  photograph as evidence, if you have the bat in hand, you

3  should be able to identify it to species.  If you're

4  looking at photographic evidence to try to identify the

5  species, there is some important information you need to

6  know about the photograph.  Some indication of size.

7  Very often people throw a pen cap or penny so you can

8  tell how big the organism is, and then some indication

9  about the conditions under which the photograph was

10 taken:  The tone, the color, the contrast, so that we can

11 understand whether the colors we see are accurate or not.

12         So if we assume that the colors are accurate in

13 this photograph and that this is a good representation --

14 and I know about how big bats are, so I can pretty much

15 make some guesses about that.  The characteristics that

16 you look at to identify bats include some very subtle

17 ones, which you have to have the bat in hand to see the

18 keel on the calcar, the toe hair, the color of the eye

19 mask, or maybe the color of the nose.

20         You can't see any of these in this photograph, but

21 you can see a couple of other characteristics.  You can

22 see a general color and length of the fur.  You can see

23 the color of the wing membranes and the ear membranes.

24 Indiana bats are described as having a fairly uniform

25 coloration.  And there is some variation certainly, but a

Direct - Tyrell

1 fairly uniform coloration of the body and the wings.

2 They have dull-colored fur.  It's a pinkish-brown color.

3 There are other species of bats that are described as

4 having longer fur or -- now, Indiana bats have tri-color

5 fur.

6        The bat in this photograph does appear to have

7 tri-colored fur.  That is the base, the middle part of

8 the hair shaft, and the tip are different colors.  That's

9 also typical for small-footed bats, which are described

10 as having longer fur with chestnut and yellow undertones,

11 as well as having dark wing membranes.  And so, again, I

12 would not venture to make a definitive species

13 identification based on this photograph, because I don't

14 know enough about the photograph.  But knowing what I

15 know about how I can make comparisons, I do not think

16 that it's likely to be an Indiana bat.

17 Q.    Thank you.  Are there any confirmed hypotheses

18 that explain bat mortality at wind power sites?

19 A.    No, there is not.  There is a number of -- and it

20 really goes toward if we knew why it was happening, maybe

21 we could come up with a quick and straightforward fix,

22 but we don't.  There are a number of hypotheses that have

23 been proposed, and none are established.  In fact, some

24 have been debunked so far.

25 Q.    Well, in the absence of a confirmed hypothesis,

Direct - Tyrell

1  what is the current approach to bat mortality by the U.

2  S.  Department of the Interior and U. S. Fish and

3  Wildlife Service and the scientists who are providing

4  support to the wind power industry?

5  A.      The approach that I've seen most recently proposed

6  is to use adaptive management.

7  Q.      And what is "adaptive management?"

8  A.      Adaptive management is a process that can be used

9  to come up with essential steps toward reaching an agreed

10 upon management, an end point.  It's called the "learn as

11 you go process."  The U. S. Department of the Interior

12 developed this process to deal with situations where we

13 have a management objective but we don't have enough

14 data; we don't have enough information.  The scientific

15 information is not available to tell us how to directly

16 reach that end point or that goal.

17         So, adaptive management allows you to state what

18 the desired end point is, to develop management

19 approaches, to test those, gather data, and then use

20 those result -- the results of those tests to incorporate

21 back into the management approach and form it and shape

22 it as you go so that you can, in a timely manner, reach

23 that management end point.  Fish and Wildlife Service has

24 adopted adaptive management.  It is a commonly used tool

25 in habitat conservation plans.

Direct - Tyrell

1 Q.    You've seen it utilized by regulators in your

2 experience?

3 A.    Yes.

4 Q.    How does it differ from your experience in

5 academia?

6 A.    Well, I -- in academia, the focus really there is

7 a pure research focus, as opposed to adaptive management,

8 which I think you can refer to as an applied research

9 focus.  So, you're applying something to solve a problem.

10 In academia, very often it's considered peer research,

11 where you test an hypothesis.  So, hypotheses are --

12 alternative hypotheses are proposed.  You test one, you

13 come up with an answer that may lead you to additional

14 hypotheses.  But they are -- the goal of the

15 scientifically- posed question is to answer a question,

16 not to come up with a strategy or plan towards solving an

17 identified end point.

18 Q.    At wind power sites, can you proceed with adaptive

19 management without gathering post-construction mortality

20 data?

21 A.    No.  No.  You would need to inform the system as

22 you go to learn.

23 Q.    Is halting a wind project consistent at the

24 present time with the adaptive management principles

25 articulated by the U. S. Fish and Wildlife Service?

Direct - Tyrell

1 A.      No.  Absolutely not.  It cuts short the learning

2 and the data acquisition process that would be required.

3 Q.      Are you familiar with post-construction monitoring

4 protocols at wind project sites?

5 A.      Yeah.  I have not managed one specifically, but

6 I'm generally familiar with them.

7 Q.      Are you familiar with any wind project that is

8 monitoring all turbines?  Or are they monitoring a subset

9 of turbines in their protocols?

10 A?      No.  I don't know -- I'm not aware of any that

11 monitor all turbines, particularly -- you know, if we're

12 talking about utility scale where their typically is a

13 great number, you know, more than 20 turbines, typically

14 what you do is look at a subset of those turbines for a

15 couple of reasons.  One is you can establish your study

16 set, typically randomly defined as a study set within

17 that group of turbines, and it allows you then to

18 randomly sample across the -- probably across the entire

19 array but not at any one point in time.

20 Q.      I want to turn to the discussion of the AnaBat

21 data that was collected in July of 2005.  You've sat and

22 listened to the testimony of -- from last week, and I

23 wanted to ask, when did you first learn of the AnaBat

24 data from July 2005 on the Beech Ridge site?

25 A.      I learned about it when it came out through the

Direct - Tyrell

1 discovery process.  I learned about it as part of this

2 case proceedings.

3 Q.     Should BHE have analyzed the data in 2005?

4 A.     No.  No.  Absolutely not.

5 Q.     Why not?

6 A.     Because the data were collected not as part of any

7 established study protocol  They were not -- if, in our

8 conversations with the Fish and Wildlife Service, they

9 had asked for AnaBat data, then certainly we would have

10 established rigorous protocol and incorporated it into

11 the study plan.  They didn't.  In fact, they specifically

12 said, as I understand it, that they did not want it.

13 Same thing at Pinnacle.  They said, we don't want you to

14 collect AnaBat data at this site.  That's another West

15 Virginia wind farm.

16       So, the data that we were collected were collected

17 by a subcontractor to us who, in his description, set his

18 AnaBat units up after he had met his primary objectives.

19 He was hired to execute the agreed upon scope of work

20 which included mist-netting.  He set his AnaBat units up

21 after the mist-nets were deployed -- now, you deploy

22 mist-nets at dusk.  So, this means he was setting his

23 equipment up and, I assume, calibrating it and orienting

24 it in the environment in the dark.  And, even with a

25 headlamp, you don't have a big view of the area around

Direct - Tyrell

1 you.

2      MR. GLITZENSTEIN:  Your Honor, I object.  We can,

3 I guess, pursue this further on cross, but in three

4 declarations that this witness has provided, as well as

5 deposition testimony, she never went into any critique

6 at all about the way the AnaBat data was collected, or

7 provided any opinion on the reliability of the AnaBat

8 data.  So, it clearly seems to exceed the scope of many

9 opportunities she's had to opine in this case.  As I say,

10 we're happy to put that objection on the record and

11 pursuit it in cross, but I think it's something the court

12 should be aware of.

13      THE COURT:  Well, she's testifying as an expert

14 and is also commenting on the testimony of other experts,

15 so I'll permit it.

16      BY MS. NATHANSON:

17 Q.    Do you have more -- you were talking about Mr.

18 Libby's collection techniques of the AnaBat data and the

19 protocol that he pursued.

20 A.    My understanding is he did it for a limited amount

21 of time and with limited data collected in a limited

22 amount of time, in uncontrolled conditions.  With my,

23 also, understanding that is widely held across the

24 industry that these data are very, very subject to

25 influences of clutter, etcetera.  I don't think the data

Direct - Tyrell

1 can be reliably analyzed.

2 Q.      In your experience, you indicated you have

3 experience with acoustical surveying techniques?

4 A.      Yes.

5 Q.      In your experience, can acoustical analysis

6 definitively determine the Indiana bat presence?

7 A.      I have not done AnaBat studies myself, so I want

8 to be clear that my expertise and use of acoustic studies

9 goes toward the realtime expansion technique, which is a

10 technique that is more closely associated with actual

11 species identification.  The zero crossing meter approach

12 that the AnaBat -- others here, undoubtedly, have

13 described in exhaustive detail.  This is a technique

14 that's developing.  The fact is, to date -- and this may

15 change in the future.  But, to date, Fish and Wildlife

16 Service does not uniformly agree that this is in fact a

17 -- I don't know of any Fish and Wildlife Service office

18 that will tell you that this is a technique that they

19 will use for positive identification of species.

20      The mist-netting studies, bat in hand where you

21 look at it, is the only way to positively identify

22 species.  We work on a number of projects where we use

23 AnaBat.  We use it for different reasons.  Those reasons

24 are clearly defined in the scope of work.  So, we use the

25 technique -- we don't use it to identify to species,

Direct - Tyrell

1 because the Fish and Wildlife Service does not accept,

2 nor does the majority or a vast number of people in the

3 bat research community that this technique is effective.

4 Q.      You're familiar with other professionals in the

5 bat community who have concerns about the reliability of

6 acoustic analysis to determine presence.

7 A.      Yes.  It's kind of an ongoing discussion.

8 Q.      All right.  Could you describe that further?

9 A.      There are a number of different things that can

10 influence -- you know, when you use any sort of bat

11 detector, what you're doing is transducing ultrasound

12 frequencies that are admitted into either an audible

13 and/or electronic signal that you can examine.  And when

14 you do that, there are a number of things that can shape

15 that output.  The equipment can shape it, the conditions

16 -- the environmental conditions, the amount of clutter,

17 things that might be in the way of the microphone.  All

18 of these things can influence the actual recording of the

19 sound itself.  Background noise.  Insects.  Trucks

20 driving by can all influence the quality of the recording

21 itself.  So, that's one source of -- multiple sources,

22 really, of variation.

23      Another important source of  variation are the

24 bats themselves.  Bats are known to change their echo

25 location calls depending on the local environment.  If

Direct - Tyrell

1 they're in a cluttered environment or flying in and out

2 the open, they change their echo location calls depending

3 on other species, other bats, or same species bats that

4 are around.  So, there are so many sources of variation

5 that this is kind of the different parameters.  There's a

6 paper I can think of by Robert Barclay and Mark Brigham

7 that I think identifies about a dozen different sources

8 of variation in the call production itself or in the

9 final output.

10 Q.     If we can go back to talking about the U. S. Fish

11 and Wildlife Service.  You've stated you have experience

12 in consulting with the U. S. Fish and Wildlife Service on

13 wind projects.

14 A.     Yes.

15 Q.     Now, in your experience, does the U. S. Fish and

16 Wildlife Service approve or sign off on wind projects on

17 private lands?

18 A.     No, they don't.

19 Q.     What is the range of action that they do take?

20 A.     Well, initially, they provide technical input.

21 They are there as a -- to provide technical guidance.  In

22 fact, we submit letters early on in the process to inform

23 them of a potential or proposed project or action and

24 then ask for technical assistance called a "technical

25 assistance letter," and then they will typically,

Direct - Tyrell

1 sometimes timely and sometimes not, provide their input

2 back to you that describes their concerns at a particular

3 location.

4 Q.     And in your experience, are you aware of any

5 developer that sought an Incidental Take Permit in the

6 absence of a recommendation to do so by the U. S. Fish

7 and Wildlife Service?

8 A.     No.

9 Q.     You're familiar with Incidental Take Permits in

10 your experience?

11 A.     Yes.

12 Q.     Does an Incidental Take Permit prevent fatalities

13 to Indiana bats?

14 A.     No.  An Incidental Take Permit is designed to

15 provide protection to the proponent or whoever is doing

16 the action.  Should there be take of an endangered

17 species, it makes that take or injury or killing of the

18 endangered species lawful.

19        MS. NATHANSON:  All right.  Thank you, Dr. Tyrell

20 I have nothing further right now, Your Honor.

21        THE COURT:  All right.  Cross-examination.

22                   **CROSS-EXAMINATION**

23        BY MR. GLITZENSTEIN:

24 Q.     Good morning.

25 A.     Good morning.

Cross - Tyrell

1 Q.     You submitted three declarations in this case;

2 isn't that correct?

3 A.     It is.

4 Q.     And I think we referred to those a little bit

5 earlier as Defendant's Exhibits 9, 10, and 11; is that

6 right?

7 A.     I don't remember the numbers, but they were

8 submitted, yes.

9 Q.     If we could take a look at Defendant's Exhibit 9,

10 which is your first declaration.  And you could agree, or

11 we could look through it.  In this declaration, you

12 didn't say anything at all about the reliability of

13 AnaBat analysis or the particular AnaBat data that was

14 collected on this site; correct?

15 A.     That's correct.  I'm not sure that I was aware

16 AnaBat data were collected at the time of producing this.

17 Q.     However, you were aware before you submitted your

18 second declaration, which is No. 10, if we can take a

19 look at that one, weren't you?  And just to, perhaps,

20 refresh your recollection.  This is the declaration that

21 was provided to us shortly before you were deposed;

22 right?

23 A.     Yes.

24 Q.     Okay.  We can look through this one, or you can

25 agree with me that this one doesn't say anything at all

Cross - Tyrell

1 about AnaBat analysis of the particular AnaBat data that

2 was collected from this site, does it?

3 A.     No, it does not.  I don't really think it's

4 pertinent in analyzing the facts at this site for the

5 reason I mentioned.

6 Q.     Well, my question is, it doesn't address at all

7 the reliability of AnaBat analysis generally, or the

8 particular data that was collected from this site, does

9 it?

10 A.     I don't recall that it does.  Without reading

11 through it, no.

12 Q.     We can look through it.

13 A.     No.  I'll agree.

14 Q.     And if you look at the "Literature Cited" section

15 in this declaration at the end, Page 7.  Those are not

16 studies that specifically address AnaBat analysis, are

17 they?

18 A.     Well, the Pennsylvania Game Commission discusses

19 it, but they are not -- it's all discussed, I believe, as

20 a technique in the recovery plan, but none of these are

21 focused on the analysis of AnaBat data.

22 Q.     And you didn't cite them in order to focus any

23 particular opinion on AnaBat analysis; correct?

24 A.     No, I did not.

25 Q.     And then you submitted a third declaration, your

Cross - Tyrell

1 second supplemental declaration.  And this one is -- was,

2 I think, just referred to as Defendant's Exhibit 11.

3 Take a look at that one.  And this was actually provided

4 after you were deposed; right?

5 A.     Correct.

6 Q.     And you've never had any deposition focus

7 specifically upon the statements made in this

8 declaration; right?

9 A.     That's correct.

10 Q.     And this declaration was submitted not only when

11 you knew there had been AnaBat data, but you also knew

12 that Dr. Robbins and Dr. Gannon had analyzed the AnaBat

13 data; correct?

14 A.     Well, that's -- yes, I believe so.

15 Q.     Well, didn't you review Dr. Gannon's and Dr.

16 Robbins' declarations in which they set forth in detail

17 their reasons for believing that the AnaBat data was

18 reliable and should be considered to be important

19 evidence of Indiana bat presence on the site.

20 A.     I was aware of their analysis of the data.  Did I

21 review it in detail to examine specifically the -- their

22 claims about the AnaBat data?  I did not address that

23 specifically in this declaration, no.

24 Q.     Well, you didn't just -- you didn't address it

25 either specifically or generally, did you?  You don't say

Cross - Tyrell

1 anything about their analysis of the AnaBat information

2 in this last declaration you submitted; correct?

3 A.     That's correct.

4 Q.     And once again, if we look at the "Literature

5 Cited" section, which is at the end -- it goes from Pages

6 7 through 8 of this declaration, you didn't cite any of

7 those particular studies in order to formulate or proffer

8 an opinion upon the reliability of AnaBat information,

9 did you?

10 A.     Because I didn't -- because I did not make a

11 comment specifically on the AnaBat, I cited no literature

12 to do so.

13 Q.     So, the three declarations you submitted,

14 including one submitted post-deposition, you did not

15 opine with any of these comments you've made here today

16 about the reliability of Indiana bat information to

17 identify Indiana bats; correct?

18 A.     I did not.

19 Q.     Okay.  And do you recall when I deposed you?

20 A.     Yes.

21 Q.     When we took your deposition?  And I specifically

22 asked you if you had any opinions that went beyond what

23 was set forth in the deposition, and you said you weren't

24 aware of any at that point; right?

25 A.     Yes.

Cross - Tyrell

1 Q.     Okay.  So your statements and commentary about

2 reliability of AnaBat information, that's all something

3 that's been developed since these declarations were

4 submitted and since your deposition.  They've never been

5 subject to any examination by plaintiff; correct?

6 A.     It has not been subject to examination by

7 plaintiffs.  It's based upon information that the

8 declarations really, but Mr. Libby's testimony and --

9 well, excuse me, the declaration of Mr. Libby.

10 Q.     Okay.  So it's based -- you never read the

11 deposition from Mr. Libby before?

12 A.     Not in detail.

13 Q.     So that's the new piece of information you're

14 relying upon since these declarations in your testimony

15 today.

16 A.     That, and what I heard last week.

17 Q.     With respect to your background.  Before going to

18 BHE, you referred to teaching positions with the

19 University of Illinois and the University of Tennessee;

20 correct?

21 A.     Correct.

22 Q.     Those were not tenure tracked positions, were

23 they?

24 A.     They were not.

25 Q.     And you never did get tenure at either of those

Cross - Tyrell

1  institutions, did you?

2  A.     I never applied for tenure, nor was I in a tenure

3  tracked role.

4  Q.     So, your professional experience, I think as

5  you've described it has generally involved your work with

6  consulting companies; correct?

7  A.     The vast majority of the number of years, yes.

8  Q.     And the last ten years have been with BHE in

9  particular?

10  A.     Yes, they have.

11  Q.     Your primary role with BHE is actually in business

12  development; correct?

13  A.     It really -- my primary by title is senior vice

14  president, and it is a primary role.  My -- I described

15  the breadth of my other requirements.  Senior project

16  management, and technical management is also a primary

17  role.

18  Q.     Could we take a look at your deposition that we

19  just referred to and look over at Page 8, Line 15.  And

20  the question was:  "Currently, what is your position?"

21  Answer:  "I'm a senior vice president at BHE

22  Environmental."  Question:  "What is your role as vice

23  president?"  Answer:  "Business development is the

24  primary role."

25          Do you see that?

Cross - Tyrell

1 A.      Yes, as a vice president.  Yes, I'm also a senior

2 project manager.

3 Q.      But that was an accurate statement that you made

4 in your deposition?

5 A.      Sure.  Yes.

6 Q.      In that capacity, you're responsible for corporate

7 outreach and marketing?

8 A.      Yes, I am.

9 Q.      And what you know of the areas that you

10 specifically are marketing to is the wind power industry;

11 correct?

12 A.      That's correct.

13 Q.      And in fact, it's one of those market sectors that

14 is one of your current and future focuses of marketing;

15 right?

16 A.      Renewable energy is one of them, and wind power is

17 a component of that.  Yes.

18 Q.      And in that capacity, BHE, and you in particular,

19 actively solicit your business to the wind power

20 industry; correct?

21 A.      Yes.

22 Q.      Currently, your overall revenue stream is about 12

23 to 14 percent or thereabouts?

24 A.      I told you "I believe" in my deposition.  I'm sure

25 you can double check this and will.  I believe I told you

Cross - Tyrell

1 it was 8 to 12 percent.  Since my deposition, I checked

2 and it's about 11 percent.

3 Q.     But that's up from zero five years ago; right?

4 A.     In the wind power industry?  Yes.  Uh-huh.

5 Q.     The revenue you're getting from the wind power

6 industry.

7 A.     Sure.  Yes.

8 Q.     And your current intention is to have that

9 increase in the future; right?

10 A.     I would like to see it increase, yes.

11 Q.     And you've actually worked not only with Invenergy

12 but with other companies on particular wind projects;

13 right?

14 A.     Yes, we have.

15 Q.     But Invenergy is one of the other companies you've

16 done work with over the years.

17 A.     Yes, it is.

18 Q.     In fact, BHE has a -- one could describe as a

19 corporate focus on supporting the wind power energy;

20 correct?

21 A.     Yes.

22 Q.     In fact, you've co-authored a document in which

23 you specifically solicited wind power industry by

24 stressing your alignment with the wind power industry;

25 right?

Cross - Tyrell

1 A.      Yes.  In regards to understanding the regulatory

2 and compliance needs, as well as the environmental

3 engineering needs, siting requirements, that sort of

4 thing.

5 Q.      If we could take a look at Plaintiff's Exhibit

6 128.  And this refers to -- this is a statement of

7 qualifications, environmental support to wind energy

8 programs.  And you're familiar with this document?

9 A.      I am.

10 Q.      This is a document you, in fact, co-authored;

11 correct?

12 A.      Yes.

13 Q.      And if we look over at Page 3 of this document,

14 PDF Page 4.  About the middle of the page there's a

15 statement that says, "BHE is a leader in developing and

16 providing innovative ways to support the wind energy.  We

17 continue to expand these capabilities by working with

18 team members in the industry, government, legal and

19 regulatory communities, and the public.  BHE's alignment

20 with the wind energy market is reflected in the

21 organizations and affiliations we actively support and

22 participate in."

23        So, here you are specifically referring to

24 alignment with that wind energy market; right?

25 A.      Yes.  And by "alignment," as I said, that

1 indicates an understanding of the issues and the

2 requirements that the industry faces, both in the

3 environmental engineering, natural resources, cultural

4 resources, across the breadth of services that we

5 provide.

6 Q.     And the first one -- organization that this refers

7 to is reflecting the alignment with the industry is the

8 American Wind Energy Association; correct?

9 A.     We are business members of the American Wind

10 Energy Association.

11 Q.     And that is the trade association for the

12 industry; right?

13 A.     It is a trade association for the industry.

14 Q.     In fact, BHE is a business member of that

15 organization and pays fees to it; correct?

16 A.     Yes.

17 Q.     And you also use that opportunity to market BHE

18 business to the industry; correct?  Let me be clear about

19 that.  You use your attendance at AWEA meetings and other

20 opportunities with that organization to market your

21 business; correct?

22 A.     Yes.

23 Q.     And if we look a little bit above that, this

24 document refers to one of these services that you're

25 offering.  And just to be clear, this is a document that

Cross - Tyrell

1 is made available to potential wind industry clients;

2 right?

3 A.     I believe it's available on our Web site, so it's

4 available to anybody that has an Internet Explorer.

5 Q.     But the purpose of it was to market your business

6 to wind energy clients; right?

7 A.     Yes.

8 Q.     And if we look above where we were just talking

9 about, one of the services that you specifically market

10 is "Expert witness testimony, and public relations

11 support."  Correct?

12 A.     Yes.

13 Q.     And so one of the things that you are at least

14 endeavoring to do is actually provide public relations

15 assistance for the industry; right?

16 A.     Yes.

17 Q.     And another service that's referred to there is

18 expert witness testimony; correct?

19 A.     That is referred to there, yes.  We obviously are

20 available to provide expert witness testimony.

21 Q.     Similar to the expert witness testimony you're

22 providing here in court today; right?

23 A.     We were asked by the client if we would support

24 this and did so.

25 Q.     So this is expert witness testimony you're

Cross - Tyrell

1 offering before you've done any work on a project site;

2 right?

3 A.     No, not at all.  I think if you look at -- that we

4 would provide expert testimony before we've done project

5 work.

6 Q.     You're saying to companies that you may provide

7 expert testimony before you've done any work in terms of

8 surveying or any other work on that particular project

9 site; correct?

10 A.     I don't understand the way you've constructed that

11 sentence.  What this document has and identifies in the

12 elements that precede the one that you have highlighted

13 here is a list of technical capabilities that the firm

14 possesses that would be available to wind power clients.

15 Q.     Your expert testimony here today is being provided

16 pursuant to an agreement between Invenergy and BHE;

17 correct?

18 A.     Correct.

19 Q.     And so you're here as an employee of BHE, not in

20 any kind of independent capacity as an expert; right?

21 A.     I am an employee of BHE, and I am being paid to be

22 here as an expert.

23 Q.     By BHE.

24 A.     Yes.

25 Q.     So the expert fee that's coming in this case is

Cross - Tyrell

1 not going to you, it's going back to the company you work

2 for; right?

3 A.      Right.  I'm salaried.

4 Q.      And didn't you agree in your deposition that you

5 are here as an employee of the consulting company?

6 A.      Um-hum.  Yes.

7 Q.      That's "yes;" right?

8 A.      Yes.

9 Q.      And Mr. Romme has testified in the same capacity

10 in this case, right, as an employee of BHE?

11 A.      Yes, I believe so.

12 Q.      Working on behalf of a client; right?

13 A.      Yes.

14 Q.      And Mr. Romme, I think, testified -- is this

15 consistent with your understanding as a vice president

16 that he's being reimbursed?  Or there is reimbursement at

17 his usual hourly rate for the work that he does for wind

18 companies generally?

19 A.      That's consistent with my understanding.

20 Q.      That applies to both his expert testimony and his

21 fact testimony; is that correct?

22 A.      That is my understanding, yes.

23 Q.      If we could take a look at Plaintiff's Exhibit 77.

24 This is a work order from BHE, and it refers to the

25 expert testimony.  If we could take a look at that first

Cross - Tyrell

1 paragraph, and maybe make that a little bit larger.  The

2 scope of work addressed here is a site visit, meetings,

3 conference calls, preparation of affidavits, preparation

4 for testimony, etcetera.  So, this refers to the expert

5 testimony you provided for this case; correct?

6 A.      That I provided?

7 Q.      No.  That is being provided for this case by BHE.

8 A.      Assume if it's been -- I've never seen this

9 before.  I assume if it's been entered, then the answer

10 is yes.

11 Q.      And if we could look down a little bit on the same

12 document.  There's a reference -- if we could go to the

13 whole document.  There's a reference down below under --

14 about two-thirds of the way down to time and materials

15 not to exceed $84,000.  Do you see that?  The work that's

16 described in this work order.

17 A.      I see that.

18 Q.      Is that consistent with your understanding as to

19 how much BHE is charging for the testimony that you and

20 Mr. Romme are providing?

21 A.      This is the first time I've seen any sort of

22 number associated with that.  I don't manage this

23 project.

24 Q.      Okay.  Do you have any reason to disagree that

25 this document reflects what is expected to be charged for

Cross - Tyrell

1 your and Mr. Romme's testimony?

2 A.      Well, I don't -- what you showed on the screen

3 previously indicates that that's not for this testimony,

4 that that is for -- it looked to me, from what you showed

5 before, that there was a number of different

6 requirements, and this is a cost not to exceed that would

7 cover a number of different activities, probably

8 including testimony, yes.

9 Q.      You referred to before assisting companies with

10 Incidental Take permits and Habitat Conservation plans.

11 Just to make sure that we're clear about this.   Habitat

12 Conservation Plan is something which is developed in

13 order to obtain an Incidental Take Permit; correct?

14 A.      Correct.

15 Q.      And in those situations where Incidental Take

16 permits are being pursued for Indiana bats, that's

17 because they've found Indiana bats on site; correct?

18 A.      Well, I did work on a -- on one HCP that is not

19 currently active where no Indiana bats were found on

20 site.

21 Q.      Okay.   So, sometimes companies are pursuing them

22 even when they haven't found Indiana bats on site;

23 correct?

24 A.      Well, in the case that I'm aware of, there is a

25 case where that is true.   I believe that in the other

Cross - Tyrell

1 cases Indiana bats have been found on site.

2 Q.     And when you -- when one goes to apply for an

3 Incidental Take Permit -- I think you may have suggested

4 this in your testimony, but just to be clear:  One of the

5 conditions for the issuance of that permit can be

6 adaptive management; correct?

7 A.     It can be, yes.

8 Q.     And one of the conditions can be monitored by

9 post-construction monitoring; correct?

10 A.     Correct.  In fact, I think monitoring is in fact a

11 requirement of an HCP, whereas, adaptive management is a

12 potential element of an HCP.

13 Q.     And one of the conditions also can be additional

14 pre-construction surveys that have to be undertaken;

15 correct?

16 A.     I'm not aware -- could it be?  I don't know.  I'm

17 not aware of any such case where that's been -- in fact,

18 just the opposite.  In any case where I'm aware of an

19 HCP, there has not been a requirement for additional

20 pre-construction surveys when we talk about Indiana bats.

21 I'm not aware of any.

22 Q.     Well, you heard Dr. Robbins' testimony about doing

23 additional pre-construction surveys for the Incidental

24 Take Permit in Missouri?

25 A.     Yes.  But I'm not aware of any of the details of

Cross - Tyrell

1 that project.  I believe he also said he wasn't

2 specifically working on the HCP, so I don't know.

3 Q.      Whatever the features of an Incidental Take Permit

4 and Habitat Conservation Plan, they're made enforceable

5 against the company by virtue of the permit that's

6 issued; correct?

7 A.      The permit has binding conditions in it, yes.

8 Q.      And if the company wants to deviate from those

9 conditions, it has to work that out with the Fish and

10 Wildlife Service which, in turn, has to approve that

11 deviation; correct?

12 A.      In order to keep a valid Incidental Take Permit, I

13 would assume that would be the step you would take is to

14 go back into consultation with the Fish and Wildlife

15 Service.  The way it's typically worded is if additional

16 information comes about that invalidates the agreement

17 that led into the elements that led into the HCP, that

18 either party could revisit that.

19 Q.      And in terms of other work you've done.  You

20 referred to your involvement with surveying for Indiana

21 bats.  You've also been involved with doing surveying for

22 Indiana bats in connection with a project in Maryland; is

23 that correct?

24 A.      Oh.  Um- --

25 Q.      Wind power project in Maryland?

Cross - Tyrell

1  A.      Yeah.  We did a little bit of mist-netting.

2  Q.      But you also did AnaBat for that project, didn't

3  you?

4  A.      You know, I was not -- I did not manage that

5  project, and I am sure you can tell me.  I'm not certain.

6  Q.      Well, didn't you say in your deposition that you

7  believed that AnaBat was not only used, but that it was

8  used to identify Indiana bats on the site?

9  A.      If I did, it's -- I don't recall saying that, so

10 I'm sure you can show me.

11 Q.      Well, let's take a look.  Page 121 of your

12 deposition, beginning at Line 2.  Question is -- and this

13 is referring to that Maryland project.  We can check the

14 context if you'd like.  "So, one of the purposes was to

15 use AnaBat to see if there were Indiana bats on the

16 project site?"  Answer:  "The purpose of the AnaBat was

17 to evaluate the activity of bats on the site and to

18 identify them to species where you could."  Question:

19 "Including the Indiana bat?"  Answer:  "That would be --

20 sure.  Yes."

21         So there was at least an effort to identify

22 Indiana bats; correct?

23 A.      An effort to identify Indiana bats specifically?

24 No.  The way AnaBat studies are used, and I believe would

25 have been used on the Dan's Mountain Project, that was

Cross - Tyrell

1 not a project that BHE was the primary consultant for.

2 We provided subcontracting and sub-consulting services to

3 identify species to -- species to species groups.  So,

4 high frequency bats and low frequency bats.  And in one

5 of those, Indiana bats are in the high frequency group.

6 I don't -- I certainly don't recall any effort to use

7 Indiana -- to use AnaBat to specifically identify Indiana

8 bats to species.  So, if it's misleading in the way it's

9 quoted there, then I erroneously stated -- a misleading

10 statement.

11 Q.     Now, in terms of acoustic.  You refer to the

12 service not wanting acoustic data for this site.  Are you

13 now aware of the three formal letters that were sent by

14 the Fish and Wildlife Service, Plaintiff's Exhibit 97,

15 98, and 99?

16 A.     Which project are you talking about now?

17 Q.     I'm talking now about the Beech Ridge project.

18 A.     Okay.

19 Q.     And I think when you were deposed, you said that

20 you were actually not read all of those letters; isn't

21 that right?

22 A.     I haven't read them in detail, no.

23 Q.     Okay.  But you've read them since you were

24 deposed?

25 A.     Not in detail, no.  In fact, no, I haven't looked

Cross - Tyrell

1 at them.

2 Q.     You haven't looked at those, so you're not aware

3 that those letters all refer to gathering acoustic

4 information in connection with this project, the Beech

5 Ridge Project; right?

6 A.     I'm not aware of the specifics of the letter.  At

7 the time that -- no, I'll leave it at that.

8 Q.     And you're not aware of that specific -- that the

9 service repeatedly asked for acoustic studies in those

10 letters; right?

11 A.     I'm generally aware that they asked for AnaBat

12 data.  I can't quote you the details of the letter.

13 Q.     Now, you've been aware of the Beech Ridge project

14 since the beginning of this project, correct, in 2005?

15 A.     I've been aware of it since 2005.

16 Q.     And in fact, you were CC'd on the first letter

17 that was sent by BHE to Invenergy discussing what would

18 be addressed with regard to this project; correct?

19 A.     I assume if you're telling me so, then it's true.

20 Q.     And that opening letter acknowledged that Indiana

21 bat concerns were a serious concern; right?

22 A.     Endangered -- yes, within the known range of the

23 Indiana bats.  So, it would be a concern.

24 Q.     In fact, from the beginning, BHE has known that

25 because of the proximity of hibernacula, that the federal

Cross - Tyrell

1 and state agencies would have serious concerns about

2 Indiana bat impacts; correct?

3 A.     My understanding would be to state that it is

4 within the known range of the species, and therefore the

5 Fish and Wildlife Service would potentially have concerns

6 for it and ask for development of the scope of work to

7 address that and better understand it.

8 Q.     And one of the reasons, specifically, was the

9 proximity of hibernacula to the project site; right?

10 A.     I don't recall the contents of that letter.  So, I

11 think it is -- the way that I would understand or assume

12 it, without knowing the details of the letter, is simply

13 to say it is within the known range of the species.

14 Q.     If we could take a look at Plaintiff's Exhibit 90,

15 which is a July 5th 2005 letter.  And this is letter from

16 Mr. Romme to Mr. Pendleton and Mr. Stihler, with the

17 service and the state.  And if we look down, we can see

18 that you're CC'd on this letter.

19 A.     Um-hum.

20 Q.     And if we look back up near the top of this

21 letter, there is a specific reference on Page 2 --

22 actually, if we go to Page 2, it discusses species of

23 bats with the potential to occur at the proposed area

24 includes Indiana bats.  That's that full paragraph.  And

25 then there's a chart attached which refers to potential

Cross - Tyrell

1 season presence.  If we can scroll down a little bit.

2 And right at the top, it's Indiana bats.  And it says,

3 potential summer presence and potential migration

4 presence.  Do you see that?

5 A.      Yes, I do.

6 Q.      So, from the very beginning it was understood that

7 Indiana bats were potentially at this location, both in

8 the summer and during migration; correct?

9 A.      Oh, absolutely.  That's the entire reason that we

10 approached the service, to get technical assistance about

11 their opinion, and develop a scope of work to address

12 this issue.

13 Q.      Now, did you hear -- were you here for Mr.

14 Groberg's testimony?

15 A.      I was.

16 Q.      Did you hear him acknowledge that Invenergy at

17 least consistently understood that the service was

18 concerned about fall migration mortality and wanted there

19 to be some analysis or study done on fall mortality?

20 A.      I'm sorry.  I don't recall him making that

21 statement, but --

22 Q.      Well, the fact of the matter is that from the

23 outset of this project, the service has indicated its

24 concern with fall mortality as the greatest concern;

25 right?

Cross - Tyrell

1 A.      That would be consistent with an overall concern

2 and documented mortality of, as I explained earlier,

3 higher mortality of all bats during -- not Indiana bats

4 but of other species of bats during the fall.

5 Q.      And that would be consistent with your testimony a

6 little bit earlier that that is the greatest risk to all

7 bat species; right?

8 A.      Yes.  There's -- there is no known documented

9 mortality of Indiana bats, but we've been over that.

10 Q.      But the service was telling you with regard to all

11 bats, including Indiana bats, that the fall migration

12 period would be the one of greatest concern; right?

13 A.      That's consistent with what I would expect, yeah.

14 Q.      And notwithstanding that fact, no survey was ever

15 done for the fall migration period; correct?

16 A.      Well, no, it wasn't.  And so if we talk about the

17 service expressing in a later post-facto after the

18 surveys were done that they're concerned about it, there

19 were a number of conversations ongoing consistently

20 throughout the project to get feedback to get input from

21 the service to design the scope of studies.  The service

22 was involved in the designing both years of mist-netting

23 studies.  They knew when the studies were taking place.

24 They knew where they were taking place.  They, in fact,

25 commented on the distribution of the mist-net sites.  So,

Cross - Tyrell

1 while they may have expressed concern, and did in later

2 letters, the contribution that they made during

3 development of the scope indicated a summer mist-net

4 period.

5 Q.     Just to be clear.  These letters -- there were

6 three letters sent at various points during the work on

7 this project site; right?  Two in 2006, and then the

8 final one in 2007?

9 A.     I've already told you that I have not read those

10 letters in detail.  I am aware of those letters.

11 Q.     So, if those who have read the letters in detail

12 -- each of those letters refers to the need for fall

13 migration analysis -- you would have no basis to dispute

14 that those letters were sent throughout the work on the

15 project; correct?

16 A.     Well, that's correct.  But what I'm also aware of

17 is another -- the ongoing conversations, and quite

18 consistent contact between Russ and Fish and Wildlife

19 Service.  In fact, I was having conversations with the

20 same people in the same Fish and Wildlife Service office

21 about another project at the same time, and they would

22 consistently talk about the two projects together.

23 Q.     Well, let me ask you about that.  Are you

24 referring to the Pendleton project?

25 A.     I'm referring to Liberty Gap.

Cross - Tyrell

1 Q.      But, Pendleton is another project that you've

2 worked on; right?

3 A.      No.  I know of no Pendleton project.

4 Q.      I'm sorry.  I'm referring to the Pinnacle wind

5 project.

6 A.      Yes.

7 Q.      That's another one that was going on in West

8 Virginia; right?

9 A.      That is not -- does not overlap -- the

10 conversations don't overlap in time.

11 Q.      But the fact of the matter is that with regard to

12 the Pinnacle Wind Force Project in West Virginia, you did

13 do fall surveys; correct?

14 A.      We did.

15 Q.      And in fact, you also did a spring mist-netting

16 for that project.

17 A.      And summer as well.

18 Q.      Summer as well.  So when you said before you don't

19 know of any survey that overlapped multiple years, or I

20 think you said three years, you, yourself, have been

21 involved in surveys that at least overlapped many more

22 seasons that were done than this mist-net survey; right?

23 A.      There's a big difference between three years and

24 three seasons.  The Pinnacle project, in conversations

25 with the Fish and Wildlife Service -- the Fish and

Cross - Tyrell

1 Wildlife Service requested that surveys be done -- mist-

2 net surveys be done in spring, summer, and fall, and that

3 we evaluate caves during the winter.  So, we did look,

4 during all four seasons, for the presence of bats on the

5 Pinnacle project, as it was advised by the Fish and

6 Wildlife Service.

7 Q.      But you didn't look at all during the fall or

8 spring migration seasons as we've stipulated for this

9 project; right?

10 A.      I know of no fall studies that were done for Beech

11 Ridge.

12 Q.      You referred to Plaintiff's Exhibit 16, which were

13 the guidelines that call for three years of

14 pre-construction surveys.  Without putting up that

15 paragraph back on the screen, I think, as I recall your

16 characterization, it says that there should be site-

17 specific assessments of what's needed for a particular

18 project site; correct?

19 A.      In coordination with the conversations with the

20 relevant agencies.

21 Q.      And that would include formal letters you're

22 receiving from the agency identifying needs at a

23 particular project site; correct?

24 A.      It would include that, as well as the detailed

25 conversations and consistent email and discussions that

Cross - Tyrell

1 are ongoing with those agencies.

2 Q.      Now, BHE regarded it as an accomplishment, for BHE

3 in particular, when Invenergy received approval from the

4 Public Service Commission; right?

5 A.      I wouldn't characterize it that way.  I don't

6 know.  Yeah.  I mean, if we're working for a client and

7 the client achieves a goal that they seek, we would be

8 happy for that client that they achieved a goal that they

9 seek.

10 Q.      Well, if we could take a look at BRINV-8890, a

11 document we obtained in discovery.  And this is an email

12 that you're sending to Mr. Romme in response to one he

13 sent below.  And if we look down below first --

14 A.      Yeah.

15 Q.      -- it's Mr. Romme reporting on the fact that the

16 PSC granted Invenergy a cert for Beech Ridge.  If we see

17 that.  And then up above you have a statement --

18 A.      Yes.

19 Q.      -- that says, "Terrific news.  Great job hanging

20 in there and following all the twists and turns.  This

21 certainly is landmark work and an important result with

22 regard to establishing procedures and the viability of

23 wind power in West Virginia."

24 A.      Right.

25 Q.      "Congratulations to all, especially Russ."  Do you

Cross - Tyrell

1 see that?

2 A.     Yes.  And that refers to the very, very confusing

3 agency coordination and comment, the fact that the phone

4 calls and the emails conflicted with the letters; that it

5 was consistently challenging and difficult to get

6 guidance and to apply it appropriately.

7 Q.     And if we could take a look at BRINV-8889, which

8 is another email I think on the same day.  And this one

9 is from John Bruck, and he's also responding to the fact

10 that the permit was issued from the PSC or the

11 authorization.  And who is Mr. Bruck?

12 A.     He is the president of BHE.

13 Q.     And his statement is at the top:  "Wow.  That's

14 awesome.  I guess the PSC didn't buy the Boy Scouts'

15 three-year pre-construction monitoring merit badge

16 program."  Do you see that?

17 A.     I do see that.

18 Q.     Now, is it fair to assume that "the Boy Scouts'

19 three-year pre-construction monitoring merit badge" is

20 the Fish and Wildlife Service's recommendation to the

21 Public Service Commission for three years of

22 pre-construction surveys?

23 A.     I did not write that email, and I don't -- I

24 assume he's -- I assume he's talking about -- no.

25 Actually, I can't characterize that accurately.  You

Cross - Tyrell

1  would have to ask Mr. Bruck.

2  Q.     Okay.  If we look down at that email.  There's a

3  reference to -- by Mr. Romme in this email that he sent

4  to you and to Mr. Bruck and others in BHE.  Last

5  paragraph, it says, "This order will free up $100,000 in

6  CRM work pretty much right away; will initiate our

7  involvement in the next phase of the project which will

8  include setting up a Technical Advisory Committee

9  developing a post-construction monitoring plan, and a

10 detailed adaptive management plan."  Do you see that?

11 A.     Yes.

12 Q.     So at this point, BHE was assuming it would be the

13 one involved in doing post-construction monitoring and

14 adaptive management; right?

15 A.     As you pointed out, one of our business objectives

16 is to provide technical support to our clients in the

17 wind energy, so that's what this is referring to.

18 Q.     But in fact, BHE was not selected to do the

19 post-construction monitoring and adaptive management;

20 right?

21 A.     At Beech Ridge?  No.

22 Q.     And were you here for Mr. Romme's testimony?

23 A.     I was, yes.

24 Q.     Did you hear him acknowledge that one of the

25 reasons that he understands is because of a potential

Cross - Tyrell

1 perception of bias or conflict for BHE doing the

2 post-construction monitoring?

3 A.      I heard him say that.

4 Q.      Do you have any reason to disagree with that?

5 A.      Well, yeah.  I asked Russ what he had heard from

6 Mr. Groberg directly.  And the response that I got was

7 that Mr. Groberg had made a business decision to use

8 another firm that he's -- in fact, I also asked John

9 Bruck to call Mr. Groberg and ask if -- if we could

10 better understand the reason for that selection and

11 learned from both of those conversations that Mr. Groberg

12 had determined that another firm was more suited to do

13 that work, and that it was his to make the decision, and

14 that was the decision he had made; and that included

15 identifying that this other firm had worked in

16 post-construction monitoring for Invenergy before, and

17 that their operators were used to working with them,

18 etcetera.

19 Q.      So, if Mr. Groberg had said in his deposition,

20 portions of which you've designated, that one of the

21 reasons he made that business decision was with the

22 concern of BHE's perceived conflict or bias, you would

23 defer to Mr. Groberg's assessment of that?

24 A.      I'm sorry.  Can you ask that again?

25 Q.      You said you were relying on Mr. Groberg's

Cross - Tyrell

1 characterization of why BHE was not selected?

2 A.     I would rely on Mr. Groberg's characterization of

3 why he did not request BHE, rather than Mr. Romme's.

4 Q.     With regard to the mist-netting that was done on

5 this project site.  That is mist-netting only for summer

6 presence; correct?

7 A.     The mist-netting was done during the summer

8 season.

9 Q.     Right.  And that's only to identify summer

10 presence of a species; right?

11 A.     Yes.

12 Q.     And I think you referred to your service with the

13 recovery team?

14 A.     Yes.

15 Q.     And in fact, you are a non-voting member of the

16 recovery team; right?  The Indiana Bat Recovery Team.

17 A.     Yes.

18 Q.     You're the only non-voting member at this point?

19 A.     At this point.  Well, Dr. Kunz described himself

20 as being a consulting member, which would also have him

21 as being a non-voting member, although I am not aware

22 that he is in fact considered a consulting member.  So,

23 that was the first I heard of it was during his

24 testimony.  So, I don't know if the answer to your

25 question is yes or no.

Cross - Tyrell

1 Q.     And in terms of the recovery plans, reference to

2 mist-net surveys.  During your deposition, you agreed

3 that you generally agreed with the current guidelines for

4 mist-net surveys that's set forth in the recovery plan.

5 A.     I was part of a group of people that were

6 considering and advising the Fish and Wildlife Service on

7 those.  At any one time, some individuals might disagree

8 and, in fact, some individuals disagree strongly with

9 elements that are in the recovery plan.  But it is a

10 group effort to describe in general the Fish and Wildlife

11 Service and the technical experts' best assumption.  So,

12 any one individual may disagree with particular elements

13 of it.

14 Q.     But you said in your deposition you generally

15 agreed with what's set forth in those mist-net

16 guidelines?

17 A.     I generally agree with them, yes.

18 Q.     And you're referring to the 2000 mist-net

19 guidelines?

20 A.     2000?

21 Q.     Excuse me.  The 2007 mist-net guidelines?

22 A.     Yes.

23 Q.     And it's the case, is it not, that the current

24 version of those guidelines provides that mist-net

25 surveys are generally valid for two years?

Cross - Tyrell

1  A.      Yes.

2  Q.      And provides that mist-nets for Indiana bats in

3  particular should be checked every 20 minutes?

4  A.      Yes.  That was one of those points that everybody

5  did not agree on but, yes, that --

6  Q.      Excuse me?  Every?

7  A.      It was changed to ten minutes.

8  Q.      Every ten minutes is what it currently provides

9  for; correct?

10 A.      Yes.  It was changed to ten minutes.

11 Q.      And it also specifically provides that, generally

12 speaking, one should only mist-net where there is

13 overhanging canopy in order to funnel bats; isn't that

14 right?

15 A.      No, it's not right.  It says that it is preferred

16 that you would -- I don't recall the precise wording, but

17 that it is preferred that you place the nets in areas

18 that you could most likely funnel them.  I've done

19 Indiana bat mist-netting in areas with practically no

20 edge vegetation, no canopy, and no nearby trees and

21 caught Indiana bats.  So, the guidelines recognize that

22 this is not only the conditions under which you can catch

23 these bats, but it is preferable given the opportunity to

24 provide or to select within a range of areas an

25 appropriate mist-net site.

Cross - Tyrell

1 Q.      Well, if we could take a look at Plaintiff's

2 Exhibit 52, which is the recovery plan.  And go to Page

3 252 of that document, which is the beginning of where the

4 mist-net survey guidelines are, and then look over at

5 Page 253.  It says at the top "Net Placement."  If we can

6 look down a little bit.  "Nets should fill the corridor

7 from side to side, from stream or ground level up to the

8 overhanging canopy."  Does that not indicate that there

9 should be overhanging canopy on a mist-net site?

10 A.      Yes.  And the first paragraph below it says,

11 "Occasionally, it may be desirable to net where there is

12 no good corridor."

13 Q.      But generally, it's preferable, as you say, to use

14 an overhanging canopy; correct?

15 A.      You have to consider a variety of different site-

16 specific characteristics, and one of them that is --

17 should be considered is the presence of canopy.

18 Q.      You, I think, have indicated in the past that you

19 looked at the survey sheets that were filled out for the

20 Beech Ridge project; right?

21 A.      I did.

22 Q.      And you also looked at the photos that were

23 attached to the mist-net survey; right?

24 A.      I did.

25 Q.      In fact, many of those do in fact show that there

Cross - Tyrell

1 were little or no canopy at many of the mist-net sites in

2 the 2005 survey; correct?

3 A.      Yeah.  Again, the area that you're mist-netting is

4 defined by a number of different criteria that you use to

5 select your mist-net sites.  So, it's not surprising on

6 this project or others that you may mist-net in sites

7 that don't have complete canopy closure.

8 Q.      Generally, the survey sheets that are filled out

9 for these mist-net tests are sent to the state agency in

10 a particular state; correct?

11 A.      That varies by state.

12 Q.      If we could take a look at a survey sheet that was

13 filled out by Mr. Libby.  And this would be Plaintiff's

14 Exhibit 119, and it's PDF Page 99, and it's P-3111.  This

15 is Mr. Libby's site description for a particular location

16 that he was doing mist-netting.  And you can see in the

17 middle, "Presence of open flyway above road," and he

18 says, "Oh, yeah.  A little too open."  Do you see that?

19 A.      I do.

20 Q.      Now, the parties have stipulated that Mr. Libby

21 then was asked to basically revise his comment to explain

22 his concern.  And then if we could look at Plaintiff's

23 120, which is also BRINV-2695, the revised sheet by Mr.

24 Libby, "Presence of Open Flyway," he writes -- actually,

25 that's not the right one.  Here we go.  "Presence of open

Cross - Tyrell

1 flyway" -- this is 2695.  He writes, "Yes, too open."

2 Sorry.  This is the right one:  "Presence of open flyway

3 above stream flyway open at top.  No road.  Closure

4 throughout this area.  The best looking net site had a

5 branch overhanging.  This is where I caught two little

6 browns, and the second night I caught one northern in a

7 small net over a water hole.  A lot of activity on

8 AnaBat; however, very difficult to catch bats here."

9        Do you see that?

10 A.    I do.  I also would not agree with your initial

11 characterization when you were shifting from one data

12 sheet to the other that he was asked to explain his

13 concerns.  He was asked to appropriately fill out a data

14 sheet.  He filled out the data sheet in a way that is not

15 appropriate.  He was asked to provide site-specific

16 definition and characteristics and that's why he did

17 this.  But, yes, I see what he's saying.

18 Q.    Well, if we could take a look at Plaintiff's

19 Exhibit 121.  This is an email from Kelly Mertz regarding

20 the data sheets, and it specifically -- if we look down

21 at the 7/24/05 net site description from Gary Libby under

22 "Presence of Open Flyway Above Stream.  Need revised

23 comment.  Canopy was very open, if it's okay to state it

24 was open and explain why your nets were placed there.

25 EGB canopy closure was expert set, but site presented

Cross - Tyrell

1 best opportunity for capturing foraging bats."

2        So, the indication from Ms. Mertz was they wanted

3 to confirm that this was the best location; correct?

4 A.    No.  I don't understand that from her comment.  I

5 think what it says is she said characterize that it was

6 open.  And if it was open and therefore not consistent

7 with guidelines or standard practices, that element, that

8 one characteristic, explain why you put it there.

9 Q.    In any event, Mr. Libby did in fact provide more

10 detail.  If we could go back to the document we were just

11 looking at, Plaintiff's Exhibit 120.  It's the one we

12 were just looking at.  So, in any event, he did provide

13 more detail and explain why it was not a good site.  It

14 was difficult to catch bats and specifically referred to

15 the fact there was a lot of activity on AnaBat.  Do you

16 see that?

17 A.    Yes.

18 Q.    Now, the parties have stipulated that this form,

19 the one that he was asked to provide more detail and that

20 he referred to more activity on AnaBat was not provided

21 -- never provided to the state Department of Natural

22 Resources but, rather, the first sheet that you said was

23 not filled out correctly was the only one ever submitted

24 to the state.

25        Do you have any reason to know why this sheet with

Cross - Tyrell

1 more information, and referring to the AnaBat

2 information, was never submitted to the state?

3 A.      No.  It would be conjecture on my part.

4 Q.      And in fact, you did make some reference to

5 acoustic information.  It's not uncommon for AnaBat

6 analysis to reflect more Indiana bat -- excuse me, more

7 bat activity at a site than would be reflected by a mist-

8 net survey; correct?

9 A.      This is not talking about analysis.  It's talking

10 about the number of bats' passes that he heard.  You

11 really need to understand that when he says "a lot of bat

12 activity."  AnaBat has no way, when you're standing in

13 the field.  So he's talking here about being in the field

14 and hearing the transducer signal from the ultrasound

15 recorder from the AnaBat unit.  You have no way of

16 knowing whether or not there's one bat flying in circles

17 around it and there is one bat there, or if there is

18 multiple bats flying in circles.

19 Q.      But in any event, it's not uncommon for AnaBat

20 recordings to reflect more bat activity than one would

21 establish through a mist-net?

22 A.      Again, you cannot equate them for the reasons I

23 just mentioned.

24 Q.      Well, you just referred, I think, to species

25 richness could be reflected by AnaBat analysis?

Cross - Tyrell

1  A.      Well, we do use AnaBat currently as requested by

2  some agencies to divide into high and low frequency bats.

3  Q.      So if an AnaBat analysis was done of this

4  information and at least reflected far more bat activity

5  and more species richness, then it would at least suggest

6  a reason to do further mist-netting at the project site;

7  correct?

8  A.      Either I'm not understanding you, or I would have

9  to say that's not correct.  I'm not following that as

10 being a logical train.

11 Q.      Well, were you in the courtroom when we were

12 talking about the Kentucky Department of Wildlife and

13 Fish and Wildlife Service --

14 A.      Ms. Slack's.

15 Q.      -- requirements for AnaBat and mist-netting?

16 A.      Yes.

17 Q.      And the reference to the fact that AnaBat will

18 frequently identify Indiana bats more reliably at a

19 particular site where Indiana bats are known to exist in

20 mist-net surveys?

21 A.      My understanding is that the way the Kentucky

22 guidelines are being developed is to read that if there

23 is a bat call that's consistent with the parameters of an

24 Indiana bat call that they would request additional

25 studies.

Cross - Tyrell

1 Q.      Just one other question about the data sheets.

2 You said you're not familiar with how these data sheets

3 would have been provided to the state.  Do you know who

4 would have decided whether Mr. Libby's more complete data

5 sheet was sent or not sent to the state?  Who at BHE

6 would have decided that?

7 A.      In this case, I'm not certain.  Russ was the

8 project manager but, obviously, Ms. Kelly Mertz was

9 communicating on this.  Who compiled the data and

10 submitted it to the state?  I am -- I don't recall.

11 Q.      Okay.  But Mr. Romme would have been overseeing

12 that process?

13 A.      As the project manager, he may have made an

14 assignment to do that; I don't recall.

15 Q.      Okay.

16 A.      Again, I wasn't involved with the technical

17 management and administration of the project.

18 Q.      And you said you were okay with BHE never

19 analyzing the AnaBat data that was collected from the

20 site, if I understand your testimony; right?

21 A.      If I understand what you mean by "okay," yes.

22 Q.      You have no problems with the fact that it sat in

23 a file unanalyzed by BHE for four years; right?

24 A.      I think that's -- I have no problem with that.

25 Q.      And so you saw the handwritten notes.  Were you in

Cross - Tyrell

1 the courtroom when we showed Plaintiff's Exhibit 122

2 which reflects Mr. Romme's notes at the bottom about the

3 concern that it would reflect Indiana bat information?

4 A.      I did.

5 Q.      And having seen those notes and Mr.- -- and heard

6 Mr. Romme's testimony that in fact he was concerned that

7 it would reflect Indiana bat presence, that doesn't have

8 any effect on your opinion about the appropriateness of

9 how that information was handled?

10 A.      No.  I'm trying to remember how Mr. Romme

11 described what he meant by that, and I was -- I was in

12 agreement with his -- we would have to go back and look

13 at the transcript.  I was in agreement with his

14 description of that.

15 Q.      So you're in agreement with how he described that?

16 A.      During his testimony, yes.

17 Q.      If we could go back to the mist-net guidelines for

18 one second.  Plaintiff's Exhibit 52, Page 252.  Look at

19 the end of those guidelines.  It refers to -- right at

20 the end.  If we can go, I think it's Page 254.  And then

21 it references to consult regarding mist-netting.  If we

22 look at the bottom of that, and then it continues over to

23 the next page.  There's two there, and it continues over

24 to the next page, 255.  I counted three out of six of

25 those studies as either authored or co-authored by Dr.

Cross - Tyrell

1 Robbins. Does that seem consistent with your

2 understanding of these publications that the recovery

3 plan refers to?

4 A.     Yes. And I also see Brad Steppen's name in there,

5 and Brad works with BHE.

6 Q.     But in any event, this would seem to suggest that

7 the service places a fair amount of stock in Mr. Robbins'

8 -- Dr. Robbins' analysis; correct?

9 A.     This indicated they cited him in developing the

10 preceding section.

11 Q.     Okay. And one of the studies that's specifically

12 cited is Dr. Robbins' and Dr. Britzke's study comparing

13 mist-net surveys and the AnaBat detector; correct?

14 A.     Yes.

15 Q.     Now, you acknowledge that Beech Ridge is being

16 built in an area where there has been high mortality with

17 regard to other wind power projects; correct?

18 A.     I think we were referring to Mountaineer,

19 specifically, is fairly close to it, yeah.

20 Q.     And in fact, Mountaineer was the project that was

21 used to make a mortality prediction for the Beech Ridge

22 project; right?

23 A.     Yes.

24 Q.     And you also agree that the percentage of *Myotis*

25 killed at these eastern Appalachian projects is in fact

Cross - Tyrell

1 higher than it has been at many of the projects studied

2 in other parts of the country; right?

3 A.     I think that's a very gray area.  I can't -- I

4 don't have confidence that it is.  I think the -- you

5 know, the percentages are fairly small, you know, so it

6 may be higher by percentages, but I don't think we have

7 enough information to make that statement with any sort

8 of confidence.

9 Q.     Well, based upon the Mountaineer experience which

10 was used as a jumping off point for this project, you

11 would agree, would you not, that the data reflects that

12 ten percent or more of the mortality for that project was

13 *Myotis* species; right?

14 A.     I don't have it in front of me, but that sounds

15 accurate.

16 Q.     Okay.  And so if we use ten percent for -- and

17 BHE's estimate of 135.000 mortalities for the Beech Ridge

18 project, we would be talking about upwards of 13,000

19 *Myotis* mortalities; correct?

20 A.     Well, again you're taking estimates and doing math

21 on -- I mean, can you follow that math through logically?

22 Yes.  I think when you start using those kinds of data to

23 make estimates on a very small sample size, you can very

24 quickly get into a realm where you are generating

25 numbers, but they are very difficult to use as accurate

Cross - Tyrell

1  predictors.

2  Q.     But, BHE itself relied on the Mountaineer

3  experience to make predictions on the mortality here;

4  correct?

5  A.     To look at overall bat mortality.  I don't think

6  BHE made any attempt to break down mortality based upon

7  species, or make inferences about any particular genre

8  or species that might be affected.  They used it as an

9  overall benchmark to come up with a general number.

10  Q.     But you don't dispute that *Myotis* species will be

11  killed at that project; correct?

12  A.     I don't know if *Myotis* species will be killed at

13  this project.

14  Q.     So, you think it's possible that no little brown

15  bats -- based upon all the research you've seen, you

16  think it's possible that no little brown bats or other

17  *Myotis* species will be killed at this project site?

18  A.     Of course, it's possible.

19  Q.     But your position is that you don't think that's

20  going to happen?  Or, you don't know if that's going to

21  happen?

22  A.     I would say that it's likely that there would be

23  some mortality of *Myotis* species.

24  Q.     And in fact, the surveys that were done, adequate

25  or inadequate, found more little brown bats than any

Cross - Tyrell

1 other species on the project site; correct?

2 A.      At which project?

3 Q.      At the Beech Ridge project.

4 A.      The mist-net surveys?

5 Q.      Correct.

6 A.      That sounds right.

7 Q.      When you were deposed, you acknowledged that some

8 of the studies you had relied upon for the relationship

9 between pre-construction monitoring and post-construction

10 mortality had been erroneously cited; correct?

11 A.      Yes.

12 Q.      And in your supplemental --

13 A.      Well, one in particular, yeah.

14 Q.      Well, in your supplemental declaration -- in your

15 second supplemental declaration, you acknowledged that

16 those studies were not cited correctly; right?

17 A.      Yes.  I corrected the error in the supplemental.

18 Q.      And then you cited a whole bunch of new studies in

19 support of your position of the second supplemental

20 declaration; right?

21 A.      I supported -- yeah.  I provided additional

22 studies.

23 Q.      And if we could take a look at that declaration.

24 And look at the third page, about two-thirds of the way

25 down.  For example, you say horry bats leaving, out a

Cross - Tyrell

1 parenthetical, may circle to altitudes similar to rotor

2 height during evening foraging periods; and you refer to

3 LaVal & Laval 1979 correct?

4 A.      Yes.

5 Q.      If we could take a look at that LaVal & LaVal.

6 This, actually, is a study that doesn't even relate to

7 horry bats; correct?  This is notes on reproduction,

8 behavior, and abundance of the red bat?

9 A.      Yes.  This is a closer related species to horry

10 bats.

11 Q.      Right.  But you cited this article for the

12 proposition in your second supplemental declaration;

13 correct?

14 A.      I need to go back and look at the two to compare

15 them back and forth.  That's a possibility.  I would need

16 to go back and read the declaration and read this paper.

17 Q.      And you also cite in your second supplemental

18 declaration from Zinn and Baker, with regard to horry

19 bats?

20 A.      I should have been talking about red bats.

21 Q.      Correct me if I'm wrong about this, but as I read

22 that article it suggested that horry bats, which you're

23 referring to as a bat species that could forage within

24 the turbine area, would forage up to 30 meters.  If you

25 look at the Zinn and Baker publication, does that sound

Cross - Tyrell

1 right?

2 A.      Well, yes.  I think what's pertinent here is the

3 use of air space by this species.  Again, most of the

4 mortality of horry bats don't -- are not commonly

5 captured in mist-net studies during the summer.  They

6 typically seem to fly and forage higher.  The incidence

7 of horry bat capture or mortality is related to the

8 migratory periods.

9 Q.      In order to make the point that Indiana bats

10 forage at a lower height, you refer to various articles

11 including Humphrey, et al; correct?

12 A.      Yes.

13 Q.      Let's take a look at Humphrey, et al and make sure

14 that this is the same article that you're referring to.

15 If we could look at -- does this appear to be the same

16 article?

17 A.      Humphrey & Cope, yeah.

18 Q.      If we could look at PDF Page 9 of this one.  In

19 fact, on that page -- and if we could take a look at it.

20 That page indicates that Indiana bats also forage up to

21 30 meters, or have been seen to be foraging up to 30

22 meters.  Does that sound about right?

23 A.      Yeah.  I would need to look back elsewhere in the

24 paper.  I think it talks about typical foraging areas.

25 Q.      So, according to these studies, it actually has

Cross - Tyrell

1 Indiana bats foraging up to the same height as the tree
2 bat you were referring to; correct?
3 A.     No.  I don't think so.  30 meters roughly, give or
4 take, is about 90'.  And I said in this area -- now
5 you're talking about trees that are in, I think, the
6 study -- I don't recall -- I think this is Missouri.
7 There is Missouri and Indiana.  The oak trees that are
8 there typically, I said previously, can go up to about
9 80'.  So, here we're talking about 90' in the air being
10 the canopy height in this location.
11 Q.     And you're talking about foraging.  You're not
12 talking about migration height; correct?
13 A.     Yes.
14 Q.     This doesn't relate to migration height for
15 Indiana bats or other bats; correct?
16 A.     I don't believe that they were discussing
17 migration at all.
18 Q.     We will look at one last one.  You refer in your
19 second supplemental declaration to the Groover article?
20 A.     Um-hum.
21 Q.     Which, in fact, is a master's thesis; correct?
22 A.     Right.
23 Q.     If we could take a look at Page 22 of that
24 document and just take a look, first, at your second
25 supplemental declaration.  You make the statement in

Cross - Tyrell

1 Paragraph 6 of that declaration -- excuse me, it's

2 paragraph -- it's on Page 4.  It's a long paragraph on

3 Page 4 near the bottom.  You say, "Groover reported that

4 while mist-net studies indicated three species of *Myotis*

5 to be present in large numbers during field surveys.

6 There was no evidence of these species being at risk of

7 collision at a nearby wind farm."  Do you see that?  But

8 that's your statement about Groover.  If we look over at

9 that master's thesis --

10 A.     Yeah.  No.  Groover is talking about the foraging

11 behavior.  It's the Erickson, et al that talks about

12 correlating Groover's findings to mist-net studies.

13 Q.     You specifically say, "Groover reported that while

14 mist-net studies indicated three species of *Myotis* to be

15 present in large numbers during field surveys.  There was

16 no evidence of these species being at risk of collisions

17 at a nearby wind farm."  Isn't that the statement you

18 made?

19 A.     Well, Groover's paper talks about the height of

20 these -- of the foraging height.  Erickson used it to

21 correlate to a particular wind farm.

22 Q.     But, Groover actually does indicate that *Myotis*

23 species, including little brown bats, were killed by that

24 particular project; right?

25 A.     Go back to the other citation.

Cross - Tyrell

1  Q.      If we can go back to Groover and look at Page 22.

2  A.      And then ask me a question again.  I'm getting

3  lost going back and forth.

4  Q.      In fact, if you look down at the bottom of that

5  page:  Mortality to big brown solar head and little brown

6  bats and other unknown *Myotis* species also occurred but

7  to a lesser extent.  Do you see that?

8  A.      Yes.

9  Q.      So the statement in your second supplemental

10 declaration that there was no evidence of these species

11 being at risk of collision at a nearby wind farm is

12 contradicted by the study you cite; right?

13 A.      Okay.  If you would go back to my second

14 supplemental, please.

15 Q.      I think the statement is at Page 4.  You cite

16 Groover 2002 for the proposition that there was no

17 evidence of these species being at risk of collision at

18 a nearby wind farm.

19 A.      Oh, right.

20 Q.      That's simply not correct?

21 A.      Identified that there was some level of mortality.

22 Q.      So, that's another inaccurate citation to a study;

23 correct?

24 A.      That there was no evidence.  Yeah.  There was

25 evidence of limited mortality of that species.

Cross - Tyrell

1 Q.      Finally, in terms of the no mortality of an

2 Indiana bat.  In this case you've relied upon the lack of

3 a confirmed death of an Indiana bat as part of the basis

4 for your opinion that the Beech Ridge project poses

5 little risk; right?

6 A.      I think that you have to consider what the Fish

7 and Wildlife Service calls "weight of evidence."  And one

8 of the things to consider overall in this weight of

9 evidence analysis is so far we don't have any known

10 mortality of Indiana bats.

11 Q.      Okay.  But you were asked about the Mountaineer

12 report and said you didn't think that that report was a

13 reliable indication of an Indiana bat being killed;

14 right?

15 A.      Are you referring to the photograph?

16 Q.      The photograph.

17 A.      I think that's correct.

18 Q.      Okay.  So, if that suggests that people at

19 Mountaineer who were filling out mortality reports don't

20 know how to distinguish an Indiana bat, it doesn't make

21 any sense, does it, for you to rely upon the lack of

22 confirmed Indiana bat deaths as a basis for your opinion

23 in this case?

24 A.      No.  I don't think that follows there are no known

25 confirmed mortalities.  Most mortality studies are done

Cross - Tyrell

1  by individuals who are trained and capable and competent

2  in species identification.  The mere fact that the

3  individual filling out that data sheet said Indiana bat

4  or gray bat, remembering that this individual had the

5  opportunity to hold the bat in hand.  Those two species

6  are very readily identifiable by a trained person.  That

7  tells me that that individual was not trained.  My

8  understanding is that post-construction mortality studies

9  are done by people that are in fact trained to identify

10  species.  So, I see that as not comparable.

11  Q.    But at least in terms of that particular mortality

12  report, you would say that that would not be something

13  that anybody could rely upon with regard to the

14  Mountaineer project's impacts on Indiana bats or other

15  species; correct?

16  A.    I don't think that that particular photograph

17  indicates whether -- indicates that there was Indiana bat

18  mortality.

19  Q.    Okay.

20  A.    So, it's consistent with the statement that there

21  is no known Indiana bat mortality.

22       MR. GLITZENSTEIN:  Okay.  I have nothing further,

23  Your Honor.

24       THE COURT:  All right.  Counsel, I just have one

25  or two questions, then we'll take a brief recess for

1  redirect.  But I want to caution you-all that we're

2  running into another time problem, and I have a --

3  assuming I don't eat lunch, I have a meeting with a

4  probation officer for a sentencing at 12:30, and I have a

5  meeting I have to go to at 1:00, for at least a half

6  hour.  We may have to carry over to the afternoon to get

7  this done, so I want to move you right along.

8         I just have a couple of questions for this

9  witness.  I believe I heard you say during your direct

10 examination that the Fish and Wildlife Service had

11 instructed your company not to do acoustic surveys.  Did

12 I understand you correctly?

13        THE WITNESS:  During the development of the scope

14 of work, the question would have gone to the service.

15 You know, this is the scope of studies that we propose.

16 What is the scope of studies that you would like to see?

17        THE COURT:  What I want to know is, can you tell

18 me who told what person, either orally or in writing, do

19 not do acoustic surveying.  That's all I want to know.

20        THE WITNESS:  On Beech Ridge, I can only make an

21 assumption that would have been Mr. Romme.  I know that

22 on Pinnacle and another West Virginia wind farm, Christy

23 Johnson-Hughes specifically told me that she did not want

24 to see acoustic studies.

25        THE COURT:  But you can't tell me a specific

1 person who told somebody at your company to not do

2 acoustic surveys on this project; is that correct?

3          THE WITNESS:  Unless it's in the email record.

4          THE COURT:  What I've got in front of me are three

5 different exhibits in the form of letters from Fish and

6 Wildlife Service saying to do acoustic surveys and to do

7 three years.

8          THE WITNESS:  Right.

9          THE COURT:  Is that what was referred to as the

10 Boy Scouts?

11          THE WITNESS:  I don't know what the Boy Scouts --

12 that was not a statement that I made, so I can't speak to

13 that.  What I can speak to is I am aware of, because of

14 my conversations with Christy Johnson-Hughes at the Fish

15 and Wildlife Service office talking directly to me about

16 the Beech Ridge project and another project that I was

17 working on, and I am aware of ongoing additional

18 conversations outside of those letters that offered

19 substantial and different guidance from what is in those

20 letters.

21          THE COURT:  So you're saying you can disregard the

22 letters?

23          THE WITNESS:  No.  No, I'm not saying that.  I'm

24 saying that we got conflicting guidance from the Fish and

25 Wildlife Service on this project, as I understand it.

1 And more importantly, from my own ability to talk

2 specifically, you know, what I heard from Fish and

3 Wildlife Service as comparing the Beech Ridge project

4 with another project I was working on.

5          THE COURT:  But you were not directly involved

6 with this project, were you?

7          THE WITNESS:  That's correct.

8          THE COURT:  All right.  Now, you've indicated that

9 you're not aware of any circumstances under which the

10 evaluation of the presence or absence of bats would be

11 based upon AnaBat data alone; is that correct?

12         THE WITNESS:  Maybe in a scientific study, but not

13 for an impact assessment for development project, no.

14         THE COURT:  Right.  I don't think anybody that's

15 testified has said that AnaBat surveying alone would be

16 appropriate for doing an evaluation for the presence or

17 absence of endangered species.  My question is this.  I

18 think I've heard this from all of the experts of whatever

19 stripe in this case that AnaBat or other type of acoustic

20 measurement is used in connection with mist-netting; and,

21 if it identifies possible bats that might be an

22 endangered species that that would serve as the basis for

23 additional mist-netting.

24         THE WITNESS:  That is a very, very -- my

25 understanding is that is a very, very recent development

1  in, like, within the last months over this summer.  And

2  the details were -- Ms. Slack spoke to that the Kentucky

3  Department of -- it's the Kentucky state agency, they're

4  a state DNR agency that has come up with a protocol that

5  says what you just specifically said, but that's the only

6  instance in which I'm aware of that.

7       THE COURT:  But you are aware that the Fish and

8  Wildlife Service in this case specifically recommended

9  doing acoustic studies.

10      THE WITNESS:  In those letters after the other

11  studies were done, yes.

12      THE COURT:  And recommended three years of

13  studies; correct?

14      THE WITNESS:  Yes.

15      THE COURT:  Okay.  Now, you have indicated that

16  post-construction adaptive management techniques are the

17  way to go in addressing concerns that wind turbines are

18  going to kill Indiana bats; is that right?

19      THE WITNESS:  I think in this case that is a very

20  appropriate approach.

21      THE COURT:  Now, if you just assume that there is

22  one or more Indiana bats out there that may be at risk in

23  this project, and after the project opens and the

24  turbines start to turn somebody comes in and says, guess

25  what?  I've just found a dead Indiana bat.  Obviously,

1  something needs to be done.  What legal requirement is

2  there under the Public Service Commission of West

3  Virginia's order that anything happen, other than that

4  the wind turbine developer consult with a committee?

5         THE WITNESS:  I think there is two different

6  things you asked about the Public Service Commission.  I

7  believe that -- well, let's start with the Fish and

8  Wildlife Service.  There would be, in that case, a

9  violation of the Endangered Species Act, and they would

10 have available to them their -- I can't say that word.

11 They would have available to them the ability to respond

12 to the take of endangered species, so there would be a

13 violation of Section 9, and there are a series of legal

14 requirements --

15        THE COURT:  If there is a risk -- if there's a

16 real risk of harm to an endangered species, the law

17 provides for the process for an Incidental Take Permit,

18 especially where it's not your purpose to kill an

19 endangered species, but it might happen.  Isn't that the

20 mechanism that the law affords to deal with the

21 possibility of killing an endangered species?

22        THE WITNESS:  If there is a presumed take of

23 endangered species, that is a process that allows the

24 applicant or the project proponent to gain protection and

25 get authorized take.  So, again, they then have

1 protection against sanctions under Section 9.

2        THE COURT:  Well, that same process, in addition

3 to protecting the wind turbine developer, could also

4 protect the endangered species by having a number of

5 conditions imposed in connection with the Incidental Take

6 Permit that would addressed such questions as operational

7 techniques that could minimize the danger to bats, isn't

8 it?

9        THE WITNESS:  Well, yes.  In my experience, what

10 the Incidental Take Permit does and, in fact, the HCP

11 process does is provide protection to the applicant.  It

12 provides protection to Section 9 sanctions to the project

13 proponent.  In so doing, the Fish and Wildlife Service is

14 evaluating a series of management, of objectives,

15 guidelines, monitoring programs that would act to

16 conserve the species.  Those become requirements of the

17 Incidental Take Permit.

18        In the case of proceeding without the Section 9

19 protection under the ITP, you can still do the adaptive

20 management and the monitoring.  You can still do the

21 things that protect the species, but you would be doing

22 so without the protection yourself against Section 9

23 violations.

24        THE COURT:  You would also be doing it without the

25 protection of any legally enforceable conditions that

1  might be imposed pursuant to an Incidental Take Permit;

2  right?

3          THE WITNESS:  No.  I don't think so, because you

4  still could have a violation -- in fact, what you've done

5  is open yourself up to an infraction of Section 9.  So,

6  the violation -- because there is a monitoring in place

7  through the adaptive management program, you still could

8  have a violation.  And if that violation occurs without

9  any ITP protections, and without any of the protections

10 that are afforded through the HCP process, then you would

11 be opening yourself up to, as I understand it, civil and

12 criminal liabilities under the Endangered Species Act --

13         THE COURT:  Part of the Incidental Take Permit

14 process is to create obligatory conditions that will

15 avoid what might otherwise be inevitable in the form of

16 the taking of an endangered species; correct?

17         THE WITNESS:  Yes.  And that's a discretionary

18 process that an applicant can go through to get that

19 approval or that permit to take the species.

20         THE COURT:  But if the person gets that permit,

21 the person is going to have to comply as a matter of law

22 with the conditions imposed pursuant to that permit;

23 correct?

24         THE WITNESS:  They would.

25         THE COURT:  Okay.  All right.  Counsel, we'll take

1 a recess until 11:30, and then we will resume.

2            (Off the record at 11:14 a.m.)

3            (On the record at 11:34 a.m.)

4       THE COURT:  You may proceed.

5       Any other questions from the plaintiff, in light

6 of my questions?

7       MR. GLITZENSTEIN:  No, Your Honor.

8       THE COURT:  All right.  You may step down, ma'am.

9            (Witness excused at 11:35 a.m.)

10       MS. NATHANSON:  Your Honor, with that, the defense

11 rests.  Similar to what the plaintiffs did, we would ask

12 that all exhibits be admitted into evidence.

13       THE COURT:  There were some deposition excerpts

14 read to the witness today.  Are they in the exhibits or

15 not.

16       MR. GLITZENSTEIN:  I think all of the exceptions

17 that we designated are exhibits.

18       THE COURT:  This may have been simply impeachment,

19 and I don't know if it's going to be an exhibit back here

20 or not.

21       MR. GLITZENSTEIN:  I think we may have filed some

22 portions of that deposition when we filed our brief with

23 the Court.  But other than that, I don't think we have

24 filed any of those portions.

25       THE COURT:  All right.  Well, let's proceed to

1  hear the -- unless there's rebuttal witnesses.

2       MR. GLITZENSTEIN:  No.  Your Honor, we have no

3  rebuttal witnesses.  The only rebuttal point we were

4  going to make, and perhaps we could just stipulate to

5  this and move on.  The contract that was referred to by

6  Mr. Groberg for the energy production.  We weren't able

7  to get that initially, because there were concerns about

8  trade secrets and confidentiality.  There is a public

9  version of that available on a website.  And the only

10 reference we would make to it is, they have standards for

11 force majeure clause.  If the Court finds the project

12 can't go forward for some reason, that would relieve

13 compliance with the contract.  If there is -- if

14 everybody agrees that that is the case, then I don't

15 think we need to put that before the Court in any kind of

16 formal way.  But that's the only rebuttal point that we

17 were going to make.

18      THE COURT:  Is there any disagreement between the

19 parties on that.

20      MS. NATHANSON:  Well, Your Honor, I need to confer

21 with Invenergy on that point.  I think the -- there is --

22      THE COURT:  Why don't we let you do that?

23      MS. NATHANSON:  There is a time limit to the force

24 majeure clause.

25      THE COURT:  Let's let you discuss that with your

1 client and review it.  But I think I can proceed with

2 closing, and then we're going to take a break after the

3 plaintiff's closing.  I have to.  So, why don't we do

4 this?  We will take the plaintiff's closing argument now.

5 I'd like to -- and I'll let the plaintiff reserve some

6 time for rebuttal, but I have to meet with a probation

7 officer at -- I've moved it up to a quarter of one.  And,

8 again, then I've got to go to a meeting at 1:00, and I

9 have got no time in there to eat anything.  So, it's

10 going be a wonderful day.

11       What I will anticipate is having the defense

12 closing at 2:00.  All right?  And then we can resolve the

13 question about the force majeure question before that.

14       MS. NATHANSON:  Sure.

15       THE COURT:  Possibly before we break, but I leave

16 that up to you.

17       MR. GLITZENSTEIN:  Thank you, Your Honor.  And we

18 apologize for putting you in the position of having to

19 miss lunch; and we do appreciate the time the Court has

20 given to us and the attention the Court has given to this

21 case.  Obviously, it's been on a fast track for all of

22 us.  And I also wanted to just, at the outset, express my

23 appreciation not only for the folks I have been working

24 with but, under trying circumstances, I think all of the

25 counsel in this case have done their best to work out

1   issues amongst ourselves, as indicated by the fact that

2   even though the discovery process was difficult and

3   chaotic at times, we avoided coming to the Court with any

4   concerns.  And so --

5          THE COURT:  No.  I'll commend both sides for doing

6   a very professional job in relation to what, obviously,

7   is a difficult case.  You all have done a very good job.

8          MR. GLITZENSTEIN:  We appreciate that, Your Honor.

9   And I, in particular, wanted to express my appreciation

10  to defense counsel for the efforts to work through those

11  issues.

12          Your Honor, as you know, this case is not about

13  whether wind power is a good or bad thing.  It's not

14  about whether wind power is the right answer to the

15  global climate change.  It's not about whether global

16  climate change is a serious problem.  Rather, the issue

17  in this case is a much more narrow and very discrete one,

18  and that is whether the plaintiffs can meet their burden

19  of proof that there is likely to be a violation of

20  Section 9 of the Endangered Species Act if this project

21  goes forward under the circumstances that are currently

22  before the Court.

23          And we would submit that if any kind of reasonable

24  approach to the evidentiary burden is applied here -- and

25  we certainly can get into more description about what is

1 the burden; we can get into the case law.  We think the

2 evidentiary standard should be applied here as is applied

3 in any other civil case.

4          THE COURT:  We all know this is a serious case,

5 and the plaintiff's burden is to prove their case by a

6 fair preponderance of the evidence.  I think the debate

7 between the sides is, assuming arguendo, how do we

8 proceed?  Do you have to have proof that it's a mere

9 certainty or a strong likelihood that there have been

10 some standards in terms of reasonable certainty,

11 substantial risk of harm?

12          So, tell me from the plaintiff's perspective what

13 you believe is the appropriate standard that you need to

14 meet by a preponderance of the evidence.

15          MR. GLITZENSTEIN:  We think the appropriate

16 standard is likelihood, Your Honor.  We get to that point

17 through a couple of different vehicles.  What I mean by

18 "likelihood" is, likelihood that the project will kill,

19 injure, harass, or otherwise take an Indiana bat.

20          THE COURT:  A little likelihood?  A lot of

21 likelihood?

22          MR. GLITZENSTEIN:  I think more likely than not,

23 Your Honor, is the classic standard which is the standard

24 that applies in medical malpractice, in automobile

25 accident, in federal tort claims acts.  And in fact, one

1  of the ways we get to the point, Your Honor, is when the

2  defendants, in their opening brief, referred to the

3  reasonable certainty standard that is suggested in some

4  of the case law, both in the endangered species contact

5  and elsewhere, we referred -- and I don't think there is

6  any dispute about that -- in the Fourth Circuit, a

7  reasonable certainty standard is that it is more likely

8  than not.  And we cited cases in our brief that the

9  Fourth Circuit has said that that is the standard

10 approach that's applied in civil cases across an array of

11 contexts.

12      THE COURT:  I assume what you're saying is that

13 the likelihood of harm is what I have to conclude has

14 been demonstrated by a fair preponderance of the evidence

15 which, in turn, means more likely than not that you've

16 established that.  You got the 51 percent test in a civil

17 case.

18      MR. GLITZENSTEIN:  That's right, Your Honor.  I

19 think it's the 51 percent test, and I think that's

20 consistent with the Fourth Circuit's approach to the

21 burden of proof, and it's consistent with the case law

22 that we have referred to in the briefs.  And just to

23 bring up some references to the cases -- and these are

24 all cited in the briefs, Your Honor.  But just to make

25 some references to some specific Endangered Species Act

1  cases.

2       While we're waiting for that.  Your Honor, again

3  these are all cases that have been cited.  Forest

4  Conservation Counsel versus Rosborough at the top.  We

5  scroll down, we have the Loggerhead Turtle County Council

6  of Lucia County, 96 F. Supp 1170, which refers to a

7  reasonably likely to cause a future taking, a protected

8  turtles test.

9       We scroll down further on this document.  National

10 Wildlife Federation versus Burlington Northern Railroad,

11 a Ninth Circuit case, refers again to "must prove that

12 there is a reasonable likelihood of future violations."

13      American Protection Institute versus Holstein, 551

14 F Supp 2d, 1073 at 1081, 2008 District of Minnesota case.

15 The court finds it likely that at additional takings may

16 occur unless further regulations are implemented.  That

17 case involved the Canada Lynx.

18      Defenders of Wildlife versus Martin, anther very

19 recent case, 2007.  Evidence supports the conclusion that

20 this type of harm and harassment is very likely to occur

21 again in the future with regard to the caribou.

22      And then Defenders of Wildlife versus Martin, 454

23 F. Supp 2d 1085, another Western District of Washington

24 case referring to the threat of future harm.

25      And so I think these cases all basically look at,

1 does the evidence show more likely than not will there be

2 harm to this species.

3         THE COURT:  By the way.  Could I ask both counsel,

4 if you're going to be using things like this, or

5 referring to cases, to give me a copy of what you've been

6 showing.

7         MR. GLITZENSTEIN:  We would be happy to, Your

8 Honor.

9         THE COURT:  Both sides.

10        MR. GLITZENSTEIN:  We will give you a full set.  I

11 think there are some other cases on this.  We would be

12 happy to make it available to you, as well as defendants.

13        So, we think that that standard is the one that is

14 applicable, both in the case law generally.  It's

15 applicable in the Fourth Circuit, and I would

16 respectfully submit that until and unless the Fourth

17 Circuit instructs the Court not to apply the ordinary

18 preponderance of the evidence test, that is the

19 appropriate test to apply.

20        And in that connection, I would also return  to

21 what I mentioned at the outset of our trial, and that is

22 the very Clean Water Act cases the defendants themselves

23 referred to and, I respectfully submit, mis-cited for the

24 proposition that future injury cannot be sufficient.  And

25 if you look at those cases, the Supreme Court case,

1  Gwaltney, as well as the Fourth Circuit case that they

2  cite; those cases themselves refer to the same standard,

3  even in a Clean Water Act context.  And that specifically

4  says that "if there is a likelihood of future violations

5  of the act."

6          So, I think every conceivable source that you

7  could refer to, that is the standard that I think makes

8  sense to apply.  And one point I would emphasize in that

9  regard, Your Honor.  The notion that we have to actually

10 bring a dead bat to the Court or meet some kind of

11 hundred percent certainty test, I think, are problematic

12 are a number of levels.

13         I think Your Honor pointed out the pretextual

14 problem, including the fact that Section 9 refers to

15 attempting to take, not simply taking.  So, it clearly

16 suggests that you should have a precautionary, preemptive

17 approach.  But secondly, and perhaps as importantly, the

18 overall purpose of this statute is to be protective of

19 listed species.

20         TVA versus Hill established that principle in a

21 seminal ruling.  It's been followed by other Supreme

22 Court cases.  And the overarching purpose of this statute

23 is to prevent harm to species before it occurs.  So,

24 therefore, saying we need to wait for the dead bat to

25 show up is essentially what I think defendant's position

1 is.  And I think your questioning of Dr. Tyrell was very

2 illuminating in that regard.  Their position essentially

3 is, well, let's wait to see if we kill some bats, and

4 then maybe we have to do some things.  Now, we have some

5 serious concerns with the adaptive management monitoring

6 that they're talking about, which I'll get to in a

7 moment.  But we think that entire approach to the statute

8 is simply impossible to reconcile with the scheme.  And I

9 think the second reason for that is this is exactly why

10 Congress created this Incidental Take Permit process.

11        And we cite a regulation to Your Honor, what I

12 referred to it in my opening statement, a regulation

13 which specifically says point-blank that you cannot

14 undertake any activity that requires a permit without

15 getting the appropriate permit from the Fish & Wildlife

16 Service.  And so if we're going to go into an activity

17 that is likely to kill, injure, or harm members of an

18 endangered species statute, the regulation, and the

19 overall protective purpose of the law are just absolutely

20 clear that, Your Honor, you not only can but, we

21 respectfully submit, you should intervene under those

22 circumstances.

23        If I could just make one other point about their

24 legal framework argument before I turn to the evidence.

25 Your Honor, they have many references in their brief to

1 some of the cases, and the Sweet Home case in particular

2 from the Supreme Court, refers to the actual death or

3 injury. And I respectfully suggest that that approach

4 that they're talking about is not what Sweet home was

5 about.  What Sweet home was about was a regulation -- one

6 of the regulations which defines the word "harm" in this

7 statute.  It defines it to constitute habitat

8 modification under certain circumstances.  And the point

9 of the actual harm or injury was not to talk about what

10 standard had to be satisfied to prove any take in a civil

11 case, it was simply to say you can't just go in and prove

12 your case by simply showing it that there would be some

13 kind of adverse habitat.

14        THE COURT:  It was a facial validity attack,

15 wasn't it?

16        MR. GLITZENSTEIN:  That's correct, Your Honor.

17 And in fact, it was rejected by the Supreme Court.  It's

18 ironic that that case would be cited by defendants,

19 considering the fact the Supreme Court, in rather

20 wringing terms, rejected the facial challenge and went

21 out of its way to stress that the taking prohibition is

22 extremely broad in the Endangered Species Act.

23        And I mentioned at the outset, they even refer to

24 an example of bird watchers coming too close to a bird's

25 nest and chasing the birds off and disrupting their

1 normal behavior, and suggested from the House or Senate

2 report that that would be a take.  Well, if that's a

3 take, that could be addressed by this statute, Your

4 Honor.  The notion that a massive industrial wind

5 turbine, which they themselves predicted to result in

6 hundreds of thousands of mortalities; and Dr. Kunz, who

7 is one of the world's leading experts, says said that it

8 could with be twice as high as that and many predictions

9 of Indiana bat mortalities.  The notion that this

10 statutory scheme cannot apply to these circumstances, we

11 respectfully submit, doesn't make any sense.

12        The other thing I would say about Sweet home, Your

13 Honor, is that all parties appear to agree that Justice

14 O'Connor's concurring opinion in this case, which

15 basically broke the tie, was one that should be looked to

16 for a controlling principle.  If you read that opinion,

17 what it actually stands for is the proposition that

18 traditional tort principles should apply in the ESA

19 citizen's suit context, unless there is some reason to

20 think that it shouldn't apply.

21        Justice O'Connor referred to proximate causation,

22 but I think the overarching point that one would draw

23 from that is, once again, since Congress did not say use

24 some absurdly high standard before you could bring these

25 cases, then the normal preponderance of the evidence, a

1 better than 50 percent standard, would apply.  Now, we

2 respectfully submit that we've actually not only met but

3 easily exceeded that standard in this particular case.

4 And let me stress the point that I said at the outset.

5 We believed we had a strong case, and continue to believe

6 we would have a strong case, even if the Court decides to

7 completely ignore the AnaBat data that was hidden from

8 view for four years.  Now, of course, we don't believe

9 you should do that.  We think it's highly probative on a

10 number of different levels.

11          But even without that AnaBat  data, we had three

12 of the leading bat experts in the country, all tenured

13 professors at major universities, all with dozens of

14 years of experience on various bat issues directly

15 related to this issue before the Court testifying before

16 the Court as to their firm conviction that not only are

17 Indiana bats likely to use this project site in a variety

18 of ways and during a variety of seasons, but that there

19 was a very high likelihood of being killed, injured, or

20 otherwise taken, along with all the other species that

21 are likely to be passing through and otherwise using this

22 site and have hibernacula in close proximity to the site.

23          Dr. Kunz.  I really have to say, Your Honor, I

24 think we were privileged to have Dr. Kunz's testimony

25 here.  He is, by all accounts, the leading, and certainly

1 one of the leading bat ecologists in the country and has

2 been for decades.  His resume is absolutely extraordinary

3 in terms of his overall knowledge base.  No suggestion

4 that he's got a bias.  No suggestion he's got a conflict.

5 No suggestion that his testimony should not be credited

6 based upon the ability of someone like him to come in and

7 offer testimony.  It's like Jane Goodall coming in and

8 giving testimony about impacts on chimpanzees, I would

9 respectfully submit.

10      When Dr. Kunz comes in giving his wealth of

11 experience serving on the National Academy of Sciences

12 panels, a member of the regional recovery team for the

13 Indiana bat, and also, by all accounts, one of the

14 leading, if not the leading, researcher thus far

15 specifically on wind power and impacts on Indiana bats.

16 We believe that is something that the Court obviously can

17 give great credit to.

18      On Page 48 of his testimony, on day two, he

19 specifically said that he believes that there was a high

20 likelihood that Indiana bats will be killed or injured.

21 He specifically said, in response to my questions, is

22 there a reasonable scientific certainty?  He said yes, he

23 believes that there is.

24      Page 75, Lines 15 through 18.  He said, I'm

25 confident we'll find dead bats, and specifically dead

1 Indiana bats.  Now, this is not someone who is given to
2 flights of fancy.  This is someone with an extraordinary
3 wealth of experience making these predictions, based upon
4 proximity of hibernacula, the experience at Mountaineer,
5 the undisputed fact that *Myotis* species have been killed
6 in large numbers at other projects; perhaps not in as
7 large numbers as some other bat species, but so what?
8 This is not a comparison that we're engaged in here.
9 It's a question about whether or not there is some reason
10 to think that Indiana bats in particular will somehow be
11 immune from the extremely high mortality that everyone
12 acknowledges, including BHE itself will occur.

13        And several different places -- on Page 45 of the
14 transcript, from the second day.  Page 48.  Page 52 I
15 asked the question several different ways, but it was
16 basically the same question:  Is there any biological
17 morphological, ecological, or any other reason you can
18 conceive of why Indiana bats will somehow manage to avoid
19 this overall carnage, particularly during the migration
20 season when everyone agrees we have the highest mortality
21 risk?  And Dr. Kunz, whose experience is unparalleled in
22 this proceeding, and probably unparalleled in the country
23 said he could think of no such reason.  We think that
24 that's enough basis to rule for the plaintiff, in and of
25 itself.

1          THE COURT:  Let me ask you a question.  There is,

2  it seems to me, a distinction between whatever criticisms

3  one might level at the defendant in its carrying out of

4  its surveying with or without following the directions

5  from Fish & Wildlife and providing that information to

6  them and to the West Virginia Public Service Commission.

7  But we're not here to retry the West Virginia Public

8  Service Commission case, and we're not here in an appeal

9  of an incidental taking permit case.  We're here with you

10 having the burden to establish if we can ultimately agree

11 upon what the standard is, but whether you've established

12 that.  And so in large part, you're having to rely upon

13 the surveying done by the defendant, however inadequate

14 it may or may not have been, to prove your case as

15 supplemented by the analysis of a the acoustic data; is

16 that right?

17          MR. GLITZENSTEIN:  I think that's right, Your

18 Honor.  But let me give you the following caveat to that,

19 because I think defendant's overall proposition that

20 simply inadequate surveys are not sufficient to prove a

21 case is correct but irrelevant here.  But what I mean by

22 that is, if our case was brought on the proposition that

23 there are Indiana bats in Baltimore, and defendants went

24 out and did a completely inadequate Indiana bat mist-net

25 survey in Baltimore, and we went into the court and said,

1 okay, they did a bad Indiana mist-net survey down in

2 downtown Baltimore, therefore, we should win.  That would

3 obviously not be a reasonable proposition and would make

4 no sense.

5        I think what defendants have done is missed the

6 point of our reliance upon their inadequate surveys, and

7 I think that point is highlighted if we go to Exhibit 125

8 which we referred to -- we've referred to several times,

9 which is their -- BHE's own initial risk assessment.  And

10 if we look at that Exhibit 125, down near the bottom of

11 Page 22 up to the -- carrying over.  You've seen us

12 highlight this language several times, and I'll just

13 characterize it for now.

14        I think the record bears this out.  Before any

15 surveying was done, BHE itself believed that there was

16 likely to be Indiana bat presence on this site during the

17 summer.  It specifically says, "with Indiana bat

18 hibernacula in Greenbrier County and in other nearby

19 counties.  It is likely male Indiana bats are present in

20 the county during summer but are as yet undetected."

21        And then it goes on to say, "considering known

22 proximate locations of summer and winter occurrences of

23 Indiana bats, it is reasonable to presume individuals of

24 the species move through Greenbrier County in spring and

25 fall."  And on the next page they talk about the higher

1 likelihood of being killed in migration.

2       Your Honor, the point we're trying to make is,

3 when defendant's own environmental consultant's initial

4 review of this project had suggested exactly what our

5 experts are saying, which is that there's a high

6 likelihood of the species being present, and there's a

7 high likelihood of them moving through the area during

8 fall migration and, therefore, a likelihood of death and

9 injury along with other species, this is why the

10 inadequacy of their surveys becomes relevant.

11       It's not dispositive by any means.   We're

12 certainly not relying upon it to carry our entire burden,

13 but here is why it becomes relevant.  I think the way to

14 look at it is a simple logic problem, Your Honor.  And I

15 kind of wrote this out to make sure I was getting this

16 right.  And in this case, we can use BHE.  If BHE

17 believes X is true but we all conduct studies that do not

18 disprove and in fact have nothing to do with whether X is

19 true, and then we conclude that the opposite is true,

20 after having done the studies which don't disprove X,

21 then there's a simple matter of -- as a simple matter of

22 logic, the Court can say that does not in fact assist

23 defendant's case, and it essentially leaves us where the

24 defendant's own expert -- own company started in the

25 first place.

1        And with regard to fall migration.  I think that

2  point is particularly acute, Your Honor.  In this case,

3  from the very beginning, the Fish & Wildlife service said

4  we've got grave concerns about fall migration, not only

5  in the three letters that you've seen repeatedly and

6  defendants have tried to -- I'm not quite sure what their

7  position on them is now.  They should be considered.

8  They should be considered a little bit.  You know,

9  considered with an asterisk.  I'm not sure what the

10 position is but not only in those three letters but also,

11 Your Honor, in the conference call that we referred to

12 that somehow keeps getting lost in the shuffle with the

13 field office.

14        And this is Plaintiff's Exhibit 101.  And Your

15 Honor may recall I asked Mr. Groberg about whether this

16 was an accurate summary.  And again, without belaboring

17 everything in here, on the second page there's a specific

18 reference to the increased risk of high bat -- Indiana

19 bat mortality when compared to other projects, and

20 particularly talking about the need for surveys designed

21 to address the fall migration risk.  And other

22 communications with the field office confirmed the same

23 thing.

24        Plaintiff's Exhibit 92, a document that they tout

25 for proving the summer surveys specifically said, in

1 point three of that document, "It does not address
2 presence of bats in the area during other times of the
3 year, and specifically during the fall."  So Your Honor,
4 in answer to your question, in a situation where even the
5 federal government, the state government, BHE itself at
6 the outset of this case said that there is a high risk of
7 mortality resulting from fall migration; our experts say
8 it's true.
9        Incredibly, Dr. Lacki, when I asked him whether
10 this landscape analysis addressed fall migration, he said
11 no, he didn't look at that in his testimony.  So the only
12 testimony you have in this case, and the only documents
13 you have is that fall migration is a grave risk and that
14 there is a likelihood of injury and death to *Myotis*
15 species, and including Indiana bats.
16        In that circumstance, the fact that defendants not
17 only failed to do a fall migration survey but refused
18 repeatedly to do it when the service was asking it to do
19 so -- and not only these official letters, which we would
20 submit would be the most compelling evidence in the
21 Service's position in any case.  But as those documents I
22 referred to, including other discussions with the field
23 office simply refutes, for reasons I have yet to
24 understand or hear about simply did not do a fall survey
25 that would address the gravest risk, I think Your Honor

1 absolutely can rely upon that as one piece of evidence

2 that is relevant to plaintiff's ability to satisfy our

3 burden of proof.

4        And Your Honor, to continue that point with regard

5 to the summer mist-net surveys -- and this does relate a

6 little bit, I think, to the AnaBat analysis.  When BHE

7 itself predicted that there could well be summer presence

8 at this site, a prediction shared by others who are

9 looking at the same issue, and sure enough the AnaBat

10 information comes along and seems to confirm exactly what

11 BHE itself predicted, the fact that you've got mist-net

12 surveys who -- which I think the testimony on this is

13 compelling, in my view, that most of them did not have

14 the kind of canopies you need to catch a large number of

15 bats.  Moonlight conditions, which the mist-net

16 guidelines themselves say you should not be putting out

17 mist-nets during.  Two years -- they're only good in any

18 event.  We had their own witness testify that this

19 mist-net survey wouldn't be acceptable in the state of

20 Kentucky to go forward with the project; and also

21 admitted point-plank that the current data shows that

22 AnaBat data is more reliable than mist-netting, even when

23 it's done right.  And this wasn't done right at

24 identifying Indiana bats.

25        Under all of those circumstances, especially in

1 light of the fact that we have the AnaBat information,

2 the inadequate surveys that they're relying upon to

3 essentially prove the absence of Indiana bats we believe,

4 again, is a relevant consideration that the court can

5 take into account.  And along those lines, Your Honor,

6 we've cited in our papers, the Marlboro decision from the

7 district court, Northern District of California, affirmed

8 by the Ninth Circuit, and also D. C. Circuit case, the

9 National Association of Home Builders case.  And those

10 cases stand for the proposition that inadequate surveys,

11 and surveys which appear designed to avoid the species

12 rather than to find it, can be one element of evidence

13 that the Court can rely on in making a Section 9

14 determination.  But again, it's certainly not the

15 definitive basis for plaintiff's case.  And any effort by

16 defendants to suggest that it is, we respectfully submit,

17 should not be given much weight.

18        Now, on the AnaBat information Your Honor.  As I

19 said at the outset of this case, it was fortuitous we

20 stumbled upon it.  Mr. Romme said in a sworn declaration

21 to the Court that there was no acoustic surveys

22 completed.  Now, whether that was intentionally

23 misleading or simply of a matter of him forgetting about

24 it, the reality is that we could easily have relied upon

25 that representation because that information was in fact

1 collected; it was collected at the very time that the
2 Fish & Wildlife Service was repeatedly asking for
3 acoustic information, and it sat in the company's files
4 for four years unanalyzed.  No questions asked to Mr.
5 Libby about how he collected the data.  This is ultimate
6 Monday morning quarterbacking to come in now, X number of
7 years later, and say, well, we're not sure how Mr.
8 Libby set it up.  Well, there was an easy way to find
9 out:  Go and ask him. There was no dispute that that was
10 never done.  There was no dispute that the data was never
11 provided to Fish & Wildlife Service.
12        And in, fact Mr. Groberg, who said well, maybe
13 this is information the Service would be interested in,
14 which would seem to be a major understatement as of his
15 testimony and, presumably, as of today, hasn't provided
16 the information to the Fish & Wildlife Service.  I think
17 that's relevant on two levels.  One, I respectfully
18 submit it casts significant doubt on all of their
19 testimony relating to this data, particularly from two
20 individuals who work for the company that did not share
21 it with anyone.  And even though Mr. Romme may claim that
22 he forgot about the data when he submitted his first
23 declaration in this case Your Honor, he testified before
24 the Public Service Commission a few short months after
25 that data was collected, and a few short months after he

1  wrote the following note on the mist-net survey sheets.

2  If we could look at plaintiff's Exhibit 122.  And you

3  reef seen this before.

4       THE COURT:  This is the draft survey?

5       MR. GLITZENSTEIN:  This is 122.  And look at the

6  page that has the -- his handwritten notes on it.  This

7  is a mark-up of the draft mist-net survey, so this is not

8  just some incidental document.  This was actually the

9  draft.  And it was interesting testimony, Your Honor,

10 because defense counsel, obviously realizing that this is

11 devastating, had Mr. Romme refer to it in his direct

12 examination but actually didn't have Mr. Romme read what

13 it says.

14      When you read what it says, this notion that this

15 was all just basically, you know, happenstance that they

16 didn't look at this information, I think, is impossible

17 to accept.  It says at the bottom -- and Mr. Romme

18 testified that it was his handwriting.  Let me just say

19 as an aside, Your Honor.  Before this testimony, because

20 of the way that, you know, our difficulty with discovery

21 and such, understandably, we didn't know this was Mr.

22 Romme's handwriting.  We didn't find out about some of

23 these documents, or have a chance to review them until

24 after his deposition.

25      So when he says at the bottom, "BH needs to

1 possess the AnaBat files recorded at the site.  Can you

2 imagine a call from Echotech a year from now saying we

3 just got around to analyzing the AnaBat calls, and we

4 think we recorded a sodalis, which is an Indiana bat?"

5          THE COURT:  Right.

6          MR. GLITZENSTEIN:  I mean, what could be more

7 telling that the reason why the data was sat upon was

8 because they knew that it might reflect the very species

9 that this case is about?  And not only that Your Honor,

10 but Mr. Romme testified before the Public Service

11 Commission just a few short months after this note was

12 prepared.  And so even if you believe that he submitted

13 his declaration forgetting this data existed, the notion

14 that he didn't know about it when he testified before the

15 Public Service Commission, when he sat in meetings with

16 the Fish & Wildlife Service who was asking for acoustic

17 data, and his communications with the people he's talked

18 about from the Service, it just doesn't make any sense

19 and does not bare scrutiny.

20          And to have the other -- he's one of their

21 experts.  To have the other -- one of the other two

22 experts, Dr. Tyrell, say this was handled in a perfectly

23 appropriate fashion, I submit, casts formidable doubt on

24 her testimony as well.

25          I think an important point for the purpose of our

1 burden of proof is, clearly, as Mr. Romme acknowledged,
2 he knew that this information could bear out exactly what
3 BHE had predicted from the outside, which is that in fact
4 this might be a site occupied by Indiana bats.  And in
5 fact, when he was asked in cross-examination what this
6 note meant, his answer was -- and I'm paraphrasing unless
7 we can get that right up on the screen, and perhaps we
8 can't.  You know, his answer was he was protecting his
9 client.  He says, "The issue here is I was concerned.
10 One of my obligations as a consultant is I never want to
11 surprise my client, and I tell the same thing to the
12 regulators.  If you get something from me that surprises
13 you, there is a problem.  And vice versa, I ask them not
14 to surprise me.  So when the data came in, recall that
15 there was no technique to analyze that was accepted by
16 the regulatory agencies.  That had been a topic of
17 discussion in the bat community for years, and the
18 anticipation was that at some time maybe that could be
19 done."
20          Your Honor, it seems to be a direct admission
21 that he at no time wanted the Fish & Wildlife service to
22 know about it be because of what it might show.  He
23 didn't want the state to know about it because of what it
24 might show.  And in fact, at least one of Gary Libby's
25 revised sheets, where he not only talked about -- we just

1 went through this with Dr. Tyrell.  He not only talked

2 about the fact that the mist-net site was an awful one

3 for catching Indiana bats.  And if you look at those

4 photos, it's obvious why.

5        And Dr. Gannon explained that bats are smart, and

6 particularly Indiana bats.  They can sense that there is

7 a mist-net, and they fly over it.  He's seen it happen.

8 That's exactly what would happen with many, many bats at

9 this site.  But Mr. Romme clearly understood that in fact

10 that data would be very interesting, at a minimum, to

11 people, and might, at the very least, result in more

12 mist-net surveying.  I think Your Honor's questions to

13 several of the witnesses is right on target in that

14 regard.

15       And yet it was never analyzed.  And now we are

16 here four years later, we found it in discovery.  And

17 sure enough, the only two witnesses in this case who have

18 analyzed the data themselves, the only two -- and the

19 only two people who are testifying in this case who are

20 recognized experts on acoustic data analysis and whose

21 expertise has not been challenged and cannot be

22 challenged by defendants, have both testified that using

23 distinct, although related techniques, they both came up

24 with plus 90 percent -- 90 percent and more probability

25 of Indiana bats being detected on those -- on that AnaBat

1  information.

2       And I think this is very interesting, Your Honor.

3  Because if we had one expert whose expertise on acoustic

4  analysis was unchallenged, I think we'd be in pretty good

5  shape.  We've got two.  And Dr. Robbins, who they

6  themselves concede is an expert on acoustic (sic), and

7  has published the leading literature on acoustic

8  analysis, he consulted with Dr. Britzke, who their own

9  witness, Ms. Slack, says is also a leading expert.  So

10 you've got three people whose expertise is not subject to

11 serious challenge in terms of their ability to analyze

12 this data all independently.

13       They didn't talk with each other.  They didn't

14 compare notes.  They didn't say let's run through this

15 analysis jointly.  We intentionally avoided having them

16 do that because we wanted their expertise on this issue

17 to be something the Court could understand and

18 independently assess.  All of them said yes, this is

19 consistent with the Indiana bats being on the site, and

20 we've screened out the calls that we don't believe can be

21 reliably evaluated.

22       I would respectfully submit that whatever

23 technology anyone could be looking at, whatever it might

24 be.  And we don't pretend that this is technology that is

25 in use for a hundred years; we don't think it has to be.

1 The question is whether or not their technique and

2 analysis is sufficiently reliable.  And I think the

3 testimony that they give to Your Honor, some of which was

4 in response to Your Honor's own questions, leaves

5 virtually no doubt that there is data which is at least

6 suggestive of highly probable presence of Indiana bats on

7 this site at the very time those mist-net surveys were

8 being done, and in the turbine locations themselves.

9        Now, in contrast to that what do you have?  I

10 would respectfully submit that what you just heard from

11 Dr. Tyrell on the acoustic analysis is an act of

12 desperation.  This is a witness who had three

13 opportunities to set forth her views in sworn

14 declarations, one of which she submitted after she was

15 deposed, Your Honor, and none of those declarations, nor

16 in her deposition, did she ever purport to have any

17 expertise on acoustic or AnaBat issues, nor did she offer

18 any opinion whatsoever on that topic.

19        And I would also respectfully submit that somebody

20 from the same company, who didn't share that information

21 with the Fish & Wildlife Service, is not entitled to a

22 great deal of weight in the Court's calculation.

23        THE COURT:  Could you clarify one thing for me?

24 There was the reference to Britzke analyzing some data.

25 Was the data that he was analyzing the data from the

1 AnaBat detection done by the subcontractor at the Beech

2 Ridge site?

3        MR. GLITZENSTEIN:  It was, Your Honor.  It

4 absolutely was.  And I think this is clear from Dr.

5 Robbins' declaration.

6        THE COURT:  Okay.

7        MR. GLITZENSTEIN:  I think it's also clear from

8 his testimony, but it's also clear from his declaration.

9 And what Dr. Robbins did is he explained, he took one of

10 his days in which there was a general reference to *Myotis*

11 species.  And without telling Dr. Britzke where it was

12 from, so he would not prejudice Dr. Britzke's analysis of

13 it, he sent it to Dr. Britzke, and Dr. Britzke came back

14 and said yes, there are calls here that are "consistent

15 with," which is the scientific terminology for highly

16 probable presence of Indiana bats.

17        And so that -- all of the data that was analyzed

18 -- and I don't think there is any serious dispute in this

19 case -- came from the site, was collected by Mr. Libby.

20 And so just to complete the point on the contrast of the

21 experts on this issue.  Certainly, I don't think you can

22 credit Mr. Romme on this point.  Dr. Tyrell has never

23 purported to be an expert on acoustic analysis and, until

24 this morning, didn't proffer a single opinion on that

25 topic throughout the last several months, having had four

1 opportunities to do so.

2       And Dr. Lacki, point-blank, said that he's not an

3 acoustic expert.   Dr. Robbins is an acoustic expert.   And

4 that -- Dr. Lacki is so much unaware of the technology

5 that, number one, he went to Dr. Britzke himself to get

6 Dr. Britzke's input on a project that Dr. Lacki's working

7 on; the very same person who came in here and said there

8 are calls consistent with Indiana bat presence.   And I

9 think the second, you know, critical point about Dr.

10 Lacki's analysis is that he has conceded he's not even

11 aware of Kentucky's own mist-netting and acoustic

12 collection requirements.

13       And this is the document -- I don't have the

14 citation right now, but this is a document admitted into

15 evidence that specifically says, Your Honor, according to

16 Ms. Slack, their own witness, that the studies being

17 done, including by Dr. Robbins, who's quoted in that

18 document.   The studies being done, once again, show not

19 only that acoustic analysis is more reliable at

20 identifying Indiana bats in places we know they exist,

21 where they're absolutely there, it actually has a higher

22 degree of probability of finding them than mist-net

23 surveys.   So it's actually better scientific evidence, we

24 respectfully submit.

25       But not only that, Your Honor, but the form of

1 discriminate function analysis and qualitative analysis
2 that Dr. Robbins did and explained in detail, in fact, is
3 the most rigorous way of evaluating AnaBat data.  And the
4 portions of Ms. Slack's deposition that we got into a
5 little bit with her questioning, but it's also an
6 independent exhibit that we submitted to the Court; you
7 could read that, Your Honor.  She flatly acknowledges in
8 her deposition that that qualitative and quantitative
9 analysis, that is the same thing that was done by Dr.
10 Robbins here, is the best way to analyze that AnaBat
11 information.

12        And so I respectfully submit, at the end of the
13 day, there is not much sitting here for Your Honor to
14 rely upon to reject the testimony of these experts.  I
15 mean, I've rarely seen a case where one attempts to
16 reject the testimony of acknowledged experts with nobody
17 on the other side who is even admitted to be or anybody
18 recognizes as an expert on that particular topic.  So, we
19 think the AnaBat information simply reenforces what BHE
20 itself predicted, which is that this is a site that would
21 be used by Indiana bats.

22        THE COURT:  Let's just assume for the moment that
23 I agree with you.  What am I supposed to do?  You've
24 indicated that perhaps I should order them to get an
25 Incidental Taking Permit, but the case law does not seem

1  to support that.

2        MR. GLITZENSTEIN:  Your Honor, I think there is

3  some case law which judges have done that, and I can

4  refer that to Your Honor.  There is certainly no doubt

5  that Your Honor can enjoin this project from going

6  forward unless and until they get an Incidental Take

7  Permit.  The citizen's supervision of the Endangered

8  Species Act, which the Supreme Court, in Bennett,

9  referred to as a provision of remarkable scope and

10 breadth specifically provides for injunctive relief,

11 enjoining violations.

12        And so there is absolutely no doubt Your Honor can

13 issue an injunction saying the project cannot proceed

14 until and unless they apply for and obtain an appropriate

15 Incidental Take Permit from the Fish & Wildlife Service.

16 So, you can certainly do that.

17        THE COURT:  When you say -- are you suggesting

18 that I should tell them to stop construction?

19        MR. GLITZENSTEIN:  Your Honor, we believe that

20 would be the most appropriate remedy in this case, and I

21 say that for a couple of reasons.  One, this is a

22 situation where the Fish & Wildlife Service is, if it's

23 going to get involved, should have an opportunity to,

24 before construction proceeds further, and before even

25 more resources are invested in putting up turbines,

1  evaluate what is necessary on this project site,

2  including evaluating the pre-construction surveys that

3  should be done and have never been carried out.  And for

4  example, the Fish & Wildlife Service may very well come

5  in and say, yeah, we really meant it when we said

6  repeatedly that we want fall migration surveys to occur.

7        THE COURT:  Let me ask you this.  In the

8  circumstances in the TVA case involving the Tellico Dam

9  were probably far more dramatic than this, in the sense

10  the thing was almost ready to be flooded and operated,

11  and the construction was almost done.  And in comes the

12  Supreme Court with Warren Berger and says no, you're

13  going to harm snail darters.

14        But my question for you is this.  It's clear from

15  the Hill case that if you flooded the place, the snail

16  darters were history.  It's not clear to me that allowing

17  construction to continue would necessarily be something

18  that would be inappropriate, as opposed to shutting them

19  down from construction.

20        It seems to me from the evidence that's before me,

21  assuming that I find in your favor on the question of

22  whether there's a violation of Section 9 or likelihood of

23  that, the question is, what will be the appropriate

24  remedy.  And if you assume for the moment that I can't

25  tell someone go get an Incidental Take Permit, then why

1 would it not be appropriate to say, you may finish

2 whatever construction you want, you just can't turn those

3 things on, because the evidence before me indicates that

4 it's the operation of the turbines that's causing the

5 problem.  If I understood the evidence correctly,

6 including the thermal imaging data, the -- when bats are

7 killed by running into them, they run into a turning

8 blade, and that's what kills them, or barotrauma.  And

9 neither one of those things happen if a turbine is

10 sitting there not turning.

11        So, why should -- why would I need to take

12 something as extreme as shutting down construction on a

13 project, especially where, if I were to be able to reset

14 the clock and we were here today on an appeal from, or a

15 challenge to the issuance of an Incidental Take Permit

16 and you were challenging whether the conditions were

17 sufficient?  I would expect that the conditions that

18 would be imposed by Fish & Wildlife Service on an

19 incidental taking permit would be ones that would require

20 surveying; it would require adaptive techniques that,

21 based upon what I've seen before me, would say, it's

22 almost sunset, turn that thing off; and don't turn it

23 back on for XYZ period of time.  Or, it's now winter,

24 we'll run them 24/7.  Or, it's fall migration and you

25 need to turn those things off for a much more extensive

1 period of time.  Those are the kinds of things I would

2 expect to come out of an Incidental Take Permit, which

3 are way beyond the expertise of a federal court to

4 fashion.

5          So why would I need to stop construction, as

6 opposed to operation?

7          MR. GLITZENSTEIN:  Your Honor, if I can give you a

8 practical answer to that, and a legal answer, and I think

9 they're related.  The practical answer is, if the Service

10 is going to go through the -- the company is going to go

11 through the Incidental Take Permit process; and they

12 certainly, presumably, would if Your Honor enjoined the

13 project unit they get such a permit -- just before I

14 forget.  One of the cases that actually the Court did

15 order a -- it wasn't a company, it was actually a state

16 agency in that case.  Strahan v Cox is actually a case

17 where the First Circuit upheld an injunction ordering

18 somebody to get a permit.  So, it has happened.

19          I agree -- I think one of the Lynx listing cases

20 -- Lynx trapping cases we cite also had the same report.

21 The ordinary relief certainly is enjoining the activity

22 until the permit is obtained.  The practical reason, Your

23 Honor, not to allow them to complete the construction is

24 that one of the options the Service would presumably be

25 looking at would not only be enforceable adaptive

1  management and enforceable monitoring.  And I think I

2  agree with the tenore of many of Your Honor's questions

3  that currently we have no such thing for this project,

4  and it's obviously desperately necessary.

5         One of the things that the Service would look at,

6  in addition to evaluating the overall possibility of harm

7  to the species, in light of various risks out there,

8  would be whether or not siting changes could be made.

9  You heard Dr. Robbins' testimony that with the HCP -- and

10  obviously that's part of the Incidental Take Permit

11  process, the Habitat Conservation Plan, one of the things

12  that the Service and the company are looking at together

13  is micro-siting:  Is there a way we can change some of

14  the turbine locations that would minimize the impact of

15  risk to bats.

16         So if you finally do the fall migration survey,

17  and you find here is where we have the concentration and

18  maybe we shouldn't go forward with this particular line,

19  or let's shift this line around, that's, of course, an

20  option that the Service would have that would be severely

21  undercut if the entire construction of the project went

22  forward.  And in fact, the exhibit that I just referred

23  Your Honor to, which was the notes of the conference

24  call, that's exactly the concern that was raised by the

25  Fish & Wildlife Service in play at that meeting.  She

1  said, we may need these pre-construction surveys to

2  assist in figuring out whether an alignment can be

3  adjusted in some appropriate way.  So that, I think, is

4  the practical concern.

5       And the legal --

6       THE COURT:  I assume by that you're saying if you

7  did some analysis and determined that there was a

8  particular route used by these bats during migration and

9  it went between Turbines 6 and 7, you'd say, whoa, 6 and

10 7 shouldn't exist at all, or they should be off most of

11 the time.

12      MR. GLITZENSTEIN:  That's exactly right, Your

13 Honor.  And in fact, that's not only a practical concern,

14 but it's also embedded in the legal structure of the

15 statute.  In our opening brief, we referred to the

16 provision of the Endangered Species Act 7(d) of the

17 statute.  And let me -- if I could just take a moment to

18 explain how 7(d) comes into play, because there has been

19 some dispute between -- among the parties on this score.

20      If in fact defendants were going to go through the

21 Incidental Permit Take process, and that happened either

22 because Your Honor said I'm enjoining construction and/or

23 operation until you do that; or, Your Honor simply

24 ordered them to do it.  A necessary part of that is the

25 Section 7 consultation process.  Section 7 and Section 10

1 permitting process then work in tandem.  And Section 7 is

2 when the agency does what's called an internal

3 consultation.  Without getting into all the weeds of the

4 regulatory scheme.  When they do that, what comes into

5 play is the prohibition on what's referred to as an

6 irretrievable or irreversible commitment of resources

7 that would foreclose the options that the Service may

8 come up with at the end of the process, such as altering

9 the design of the site.

10        7(d) actually, Your Honor, was enacted by Congress

11 as one of the responses to TVA versus Hill.  Because one

12 of the concerns that Congress had was, we don't want to

13 be in the position of having these massive projects built

14 and waiting to turn the key or press the button and be

15 put in that position where there is this momentum built

16 up.  And so in our brief, we refer to two 7(d) cases

17 which talk about not steam rolling projects to completion

18 in a way that forecloses the Service from exercising its

19 review in an appropriate fashion and, you know,

20 specifically refers to the bureaucratic tendency to

21 rubberstamp what's already there.  Whereas, if the other

22 analysis is done, you might have a different result.

23        So that's why we believe the most appropriate

24 relief would be say, start the process rolling; don't do

25 further construction.  Now, if Your Honor is not willing

1  to go that far, for whatever reason, you know, we're

2  prepared to make an alternative suggestion for what we

3  think would be sort of a middle ground approach.  I don't

4  want to sort of be bargaining against myself here.  We do

5  think the most appropriate relief is a full scale

6  injunction under these circumstances, and it's a

7  practical and a legal rationale for.  That but we do have

8  alternative approach that we would be happy to share with

9  the Court, if the Court would want to hear our

10  suggestion.

11         THE COURT:  Tell me what your Plan B is.  I might

12  go Plan A, I might go Plan B, I might Plan C.  I just

13  need to know the range of options that would be available

14  to me were I to find a violation.

15         MR. GLITZENSTEIN:  I think Plan B is basically

16  what we would suggest that would build off what's already

17  happened on this site, and that is Your Honor did allow

18  defendants to continue with construction, as you may

19  recall, of 40 of the turbines, turbines furthest away

20  from the Indiana bat hibernacula.  And it's our

21  understanding on some level or another, defendants have

22  been continuing with those.

23         So, Plan B, which I would stress is our far less

24  favorable alternative, would be allowing them to continue

25  to construct those 40, since they've already been

1 constructing those, and they've been getting turbines on

2 the site for those.  And you would have an injunction

3 against any other work proceeding as to the remainder of

4 either the phase one or phase two turbine sites.

5        And even as to those 40, defendants could not

6 proceed with construction unless or within some

7 reasonable period of time -- we were going to suggest 30

8 days -- defendants would advise the Fish & Wildlife

9 Service in writing that they intend to pursue an ITP for

10 the project and initiate discussions with the Service

11 concerning that process and what it would entail.

12        And within a certain period of time from the

13 Court's order, we were thinking 60 days, but certainly

14 before operation could occur, they would present to the

15 Court a binding concrete plan for post-construction

16 monitoring and adaptive management that our clients, as

17 well as, more importantly, our experts would have an

18 opportunity to review.  And then Your Honor would decide,

19 in light of where the ITP process was, in light of

20 whether or not they are committing to something

21 enforceable, to allow operation of those 40 turbines.

22        Again, we think that in and of itself would limit

23 the Service's options as a way I just talked about before

24 and, I think, creates 7(d) issues.  Actually, I neglected

25 to mention one thing along those lines, Your Honor.

1 Certain exhibits we've moved into evidence.  They're in

2 evidence but haven't really been front and center that I

3 just ask Your Honor to refer to are Plaintiff's Exhibits

4 103 through 107, I think it is, and they relate to the

5 Shaffer Mountain project that you've heard about.  This

6 is the one in Pennsylvania where they're pursuing

7 incidental take authorization.  It's actually under the

8 Section (7) process, because in that case there is a

9 federal nexus, there's a Clean Water Act permit required

10 for the whole project.

11        But the reason I refer Your Honor to these letters

12 is that if you review them, you will see that the Service

13 actually raises the same 7(d) -- they call it

14 irreversible, irretrievable commitment of resources

15 concerns with the company they're dealing with there

16 which, I think, is called GMASA, and basically tells the

17 GMASA, we don't want you to proceed including with road

18 building and other construction activities because that

19 might actually undermine the process that we're talking

20 about.

21        So, we think it's an analogy to at least what

22 we're talking about here in terms of possible relief.

23 But the remedy we've suggested -- now, again, it's Plan

24 B, it recognizes the fact that they've at least been

25 allowed to construct on those 40.  It would minimize

1  what's done on the rest of the site in terms of impact on

2  the species and keeps the Service's options open, at

3  least to a fair degree.  But if Your Honor were willing

4  -- interested in entertaining something that doesn't

5  involve what we think is the most appropriate relief,

6  that's -- something along those lines is what we were

7  contemplating, and we wanted to put that before the

8  Court.

9        THE COURT:  All right.  Why don't I do this?  I

10 will give you some time for rebuttal, and you can -- and

11 we'll hear from the defense at 2:00.

12       I'll take a recess now and try to get everything

13 done I need to get done in the next hour and a half.

14 Thank you.

15                (Off the record at 12:29 p.m.)

16                (On the record at 2:03 p.m.)

17       THE COURT:  You may proceed.

18       MS. NATHANSON:  Good afternoon, Your Honor.  Thank

19 you.  I'd like to first start by echoing Mr.

20 Glitzenstein's opening comments on, first, thanking the

21 Court for its efficiency and how it's conducting this

22 process, obviously, resulting in a very expedient process

23 for all.  And I do thank plaintiff's counsel for working

24 with us through some of the unique procedural issues that

25 were proposed to us, and also thank the members of my

1 team for helping us get to where we are.

2        THE COURT:  You have all worked very hard, which

3 makes my job harder, but that's what I'm here for.

4        MS. NATHANSON:  Your Honor, I'd like to start by

5 talking about some of the testimony we've heard last

6 week.  In our opening statement, my partner, Mr. Zatz,

7 said this case is about an untested hypothesis and that

8 an Endangered Species Act injunction is not appropriate

9 under such uncertain circumstances.  And I will turn to

10 the issue of the legal test, after reviewing some of the

11 testimony we've heard.

12        Last Wednesday, Dr. Robbins could not have more

13 plainly agreed with us on that point.  When offering his

14 opinion on the ultimate issue in this case, he stated

15 that the likelihood of Indiana bat death.  When asked

16 whether that was a sound, scientific conclusion, he

17 stated, "It's a sound hypothesis that needs to be

18 tested."  Your Honor, we submit to you that there is no

19 modern Endangered Species Act precedent for an injunction

20 under Section 9, based on a hypothesis of whether the

21 endangered species will be killed.

22        THE COURT: Was he speaking in terms of the way

23 scientists speak in a foreign language that no judge or

24 lawyer can understand about testing hypotheses and so

25 forth?  And what does that have to do with the legal

1 standard before me?  Because, he may have been able to,

2 on the basis of what he saw, give an opinion that might

3 not be something that biologists would all be proud of at

4 a convention, but is it insufficient for a court?

5          MS. NATHANSON:  Good question, Your Honor.  I

6 think -- well, what we would submit to you is that Dr.

7 Robbins, he said what he said.  I don't know if he will

8 explain what he meant by hypothesis in that regard.  But

9 what we meant, when we said that we're dealing with an

10 untested hypothesis is that we do not have the evidence

11 to satisfy what we believe is the test that springs from

12 the Ninth Circuit case law and the First Circuit case

13 law, and the related case law under the Endangered

14 Species Act which is that actual death or injury to an

15 Indiana bat must be reasonably certain and imminent.  And

16 we do not, with the evidence we have before us today,

17 know whether such imminent and reasonably certain injury

18 or death will occur.

19          The Court has heard testimony on a wide range of

20 issues in this case, but actually -- and the only legal

21 question this court must resolve in assessing this

22 evidence is under this test, whether a reasonably certain

23 threat of imminent, actual death or injury to the Indiana

24 bat will occur.

25          In addition to Dr. Robbins' articulation of a

1  hypothesis, plaintiff's witnesses also made a number of

2  statements that we believe undermine their ability to

3  make that demonstration and/or also are actually in

4  accord with our experts' views.  For example, on day one,

5  Dr. Kunz testified that there is no relationship between

6  common bat mortality and Indiana bat mortality.

7          This view supports the testimonies of Drs. Lacki

8  and Tyrell, who spoke of the species differences among

9  the different kinds of bats who are subject to mortality

10 at wind power sites, and it undermines plaintiff's

11 counsels' attempts to link the common bat's experience to

12 Indiana bats.  There are 45 species of bats in North

13 America north of Mexico, as reported in Ed Arnett's 2007

14 study, and only 12 of them are subject to mortality at

15 wind power sites.

16         Dr. Kunz also testified that there is no evidence

17 of take of death or injury of the Indiana bat at any wind

18 project, and this includes wind projects that are closer

19 to hibernacula and critical habitat and have more bats

20 within ten miles than the Beech Ridge Project.  And in

21 the exhibits before the Court, we have studies at

22 Plaintiff's Exhibits 21, 28, 31, and 47 that all count,

23 in total, thousands of common bats in mortality studies,

24 including -- as Dr. Tyrell testified today, including the

25 smaller bats that are much harder to find, the smaller

1 bats than Indiana bats are being found.  And yet no

2 Indiana bats have yet been discovered at any wind power

3 facilities.

4        THE COURT:  Can that circumstance be just as well

5 related to the fact that there's a lot less Indiana bats?

6        MS. NATHANSON:  Yes, Your Honor --

7        THE COURT:  They're an endangered species.  I

8 assume that numerically there's a lot less Indiana bats

9 lying around -- flying around, I should, say than common

10 bats.  So, therefore, you would expect that result, would

11 you not?

12        MS. NATHANSON:  Yes, Your Honor.  But in the year

13 -- multiple years now of wind power operation and

14 development in the Indiana bat's range, and we still have

15 not seen yet one reported mortality of -- sufficient for

16 the Fish & Wildlife Service or --

17        THE COURT:  Is the absence of reported mortality

18 mean there has been no bat mortality?

19        MS. NATHANSON:  We don't know the answer to that,

20 Your Honor.

21        THE COURT:  I mean, they are a very small bat.

22 And unless you're monitoring every single wind turbine

23 24/7, the amount of time they're going to last on the

24 ground before some predator or scavenger comes up and

25 picks them up is not a long time is it?

1        MS. NATHANSON:  That is perhaps true, Your Honor.

2  The search or efficiency studies have discussed that, and

3  that is why we point out the fact that, you know, there

4  are the smaller bats, and the Indiana bats are being

5  discovered as well.  And it is true though -- I think the

6  rarity is an important point that goes to, again, the

7  likelihood -- the likelihood of death or injury from this

8  particular project, particularly in the fringe of their

9  range in West Virginia.

10        We also wanted to point out that, as Dr. Robbins

11  and Dr. Kunz testified, as of now the migration path of

12  the Indiana bat is unknown.  There is still no data to

13  suggest that they migrate over Beech Ridge now as opposed

14  to the scores of other ridges in the area.  And when Dr.

15  Kunz testified that there is no evidence that Indiana

16  bats are attracted to wind turbines, we have no evidence

17  that they will be drawn to do so after the turbines begin

18  operation.

19        THE COURT:  What evidence is there that they are

20  any different than any other bat that either gets whacked

21  by the turbine going around or gets barotrauma by being

22  in the wrong place?

23        MS. NATHANSON:  Well, Your Honor, I think -- Drs.

24  Lacki and Tyrell discussed the difference in species of

25  bat that are subject to bat mortality; how the vast

1  majority of bats are these migratory tree bats that fly

2  at higher distances and longer distances, and also there

3  are hypotheses about that they may be using the turbines

4  as a breeding congregation and are congregating around

5  the turbines -- the horry bats, the red bats, the

6  silver-haired bats.

7          Whereas, the Indiana bat, as Dr. Tyrell testified,

8  and Dr. Lacki testified, forage below the rotor-swept

9  area, and they forage along the edges of the trees.

10 That's where the bugs are; that's where the prey is that

11 they eat.  And there is no -- and the study that Mr.

12 Glitzenstein put on the screen while Dr. Tyrell was

13 testifying show that Indiana bats forage up to 30 -- they

14 forage up to 30 meters at the edge of the foliage, and

15 that is still underneath the rotor-swept area.  Again,

16 these are all -- the science is still working very hard

17 on this.

18          The researchers are working very hard to figure

19 out why bats are dying to begin with, which bats are

20 dying, when they're dying, and why that's happening.  And

21 the fact of the matter is that in all the studies that

22 have been done to date across multiple wind projects

23 across the Appalachian range, there is yet no evidence

24 that the Indiana bat is affected by this; and the fact

25 that they do not mate around fixed structures like the

1 migratory tree bats do.  They mate at the caves and near

2 the caves.  That's where they swarm in the fall, and they

3 have their mating season.  So, we simply do not have the

4 evidence to support that they're going to be up in that

5 rotor-swept area and be subject to impact by the

6 turbines.

7        All three experts also testified that there is no

8 evidence of maternity colonies at Beech Ridge or above

9 3,000' in West Virginia.  Thus, illustrating the low

10 likelihood that this most important summer activity for

11 the Indiana bats will occur at Beech Ridge.

12        THE COURT:  By the way, can you give me a copy of

13 your slides when you're finished?

14        MS. NATHANSON:  I was going to give it to you.

15        THE COURT:  I can't take notes quite that fast.

16 But if you give me the slides, that would be great.  Just

17 give them to my -- thank you.

18        MS. NATHANSON:  Sure.

19        THE COURT:  Thank you very much.

20        MS. NATHANSON:  But again, Your Honor, I think the

21 issue of legal elevation was one in which plaintiff's

22 experts were mostly silent.  I think the -- as Drs.

23 Lacki and Tyrell testified, the issue of elevation in

24 terms of temperature, in terms of the type of habitat

25 that's at these altitudes, the bugs that are -- the

1  insects that are available at these altitudes, it's a

2  significant consideration as to whether Indiana bats will

3  be above 3,000'.  There is certainly no evidence in West

4  Virginia that they'll be above 3,000'.  And in fact, the

5  current active maternity colonies in West Virginia are,

6  you know, are below or well below 3,000'.  In fact, the

7  active ones are below 2,000'.

8        Dr. Robbins also testified that potentially

9  suitable habitat is not proof of presence.  And, again,

10 the Northern District of California, in the Coside

11 habitat case that we cite in our pre-trial brief, agrees

12 with that principle.

13       Dr. Robbins also testified that in his view

14 adaptive management will decrease the likelihood of kill

15 or take.  And Dr. Gannon testified and agreed with our

16 experts that there is no imminent threat of harm to

17 hibernating Indiana bats.  And indeed, during -- at least

18 for six months of the year, there is no risk to Indiana

19 bats from wind power.  Your Honor, based on these

20 statements, and the other evidence presented, we do not

21 believe that plaintiffs have demonstrated reasonably

22 certain threat of imminent actual death or injury.

23       With respect to the legal test.  Actually, I will

24 come back to this slide.

25       With respect to the legal test, Mr. Glitzenstein

1 discussed a number of cases during his presentation, and

2 he argued that by a preponderance of the evidence they

3 should show that it's a mere likelihood that death or

4 injury would occur.  We do not agree that it's 51

5 percent.  And, we believe that plaintiffs need to prove

6 by a preponderance of the evidence that it's reasonably

7 certain that imminent harm will occur.

8        This is the language, we believe, that springs

9 from the bulk of the case law and, indeed, it's the

10 language that the Fish & Wildlife Service used in its

11 letter to Liberty Gap that we showed during Mr. Romme's

12 testimony, where the Fish & Wildlife Service said to the

13 Liberty Gap Wind Project, we believe it is reasonably

14 certain that your project will result in the take of a

15 federally-listed species, despite your adaptive

16 management, and we recommend that you pursue an

17 Incidental Take Permit.  That "reasonably certain"

18 language, we believe, requires higher than 51 percent

19 likelihood of death or injury to Indiana bats, and we

20 believe the case law bears that out.

21        The cases that Mr. Glitzenstein cited during his

22 closing argument -- I mean, he ran through quite a few of

23 them.  The ones we could quickly write down and take a

24 look at, the Loggerhead case and the Holstein case, both

25 those cases involved past take that had already occurred;

1  and the issue before the Court was whether the take would

2  be likely to recur.  There was already evidence that the

3  endangered species was being harmed -- was being subject

4  to death or injury.

5        The Loggerhead case was just a preliminary

6  injunction case in that, so that you -- again, you were

7  dealing with the preliminary injunction standard of

8  whether you were likely to succeed on the merits.  It was

9  not the full blown merits analysis of the Section 9 case.

10        And for Holstein.  Again, it was a past take, and

11  the issue before the court was the likelihood of

12  recurrence.  And the Holstein case cited a preliminary

13  injunction case for its analysis, even though it was a

14  merits case.

15        I will admit, Your Honor, that the case law across

16  this -- I mean, the language has been -- you know,

17  there's been a variety of dicta and semantics that have

18  been used across the case law.  But when you sit down and

19  look at the body of Section 9 case law, not in the

20  preliminary phase, in the full merits phase, the phrases

21  that we have on the next few slides are the ones that

22  come out.

23        "Mere potential for harm is insufficient."

24        "General evidence of possible effects:

25  Insufficient."

1          "Speculative evidence:  Insufficient."

2          There must be actual harm that has occurred or is

3    reasonably certain to occur.  And those --

4          THE COURT:  Well, let me ask you this.

5          MS. NATHANSON:  Yes.

6          THE COURT:  I have to credit and discredit various

7    testimony in the case.  If I were to credit the testimony

8    of the plaintiff's experts who have evaluated the

9    information developed by your experts, and including

10   analysis of the acoustic data, and conclude that there

11   are (a) Indiana bats are present in the Beech Ridge

12   project area, and that there is little to distinguish

13   their likelihood of dying from exposure to a wind turbine

14   in comparison to any other bat, and that your project is

15   going to kill 130-some thousand bats over 20 years.

16   Isn't it reasonably certain then, therefore, that one of

17   those 130,000 bats is going to be an Indiana bat?

18         If I consider all of those things, don't I have

19   enough information in front of me to conclude that there

20   is a reasonable certainty, or a strong likelihood of

21   taking of an Indiana bat under those circumstances?

22         MS. NATHANSON:  Well, Your Honor, I mean, it

23   depends on how --

24         THE COURT:  It depends on how much I credit their

25   testimony.  I've got to credit and discredit various

1 testimony in the case.  But if I credit all of it, isn't

2 there enough there to conclude something that would meet

3 the Ninth Circuit's standard?

4      MS. NATHANSON:  If we credit all their testimony

5 -- their testimony there was a high likelihood of that;

6 there was a high likelihood of death or injury --

7      THE COURT:  Right.

8      MS. NATHANSON:  -- and based off the risk

9 assessment analysis of common bats being killed.

10      THE COURT:  I mean, if I understood the testimony

11 of the plaintiff's experts, they were not aware of any

12 factor that would indicate that the risk to Indiana bats

13 of death or injury as a result of either running into a

14 turbine blade or barotrauma is no different than that of

15 any other ordinary bat, and that we know 135,000 bats,

16 plus or minus, are likely to die over the next 20 years

17 with this project.  And if I assume also that there is

18 credible evidence that Indiana bats are present in the

19 vicinity, why is it not reasonably likely that there will

20 be an injury or harm to an Indiana bat?

21      MS. NATHANSON:  Well, Your Honor, I think if you

22 look at the cases where this has been discussed, where

23 you have a -- there is usually a confirmed presence of

24 the animal in the vicinity or on the project site itself.

25 And there is little question that the habitat

1  modification that is going to occur is going to

2  irreparably harm that species.

3          Now, if you -- are you asking me to assume that

4  take all of what plaintiff's expert said is true --

5          THE COURT:  Yeah.  And that may be a large leap of

6  faith.  But if I were to conclude that the analysis

7  provided by the plaintiff's experts provides, by a

8  preponderance of the evidence, sufficient information to

9  indicate that (a) Indiana bats are 95 percent likely to

10 be present in the area; and (b) because of the widespread

11 taking that's going to take place of un-endangered bats,

12 and there being no indication that they are less or more

13 susceptible to death by running into a turbine or

14 barotrauma, why would it not be enough for me to conclude

15 that there is a reasonable certainty of the death or harm

16 to an Indiana bat?

17         MS. NATHANSON:  Well, Your Honor, based on all

18 those assumptions, I don't know how strongly I can

19 disagree with you.

20         THE COURT:  It seems to me a standard for what is

21 necessary to make out a case is inextricably intertwined

22 with the sufficiency of the evidence in the first place.

23         I mean, if there isn't any reasonable likelihood

24 of injury or death of an Indiana bat, then we don't even

25 get to first base in this case; right?

1          MS. NATHANSON:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MS. NATHANSON:  But what I asked Your Honor is

4 whether the plaintiff's experts have shown with

5 sufficient certainty that this threat to the Indiana bat

6 is definitive, as required by the Burlington Northern

7 case, and is not based on mere speculation given, again,

8 the absence of data we have on this rare species and how

9 it moves throughout the state of West Virginia.

10          I think an important consideration here, again,

11 unlike other cases, is the temporal variation or

12 variation of this risk.  We have a species where half the

13 year there is no possibility of them being on the site.

14 There is an extremely low to negligible likelihood that

15 they will be on the site during the daylight hours.  And

16 we're looking at, you know, a brief period of time during

17 the bimodal foraging that Dr. Tyrell discussed, during

18 dusk and before dawn, where there is a potential for all

19 bats to be subject to mortality. And again, we have the

20 experience of, you know, as found by the Fish & Wildlife

21 Service in all wind power projects to date, of not seeing

22 the species subject to this mortality.

23          But one case I would -- I think the -- one of the

24 most analogous cases to show -- to bring to Your Honor's

25 attention.  The Bernal case in the Ninth Circuit involved

1  the construction of a school in critical habitat for the

2  pygmy owl.  And the owl was known to be in the immediate

3  vicinity of the school construction site.  And there was

4  no conclusive evidence that the owl used the project for

5  the construction site itself.

6        There was conflicting expert evidence on harm.

7  And ultimately, the Ninth Circuit upheld the district

8  court finding that there was not sufficient evidence of

9  reasonably certain imminent harm and also ruled that it

10 was up to the school district's decision not to pursue an

11 ITP was sufficient and was not something the court could

12 order, and that the school construction should move

13 forward, knowing that the school bore the risk if the owl

14 was taken in any way -- harmed, injured, killed -- that

15 they would face the hammer of Fish & Wildlife Service

16 civil and criminal penalties, and injunctive relief both

17 from the Fish & Wildlife Service, and from any citizen

18 plaintiffs who wished to pursue.

19       Your Honor, going back to discussing our reasons

20 why we believe the risk -- to summarize the testimony of

21 our expert witnesses and the evidence before the Court on

22 why we believe the risk is extremely low to Indiana bats

23 at this project site.  Starting with the fact of their

24 rarity in West Virginia.

25       In the three-state range Pennsylvania, West

1 Virginia and Virginia, it's 3.5 percent of the total

2 Indiana bat population.  We're looking at 16 --

3 approximately 16,000 individual bats in this range, with

4 approximately 500 of them who hibernate within ten miles

5 of the project site.

6        I mentioned the elevation factor which, again, is

7 something that plaintiff's experts did not highlight much

8 in discussing the likelihood of take to Indiana bats.

9 And I think it's a key component of Dr. Lacki's testimony

10 and Dr. Tyrell's testimony that the elevation, combined

11 with the lack of suitable habitat.

12       This is an area -- as you saw in the project

13 photos, Your Honor, this area is subject to timber clear

14 cutting, to surface mining.  And in the immediate

15 adjacent area of this project site, this is an extremely

16 disturbed area.  It may have isolated roost trees, as

17 identified by plaintiff's experts, but it does not

18 present the type of suitable habitat that is found

19 elsewhere.

20       As Dr. Lacki observed, when he drove through the

21 valley and saw the suitable habitat down off the

22 mountains on Beech Ridge, the meadows and the edge

23 habitat closer to Snedgars cave, you know, where Indiana

24 bats would more likely want to spend their time rather

25 than expending the energy to go up 3,800' to a cold area

1 with fewer trees and less hospitable conditions.

2       Dr. Lacki also talked about the landscape barriers

3 between Snedgars cave and Beech Ridge.  While there is

4 individual evidence of individual bats that have crossed

5 over ridges, Dr. Lacki performed a radio-tracking study

6 of hundreds of bats that showed, in general, bats follow

7 -- they follow corridors.  They follow streams as they

8 move.  They are not going to cross over the multiple

9 ridges between Snedgars cave and Beech Ridge to spend

10 time at the wind project site.

11      Dr. Tyrell -- both Dr. Tyrell and Dr. Lacki

12 discussed the foraging behavior of Indiana bats and how

13 the data does not show that they would have any reason to

14 be at the heights of the wind turbines as opposed to the

15 species of bats, the vast majority of whom are being

16 killed by these wind projects.

17      And the size and distance of hibernacula.  We have

18 other wind projects that are closer to hibernacula -- the

19 Myersdale project, and that's operating in Pennsylvania

20 three and a half miles away from an active hibernacula.

21 And there are almost 800 bats within ten miles of the

22 Mountaineer project in West Virginia.

23      I'd like to talk about presence next, Your Honor.

24 Court's indulgence.  All these cases are cited in our

25 pre-trial brief, Your Honor, that are summarized on the

1  slides.  The case law shows Your Honor, first of all,

2  that use of the vicinity of a project site is

3  insufficient for presence and is inappropriate to presume

4  presence, and also there is no legal duty to survey.

5       And I'd like to discuss the surveying issue that's

6  been much discussed hire.  We agree with you -- Your

7  Honor mentioned, during Mr. Glitzenstein's closing, that

8  this could be a way to re-litigate an issue that was

9  already put before the PSC, and we do agree with that

10 Your Honor that the issue of what mist surveys we perform

11 and what surveying is performed and when it's done, that

12 is not -- and whether it's done properly.  None of that

13 is an actionable claim under the Endangered Species Act.

14 These were obligations put on us by the Commission.  The

15 adequacy of the mist-net survey has already been played

16 out about the Commission and with the Fish & Wildlife

17 Service.

18       THE COURT:  What, if any, teeth do the provisions

19 in the West Virginia Public Service Commission's order

20 have?  I mean, all it says is they're going to create a

21 Technical Advisory Committee, and you have to consult

22 with it.  And your expert -- your witness, Mr. Romme, did

23 not have any differentiation between the kind of advice

24 he got from Fish & Wildlife Service, which he disregarded

25 in substantial part on the one hand, from whatever he

1 might get from a Technical Advisory Committee that might

2 say, hey, shut these things down 12 hours a day all

3 summer long.  And you might say, we're not going to do

4 that.  What teeth are there in these conditions?

5     MS. NATHANSON:  I would like to address that.

6 Thank you.  It is more of a legal question than it is a

7 question for Mr. Romme to answer.  And also, I think it's

8 a question that involves Invenergy more so than it

9 involves BHE.  The PSC order first requires three years

10 of post-construction monitoring and then requires

11 consultation with a Technical Advisory Committee, of

12 which various regulatory agencies and citizen groups and

13 wildlife groups will be providing input and having

14 membership.  Should the post-construction monitoring

15 discover a dead Indiana bat, that --

16     THE COURT:  Is that what it would take for you to

17 be convinced that something needs to be done?

18     MS. NATHANSON:  Not something that needs to be

19 done, Your Honor.  Well, I think --

20     THE COURT:  What if our your post-construction

21 monitoring discovers there is thousands of Indiana bats

22 flying around near these turbines and that there is a

23 strong likelihood, because of that, as contended by the

24 plaintiffs, that one of them is going to get killed?  Are

25 you still going to take the position you have to have a

1 dead Indiana bat?

2          MS. NATHANSON:  You're asking about

3 post-construction present surveys, as opposed to

4 mortality surveys.

5          THE COURT:  Either one.

6          MS. NATHANSON:  We can talk about both.  In terms

7 of post-construction monitoring of presence that may

8 occur.  I mean, I -- it's difficult to engage in

9 hypotheticals right now, but we can say that both the PSC

10 and the Fish & Wildlife Service, once a violation is

11 proven -- Your Honor, it is true.  Once a violation

12 occurs, they have significant injunctive relief, hammers,

13 to bring to bear on this.  That's first of all.  But

14 second of all, to go to -- let's say we do have presence

15 surveying, we do see high -- through some new technology,

16 we're able to see high Indiana bat activity and, as a

17 result, the TAC provides recommendations:  Maybe you

18 should do feathering during these hours.  Maybe you

19 should shut down these turbines, you know, in the

20 pre-dawn hours during the -- maybe during the fall

21 migration season.

22          That's a very different calculus for Invenergy in

23 terms of how it weighs recommendations in the face of

24 known presence.  In the face of significant civil and

25 criminal penalties, if they knowingly and unreasonably

1  disregard those recommendations and a violation later

2  occurs, that's a very different calculus from the

3  decision making that went on with respect to

4  recommendations on pre-construction surveys of

5  presence/absence, where the PSC was asking for a certain

6  protocol and the Fish & Wildlife Service was recommending

7  conflicting protocols.

8        And I would -- one exhibit that has not really

9  been discussed or highlighted through the testimony due

10 to time constraints, but I would direct Your Honor to

11 Defendant's Exhibit 79 which is Invenergy's submittal to

12 the PSC in response to one of the Fish & Wildlife

13 Service's letters in which Invenergy explains to the PSC

14 the context of these requests for pre-construction

15 surveys that are not just focused on endangered species

16 but apply to all bats, and displays the evidence and

17 testimony that Invenergy put before the PSC on its view

18 on what is reasonable in terms of surveying.

19       The PSC did not recommend -- did not, you know,

20 concur with three years of pre-construction surveys, and

21 the Fish & Wildlife Service did not submit any objections

22 to the PSC with respect to the pre-construction surveys.

23       THE COURT:  Isn't there historic role not to do

24 such things like that?

25       MS. NATHANSON:  For the Fish & Wildlife Service,

1 Your Honor?

2        THE COURT:  Right.

3        MS. NATHANSON:  I mean, the Fish & Wildlife

4 Service Did offer input to the PSC.  We've seen the

5 exhibit during Mr. Romme's testimony; and also that

6 exhibit, where they discuss the likelihood of risk from

7 the Beech Ridge site, in which they characterize it as

8 lower risk than another project in West Virginia.  That

9 communication from the Fish & Wildlife Service to the PSC

10 did not reference surveying at all.

11        But, again, going back to the initial point and

12 your concern about what's perceived as the disregarding

13 of recommendations on pre-construction survey; how that

14 plays into a post-construction recommendation scenario.

15 I submit they are very different things.  And it's a very

16 different calculus for the Fish & Wildlife Service to, in

17 your scenario, tell Invenergy we are detecting a high

18 presence of Indiana bats; you need to do X, Y and Z.

19        And I would submit to you that the company bears

20 an extremely high risk of disregarding that advice,

21 should a violation later be proven, because it will

22 become -- it will bear strongly on the penalties and

23 injunctive proceedings that will certainly follow that

24 kind of scenario.

25        THE COURT:  I would assume that the plaintiff

1 might respond that that's where we are now, that they

2 have, through the analysis of the same information your

3 experts got, plus the acoustic data, have indicated that

4 that's precisely the case now.

5          MS. NATHANSON:  That there is a high level of

6 Indiana bat presence?

7          THE COURT:  No.  High likelihood of taking one.

8 We might all disagree on what it takes to be a "high

9 level of presence," but the thrust of the defense case

10 has been there aren't any Indiana bats around; we

11 couldn't find them; there is no dead ones been showing

12 up.

13          And the plaintiff is saying that's not the case;

14 there's demonstrable existence of Indiana bats at a

15 number of locations in the vicinity of this project.  And

16 the defendant's own acoustic data, analyzed by renowned

17 experts, indicates with a 95 percent certainty that

18 they've identified an Indiana bat, and your project is

19 not going to be a happy project for bats generally.  Why

20 isn't that enough to cause concern right now as to what

21 ought to be done about it?

22          MS. NATHANSON:  Well, two things.  Actually,

23 looking at the time, let me -- I'd like to briefly

24 address the AnaBat issue.

25          THE COURT:  I haven't worried that much about time

1  so far, so -- you know, this case has been a train wreck

2  on time, so don't worry.

3       MS. NATHANSON:  I appreciate it, Your Honor.  Let

4  me -- If I could, I would like to address the AnaBat

5  issue first, and then I think your question goes to some

6  thoughts we have on remedy, should Your Honor find that

7  the plaintiffs have met this burden of reasonably certain

8  threat of imminent harm, which includes actual death or

9  injury.

10       First of all, with respect to the AnaBat data.  I

11  think it's -- one thing I would like to focus on here is

12  that when BHE, when it was analyzed pursuant to the only

13  protocol currently in place that's accepted by any

14  regulatory agency, the Kentucky Fish & Wildlife Service

15  field office and the state agency in Kentucky.  When that

16  data was analyzed, they came up with zero Indiana bat

17  calls.  Under the five-pulse rigorous analysis test --

18  they call it the "MoreNet Filter."

19       So, even if that filter and analysis were

20  available in 2005, and we took Gary Libby's data, which

21  we have no idea exactly where he pointed the detectors

22  and how it was collected, and he had no protocols, and

23  all the things you have heard about our concerns about

24  the methodology used by Mr. Libby.  Taking all of that

25  into account, even if they analyzed it with a technology

1 that didn't exist in 2005, it would have come up with

2 zero Indiana bat calls.  And what could they have done in

3 response to that?

4          And, I would point out that Dr. Robbins and Dr.

5 Britzke have put forth this discriminate function

6 analysis.  Their paper came out in 2002.  And if you look

7 at the closing paragraph of their paper, it is

8 essentially a pitch to the agencies.  They say, look at

9 this wonderful analysis we have.  Look at what we can do

10 with discriminate function analysis to identify species.

11 And they make a pitch to the agencies to include this

12 analysis in the Indiana Bat Recovery Plan for the

13 agencies to use it to determine presence or absence.  And

14 since 2002, no one has taken them up on that offer.  And

15 I think having -- you know, having Dr. Robbins, one of

16 the two people in the United States who perform this

17 analysis, here testifying to it doesn't exactly make it

18 certain or make it right.

19          And, you know, Dr. Lacki -- it is true Dr. Lacki

20 does not have, as Mr. Glitzenstein stated, experience

21 with acoustical analysis, but he is extremely well

22 trained in statistical analysis, and he teaches it.  And

23 he testified to the Court on how Robbins' misstated the

24 confidence level, and he described what he believes are

25 the errors in Dr. Robbins' analysis.  And so there is --

1 so I just want to point out that this -- you know, this

2 technology, and this technique that's been introduced

3 into this case is, you know, extremely new and is not

4 widely accepted.  And even though it's been published

5 since 2002, no regulatory agency uses it to definitively

6 determine presence or absence.

7         Going to the Court's question on where we are

8 right now under plaintiff's view of the case, where you

9 stated that they believe there is likely presence and

10 high likelihood of death or injury.  Obviously, Your

11 Honor, with respect to -- I mean, obviously, with respect

12 to remedy using the Plan A and Plan B discussed by

13 plaintiffs -- I mean, should you find a violation of the

14 Endangered Species Act under the applicable test of

15 Section 9, any relief that you craft must be narrowly

16 tailored to the violation that you find.  And we do not

17 believe there is any evidence in the record right now to

18 justify enjoining the entire project and that, you know,

19 shutting down all construction of the rest of phase one

20 would be overly broad.

21         We believe that the Plan B provided by plaintiffs

22 of just proceeding with 40 turbines that are currently

23 under construction and not building the remaining 27; I

24 believe it's a spurious plan, Your Honor, because the 27

25 turbines that are currently not being constructed are

1 turbines that have been identified over the years by

2 plaintiffs as turbines of greatest concern to them.  They

3 are not the closest turbines to the bat caves.

4       These 27 turbines, you know, are not the closest

5 turbines to Snedgars cave, and they have really no nexus

6 to the bat concerns -- the Indiana bat concerns being

7 raised here.  Also, as you heard from David Groberg, the

8 company needs to have 85 percent of the turbines

9 operational by June 2010 or they'll be in violation of

10 the contract.  And there are -- and AEP can terminate the

11 contract.  85 percent of 67 is 57.  If 57 turbines are

12 not operating by next summer, it will bankrupt the

13 project, and therefore there will be no need for an HCP

14 or an ITP or any other relief plaintiffs may seek,

15 because the project will simply go away.

16       Our Plan B, Your Honor, should you find a

17 violation, and we would ask that one particular option.

18 Given the Court has clearly expressed its concern about

19 the lack of what the Court perceives as a lack of

20 enforceability and accountability of the post-

21 construction process.  We, again, say that the

22 post-construction monitoring is mandatory.  It is three

23 years.  It is going to be daily, and it is going to be

24 rigorous.

25       There are going to be regular reports to the PSC

1 and to the Fish & Wildlife Service.  But if Your Honor

2 would like to have continuing jurisdiction over this

3 case, and have participation and receive the same reports

4 that will be going to the PSC, receive the information

5 from the TAC, receive their reports and their

6 recommendations, and receive the actual adaptive

7 management plans once they are developed, we can come

8 back here and we can talk about an adaptive management

9 plan, and the Court can make the adaptive management plan

10 enforceable.

11          THE COURT:  Well, that -- as attractive as that

12 might be, my competence in the matters of bats is not

13 real high, other than the fact that on Halloween we have

14 images of bats.  It's a very appropriate time of year to

15 hear this case, I suppose.

16          MS. NATHANSON:  Indeed.

17          THE COURT:  Wouldn't you be asking me to do what

18 Fish & Wildlife should really be doing?  I mean, I don't

19 -- I don't have a lot of competence in this area, and I

20 -- this is one of those cases where courts are not

21 necessarily required but enthusiastically required to

22 defer to agency expertise.  I mean, if there's an agency

23 out there with expertise on bats, it's not me; it's not

24 the West Virginia Public Service Commission; it's the

25 Fish & Wildlife Service, isn't it?

1        MS. NATHANSON:  Yes, Your Honor, they are the

2 expert agency.  And I think this goes to the -- I mean,

3 there is -- the way the Fish- -- the way the Endangered

4 Species Act is structured, I mean, there is no -- there

5 is no enforceability option for them, you know, prior to

6 the finding of a violation, you know, unless the company

7 volunteers to go through HCP process, which takes years,

8 which is extremely expensive, and which I would also note

9 --

10       THE COURT:  Does it really take years?  I've never

11 applied for one, so I don't know how long it takes.

12       MS. NATHANSON:  In our experience, Your Honor, my

13 partner, Steve Quarrels, who has entered an appearance in

14 this case, works with clients -- has worked with clients

15 in multiple industries across the years on this.  It

16 generally takes three to five years.  It costs six

17 figures, almost up to seven figures in fees for the

18 consultants and for the reports that must be prepared.  I

19 mean, there is a reason that private entities balance

20 very carefully whether they're going to pursue this

21 route.

22       I would also note, because it's voluntary, it can

23 be terminated at any time, and the Fish & Wildlife

24 Service would lose its enforceability.  The only

25 enforceability that extends once an Incidental Take

1 Permit is cancelled is if there was a prior take and you

2 have mitigation measures in place to address that prior

3 take.

4        If that -- if that happens, and that's still

5 enforceable.  But if you haven't had a prior take, and

6 you don't want your Incidental Take Permit anymore, you

7 can cancel it and walk away, and there is nothing the

8 Fish & Wildlife Service can do.

9        THE COURT:  The Endangered Species Act sort of

10 puts people like you in a Hobson's choice situation --

11        MS. NATHANSON:  Yes, Your Honor.

12        THE COURT:  -- where you can have smiling

13 bureaucrats say nothing to you and tell you you don't

14 have to get one of these permits; and then you don't get

15 one, and then suddenly you get whacked with criminal or

16 civil penalties.  And they don't demand that you get them

17 but, of course, if you get one that provides you with

18 significant cover if there is a take of an endangered

19 species that was not the purpose of your project and was

20 incidental to it, and you've done whatever mitigation

21 strategies may be appropriate.

22        So, it's a Hobson's choice that I wouldn't enjoy

23 being in if I were a developer of anything.  That's the

24 law the way it is; I have to take it the way I find it.

25        MS. NATHANSON:  Yes, Your Honor.  Again, I think

1  the Ninth Circuit's articulation of this choice and of

2  this -- of the analysis and what the courts must do in

3  the face of this choice is well-articulate by the Ninth

4  Circuit in the Bernal case, and so I commend that case to

5  you.

6          And one other point I'd like to address with

7  respect to ITPs and HCPs that Mr. Glitzenstein touched on

8  is this issue of, let's not build the 27 turbines because

9  we may -- the HCP process may cause some re-siting.  The

10 HCP -- under the HCP process, you consider alternatives,

11 that is true.  But there -- the Fish & Wildlife Service

12 -- there is no consideration of alternatives that are

13 deemed not economically feasible, provided that the

14 developer provides, you know, confidential business

15 information to the Fish & Wildlife Service describing how

16 the proposed alternative is not feasible.

17         So with respect to phase one of this project, you

18 know, where we have 40 turbines going up; we have 27

19 other turbine foundations already laid; you know,

20 Invenergy will more likely than not be able to make the

21 demonstration to the Fish & Wildlife Service that

22 re-siting of phase one is not an economically feasible

23 alternative in the HCP process.

24         Now, phase two, Your Honor, is another matter, and

25 that is another remedy option available to you, should

1  you find reasonably certain imminent threat of actual

2  death or injury.  You could seek to enjoin phase two of

3  this project, pending further present surveys or pending

4  whatever further action the Court deems appropriate in

5  order to, you know, nail down, you know, the actual, you

6  know, what's going on with phase two of this project.

7         Phase two turbines are the ones that are closest

8  to Snedgars cave, the D Line that you've heard much

9  about.  That is phase two of this project.  That has not

10  been -- you know, that has not been finalized.  Those

11  turbine sites have not been finalized.  It's still in

12  play.  And we would submit to you that, you know, a

13  remedy tailored toward some sort of increased scrutiny by

14  the Court, or present surveys with respect to phase two

15  and allowing the company to analyze whatever further

16  present surveys revealed, and then make a decision what

17  -- let the company make a decision whether to pursue an

18  ITP with respect to phase two is another option available

19  to the Court.

20         THE COURT:  Well, are you suggesting that one of

21  the things I could do, if I were to conclude things

22  adversely to you -- we're in Plan B for the moment, just

23  as a matter of arguendo; I'm not asking you to concede

24  that -- is I could say, well, these folks sure didn't do

25  a very good job of listening to Fish & Wildlife Service.

1 And they sure didn't tell a lot to the West Virginia

2 Public Service Commission.  So what I'm going to do is to

3 say, look.  You've got these multiple letters from Fish &

4 Wildlife saying to do some things.  I'm going to tell you

5 to go out and do three years of surveys; and I'm going to

6 tell you to do acoustic surveys; and I'm going to ask you

7 to report those results to me; and then I'm going to make

8 a decision as to whether or not anything further is

9 required from this court, which might or night not

10 include telling you to shut down or don't operate unless

11 you get an Incidental Take Permit, because I might be

12 satisfied -- I think that's what you're telling me, that

13 after I sit here with this case open for three years,

14 that your company comes back in here with, you know, gobs

15 and gobs of mist-netting surveys and acoustic analyses

16 and so forth and they say, Judge, we have scoured these

17 mountains and we haven't found a single Indiana bat, that

18 I would then say, well, I'm not going to tell them to go

19 get an Incidental Take Permit.  Are you suggesting that I

20 would do that as one alternative?

21          MS. NATHANSON:  Your Honor, you do -- if you find

22 a violation in this case, the remedy --

23          THE COURT:  Let's assume I don't necessarily find

24 a violation but that I find that the evidence is

25 sufficient by a preponderance of the evidence of the

1  evidence to indicate a high likelihood of taking of

2  endangered species, but that, rather than to enjoin your

3  project from construction, or rather than to enjoin it

4  from operation in the absence of Incidental Take Permit,

5  I'm going say I want it done right this time, and I'm

6  going to tell you to go out and do three years' worth of

7  all of the various things that you were asked to do by

8  Fish & Wildlife but didn't do.

9          I mean, that's -- is that something that I would

10 be capable of doing, as opposed to ordering you off to

11 Fish & Wildlife Service, or giving you the choice of

12 either no operation or go to Fish & Wildlife?

13         MS. NATHANSON:  Yes, Your Honor.  Well, I think --

14 there is -- the precedent in this area is rather limited

15 in terms -- usually, the -- you know, usually there's --

16 we've had -- it's usually been timber harvests or other

17 areas where it's just been a complete enjoinment of the

18 timber harvesting.  Here, we have, you know, a continuous

19 operation where for part of the year there is no risk at

20 all, and so it's a different calculus here.

21         I don't know of anything in the Endangered Species

22 Act that would preclude you from allowing the project to

23 move forward with the operation, yet have us do

24 surveying; nor do I know anything under the Endangered

25 Species Act that authorizes you to do that, either.

1          THE COURT:  Yeah.  I'm dealing with a far cleaner

2  slate than I'm used to dealing with.  There is not as

3  much precedent out there as would be making me much more

4  comfortable in what to do.

5          MS. NATHANSON:  Right.  But what we would say,

6  Your Honor, is if you do find reasonably certain threat

7  of imminent harm, that we do not -- we believe that

8  enjoining construction and operation of phase one would

9  be an overly broad remedy, in light of what we know about

10  the time frames and the extent of what we can agree on

11  with respect to the risk.

12          THE COURT:  Let me ask you this, just thinking out

13  loud.  If I were to retain jurisdiction over this case

14  for three more years, while all these surveys were done

15  and so forth, wouldn't it be more logical to have Fish &

16  Wildlife do that, which is part of the Incidental Take

17  Permit process, as opposed to having me do it?  And then

18  I come to the conclusion after all that, yep, there's

19  lots and lots of Indiana bats around there, and they're

20  going get killed, and this project can't go forward

21  without doing it.  Then you've got to start another

22  three-year process; right?  That would be three years of

23  putting up with me, and three years of putting up with

24  Fish & Wildlife Service.  That would be pretty awful,

25  wouldn't it?

1          MS. NATHANSON:  Well, you said that Your Honor,

2 not me.

3          Well, I would -- yeah.  It's a difficult

4 hypothetical, Your Honor, because I think the -- I mean,

5 the issue here is that, you know, the -- I mean, the

6 project is moving forward and is under way and needs to

7 -- and needs to operate or it will terminate.  And so to

8 the extent that -- and again, where the -- the paradigm

9 is such that, you know, a court cannot -- it's not within

10 the authority to order us to go through the incidental

11 permit take process.

12          And the case mentioned by Mr. Glitzenstein

13 involved a public entity who was forced to -- to our

14 knowledge, a private regulated party has never been

15 forced to go through this process.  And so we have been

16 -- and so, because of that legal paradigm, we have been

17 brainstorming for other ideas to give the Court

18 assurances, based on the concerns you've raised during

19 this hearing, while at the same time, you know, allowing,

20 you know, the project to go forward, which we believe

21 reasonably should do so based on the data that exists

22 with respect to what we believe is a very low risk to

23 this species.

24          I guess -- I don't want to -- well, one final

25 point I wanted to make, Your Honor, also on the

1 implications of this case.  We believe the risk that has

2 been presented by plaintiff's witnesses is speculative.

3 And should this project be enjoined based on the risk the

4 plaintiffs have presented, it will provide precedent for

5 other types of suits against any wind project, you know,

6 on a ridge line in the Indiana bat's range.

7         You know, regardless of, you know, what --

8 irrespective of the fact that we don't know anything

9 about the migration routes, regardless of elevation,

10 species data, the lack of mortality data, this is -- we

11 do believe it is a -- that it is premature at this point,

12 actually, you know, to make a finding of reasonable

13 certainty of imminent harm because the data -- the

14 available data is simply not there.  It's the plaintiff's

15 burden to bring that data to the court, and they have not

16 done so.

17         And we do believe that the adaptive management

18 process that Dr. Tyrell described this morning, that our

19 other witnesses have described, that rings throughout the

20 Fish & Wildlife Service letters, is a meaningful process.

21 And we submit that Invenergy will heed carefully and

22 closely the recommendations of the TAC, because the

23 implications that they -- if they do not do so are severe

24 and could have drastic implications for this project.

25         The final thing I'd like to mention -- I mean,

1 much has been said about these three Fish & Wildlife

2 Service letters; about the other informal communications

3 between the Invenergy's consultants and the Fish &

4 Wildlife Service.  But I just want to end by focusing the

5 Court on what has not been said by the Fish & Wildlife

6 Service in this case.  They have not communicated to us a

7 reason that they believe there is a reasonable certainty

8 of take; they have not communicated to us that they

9 recommend an ITP for this project; and they have not

10 pursued any pre-operational injunctive relief which they

11 have -- they have the same authority plaintiffs here do,

12 and they have not pursued that here.  And we believe that

13 what they have not said to us is just as instructive as

14 what they have.

15        Again, I urge the Court to review Defendant's

16 Exhibit 79 with respect to our rationale of why we -- of

17 why we did not fully agree with the Fish & Wildlife

18 Service recommendations on the pre-construction

19 surveying.  And that is the only point of contention with

20 these letters.  These are three very substantive letters

21 that deal with all species of bats and all species of

22 birds.

23        The August 2006 letter, in particular, lists eight

24 recommendations, one of which Invenergy disagreed with

25 the Fish & Wildlife Service on:  The three years of

1  pre-construction survey.  Every one of the other

2  recommendations pertains to adaptive management

3  post-construction monitoring which the company has

4  committed to perform, is required to perform monitoring,

5  is required, you know, to consult with the TAC and,

6  again, as I said, runs a high risk if it does not -- if

7  it does not comply with the recommendations of the TAC.

8       THE COURT:  Well, I can assure you I cannot

9  understate the discomfort I have in dealing with

10 competing public policies of protection of endangered

11 species on the one hand, and the critical need to develop

12 renewable energy resources and all of the various credits

13 and grants and money that has been poured into that

14 industry by the federal government.  It's not too

15 different than what was in front of Chief Justice Berger

16 in the Tellico case where he ended up the opinion quoting

17 something ascribed to Sir Thomas Moore that --

18      MS. NATHANSON:  Well, Your Honor --

19      THE COURT:  -- I won't read the whole thing, but

20 it's talking about the law is the law and --

21      MS. NATHANSON:  Well, Your Honor, let's -- let's

22 touch on TVA very quickly before I finally sit down.  In

23 that case, all the parties agreed that extinction of the

24 species in question was certain.  I mean, in terms of the

25 level -- I mean, the level of certainty there was not in

1 question; the level of presence was not in question.

2 This was a fish that can only live in shallow water;

3 there was no question of what would happen to it.

4        And in that instance -- and also it was a Section

5 7 case, not a Section 9 case.  And the issue there was

6 jeopardy to the whole -- to the species as a whole.  And

7 under that analysis, the Supreme Court determined that

8 the project should be shut down.

9        THE COURT:  As they say, bad facts make bad law,

10 or whatever the case may be.

11        MS. NATHANSON:  Exactly.

12        THE COURT:  By the way, do you know what happened

13 to Tellico Dam?  Did it ever get built?  Did it ever get

14 flooded?  It looks like it has been operated.  So, I

15 don't know how that happened.

16        MS. NATHANSON:  Yes, it did.

17        THE COURT:  Somehow they got around this.

18        MS. NATHANSON:  I wanted to make sure I wasn't

19 misspeaking.

20        THE COURT:  Somehow they got around this pesky

21 Supreme Court decision and built it.

22        MS. NATHANSON:  They did, Your Honor.

23        THE COURT:  I'm not sure how they did it.  You've

24 done a wonderful job, both of you.

25        And now I will hear from Mr. Glitzenstein in

1  rebuttal.

2        MR. GLITZENSTEIN:  I appreciate the Court's

3  patience.  Two quick matters, Your Honor.  You had asked

4  for the excerpts of some of the cases we had referred to.

5  We've got copies of that we can provide to the Court --

6        THE COURT:  Thank you very much.

7        MR. GLITZENSTEIN:  -- at your earliest

8  opportunity.  And then secondly, in terms of that last

9  potential rebuttal exhibit, which is the contract.  We

10  were going to, I think, want to make that part of the

11  record as the plaintiff's final exhibit, if there was no

12  objection to that.  We've got copies of that, and it will

13  be Plaintiff's No. 134.  That's the one that has the

14  various provisions on force majeure and that kind of

15  information.  And part of it is deleted, because various

16  parts were not available on the copies that we received.

17  So, that's the format in which we would provide it to the

18  Court.

19        THE COURT:  What is your view on what sounds like

20  a Plan C or D of somehow me taking jurisdiction and

21  supervising three years of post-construction surveys and

22  so on?

23        MR. GLITZENSTEIN:  Your Honor, I think we would

24  share, I think, the concern expressed by the Court that,

25  even aside from whether Your Honor would want to take on

1  a role like that, it really does seem that that's

2  basically creating a substitute for the process that

3  Congress already created, which is the Incidental Take

4  Permit process.  I mean, there's a reason why Congress

5  went to the trouble of creating Section 10 of the act,

6  and has very detailed provisions for public input and

7  comment and findings that the service must make, and

8  development of a habitat conservation plan which is

9  critical to getting an Incidental Take Permit, the way in

10  which the conditions will be made enforceable.  And I

11  think although we would have confidence in Your Honor,

12  obviously, performing that role to the extent that you

13  could, there is --

14        THE COURT:  I'm not sure that I do.

15        MR. GLITZENSTEIN:  The reality is that there is a

16  process that exists for this precise purpose, and we

17  think the far more sensible result, in light of this

18  congressionally-authorized process, is to have that

19  process unfold in the way that it reads in the statute.

20        Again, we can sort of quibble about whether the

21  Court could specifically order them to get an Incidental

22  Take Permit and whether there is a legal distinction

23  between an order to a state entity to do that which

24  defense counsel acknowledged has occurred, or ordering a

25  private party to do it.  It's not clear to me, based on

1 the citizens supervision why that distinction makes any

2 sense.

3         In any event, everybody seems to agree, and I

4 think Ms. Nathanson conceded that the ordinary relief in

5 these kinds of cases is an injunction against a project

6 until and unless the agency -- the party obtains an

7 Incidental Take Permit.  And so I think that would

8 actually have the effect of, obviously, having the

9 company go through the congressionally-authorized

10 process.

11        Along those lines, one thing I would say is that a

12 three to five year time frame for an ITP -- I mean, there

13 was no testimony before the Court as to exactly how long

14 it takes to do that.  So, I guess we're now sort of in

15 the posture of just making, you know, general

16 representations.

17        THE COURT:  Well, you're an experienced lawyer in

18 this field.  How long does it take?

19        MR. GLITZENSTEIN:  It varies.  There are

20 Incidental Take Permit processes that take a year or

21 less; sometimes much less than a year.  And there are

22 Incidental Take Permit processes that take longer than

23 that.

24        One thing I would note is that when an Incidental

25 Take Permit was being pursued at some point for the

1  Liberty Gap project that you've heard some discussion of,
2  it appears that there was an understanding with the Fish
3  & Wildlife Service field office that they would try to
4  process that request as rapidly as possible.  And I
5  strongly suspect --
6          THE COURT:  What do you think would be the effect
7  if a federal judge said that they ought to process it as
8  fast as possible?
9          MR. GLITZENSTEIN:  I think it would have an
10  effect.  I mean, based on my experience, which I am
11  speaking to, this case obviously is being very carefully
12  watched, as I'm sure Your Honor knows, by people not only
13  in the industry but in the conservation community.  And I
14  think if Your Honor made clear that this project
15  shouldn't go forward, in whole or in part, until an ITP
16  is obtained, and urges that that process be pursued as
17  rapidly as possible -- obviously, you can't bind the
18  Service; they're not a party to these proceedings.  But,
19  I think that the Service would take notice.  I think that
20  they would take notice at the field off level; I think
21  they would take notice at the regional office level; and
22  I think they would take notice at the national level.
23          THE COURT:  Do they know this case is going on.
24          MR. GLITZENSTEIN:  Our understanding is they do
25  know this case is going on, and that's not surprising.

1 Your Honor, obviously, it's a case which, as we have

2 discussed, involves a project that -- and in general

3 terms, wind power is not something that anybody believes

4 is not something that should go forward.  But on the

5 other hand, on the other side of the coin, there are

6 obviously, again, extremely serious concerns that it go

7 forward in the right way.

8       And when I go back to the point about the

9 Incidental Take Permit, what I would note, Your Honor, is

10 -- and just since we're discussing the overall approach.

11 About 900 Incidental Take Permits have been issued by the

12 Fish & Wildlife Service, mainly during the last ten years

13 or so.  So this is not an incredibly uncommon process.

14       Incidental Take Permits have been issued for

15 logging operations; they've been issued for mining

16 operations; they've been issued for home developments;

17 they've been issued for natural gas pipelines.  Hundreds

18 of such permits have been issued.  So, this is not --

19 we're not asking Your Honor to turn the defendants over

20 to some kind of completely new and untested process.

21 It's been going on for years.  It's part of the law.

22       And I think one of the arguments we would make, in

23 response to Ms. Nathanson's last point about the message

24 it would send.  Part of the message we think is important

25 is, simply because you label something "renewable energy"

1 doesn't mean it gets special dispensation under the law.

2 Nuclear plants have had to go through these kinds of

3 processes; coal operations certainly do.  This project

4 should be basically on the same par and operated under

5 the same set of rules that everybody else does.

6         So I can't give you a guarantee as to how long it

7 would take; I don't think anybody could do that.  But it

8 is certainly the case, if the Service put time and

9 resources into it and was pressed to do so by the Court,

10 and certainly by defendants, and I think for our part

11 plaintiffs would hope to play a role in that process,

12 that it's something that could proceed, you know, much

13 more rapidly than the time frame than Ms. Nathanson gave

14 to you.  So I think that's an important point to bear in

15 mind as we go forward and that, I think, is the right

16 context for the expertise of the agency being applied.

17         Your Honor, if I could make a couple of more

18 points.  I won't respond to every single thing that was

19 said.  Your Honor is well aware of a lot of the documents

20 and the testimony.

21         The testimony that was referred to of plaintiff's

22 experts.  I think if you go back and read in context, you

23 will see that that testimony was taken somewhat out of

24 context.  Dr. Robbins, over on the very next page of what

25 Ms. Nathanson showed, said that his conclusion is that

1 Indiana bats will be killed by the project.

2        Dr. Kunz stressed repeatedly that there is no

3 difference between Indiana bats and other species not

4 only that will be killed but that have been killed,

5 including Little Brown bats and other *Myotis* species.

6        And Your Honor referred to their own prediction of

7 130,000 -- 135,000 deaths.  That's a 20-year time frame.

8 Mr. Groberg testified that he anticipates this project

9 lasting longer than 20 years.  So, on that level alone,

10 we're talking about a higher mortality estimate.

11       And Dr. Kunz, you heard his testimony about recent

12 research on search or efficiency and other variables.

13 His estimate -- again, nobody has questioned -- and even

14 Ms. Nathanson did not, in her presentation to the Court,

15 dispute Dr. Kunz's expertise.  It can't be disputed.  He

16 estimated that 270,000 bats would be killed at this

17 project.

18       THE COURT:  Let me ask you this.  It probably has

19 nothing to do with the legal issues in this case because

20 we're dealing with the finite issue of the Endangered

21 Species Act, but has there been any analysis made of the

22 effects on the ecosystem of killing 135,000 bats over a

23 20-year period in terms of uncontrolled mosquito growth

24 or whatever might be the results?

25       MR. GLITZENSTEIN:  I don't think there has been

1 any definitive analysis.  What I would say is that the

2 exhibits we've put into the record from Mr. Stihler said

3 that he -- and if you -- you saw Mr. Stihler's videotaped

4 deposition and portions we designated.  Mr. Stihler said

5 that he believes that that level of mortality would be

6 enough to have population level impacts on the bats that

7 are migrating through the Beech Ridge Project site.  And

8 in the conference call that I referred to that Ms.

9 Nathanson did not respond to, which involved the field

10 office, both Mr. Stihler and the Fish & Wildlife Service

11 said this would have unacceptable effects on the

12 populations of various bats in the area.  And Dr. Kunz,

13 in his declaration, others have talked about the

14 ecological service performed by bats.

15       One side benefit of going through the Incidental

16 Take Permit process, Your Honor, which we think is

17 legally required by the Endangered Species Act, if they

18 want to go forward with the project, is that there

19 actually has to be an analysis as part of that process

20 under another federal statute, the National Environmental

21 Policy Act.  There has to be an analysis of a full range

22 of environmental impacts that would be associated with

23 the project.  And so, actually, that would probably be an

24 opportune time for people to be able to grasp some sense

25 of what Your Honor is asking about.

1          THE COURT:  Who would have jurisdiction over the

2    question of mass extinction of bats, other than Fish &

3    Wildlife?  Does the Public Service Commission have

4    authority to look into that?

5          MR. GLITZENSTEIN:  I don't think there is any

6    indication the Public Service Commission regards itself

7    as an expert on that topic.  If there is anybody who has

8    expertise within the state of West Virginia, it's Mr.

9    Stihler.  We actually haven't talked about Mr. Stihler,

10   as a general matter, and I would like to obviously

11   reenforce what he said, not only abouts as a whole, but

12   his prediction that dozens of Indiana bats would be

13   killed by this project.

14          Ms. Nathanson focused upon the experts who are

15   testifying for plaintiffs.  But, obviously, we regard as

16   absolutely critical testimony in this case the fact that

17   the very person they're putting on their Technical

18   Advisory Committee, and every single person in this case

19   has recognized as the definitive expert on bats in West

20   Virginia, has predicted not only "many" Indiana bat

21   mortalities, based upon a methodology that he explained

22   in his deposition, but also has said that there would be

23   unacceptable levels of impacts on other bat populations.

24          In terms of jurisdiction over who can do something

25   about that.  Your Honor, that's an extremely good

1  question, and I think the answer is that at this point,
2  until and unless the species gets listed, there really is
3  no federal regulatory response to that problem.  What I
4  would say is that if this project has that level of
5  mortality, and other projects have the same kind of
6  mortality, what we're talking about -- all the experts
7  say is the Indiana bat is the tip of the iceberg. You're
8  talking about multiple species down the road having to be
9  listed under the Endangered Species Act.  It's not clear
10 that the wind power industry, now that we're sort of on a
11 more general topic, has fully confronted that reality.
12        THE COURT:  Well, I apologize for wandering off
13 into something that has nothing to do with the precise
14 issue before me.  It just seemed to me, if you've got a
15 public policy that we should be sensitive to the
16 environment and to ecological issues on the one hand, and
17 we should be developing lots and lots of alternative
18 sources of energy, there ought to be some effort to bring
19 those two concerns together and address them in a way
20 that wind turbines can co-exist with bats and not kill
21 135,000 bats.  But as I said, that's not the issue before
22 me.  The issue before me is, are we going to be killing
23 Indiana bats.
24        MR. GLITZENSTEIN:  Right.  And I completely agree
25 with that.  But the one point, I think, that's worth

1 stressing in that regard is that since we do believe that

2 the record here shows that Indiana bats will be taken,

3 and that the result is they have to go through this

4 Incidental Take Permit process, the analysis that Your

5 Honor is talking about would have to be evaluated as part

6 of that permit process.  Because when they issue an

7 Incidental Take Permit, it's a federal action like any

8 other federal action that an agency takes, and they do

9 analysis under the National Environmental Policy Act on

10 the range of impacts, including the impacts on other bat

11 species.  So that would actually be, I think from my

12 standpoint, a fortuitous by-product of them going through

13 that process.

14        And if you look at the Shaffer Mountain letters

15 that I referred Your Honor to before, another project,

16 incidentally, which is in the Appalachian ridge, several

17 thousand feet high, where they actually caught Indiana

18 bats on site after doing far more expensive mist-net

19 surveys than were done here.  The service has

20 specifically said we need to look at the full range of

21 environmental impacts if we're going to give you

22 incidental take authorization, including impacts on other

23 bat species, and impacts on migratory birds and other

24 potential environmental effects, as well as looking at

25 the value that bats have in the echo system.

1          And I think the other point along those lines,

2  Your Honor, to stress is, this is why Congress created

3  the Incidental Take Permit process.  Congress -- before

4  the ITP process was created in the 1980s, the answer was,

5  you can't take an endangered species.  That used to be

6  the legal answer under the statute that we're dealing

7  with.  Congress initially said not even one member of a

8  species could be taken.

9          The purpose of the Section 10 process, and its

10  counterpart in Section 7, was precisely to balance these

11  interests in the way that Your Honor is suggesting.  So

12  that, yes, certain activities which society would regard

13  as useful, or even simply useful to a private party, can

14  go forward when the service has made the appropriate

15  findings that it won't jeopardize the overall existence

16  of the species, and that minimization and mitigation of

17  impacts will occur, and that those are binding

18  conditions.

19          And so Your Honor's question, I think, gets to the

20  heart of what that process is all about, which is

21  basically distilling down how you make those very

22  difficult judgments.  And fortunately, Congress actually,

23  after TVA versus Hill, had the foresight to create a

24  mechanism that accomplishes exactly that result.

25          We talked about Mr. Stihler a little bit.

1          In terms of the Fish & Wildlife Service and no

2  deaths.  You've seen this document before Your Honor, but

3  I just want to highlight it again because I think it's

4  very important.  Plaintiff's Exhibit 112, which is a

5  document that we've referred to a couple of times with a

6  couple of different witnesses.  And if we look again at

7  the second page of this document, discussing the

8  Mountaineer project, and highlight the first full

9  paragraph.  This is the paragraph, again, where the Fish

10  & Wildlife Service, the agency that Your Honor is saying

11  we should be looking to, says point-blank, it is

12  impossible to make a conclusion that turbines do not kill

13  federally-listed bats based on one short season of

14  monitoring.  In fact, the number of bats killed there

15  shows a high likelihood that endangered bats are also

16  likely to be killed.

17          So we have the Service with regard to the project

18  that BHE and defendants appear to acknowledge is the

19  closest analog to this one saying point-blank, we think

20  there have been deaths of Indiana bats already, for

21  exactly the reasons Your Honor was articulating in your

22  questions:  Failure to find the carcasses, failure to do

23  any kind of effective monitoring, etcetera.  So, we have

24  she the federal agency speaking to that point.

25          Your Honor, I think the other point I would simply

1 make about this with regard to the much maligned
2 Mountaineer mortality report we've talked about.  For a
3 while we were referring to it as a forklift operator, as
4 Your Honor may remember.  It seems to me a very strange
5 line of reasoning by defendants.  They initially say no
6 documented Indiana bat mortality, and therefore we can
7 draw some conclusion that it's not killing the endangered
8 species.

9        Then we come up with a documented report from a
10 company that is closest to this one, the Mountaineer
11 facility, and then the answer is, oh completely ignore
12 that because there is no effective monitoring; and the
13 fellow doing the analysis has no idea what he's doing.
14 Well, Your Honor, that seems to reenforce the Service's
15 point that we do have Indiana bats at these project
16 sites, but we have no effective system at this point for
17 monitoring or for doing anything about those.  And I
18 think that leads you again, as many roads do, to the
19 Incidental Permit Take process.  That is where you would
20 get, if this project goes forward, meaningful monitoring.

21        You heard Mr. Groberg's testimony that at this
22 point they don't even have a concrete monitoring plan
23 that anybody could look at.  They have no obligation to
24 do anything in terms of implementing something concrete.
25 If you look at Mr. Groberg's testimony, both his

1  testimony that he provided in court, as well as his

2  deposition testimony, he was asked point-blank in his

3  deposition testimony to describe the current system and

4  the amount of uncertainty that exists in it.

5         And his answer was, at Page 185 of his deposition,

6  "I guess it's wide open what's going to work and what's

7  going to get implemented, because there is an awful lot

8  of uncertainty regarding what can get done and how

9  effective it will be, and at what cost."

10        And then over at Page 200 through 201 of his

11 deposition, he was talking about some of the exchanges

12 with Russ Romme about the adaptive management.  And his

13 answer was, "Yes.  I guess the adaptive management

14 adjustment would be set by dollars, rather than

15 fatality."

16        And his testimony here, I think, acknowledged -- I

17 think about four or five times he used the word "hope" in

18 defining what the company might do if it basically

19 decides that it's feasible enough for the company and is

20 something that it's willing to go along with after the

21 monitoring takes place.

22        And, again, if you just look quickly Your Honor at

23 the Public Service Commission condition that we're

24 talking about.  Because I think, really, it is worth

25 highlighting exactly what the phrase is that's used in

1 this document.  And this is Plaintiff's Exhibit 95, the

2 last page -- actually, the second to last page, Page 90.

3      Again, under D -- once again, the ultimate

4 requirement after there is some studies that are done --

5 the actual requirement for doing anything is the

6 following language:  "If the project causes significant

7 levels of bat or bird mortality, and adaptive management

8 techniques are proven effective and economically

9 feasible, Beech Ridge and its successors will make a good

10 faith effort to work with the Commission to apply

11 parameters to implement facility-wide adaptive management

12 strategies on an ongoing basis."

13      Now, in his deposition, as Your Honor can see, and

14 I think in his testimony here today, that has so many

15 qualifiers.  Mr. Romme referred to it as "weasel words."

16 That at the end of the day, nobody can look at that

17 standard and say it's actually going to result in the

18 kind of meaningful protection.

19      THE COURT:  It's sort of like Potter Stewart in

20 terms of trying to define precatory:  I know it when I

21 see it.  In this context, that doesn't have a lot of

22 teeth.

23      MR. GLITZENSTEIN:  It doesn't have a lot of teeth,

24 Your Honor.  And in fact, actually, it's not even clear

25 that the Public Service Commission would know it when it

1 saw it, because I asked Mr. Groberg, both in court and

2 in his deposition:  "Does anybody know, or does the

3 Public Service Commission, as far as you know, what a

4 significant mortality would be?"  And he said, "No.

5 Nobody's figured that out yet."  And that's only the

6 first of the various threshold standards.

7        And so I think the critical point is that

8 hopefully people operate in good faith.  But this is

9 nothing remotely like the kind of enforceable meaningful

10 process you get through the ITP process.

11        And the other critical point about the Public

12 Service Commission, Your Honor, is that this very order

13 recognizes that this court may exercise jurisdiction.

14 And we -- I won't belabor that point, but it's got a

15 condition which specifically says that if a court with

16 appropriate jurisdiction makes a determination under the

17 Endangered Species Act, that should be reported back to

18 the PSC.  It's a flat out recognition that a court like

19 this may be asked to make exactly the kind of ruling that

20 is being discussed, you know, here today.

21        I don't want to take, you know, too much more of

22 the time than we've already been allotted, and we do

23 appreciate the Court's patience.  If I could just make a

24 point about the legal standard and the legal framework

25 that was discussed.

1          THE COURT:  Okay.

2          MR. GLITZENSTEIN:  These cases are all very fact

3   specific.  I mean, if you read the facts of these cases,

4   what becomes absolutely obvious is that each one turns on

5   the Court's analysis of the particular testimony and

6   evidence before the Court.  Just to give an example.

7   There is no case that I'm aware of remotely like this one

8   in terms of people finding acoustic data that had not

9   been made available to the state for four years.  You

10   won't find a case like that.

11          The example of the Bernal case which involved the

12   school district.  The district court judge made a factual

13   finding that the owl was not present on the particular

14   place where the school was being built.  And you did not

15   have the same kind of expert testimony that you've heard

16   hear, from people who are probably the leading experts on

17   various matters of expertise.

18          And so, yes, you can look to those cases for some

19   degree of guidance, I'm not disputing that.  But I think

20   at the end of the day, these are very fact, you know,

21   intensive cases.  And we believe that the facts as

22   presented by our experts, Mr. Stihler, and all the other

23   accumulated evidence is more than sufficient to meet the

24   standard that we believe applies which, however you want

25   to phrase it, appears to be preponderance of the

1 evidence; likelihood of death or injury to a species.

2         The AnaBat information I won't belabor, Your

3 Honor.  The reality at the end of the day is that the

4 only people who testified and who have expertise on that

5 topic, by concession of their own witnesses, are Dr.

6 Gannon, who, as far as I can tell, his analysis hasn't

7 been touched by anybody.  Dr. Lacki said nothing about

8 the way in which he approached it.

9         Dr. Robbins, I think, has explained at length how

10 he did his analysis.  Whether you consider it to be 97

11 percent, 95 percent, or considering all three of the

12 experts together, something well over that, I think the

13 record simply cries out for ruling that they had data in

14 their files that reflected likely Indiana bat presence.

15 I think that goes not only to the legal question, but I

16 think it bears upon any kind of equitable consideration

17 that might enter into the Court's analysis.  Obviously,

18 in our view, under TVA versus Hill, there is a limited

19 role for equity to play.  But in terms of shaping your

20 approach, I think it's a highly, you know, relevant

21 consideration.

22         And the final point on the relief that we've

23 discussed.  Obviously, we will proceed with that in any

24 way Your Honor would like us to.  If you wanted us to

25 submit some kind of separate proposed order laying out

1 what our alternative option was so that way would work
2 clearer for the Court, or commenting on anything the
3 defendants would put forth.  Obviously, we would be happy
4 to do that.  We do believe the most sensible, clean cut
5 approach to remedy, and the one that is obviously easiest
6 for the Court, as well as most sensible from how the act
7 operates, is simply enjoining ongoing activity at the
8 site until and unless an Incidental Take Permit is
9 obtained, and at that point the Service will have to play
10 a role, because that's the way the legal process unfolds.
11         I appreciate your time, Your Honor.
12         THE COURT:  All right.  As the old song goes,
13 "Don't cry for me, Argentina."  Don't cry for me having
14 to decide this case.  This is not going to be an easy
15 one, and it does bring a classic collision between two
16 very good notions of public policy of protecting the
17 environment and the ecology on one hand, and not being
18 dependent on Arabs for the rest of our life for energy.
19 So, it's a classic puzzlement that has landed in my lap,
20 and I will do the best I can.
21         I want to thank you both again, both sides.  We
22 put this case on a fast track to move it along to a final
23 resolution, rather than drag it out for a long period of
24 time.  And now I'm going to have to do something to get
25 it cranked out by my office.

1        I begin a two-week criminal trial next week, and

2 as best I can multitask and my law can work with me, I'm

3 going to try to get something out as absolutely quickly

4 as I can.  I know how important this is to both sides,

5 and I don't want to delay it, but I, unfortunately, have

6 other cases that I have to work on, and I will do the

7 best I can.

8        All right.  In the best traditions of the Fourth

9 Circuit, I will come down and greet counsel, and then

10 pray for me.

11              (Off the record at 3:23 p.m.)

12

13                    **<u>CERTIFICATE</u>**

14        Tracy Rae Dunlap, RPR, CRR, an Official Court
   Reporter for the United States District Court of
15 Maryland, do hereby certify that I reported, by machine
   shorthand, the proceedings had in the case of ANIMAL
16 WELFARE INSTITUTE, et al versus BEECH RIDGE ENERGY, LLC,
   et al, Civil Action Number RWT-09-1519 on October 29,
17 2009.

18        In witness whereof, I have hereto subscribed my
   name, this 3rd day of November 2009.

19

20                   _____/S/_____
                    TRACY RAE DUNLAP, RPR, CRR
21                  OFFICIAL COURT REPORTER

22

23

24

25